David B. Rosenbaum, 009819
Emma J. Cone-Roddy, 034285
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
(602) 640-9000
drosenbaum@omlaw.com
econe-roddy@omlaw.com

*(Additional Counsel for Plaintiffs Listed on the Following Page)*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| C.M., on her own behalf and on behalf of her minor child, B.M.; L.G., on her own behalf and on behalf of her minor child, B.G.; M.R., on her own behalf and on behalf of her minor child, J.R.; O.A., on her own behalf and on behalf of her minor child, L.A.; and V.C., on her own behalf and on behalf of her minor child, G.A., <br><br> Plaintiffs, <br><br> v. <br><br> United States of America, <br><br> Defendant. | No. <br><br> **COMPLAINT** |

R. Stanton Jones*
Daniel Jacobson*
Emily Reeder*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
202-942-5000
stanton.jones@arnoldporter.com
daniel.jacobson@arnoldporter.com
emily.reeder@arnoldporter.com

Lucy McMillan*
Diana Reiter*
Erik Walsh*
Tanya Kalivas*
Kaitlyn Schaeffer*
Arnold & Porter Kaye Scholer LLP
250 West 55th Street | New York, New
York 10019-9710
212-836-8000
lucy.mcmillan@arnoldporter.com
diana.reiter@arnoldporter.com
erik.walsh@arnoldporter.com
tanya.kalivas@arnoldporter.com
kaitlyn.schaeffer@arnoldporter.com

Jonathan H. Feinberg*
Kairys, Rudovsky, Messing, Feinberg
  & Lin LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
215-925-4400
jfeinberg@krlawphila.com

Mark Fleming*
Katherine Melloy Goettel*
National Immigrant Justice Center
224 S. Michigan Ave., Suite 600
Chicago, IL 60604
312-660-1370
mfleming@heartlandalliance.org
kgoettel@heartlandalliance.org

Trina Realmuto*
Emma Winger*
American Immigration Council
1318 Beacon Street, Suite 18
Brookline, MA 02446
857-305-3600
trealmuto@immcouncil.org
ewinger@immcouncil.org

Mary Kenney*
Claudia Valenzuela*
American Immigration Council
1331 G Street NW, Suite 200
Washington, DC 20005
202-507-7512
202-742-5619
mkenney@immcouncil.org
cvalenzuela@immcouncil.org

* Pro hac vice application forthcoming

### INTRODUCTION

1.     This matter concerns an unprecedented policy issued at the highest levels of the federal government to separate asylum-seeking parents from their children.  The government's policy of forcibly taking children from their parents caused extraordinary trauma to thousands of families, including Plaintiffs—five mothers and their respective five children, who at the time of separation were between five and twelve years old, and who were separated for months.  The trauma suffered by Plaintiffs and other parents and children was no incidental byproduct of the policy. It was the very point.  The government sought to inflict emotional distress in order to deter parents and children from seeking asylum in this country.

2.     Executive branch officials intended to use the trauma resulting from family separations, and media reporting about that trauma, to deter future asylum seekers.  Federal officials at the highest levels made repeated public statements acknowledging the policy's purpose.  Despite widespread condemnation and a federal court injunction requiring the government to reunite separated families and stop further separations, President Trump has continued to defend the policy as a deterrent to migration from Central America, such as when he tweeted, "[I]f you don't separate, FAR more people will come."[1]

---

[1] Donald Trump (@realdonaldtrump), TWITTER (Dec. 16, 2018, 11:25 AM), https://twitter.com/realDonaldTrump/status/1074339834351759363 (emphasis in original); *see also* Kimberly Kindy, Nick Miroff & Maria Sacchetti, *Trump Says Ending Family Separation Practice Was a "Disaster" That Led to Surge in Border Crossings*, WASH. POST, Apr. 28, 2019, https://washingtonpost.com/politics/trump-says-ending-family-separation-practice-was-a-disaster-that-led-to-surge-in-border-crossings/2019/04/28/73e9da14-69c8-11e9-a66d-a82d3f3d96d5story.html.

3.     In total, the government has acknowledged that it has separated at least 3,800 children from their parents or guardians after they crossed the southwestern U.S. border.[2]  Additional government reporting indicates that the number of families separated likely is much higher.[3]

4.     After taking children from their parents, the government inflicted further trauma when it delayed providing information to parents and children of each other's whereabouts or well-being, failed to facilitate adequate communication between the parents and children during their separation, and failed to implement any system for tracking the children to ensure that the families could be reunited.

5.     The ten Plaintiffs in this action fell victim to the Administration's policy in May 2018, when federal officers forcibly separated each Plaintiff mother from her child while they were detained at various immigration holding centers in Arizona. Each family remained separated for more than two months.  Throughout that time, the government provided only limited information to each mother about her child's whereabouts and well-being and afforded only minimal opportunities for each mother and child to communicate, sometimes at the mother's expense.  As a result of the

[2] Joint Status Report at 1, 10, *Ms. L. v. U.S. Immigration and Customs Enf't*, No. 18-cv-00428 DMS MDD (S.D. Cal. Sept. 9, 2019), ECF No. 465 (the government acknowledged that, for the original class, as many as 2,814 children were separated from their parents, and has so far acknowledged an additional 986 children as part of the expanded class); *see also* OFFICE OF THE INSPECTOR GENERAL, U.S. DEP'T OF HEALTH & HUMAN SERVS., OEI-BL-18-00511, SEPARATED CHILDREN PLACED IN OFFICE OF REFUGEE RESETTLEMENT CARE 11 (Jan. 17, 2019) [hereinafter HHS OIG REPORT I].

[3] *See* HHS OIG REPORT I, *supra* note 2, at 1, 6, 13 (reporting that "thousands of children may have been separated . . . before the accounting required by the Court [in *Ms. L.*]").

government's actions, all Plaintiffs suffered, and continue to suffer, substantial and ongoing trauma.

6.     The government's family separation policy was cruel and inhumane, and it was unlawful.   The United States is liable for the conduct which harmed Plaintiffs under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671, *et seq.* ("FTCA").

7.     Plaintiffs bring this action under the FTCA seeking compensation for the extraordinary harms they suffered at the hands of the federal government.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 1331, 1346(b).

9.     On February 11, 2019, Plaintiffs submitted administrative claims to the U.S. Department of Homeland Security ("DHS") and the U.S. Department of Health and Human Services ("HHS").   Neither agency has made a final disposition of any Plaintiff's administrative claim and, as six months have passed since Plaintiffs' submission of the claims, they are deemed finally denied.   28 U.S.C. § 2675(a). Accordingly, Plaintiffs have exhausted all potential administrative remedies.

10.     Venue is proper in this District under 28 U.S.C. § 1402(b) as the acts and omissions which are the subject of this Complaint occurred in this District.

## PARTIES

11.     Plaintiff C.M., now 29 years old, was 27 years old at the time of the forced separation described in this Complaint.   She is the mother of Plaintiff B.M.,

now seven years old, who was five years old at the time of the separation.  C.M. and B.M. are nationals of Guatemala and are presently seeking asylum in the United States.  They reside in the United States.

12.    Plaintiff L.G., now 24 years old, was 23 years old at the time of the forced separation described in this Complaint.  She is the mother of Plaintiff B.G., now eight years old, who was seven years old at the time of the separation.  L.G. and B.G. are nationals of Guatemala and are presently seeking asylum in the United States.  They reside in the United States.

13.    Plaintiff M.R., now 35 years old, was 34 years old at the time of the forced separation described in this Complaint.  She is the mother of Plaintiff J.R., now 14 years old, who was 12 years old at the time of the separation.  M.R. and J.R. are nationals of Guatemala and are presently seeking asylum in the United States.  They reside in the United States.

14.    Plaintiff O.A., now 26 years old, was 25 years old at the time of the forced separation described in this Complaint.  She is the mother of Plaintiff L.A., now six years old, who was five years old at the time of the separation.  O.A. and L.A. are nationals of Guatemala and are presently seeking asylum in the United States. They reside in the United States.

15.    Plaintiff V.C., now 24 years old, was 23 years old at the time of the forced separation described in this Complaint.  She is the mother of Plaintiff G.A., now eight years old, who was six years old at the time of the separation.  V.C. and

4

G.A. are nationals of Guatemala and are presently seeking asylum in the United States.  They reside in the United States.

16.     Defendant United States of America is the appropriate defendant under the FTCA.  28 U.S.C. §§ 1346(b), 2671, *et seq.*

17.     All federal officers referenced in this Complaint were at all relevant times employees of the United States, working within the scope and course of their employment with federal agencies including, but not limited to, DHS, U.S. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP"), and HHS.

18.     DHS employees were responsible for separating C.M., L.G., M.R., O.A., and V.C. from their children.  DHS employees also are responsible for supervising and managing detained individuals at CBP and ICE facilities, including those located in Arizona, California, Nevada, and Texas where C.M., L.G., M.R., O.A., and V.C. were detained during the course of their separations from their children.  In addition, DHS employees are responsible for supervising and managing detained individuals at the South Texas Family Residential Center in Dilley, Texas ("Dilley") where Plaintiffs were detained after they were reunited.

19.     HHS employees are responsible for supervising and managing the detention of children the government classifies as unaccompanied, including at facilities in New York and Arizona, where B.M., B.G., J.R., L.A., and G.A. were detained while they were separated from their mothers.

20.     At all relevant times, all DHS employees referenced in this Complaint who interacted with Plaintiffs were acting as investigative or law enforcement officers.  28 U.S.C. § 2680(h).

## STATEMENT OF FACTS

### A.     The Family Separation Policy

#### 1.     The Development of the Separation Policy and Its Intent To Deter Future Central American Asylum Seekers

21.     Curbing the number of individuals seeking asylum in the United States has been a central focus of the Trump Administration's immigration policy.[4]

---

[4] *See, e.g.*, *U.S. Judge Bars Trump Administration From Enforcing Asylum Ban*, CNBC, Nov. 20, 2018, https://www.cnbc.com/2018/11/20/immigration-policy-judge-bars-us-from-enforcing-trump-asylum-ban.html; Shaw Drake & Edgar Saldivar, *Trump Administration Is Illegally Turning Away Asylum Seekers*, ACLU, Oct. 30, 2018, https://www.aclu.org/blog/immigrants-rights/trump-administration-illegally-turning-away-asylum-seekers; Nick Miroff & Josh Dawsey, *The Advisor Who Scripts Trump's Immigration Policy*, WASH. POST, Aug. 17, 2019, https://www.washingtonpost.com/graphics/2019/politics/stephen-miller-trump-immigration/; Emma Platoff, Alexa Ura, Jolie McCullough & Darla Cameron, *While Migrant Families Seek Shelter From Violence, Trump Administration Narrows Path to Asylum*, TEXAS TRIBUNE, July 10, 2018, https://www.texastribune.org/2018/07/10/migrant-families-separated-border-crisis-asylum-seekers-donald-trump/; Maria Sacchetti, Felicia Sonmez & Nick Miroff, *Trump Tightens Asylum Rules, Will Make Immigrants Pay Fees to Seek Humanitarian Refuge*, WASH. POST, Apr. 30, 2019, https://www.washingtonpost.com/politics/trump-issues-memo-calling-for-changes-to-handling-of-asylum-cases/2019/04/29/df41b5f2-6adb-11e9-be3a-33217240a539_story.html?noredirect=on&utm_term=.5e3bcec9eead; Glenn Thrush, *U.S. to Begin Blocking Asylum Seekers From Entering Over Mexican Border*, N.Y. TIMES, Jan. 24, 2019, https://www.nytimes.com/2019/01/24/us/politics/migrants-blocked-asylum-trump.html?action=click&module=Top%20Stories&pgtype=Homepage; Yeganeh Torbati & Kristina Cooke, *Trump Administration Moves to Curb Migrants' Asylum Claims*, REUTERS, Nov. 8, 2018, https://www.reuters.com/article/us-usa-immigration-asylum/trump-administration-moves-to-curb-migrants-asylum-claims-idUSKCN1ND35K.

22.     To that end, in July 2017, the government established a family separation pilot program in CBP's El Paso sector, through which it targeted for criminal prosecution parents who crossed the border with children.[5]   It detained the parents and forcibly took their children away from them, designated the children as unaccompanied minors (despite their arriving with their parents), and placed the children in the custody of the Office of Refugee Resettlement ("ORR"), a component of HHS.   Through this initiative, the government separated 281 individuals in families between July and November 2017.[6]

23.     In December 2017, a month after the pilot program ended, senior officials at the Department of Justice and DHS exchanged a memorandum titled "Policy Options to Respond to Border Surge of Illegal Immigration."[7]   Two of the policies outlined in the memorandum were titled: "Increased Prosecution of Family Unit Parents" and "Separate Family Units."   Under the prosecution policy, the memorandum stated that "parents would be prosecuted for illegal entry . . . and the minors present with them would be placed in HHS custody as [unaccompanied alien children]."   Similarly, according to the memorandum, the separation policy would call

---

[5] HHS OIG REPORT I, *supra* note 2, at 3.

[6] *Id.*

[7] *Policy Options to Respond to Border Surge of Illegal Immigration*, (Dec. 16, 2017), https://www.documentcloud.org/documents/5688664-Merkleydocs2.html (hereinafter "Policy Options"); *see also* Julia Ainsley, *Trump Admin Weighed Targeting Migrant Families, Speeding Up Deportation of Children*, NBC NEWS, Jan. 17, 2019, https://www.nbcnews.com/politics/immigration/trump-admin-weighed-targeting-migrant-families-speeding-deportation-children-n958811 (explaining that the December 2017 policy options draft plan was made public by the office of Senator Jeff Merkley).

for an announcement that adults would be placed in adult detention while children would be placed in HHS custody.[8]   The memorandum asserted that "the increase in prosecutions would be reported by media and it would have substantial deterrent effect."[9]

24.     On April 6, 2018, President Trump issued a memo entitled "Ending 'Catch and Release' at the Border of the United States and Directing Other Enhancements to Immigration Enforcement."[10]   The memo, among other things, directed the Secretary of Homeland Security, the Secretary of Defense, the Attorney General, and the Secretary of Health and Human Services to submit a report to the President detailing all of the measures their respective departments had pursued or were pursuing to end "'catch and release' practices."[11]

25.     "Catch and Release" is a simplified, misleading term that refers to a federal practice that various administrations have implemented allowing asylum-seekers, among other groups of immigrants, to live in the community, rather than be held in government custody, while awaiting their immigration hearings.[12]   This practice is fully in accord with immigration law.

---

[8] Policy Options, *supra* note 7.
[9] *See id.*
[10] 83 Fed. Reg. 16,179 (Apr. 6, 2018).
[11] *Id.*
[12] Katie Benner & Charlie Savage, *Due Process for Undocumented Immigrants, Explained*, N.Y. TIMES, June 25, 2018,
https://www.nytimes.com/2018/06/25/us/politics/due-process-undocumented-immigrants.html.

26.    On the same day that President Trump issued his directive, then-Attorney General Jeff Sessions announced that the government would institute a "Zero Tolerance" policy, mandating the prosecution of all persons who crossed the United States border between ports of entry, thereby extending to the entire southern border the practices of criminal prosecution and family separation previously tested in the El Paso pilot program.[13]  Consistent with its announcement, the Administration promptly began separating families along the entire border.

27.    The purpose of this policy was to deter individuals from seeking asylum or otherwise coming to the United States.[14]  The Administration intended to deter immigration by harming families through the forcible separation of parents and children.

28.    The Administration knew that separation would cause enormous trauma to the children and parents.  Indeed, the Administration intended that publicity concerning the trauma suffered by asylum seekers would deter other would-be asylum seekers from seeking refuge in the United States for fear of suffering the same fate. Administration officials at the highest levels thus planned and implemented a policy of separating families both knowing that the policy would cause severe harm to the

---

[13] *Attorney General Announces Zero Tolerance Policy for Criminal Illegal Entry*, DEP'T OF JUSTICE (Apr. 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

[14] *See 60 Minutes*, *Chaos on the Border, Robots to the Rescue, To Kill a Mockingbird* (CBS Television Broadcast Nov. 25, 2018) (revealing an un-redacted copy of the memo implementing the "Zero Tolerance" policy that stated that the policy's purpose was deterrence); *see also* Policy Options, *supra* note 7.

9

people it affected and specifically intending that it would cause such harm.[15]   For

example:

    a.  In September 2016, the DHS Advisory Committee on Family Residential Centers issued a report that concluded that "[t]he best interests of the child should be paramount in all custody decisions regarding family members apprehended by DHS," and warned that "separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children."[16]

    b.  Commander Jonathan White, former Deputy Director of ORR for the Unaccompanied Alien Children's ("UAC") Program, testified before Congress that, starting in February 2017, he repeatedly warned those devising the policy that separating children from their parents would likely harm the children, including "significant potential for traumatic psychological injury to the child."[17]   Administration officials ignored

---

[15] Policy Options, *supra* note 7; *see also* Philip Bump, *Here Are the Administration Officials Who Have Said that Family Separation Is Meant as a Deterrent*, WASH. POST, June 19, 2018, https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent/?utm_term=.6fce092b57af.
[16] U.S. IMMIGRATION & CUSTOMS ENF'T, DEP'T OF HOMELAND SEC., REP. OF THE DHS ADVISORY COMMITTEE ON FAMILY RESIDENTIAL CENTERS 2 (2016), *available at* https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf.
[17] Jeremy Stahl, *The Trump Administration Was Warned Separation Would Be Horrific for Children, Did It Anyway*, SLATE, July 31, 2018, https://slate.com/news-and-politics/2018/07/the-trump-administration-was-warned-separation-would-be-horrific-for-children.html; *see also Examining the Failures of the Trump*

Commander White's warnings up through the day he left ORR (on March 15, 2018), just weeks before the policy was launched across the entire southern border, and continued to disregard his warnings thereafter.

c. In March 2017, several DHS officials told the press that the department was considering a policy of separating mothers and children who cross the border illegally in order to deter families from migrating to the United States.[18]  The day after the press report, the American Academy of Pediatrics responded with a statement opposing DHS's proposed family separation program, warning that:

> Federal authorities must exercise caution to ensure that the emotional and physical stress children experience as they seek refuge in the United States is not exacerbated by the additional trauma of being separated from their siblings, parents or other relatives and caregivers.  Proposals to separate children from their families as a tool of law enforcement to deter immigration are harsh and counterproductive.  We urge policymakers to always be mindful that these are vulnerable, scared children.[19]

29.  Moreover, it is well established that forcibly separating families causes severe harm to children.  Scientific and medical evidence shows that the trauma

---

*Administration's Inhumane Family Separation Policy: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Commerce*, 116th Cong. (Feb. 7, 2019) (testimony of Commander Jonathan White).

[18] Julia Edwards Ainsley, *Exclusive: Trump Administration Considering Separating Women, Children at Mexico Border,* REUTERS (Mar. 3, 2017), https://www.reuters.com/article/us-usa-immigration-children-idUSKBN16A2ES.

[19] Fernando Stein & Karen Remley, Am. Acad. Of Pediatrics, AAP Statement Opposing Separation of Mothers and Children at the Border (Mar. 4, 2017), https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/immigrantmotherschildrenseparation.asp.

caused by separating a child from his or her parent is likely to have extraordinarily harmful and long-lasting effects on the child's development.  Such trauma can cause permanent emotional and behavioral problems and brain damage.[20]

30.    In May 2018, extensive media reporting concerning the separation policy began to generate public outrage and condemnation.  In the face of this reaction, Administration officials attempted to change their messaging about the

---

[20] *See, e.g.*, Allison Abrams, *Damage of Separating Families:  The Psychological Effects on Children*, PSYCHOL. TODAY (June 22, 2018), https://www.psychologytoday.com/us/blog/nurturing-self-compassion/201806/damage-separating-families (Children who are separated from a parent "develop insecure/disorganized attachment and persisting high levels of stress."); *id.* ("[T]he effects of mother-child separation on children's aggressive behavior are early and persistent."); Sarah Reinstein, *Family Separations and the Intergenerational Transmission of Trauma*, CLINICAL PSYCHIATRY NEWS (July 9, 2018), https://www.mdedge.com/psychiatry/article/169747/depression/family-separations-and-intergenerational-transmission-trauma ("[C]hildhood trauma is associated with emotional dysregulation, aggression against self and others, difficulties in attention and dissociation, medical problems, and difficulty with navigating adult interpersonal relationships."); Jeremy Raff, *"The Separation Was So Long.  My Son Has Changed So Much.":  U.S. Border Guards Took a 6-Year-Old Honduran Boy from His Mother, and Ultimately Returned a Deeply Traumatized Child*, THE ATLANTIC, Sept. 7, 2018, https://www.theatlantic.com/politics/archive/2018/09/trump-family-separation-children-border/569584/ ("The trauma of separation 'can disrupt the architecture of a child's brain[.]' . . . Prolonged separation weaponizes a child's fight-or-flight response, elongating it into toxic stress that can damage health in both the short and long term[.]"); Olga Khazan, *Separating Kids From Their Families Can Permanently Damage Their Brains:  A Pediatrician Explains How the Trauma of Family Separation Can Change Biology*, THE ATLANTIC, June 22, 2018, https://www.theatlantic.com/health/archive/2018/06/how-the-stress-of-separation-affects-immigrant-kids-brains/563468/ (Separating a child from his or her parents "can permanently affect . . . children's brains, especially if it occurs early in childhood. . . .  Studies show that high levels of cortisol[, a stress hormone induced by separation] . . . can suppress the immune system and change the architecture of a developing brain[.] . . .  Another stress chemical, corticotropin-releasing hormone, can damage the hippocampus, which plays a major role in learning and memory.").

policy; they claimed their hardline stance on prosecuting border crossings was not intended to discourage immigration, and, shockingly, they even denied the existence of a family separation policy.[21]

31.    These statements, however, were contradicted by the admissions of numerous high-level officials that family separation was the express policy and that the purpose of the policy was to harm asylum seekers arriving in the United States so as to deter future asylum seekers.  For instance:

a.    When asked about the policy by NPR on May 11, 2018, John Kelly, President Trump's then-Chief of Staff, responded that "a big name of the game is deterrence. . . .  It could be a tough deterrent — would be a tough deterrent."[22]  As for the children affected, he said: "[t]he children will be taken care of — put into foster care *or whatever*."[23]

b.    On June 18, 2018, on Fox News's "The Ingraham Angle," host Laura Ingraham asked then-Attorney General Jeff Sessions, "is this policy in part used as a deterrent?  Are you trying to deter people from bringing children or minors across this dangerous journey?  Is

---

[21] *See* Christina Wilkie, *White House Denies Separating Families Is "Policy," but Insists It Is Needed "to Protect Children*," CNBC, Jun. 18, 2018, https://www.cnbc.com/2018/06/18/white-house-denies-separating-families-is-policy.html; *The Way Forward on Border Security: Hearing Before the H. Comm. on Homeland Sec.*, 116th Cong. 46-47, 48 (Mar. 6, 2019) (statement of Sec'y Kristjen Nielsen, Dep't of Homeland Sec.).
[22] *Transcript: White House Chief of Staff John Kelly's Interview with NPR*, NPR, May 11, 2018, https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr.
[23] *Id.* (emphasis added).

13

that part of what the separation is about?"  Sessions replied, "I see that the fact that no one was being prosecuted for this as a factor in a five-fold increase in four years in this kind of illegal immigration. So yes, hopefully people will get the message and come through the border at the port of entry and not break across the border unlawfully."[24]

c.  On June 19, 2018, Steven Wagner, Assistant Secretary of HHS, told reporters that "[w]e expect that the new policy will result in a deterrence effect, we certainly hope that parents stop bringing their kids on this dangerous journey and entering the country illegally."[25]

32.    Even after a federal judge enjoined the family separation policy, concluding that the separated parents would likely succeed on their claim that the separations were unconstitutional,[26] President Trump continued to claim that the separation policy, and its intended deterrent effect, was a necessary component of federal immigration enforcement:

---

[24] *The Ingraham Angle* (Fox News television broadcast Jun. 18, 2018), *available at* https://video.foxnews.com/v/5799065216001/#sp=show-clips.
[25] Bump, *supra* note 15.
[26] *Ms. L. v. U.S. Immigrations and Customs Enf't*, 310 F. Supp. 3d 1133, 1142-45, 1149 (S.D. Cal. 2018), *modified* 330 F.R.D. 284 (S.D. Cal. 2019).

14

a. When speaking with reporters at the White House on October 13, 2018, he said: "If they feel there will be separation, they don't come."[27]

b. On December 16, 2018, he tweeted, "[I]f you don't separate, FAR more people will come."[28]

c. And on April 28, 2019—after the family separation policy had purportedly ended—he told Fox News host Maria Bartiromo, "Now you don't get separated, and while that sounds nice and all, what happens is . . . literally you have ten times as many families coming up because they're not going to be separated from their children[.] . . . It's a disaster."[29]

33. Accordingly, from 2017 through the time period at issue in this Complaint, senior government officials made the express choice to intentionally cause parents and children, including very small children, extraordinary pain and suffering in order to accomplish their policy objectives.

34. The government's policy of separating children was a mandatory policy that, as implemented, required CBP and ICE agents to separate parents from their children after crossing the border, even if the parents were not targeted for

---

[27] David Shepardson, *Trump Says Family Separations Deter Illegal Immigration*, REUTERS, Oct. 13, 2018, https://www.reuters.com/article/us-usa-immigration-trump/trump-says-family-separations-deter-illegal-immigration-idUSKCN1MO00C.
[28] Donald Trump, *supra* note 1 (emphasis in original).
[29] Kindy, *supra* note 1.

prosecution—the Administration's pretext for separation and deterrence—as was the case with Plaintiffs.

### 2. The Implementation of the Separation Policy and the Chaos of Reunification

35. CBP officers generally carried out separations of parents and children under the family separation policy at various immigration detention sites near the southwestern border.

36. Immigration officials frequently put arriving parents and children in cells in short-term detention centers and told the parents that immigration officials would take their children.

37. Immigration officials often told parents that they committed a crime by crossing the border, even when parents crossed through official ports of entry.

38. Many parents waited in terror as they watched immigration officials take children from their parents, knowing that their children's names might soon be called.

39. In many cases, when children's names were called, immigration officers told their parents to bring the children to the showers to bathe them.

40. In many instances, once the parents bathed the children, immigration officials told the parents to say goodbye.

41. If the parents did not willingly hand their children over to immigration officials, the officials often forcibly ripped the children out of their parents' arms.

42.     Immigration officials separated children as young as infants and as old as 17 from their parents, without regard to age or language ability.

43.     In many cases, parents begged immigration officials not to take their children, but immigration officials did so, often with callous disregard for the parents' and children's anguish.

44.     Parents often had to watch immigration officials walk their children out of the cells and out of their sight.

45.     Many parents watched immigration officials separate other parents and children after they were separated from their own children, compounding the trauma.

46.     In many cases, immigration officials flew children thousands of miles away from their parents under the pretense that the separation was the necessary result of the criminal prosecution of the parents.  In an effort to create maximum chaos and harm, the government took the children regardless of whether their parents were taken into criminal custody, remained in criminal custody for any length of time, or were even prosecuted at all.

47.     After forcibly separating family units, CBP transferred many parents into ICE custody.[30]

48.     The government then classified the children as "unaccompanied," even though they were accompanied by their parents when they arrived in the United States

---

[30] OFFICE OF THE INSPECTOR GENERAL, U.S. DEP'T OF HOMELAND SECURITY, OIG-18-84, SPECIAL REVIEW - INITIAL OBSERVATIONS REGARDING FAMILY SEPARATION ISSUES UNDER THE ZERO TOLERANCE POLICY 2-3, 13, 15 (Sept. 27, 2018) [hereinafter DHS OIG REPORT].

17

and remained accompanied until the government separated them from their parents and transferred the children to ORR custody.  ORR is responsible for the long-term custodial care and placement of "unaccompanied alien children."[31]  *See* 6 U.S.C. § 279(a).

49.     As predicted by John Kelly, ORR staff then placed the children in "foster care or whatever."[32]  The "whatever" included placement of many children in ORR facilities throughout the United States.

50.     The parents and children were not told where the other was located or when they would be able to see each other, or even speak to each other, again.  Some parents had to wait weeks before speaking to their children.  In some cases, when parents finally obtained contact information for their children, they were told they had to pay to make phone calls, a significant obstacle for detained parents who had no resources.

51.     Parents suffered physically, mentally, and/or emotionally during the separation from their children.

52.     Likewise, children separated from their parents suffered physically, mentally, and/or emotionally.  This trauma was aggravated by the fact that many

---

[31] *Id.* at 3.
[32] *Transcript: White House Chief of Staff John Kelly's Interview with NPR*, *supra* note 22.

children did not understand why they had been separated and some believed their parents had abandoned them.[33]

53.     In implementing the separation policy, the government significantly exacerbated the trauma it intended to cause by failing to take even the most basic steps to record which children belonged with which parents.   The government's failures resulted in delays in parents' ability to locate and communicate with their children, and ultimately to be reunited, causing even more anguish for separated families.   These failures "also contributed to children's anxiety and fear for their parents' well-being."[34]

54.     The government's failure to ensure appropriate recordkeeping manifested itself in many ways.   For example, ICE's computer system "did not display data from CBP's systems that would have indicated whether a detainee had been separated from a child."[35]

55.     As a result, when ICE processed detained parents for removal, "no additional effort [was made] to identify and reunite families prior to removal."[36]

---

[33] OFFICE OF THE INSPECTOR GENERAL, U.S. DEP'T OF HEALTH & HUMAN SERVS., OEI-09-18-00431, CARE PROVIDER FACILITIES DESCRIBED CHALLENGES ADDRESSING MENTAL HEALTH NEEDS OF CHILDREN IN HHS CUSTODY 10 (Sept. 2019) [hereinafter "HHS OIG REPORT II"] ("Children who did not understand why they were separated from their parents suffered elevated levels of mental distress.  For example, program directors and mental health clinicians reported that children who believed their parents had abandoned them were angry and confused.").
[34] *Id.* at 10-11.
[35] DHS OIG Report, *supra* note 30, at 9-10.
[36] *Id.* at 10.

56.     When the DHS Office of Inspector General ("OIG") pressed ICE for information that should have been available to ICE (*e.g.*, information on the current location of separated children), ICE could not provide the information, and had to request it from HHS.  DHS later "acknowledged to the OIG that there is no 'direct electronic interface' between the DHS and HHS tracking systems."[37]

57.     As emphasized by the Honorable Dana M. Sabraw of the Southern District of California in a ruling addressing the constitutionality of the family separation policy in *Ms. L. v. U.S. Immigration and Customs Enforcement*, the agencies' failure to coordinate tracking of separated families was a "startling reality" given that:

> The government readily keeps track of personal property of detainees in criminal and immigration proceedings.  Money, important documents, and automobiles, to name a few, are routinely catalogued, stored, tracked and produced upon a detainee's release, at all levels—state and federal, citizen and alien.  Yet, the government has no system in place to keep track of, provide effective communication with, and promptly produce alien children.  The unfortunate reality is that under the present system migrant children are not accounted for with the same efficiency and accuracy as *property*.  Certainly, that cannot satisfy the requirements of due process.[38]

58.     The government compounded the harm it caused by failing to provide parents and children, including Plaintiffs, with any information regarding each other's whereabouts or well-being for weeks and, in many cases, months, and by failing to

---

[37] *Id.* at 10-11.
[38] *Ms. L.*, 310 F. Supp. 3d at 1144 (emphasis in original).

facilitate adequate communication between parents and children.[39]  The torture of not

knowing where their family members were, whether they were healthy and safe, and

when or whether they would see each other again further exacerbated the trauma

parents and children suffered as a result of being torn apart.[40]

59.    Only    after    the    family    separation    policy    garnered    widespread

condemnation did President Trump, on June 20, 2018, sign an executive order ("EO")

purporting to end it.

---

[39] *See, e.g.*, *id.* at 1136-37 ("[T]here is no genuine dispute that the Government was
not prepared to accommodate the mass influx of separated children.  Measures were
not in place to provide for communication between governmental agencies
responsible for detaining parents and those responsible for housing children, or to
provide for ready communication between separated parents and children."); Kevin
Sieff, *The Chaotic Effort to Reunite Immigrant Parents with Their Separated Kids*,
WASH. POST, June 21, 2018,
https://www.washingtonpost.com/world/the_americas/the-chaotic-effort-to-reunite-
immigrant-parents-with-their-separated-kids/2018/06/21/325cceb2-7563-11e8-bda1-
18e53a448a14_story.html?utm_term=.f32056f25ced (reporting that "government
authorities have often been unwilling to arrange phone calls between [separated
parents and children], or provide details about where the child is held").

[40] *See, e.g.*, HHS OIG REPORT II, *supra* note 33, at 11 ("Adding to the challenge of
addressing mental health needs of separated children was the uncertainty that came
with a hectic reunification process for children covered by the *Ms. L v. ICE*
lawsuit. . . .   Changing guidance resulted in uncertainty around how or when
reunification would happen.  For example, case managers in facilities were not always
able to let children know when, or even if, they would be reunified with their parents,
or whether that reunification would happen in the United States.  This type of
uncertainty added to the distress and mental health needs of separated children. . . .
[F]acilities reported that logistical issues introduced further uncertainty that could lead
to emotional distress.  Facilities reported that some reunifications were scheduled with
little advance notice, or suddenly canceled or delayed, which increased the levels of
uncertainty and anxiety in separated children . . .").

21

60.     The EO stated that it is the "policy of this Administration to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources."[41]

61.     The EO, however, did not explain whether or how the federal government would reunify children whom the government had forcibly separated from their parents.  In fact, on June 22, 2018, the government admitted that it had no reunification procedure in place.[42]

62.     On June 26, 2018, in *Ms. L.*, Judge Sabraw ordered the government to reunify families.   The class-wide preliminary injunction, among other things, prohibited the government from separating parents from their minor children in the future, absent a determination that the parent is unfit or presents a danger to the child;

---

[41] Affording Congress an Opportunity to Address Family Separation, Exec. Order No. 13,841, 83 Fed. Reg. 29,435 § 1 (June 20, 2018).

[42] *See Ms. L.*, 310 F. Supp. 3d at 1140–41 (citing Transcript of Status Conference at 29-30, *Ms. L.*, No. 18-cv-00428 DMS MDD (S.D. Cal. June 22, 2018), ECF No. 77); *see also* U.S. GOV'T ACCOUNTABILITY OFF., GAO-19-163, UNACCOMPANIED CHILDREN: AGENCY EFFORTS TO REUNIFY CHILDREN SEPARATED FROM PARENTS AT THE BORDER 21 (Oct. 2018) [hereinafter GAO REPORT] ("HHS officials told [the GAO] that there were no specific procedures to reunite children with parents from whom they were separated at the border prior to the June 2018 court order.").  The only procedure in place capable of reuniting children with their parents was the procedure developed to place unaccompanied children with sponsors in compliance with the Trafficking Victims Protection Reauthorization Act.  *Id.*  Under this procedure, however, a parent could only be reunited with his or her child if the government deemed them eligible to be a sponsor.  *Id.*  Judge Sabraw noted that this procedure was inadequate because it was created to address "a different situation, namely what to do with alien children who were apprehended *without their parents* at the border or otherwise," and further, that the procedure was not developed to address situations such as this one where family units were separated by government officials after they crossed the border together.  *Id.* at 27 (quoting Order Following Status Conference at 2, *Ms. L.*, No. 18-cv-00428 DMS MDD (S.D. Cal. July 10, 2018), ECF No. 101).

prohibited the deportation of any detained parent before reunification with his or her separated children; and ordered the government to reunify parents separated from children under the age of five within fourteen days, and with children aged five and older within thirty days.[43]  Each of the parent Plaintiffs in this Complaint is a member of the class in *Ms. L.*[44]

63.     Only after Judge Sabraw issued the injunction did the government begin taking meaningful steps to reunify families.[45]

64.     Those efforts, however, were defined by chaos.  The government claimed that DHS and HHS had created a centralized database containing all relevant information regarding parents separated from their children.  But there was "no evidence that such a database exists."[46]

65.     Any data the government collected was incomplete, contradictory, and unreliable.[47]  Accordingly, the agencies resorted to a variety of inefficient and ineffective methods to determine which children were subject to Judge Sabraw's injunction,[48] including hand-sifting through agency data looking for any indication that a child in HHS custody had been separated from his or her parent,[49] and calling in the Office of the Assistant Secretary for Preparedness and Response, an HHS agency

---

[43] *Ms. L.*, 310 F. Supp. 3d at 1149-50.
[44] *See* Order Granting in Part Plaintiffs' Motion for Class Certification at 17, *Ms. L.*, No. 18-cv-00428 DMS MDD (S.D. Cal. June 26, 2018), ECF No. 82.
[45] *See Ms. L.*, 310 F. Supp. 3d at 1140-41.
[46] DHS OIG Report, *supra* note 30, at 10.
[47] *Id*. at 11-12.
[48] GAO Report, *supra* note 42, at 23-25.
[49] *Id.* at 24.

23

whose normal prerogative involves responding to hurricanes and other public health

disasters, to review data provided by HHS, DHS, and ORR.[50]

66.     The method for determining which family units required reunification

changed frequently, sometimes more than once a day, with staff at one ORR shelter

reporting that "there were times when [they] would be following one process in the

morning but a different one in the afternoon."[51]

67.     Judge Sabraw criticized the agencies for their callous treatment of

families: "[W]hat was lost in the process was the family.  The parents didn't know

where the children were, and the children didn't know where the parents were.  And

the government didn't know, either."[52]

68.     Consistent with Judge Sabraw's rulings, the government's policy of

separating children from their parents in the absence of a determination that the

parents were unfit or presented a danger to their children and its failure to track the

children and promptly reunite the families once they were separated violated the

constitutional right to family integrity of the persons subject to the policy, including

Plaintiffs.[53]

---

[50] *Id.* at 23.

[51] *Id*. at 27.

[52] Transcript of Status Conference at 58, *Ms. L*., No. 18-cv-00428 DMS MDD (S.D. Cal. July 27, 2018), ECF No. 164.

[53] *See Ms. L. v. U.S. Immigration and Customs Enf't*, 302 F. Supp. 3d 1149, 1161-67 (S.D. Cal. 2018) (finding that plaintiffs had stated a legally cognizable claim for violations of their substantive due process rights under the Fifth Amendment to the United States Constitution based on their allegations that the government had separated them from their minor children, and kept them separated from their minor children, while they were held in immigration detention and without a showing that

69.    As evidenced by Administration officials' statements that the policy's purpose was to deter asylum seekers, the government's refusal to provide parents and children any information about each other's whereabouts and well-being, and its failure to track separated families and address reunification in any meaningful way until a federal judge ordered it to do so, the government instituted and implemented this policy to intentionally inflict emotional distress on the parents and children whom it separated.  It succeeded, with devastating consequences for Plaintiffs.

**B.    C.M and B.M.**

**1.    The Two-And-A-Half Month Separation of C.M. and B.M.**

70.    On or around May 9, 2018, C.M. entered the United States with her then five-year-old son, B.M., after fleeing life-threatening violence in Guatemala.

71.    When C.M. and B.M. crossed the border at or near San Luis, Arizona, immigration officers apprehended them and took them to a short-term detention center commonly referred to as the "*hielera*" or "ice box" due to the very cold temperature inside.  C.M. and B.M. arrived at the *hielera* late at night.  As soon as they arrived, an immigration officer told C.M. and three other women who arrived

---

they were unfit parents or otherwise presented a danger to their children); *Ms. L.*, 310 F. Supp. 3d at 1142-46 (finding that plaintiffs were likely to succeed on the merits of their substantive due process claim); *see also Smith v. Org. of Foster Families for Equal. & Reform,* 431 U.S. 816, 845 (1977) (liberty interest in family relationships has its source in "intrinsic human rights").

with her that immigration officers would take away their children and send the women back to Guatemala.[54]

72.    C.M. was horrified by the news.  The officer laughed at her shocked reaction and the reaction of women she was with and said, "Happy Mother's Day."

73.    A second immigration officer asked C.M. to sign papers written in English that she did not understand.  Unable to read or write, she told the officer that she did not know how to sign her name.  The immigration officer told her to put an X on the signature line.

74.    The immigration officer confiscated C.M. and B.M.'s belongings, including extra articles of clothing that could have helped them stay warm in the *hielera*, and locked C.M. and B.M. in a cell with many other women and children.

75.    There were no beds in the cell, and C.M. and B.M. received nothing to eat except watered-down broth.  Other distraught mothers detained in the same cell told C.M. that the immigration officers had taken away their children, and that they would take B.M. away as well.  C.M. was terrified.

76.    During C.M.'s first night in the *hielera*, an immigration officer called her name and asked B.M.'s age.  C.M. told the officer that B.M. was five years old.  A short while later, the same officer again called C.M.'s name and again told her that immigration officers would take B.M. away from her and send him to a shelter

---

[54] None of the Plaintiffs speak English.  All referenced conversations involving a Plaintiff occurred in Spanish, except conversations between C.M. and her son, B.M., which occurred in Mam.

because he was old enough to go, and that only mothers with children under four years old might be released with their children. C.M. sobbed at the news.

77. Less than two days later, very early in the morning on or around May 11, 2018, an immigration officer told C.M. to wake her son up because the immigration officers would be taking him to a shelter for children that morning. When C.M. woke B.M., he saw the officer and began to cry.

78. The officer tried to take B.M. to another room so that B.M. could have a bath, but, because B.M. was crying so hard, the officer told C.M. that she would have to bathe B.M. The officer took C.M. and B.M. to a room where there was a shower and ordered her to bathe and dress B.M. Believing she had no choice, C.M. complied.

79. Once B.M. was dressed, the officer took them to a different room and told C.M. that she had to say good-bye to her son. C.M. begged the immigration officer not to take her son away, stating over and over that he was only five years old and he only spoke Mam, did not understand Spanish or English, and would not be able to understand what anyone said to him. The officer did not relent.

80. Desperate to keep her son, C.M. asked the officer to send her back to Guatemala with B.M. rather than separate them. C.M. and B.M. had fled to the United States after suffering horrific abuse in Guatemala, based in part on their indigenous identity. C.M. was terrified to return, but the thought of losing her son was inconceivable. The officer laughed. He made fun of her indigenous accent and said "it's not that easy."

81.     C.M. continued to refuse to let her son go.   Eventually, another immigration officer came over and told her to hurry up because they were putting B.M. on a plane, and the plane was about to take off.   When C.M. continued to resist, the two officers threatened to throw her son in a cell without her if she did not let them take him.

82.     Recognizing that the officers would take B.M. no matter what she did, C.M. explained to her five-year-old son that he would be going away for a few days. Despite her anguish, she tried to be positive for him and told him that he would go to a shelter to play with lots of other children and that she would see him in a few days.

83.     B.M. asked C.M. if she would go back to Guatemala without him.   She assured him that she would never leave without him.   He sobbed and clutched her. The immigration officers pried B.M. away by force as he cried and grabbed at C.M.'s clothes.

84.     Without her child, C.M. fell apart.   She was extremely cold and heartbroken and she cried constantly.   She could not sleep because she was so distraught.   The government gave C.M. no information about B.M.   She became disoriented, unable to gauge the passage of time, had no appetite, and began to suffer chronic headaches.   Days after they took B.M. away, an immigration officer commented that she was losing weight.

85.     While C.M. stayed in the *hielera*, she watched immigration officers take other children away from their parents.   Through the interior window of her cell, she could see fathers crying.

86.    About four days after immigration officers took B.M. from C.M., officers moved C.M. to the Florence Staging Facility, and, one day later, to the Eloy Detention Center, where she was held for approximately two days.

87.    In Eloy, officers finally allowed C.M. to speak to her son—but only for a matter of minutes.  B.M. repeatedly asked his mother when she was coming to get him.  He told her he was all alone and did not know what anyone was saying to him because he could not speak Spanish.  Not knowing the answer, or even where B.M. was, C.M. was unable to comfort him.

88.    B.M. sounded terrified and heartbroken, which left C.M. more traumatized than before they had spoken.  She still did not know where he was being held.

89.    After spending a night or two in Eloy, immigration officers transferred C.M. by plane to a detention center outside of Las Vegas, Nevada.  During this transport, officers handcuffed her and shackled her around her waist, feet, and wrists. C.M. could not stop crying.

90.    In Nevada, a woman being held with her tried to put water to C.M.'s cracked and dry lips.  Another woman tried to get C.M. to eat and encouraged her to sleep.  The woman also translated for her when immigration officers walked past and said in English: "What's wrong with you?"

91.    Several weeks after she arrived in Nevada, C.M. was finally able to speak to B.M. again.  A male officer called C.M.'s name and led her to a small room with a telephone.  When the phone rang, he told her to answer it.  When she did, she

29

heard B.M.'s voice for only the second time since they had been separated more than a month earlier.

92.     When she spoke to B.M., C.M. cried so hard that she could barely speak.  B.M. had difficulty speaking because he was so sad and scared.  C.M. could hear the fear through his voice.  He could only keep asking when they would go home.

93.     After C.M. and B.M. spoke, a social worker told C.M. that B.M. was in a shelter in New York, thousands of miles away.  The social worker told C.M. that she had to fight her immigration case and that she should not give up.  She impressed upon C.M. the urgency of the situation and told her that if she did not fight her case, the government could deport her, and she might never see B.M. again.  The possibility of never seeing her child again horrified her.

94.     While C.M. was later allowed additional phone calls with B.M. during her detention in Las Vegas, B.M. was so traumatized that he was unable to say much. As soon as he heard his mother's voice, B.M. would become very upset, begin to sob, and repeatedly ask C.M. when they would be able to go home.  Listening to B.M. cry was excruciating for C.M.  She could do nothing to take care of her child beyond pleading with the social worker to make sure he was all right.

95.     B.M. turned six while he was in the shelter in New York.  C.M. spent B.M.'s birthday crying in the detention center, wishing she could be with him.  One of the other women in the detention center tried to comfort her, but C.M. could not be consoled.

96.     On June 19, 2018, while she was being held in Nevada, C.M. had a hearing before an immigration judge, who ordered her deported to Guatemala.

97.     Shortly after C.M.'s hearing, on June 26, 2018, Judge Sabraw issued the injunction enjoining the U.S. government from removing separated parents without their children.[55]   As a result, the government was prohibited by judicial order from carrying out C.M.'s worst fear—being deported without B.M.

98.     While Judge Sabraw's injunction spared C.M. from immediate removal, she was not told about the injunction and she remained in the detention center in Nevada for approximately a month after her immigration hearing, terrified that she could be deported without B.M. at any time.

### 2.     B.M.'s Separation From His Mother

99.     While C.M. suffered in detention, B.M. suffered on his own.   After immigration officials tore him from his mother's arms, they put B.M. on a plane to New York, thousands of miles away from his mother.   It was B.M.'s first time on an airplane.

100.    B.M. was transferred to the Safe Haven for Children Program in New York.  He arrived very late at night on May 11, 2018.  As B.M. did not speak Spanish or English, he was unable to communicate with anyone at the shelter when he arrived.

101.     Staff at Safe Haven placed B.M. with a foster care family shortly after he arrived in New York, but he was removed from that home after B.M. and another

---

[55] *Ms. L.*, 310 F. Supp. 3d at 1149-50.

31

child reported that the foster care mother had hit them both.  No government official or shelter staff member informed C.M. about this reported abuse.

102.   Following this incident, Safe Haven staff placed B.M. with a second foster care family, and he remained with that family for approximately two months, until late July.

### 3.   C.M. and B.M.'s Reunification

103.   On or about the night of July 18, immigration officers, without explanation, transported C.M. and several other mothers to the Port Isabel Detention Center in Texas ("Port Isabel").  They locked C.M. again in an *hielera*.  Some of the other parents at Port Isabel told C.M. that they thought they were getting their children back, but C.M. did not believe them.  By this time, C.M. believed that immigration officers would never return her son.

104.   C.M. was locked in the *hielera*, which was filthy and so cold that she and the other women could not sleep.

105.   On the evening of July 25, 2018, immigration authorities again placed B.M. on a flight across the country, to Port Isabel.  On or around July 26, while C.M. waited in the *hielera*, an immigration officer called C.M.'s name and escorted her into a small room.  She waited there for approximately thirty minutes.  The officer forced her to sign a form that she could not read and did not understand.

106.   A few minutes after signing the form, C.M. saw B.M. and several other children enter the room.  She called his name and, when he saw her, he threw

his bag to the side, ran toward her, and threw himself in her arms.  They sobbed with relief.

107.    After they were reunified, immigration officials transferred C.M. and B.M. by bus to Dilley, one of ICE's family detention centers.  As soon as they boarded the bus, B.M. began crying.  C.M. tried to comfort him, but B.M. was terrified that they would be separated again.

108.    C.M. and B.M. were detained at Dilley for approximately four months. DHS finally released C.M. and B.M. from Dilley in November 2018, more than six months after they arrived in the United States.

### 4. C.M. and B.M.'s Harms and Losses

109.    C.M. suffered severe emotional distress as a result of the forcible separation from her son by the government.  From the moment of the separation, when an officer laughed at C.M. while she cried in desperation, she has endured palpable trauma.  After they separated C.M. and B.M., immigration officers told C.M. nothing about her son's well-being or whereabouts, causing her acute anxiety and distress.  She worried about her son constantly.

110.    C.M. was so consumed with worry that she was frequently unable to sleep, had no appetite, and suffered from chronic headaches.  During C.M.'s forced separation from B.M., immigration officers did nothing to help her locate him other than arrange phone calls.  This cruelty compounded C.M.'s distress.

111.    C.M. continues to suffer as a result of the separation from her son.  A psychological evaluation confirms that C.M. suffered severe trauma tied directly to

that separation and the failure of immigration officers to provide her with information about her son.

112.   The clinical social worker who evaluated C.M. during her detention in Dilley found that she exhibits symptoms consistent with Post-Traumatic Stress Disorder ("PTSD").

113.   C.M.'s concern about her son's well-being dominated her every waking hour.  She now has difficulty sleeping and suffers from chronic headaches.  She suffers flashbacks of the separation which cause her extreme anxiety and an acute feeling that she is losing control.  C.M. remains traumatized by the thought of her son spending his sixth birthday scared and alone.

114.   B.M. experienced similar fear and mental anguish when he was taken from his mother.  After DHS separated him from C.M., he was detained in an unfamiliar place, far from his mother, where he was unable to communicate with anyone because of his indigenous Mam language.  He did not know what was happening or when he would see his mother again.

115.   During his time in Dilley, B.M. continued to be extremely sad and repeatedly asked his mother why they were there and why they were locked up.  He had little appetite and suffered from nightmares.

116.   The severe emotional distress B.M. suffered during the separation continues today.  He refuses to talk about his time in the shelter in New York.  He continues to eat very little.

117.    After they were reunited, B.M. told his mother that he thinks she brought him to the United States to give him away.   C.M. worries that their relationship may never recover.

118.    To this day, whenever C.M. leaves the house, B.M. asks whether she is coming back.   Despite her reassurances, C.M. perceives that B.M. does not believe her.

### C.     L.G. and B.G.

#### 1.     The Two-Month Separation of L.G. and B.G.

119.    On or around May 16, 2018, L.G. and her then-seven-year-old daughter, B.G., fleeing horrific violence and threats of violence in Guatemala, entered the United States near San Luis, Arizona.

120.    CBP officers escorted L.G. and B.G. through what L.G. believed was an official port of entry, where L.G. told the officers that she feared for her safety and the safety of her daughter.

121.    The CBP officers transferred L.G. and B.G. to an *hielera* located in or near Yuma, Arizona.

122.    Shortly after L.G. and B.G. arrived at the *hielera*, immigration officers told L.G. that the law had changed, and that the U.S. government was going to take B.G. away from her.   L.G. was horrified.

123.    Even though L.G. and B.G. had entered through what L.G. perceived to be an official port of entry, the immigration officers told her that she had entered the

country illegally and accused her of using B.G. as a free ride to gain entry to the United States.

124.    The immigration officers put L.G. and B.G. in a cell with approximately 100 other women and children.  The cell was over-crowded.  It had no beds.  The women and children slept on the floor with only aluminum foil sheets.  There was only one toilet and one sink for everyone.  There was no soap or bathing facility.

125.    Other women in the cell told L.G. that immigration officers had taken their children.  Many of these women were crying and praying.  L.G. watched as the immigration officers ignored these mothers when they pleaded for information about their sons and daughters.

126.    L.G. was unable to sleep that night.  Instead she cried, holding her daughter in her arms.

127.    The next morning, on or around May 17, 2018, an immigration officer called L.G.'s name and told her that they would be taking B.G. to a "better place," but did not give her any details.  L.G. began to cry.

128.    Later that day, in the afternoon, two immigration officers entered the cell and began calling the names of children.  L.G. and B.G., along with everyone else in the cell, watched as immigration officers took children away from their mothers.  Many people were crying.

129.    One young boy, who was about five or six years old, cried and clung to his mother after one of the immigration officers called his name.  Because the boy

refused to let go, an immigration officer forcibly yanked the boy from his mother's arms.  Watching this further traumatized L.G.

130.    After L.G. witnessed immigration officers taking the boy by force, an immigration officer called B.G.'s name.  B.G. looked at her mother and the officer ordered B.G. to come to him.  He told L.G. and B.G. to say good-bye.

131.    L.G. told her daughter to be strong and that they would not be apart long.  B.G. was confused and terrified.  She did not want to leave her mother.  As the immigration officer escorted her away, B.G. turned around and caught her mother's eye.  L.G. sobbed as she watched the immigration officers take away her child.

132.    L.G. witnessed approximately six or seven other children being taken away with B.G.   These children ranged in age from approximately five to approximately sixteen years old.

133.    After taking their children, the immigration officers did not give L.G. and the other women any information about where their children were going or when the mothers would speak to their children again.

134.    L.G. remained in the holding cell for several more days.  Almost every day, and sometimes more than once a day, immigration officers entered the cell and forcibly separated children from their mothers.

135.    L.G. had to watch these separations and re-live the trauma of having been separated from her own daughter again and again.

136.    Every day, L.G. and the other mothers asked the immigration officers about their children.  The officers never answered their questions.

137.   On or around May 25, 2018, approximately one week after they took her daughter, immigration officers transported L.G. and some of the other women in handcuffs and shackles to the Florence Staging Facility and, one day later, to the Santa Cruz County Jail.  L.G. remained in the jail for several days.

138.   On or around May 28, 2018, immigration officers transported L.G. back to the Florence Staging Facility in handcuffs and shackles.  The following day, on or around May 29, 2018, immigration officers again handcuffed and shackled L.G. and other women and, without providing them any information, took them on a bus to an airport.  L.G. was crying and distraught.  She was convinced that she was going to be deported without her daughter.

139.   Upon arriving at the airport, immigration officers instructed L.G. and the other women to board a plane.  It was only once the plane had left the ground that a woman, who may have been a flight attendant, told the women that the plane was going to California.

140.   Upon arrival in California, the immigration officers loaded L.G. and the other women, still in handcuffs and shackles, into a van and took them to an immigration detention center near Los Angeles.

141.   The following day, on or around May 30, 2018, immigration officers again put L.G. and the other women in handcuffs and shackles and transported them to the James A. Musick Facility ("Musick") near Irvine, California.

142.   L.G. had been transferred to multiple facilities since leaving the *hielera* where she last saw her daughter.  Despite repeatedly asking immigration officers at

38

each of these facilities for information about her daughter, she still had no information about B.G.'s whereabouts or well-being.  When L.G. asked if she could have a phone call with B.G., an immigration officer told her that the immigration authorities could not set up a call with B.G. because then they would have to set up calls for every mother who had been separated from her child.

143.    On or around June 15, 2018, still having heard nothing about her daughter, L.G. was taken to an immigration court where she saw an immigration judge.  The immigration judge told her that she would be deported.

144.    L.G. became more distraught.  She told the judge that she had a daughter in the United States, and that she could not be deported without her.  The judge ordered L.G.'s removal that day and handed L.G. a piece of paper in English.

145.    L.G. was not deported after the hearing, likely due to the injunction issued by Judge Sabraw on June 26, 2018 prohibiting DHS from deporting parents separated from their children.  Instead, L.G. remained at Musick for more than a month after her hearing.  During this time, L.G. lived in constant fear that she would be deported without B.G.  She still had no idea where B.G. was, or how B.G. was doing.  L.G. had asked immigration officers in every place she had been detained for information about her daughter.  They had all ignored her or refused to answer her questions.

146.    After L.G. made repeated written requests to speak with her daughter and for information about her daughter's whereabouts, immigration officials finally informed L.G. that B.G. was in Arizona.

147.   L.G. was finally able to speak to B.G. by telephone in late June, after approximately six weeks of separation.

148.   L.G.'s joy upon hearing her daughter's voice did not last long.   B.G. gave L.G. one-word answers and began crying partway through the conversation. The social worker ended the call after a few minutes because B.G. was so upset.

149.   Hearing her daughter in such distress, and knowing that she was unable to do anything to help her, L.G. was filled with anguish and despair.

150.   Approximately one to two weeks later, L.G. had another brief telephone call with B.G.   Again, B.G. did not speak much.   L.G. tried to engage her daughter and told her not to be sad.

151.   These were the only telephone calls L.G. had with B.G. during the entirety of their two-month separation.   Although L.G. asked for and received the number for the social worker during her second call with B.G., L.G. could not afford to make any calls from the jail, which charged by the minute.

### 2.   B.G.'s Separation From Her Mother

152.   After immigration officials forcibly separated B.G. from her mother on May 17, 2018, government officials took B.G. to Hacienda Del Sol, a Southwest Key facility, in Youngstown, Arizona.

153.   Upon arrival, B.G. asked to speak to her family, but none of the staff at the facility had any information about her mother.   In fact, officials at Hacienda Del Sol had no information about and no contact with B.G.'s mother until on or around June 25, 2018, well over a month after B.G. arrived at the shelter.

154.   B.G. spent over two months alone at a shelter without her family and with very little contact—only two brief phone calls—with her mother.

### 3.   L.G. and B.G.'s Reunification

155.   On or around July 17, 2018, immigration officers handcuffed and shackled L.G., and transported her from Musick to Port Isabel in Texas.

156.   Approximately one week later, around midnight on or about July 24, after more than two months of separation, L.G. and B.G. were reunited at Port Isabel.

157.   L.G. was relieved to be with B.G. again.  They hugged each other and cried.

158.   Immigration officers then transferred L.G. and B.G. to Dilley.

159.   During the time that the government detained L.G. and B.G. at Dilley, an asylum officer interviewed B.G. and determined that B.G. had a credible fear of persecution in Guatemala.  This threshold finding allows B.G. to pursue asylum before an immigration court.

160.   Following the credible fear interview, DHS finally released L.G. and B.G. in November 2018, after four months at Dilley and more than six months after L.G. and B.G. were first detained.

### 4.   L.G. and B.G.'s Harms and Losses

161.   L.G. suffered severe emotional distress as a result of the forcible separation from her daughter by the government.  L.G. continues to experience symptoms of distress to this day.

162. Immigration officers failed to provide L.G. with information regarding her daughter's well-being or whereabouts for more than six weeks, which increased her acute anxiety and distress.

163. L.G. cried constantly for the duration of her separation from her daughter. She was so overwhelmed by feelings of loss, despair, fear, and grief that she was unable to sleep, had no appetite, and began to suffer migraines so severe that they caused her nausea and sensitivity to light and noise.

164. L.G. worried and continues to worry about her child constantly. She continues to have difficulty sleeping and to suffer from migraines.

165. L.G. remains afraid that B.G. will be separated from her again. This constant fear is a source of ongoing stress and anxiety for L.G., and makes her extremely sad.

166. A medical doctor conducted a psychological evaluation of L.G. at Dilley and confirmed that L.G. suffered trauma as a result of the separation from B.G., as well as from the accompanying lack of information concerning B.G.'s safety, well-being, and whereabouts after the immigration officers took B.G. from her.

167. The doctor further concluded that L.G. exhibited features of PTSD, Generalized Anxiety Disorder, and Major Depressive Disorder.

168. Medical personnel at Dilley also examined B.G. at L.G.'s request. The psychologist who examined B.G. told L.G. that B.G. was suffering from severe stress.

169. Since being reunited with her mother, B.G. has continued to experience severe emotional distress resulting from the separation.

42

170.   L.G. has noticed that her daughter has changed as a result of the separation.   B.G. is afraid to leave her mother, even to go to school.   Seeing police officers makes B.G. anxious.   B.G. is terrified that she and her mother will be separated again.   B.G. has trouble falling asleep unless her mother holds her.

**D.    M.R. and J.R.**

**1.    The Two-and-a-Half Month Separation of M.R. and J.R.**

171.   On or around May 8, 2018, M.R. and her then twelve-year-old son, J.R., entered the United States near San Luis, Arizona, after fleeing life-threatening violence in Guatemala.

172.   When M.R. and J.R. entered, immigration officers took them to an *hielera*.   During this encounter, an immigration officer told M.R. that she would be separated from her son and taken to jail.

173.   At the *hielera*, M.R. and J.R. were locked in a crowded cell with approximately twenty people, where they remained for two days.

174.   The only food they were given was cold instant soup.

175.   Despite the extremely cold temperatures inside the cell, immigration officers provided only a single foil sheet for M.R. and J.R., which M.R. gave to her son.

176.   There was no bed or bedding in the cell, and M.R. and J.R. were forced to sit on the cold floor.

177.   The cell was so crowded that it was impossible to lay down, and they sat all night with their legs pulled in because there was so little space in the room.

178.   M.R. did not sleep the first night because she was afraid for the well-being of her son.

179.   M.R. and J.R. overheard an immigration officer telling mothers that they would be separated from their children, which scared them both.

180.   Several times, J.R. said to his mother that he wanted to leave because he was frightened and could not understand why they were detained.  M.R. told him they could not leave because the door was locked.

181.   The *hielera* was often filled with the sounds of crying children.

182.   On M.R. and J.R.'s second day of detention, an immigration officer came to their cell and yelled at the mothers, "why did you bring your children here?"

183.   The officers told the mothers that they would take the mothers' children away and that the mothers would not know where to find them.

184.   Late that night, immigration officers started entering the room and reading children's names from a sheet of paper, starting with the youngest.

185.   A few at a time, the children were taken to shower, and then dressed in identical blue uniforms and blue shoes.

186.   The officers ordered the mothers to take the younger children to the showers and bathe them.

187.   The older children were ordered to shower on their own and their mothers were not allowed to go with them because, according to the immigration officers, they were old enough to be alone.  The children never returned to the cell

44

after showering, but they were visible to the mothers through a window, before they were taken away.

188.    J.R. was asleep on the floor when the officers called his name very early in the morning.  M.R., who had been too afraid to sleep during the night, woke her son and told him that the officers were calling him to be taken away.

189.    In an effort to comfort her terrified son, M.R. told J.R. not to cry, to eat well, and that it would not be long until they were reunited.

190.    After J.R. was sent to shower alone, M.R. watched from the cell as her son—now dressed in blue shoes and a blue uniform—was lined up with other children and taken away.  She was despondent. M.R. asked the immigration officers where they would take J.R., but they would not tell her.

191.    M.R. also asked the immigration officers what was going to happen next.  An immigration officer told M.R. that she would be deported and that her son would stay in the United States.

192.    M.R. told the immigration officer that she did not want to leave her son in the United States alone, and that she wanted to wait for him in the United States. When the immigration officer told M.R. that would not happen, M.R. was distraught and feared that she would never see her son again.

193.    Although M.R. did not know it at the time, immigration officials took J.R. to the airport to be sent on a plane to New York, thousands of miles away from her.

194.   In the early evening of the day that M.R. and J.R. were forcibly separated, immigration officers shackled M.R. by her waist, hands and feet, and transferred her to a detention center in Eloy.

195.   Every day that she was in the detention center, M.R. asked immigration officers where her son was and when she would be with him again, but they did not give her any information about her son.

196.   M.R. was so anxious and consumed with worry for J.R. that she could not eat.  She began to suffer from debilitating headaches.

197.   After approximately two weeks at Eloy, an immigration officer escorted M.R. to a room with a telephone where she was able to speak to J.R. for the first time. The call lasted five minutes.

198.   J.R. cried during the call, which caused M.R. to cry as well.  When she began crying, the immigration officers laughed at her and shook their heads.

199.   M.R. learned from other women at the facility that the immigration officers would frequently laugh as crying mothers spoke with their separated children.

200.   Over approximately the next month, immigration officers repeatedly ignored M.R.'s written requests to call her son.  On the few occasions when she was able to call her son, using money her brother-in-law had placed into an account for her, no one answered the phone.

201.   Nearly a month went by before M.R. finally spoke to J.R. again.  M.R. tried to reassure J.R. that they would soon be reunited.  J.R. spoke little and, when

46

M.R. asked how he was feeling, J.R. told his mother that he did not want to talk about it.

202.    After this call, M.R. went several more weeks without speaking to J.R. because her phone calls continued to go unanswered.  On one occasion, a woman answered the phone and gave M.R. a different phone number to try.  When M.R. called that number, a woman answered and told her she had the wrong number, and that there were no children there.

203.    M.R. felt panicked, as well as worried for J.R.'s safety and losing what little contact she had with her son.

204.    M.R. appeared before an immigration judge twice while detained at Eloy.  At her first hearing, the immigration judge asked her whether she had anyone who could sponsor her for her release, but M.R. did not have anyone. The immigration judge then continued her case.

205.    On or about June 21, 2018, M.R. appeared before an immigration judge for the second time.  An officer posted a sign on the hearing room door that instructed M.R. that she could not say anything to the judge other than "yes" or "no" in response to the judge's questions.

206.    Although she tried her best, M.R. could not focus on what the judge was saying.  All M.R. could think about was asking the judge whether her son was safe, but she did not believe she was permitted to talk to the judge about J.R.   The immigration judge ordered M.R.'s deportation.

207.    Approximately a week after this hearing, an immigration officer told M.R. that she needed to sign some papers.   The officer instructed M.R. to sign a statement that she wanted to be deported with her child, and told her that signing the statement was the only way for M.R. to be reunited with J.R.   M.R. began to panic, and to ask questions about what would happen to her and her child, but the officer would not answer her questions.

208.    She finally signed the papers because she believed that she would only be reunited with her son if she did so.

### 2.    J.R.'s Separation From His Mother

209.    After immigration officials forcibly separated J.R. from his mother, they put him on a plane to New York, thousands of miles away from her.

210.    It was J.R.'s first time on an airplane. He took two separate flights to New York.  He was scared and sad, and thought he would never see his mother again.

211.    Immigration officers later transferred J.R. to the Cayuga Centers in New York ("Cayuga"), a facility contracts with ORR to provide foster care programs for unaccompanied noncitizen children.[56]   ORR staff subsequently placed him in foster care, where he remained for over two months.

---

[56] *See Cayuga Centers Awarded Expanded Grants by U.S. Office of Refugee Resettlement*, CAYUGA CENTERS (Mar. 21, 2017) http://cayugacenters.org/news/2017/03/cayuga-centers-awarded-expanded-grants-us-office-refugee-resettlement/; *see also Cayuga Centers Provides Foster Care and Services for Unaccompanied Children*, CAYUGA CENTERS (Jun. 21, 2018), http://cayugacenters.org/news/2018/06/cayuga-centers-provides-foster-care-and-services-unaccompanied-children/.

212.   J.R. did not speak to his mother until two weeks after immigration authorities separated them.   During that first call, he cried the entire time and spoke little.

213.   On July 26, 2018, immigration authorities again placed J.R. on two flights from New York to Arizona.

### 3.   M.R. and J.R's Reunification

214.   On or about July 25, 2018, immigration officers told M.R. that she would be leaving Eloy that day.   M.R. was terrified that she would be deported without her son, who was turning thirteen years old the next day.   She asked the officers, but they told her only that she would receive more information when she arrived at her destination.

215.   M.R. was devastated and began to cry.   She wanted desperately to hug her son, to comfort him, and to be with him on his birthday.

216.   M.R. did not know that Judge Sabraw had issued the injunction in *Ms. L.* on June 26, 2018, forcing the government to reunite M.R and J.R.

217.   The immigration officers placed her in shackles and put her in a van which took her to an *hielera*.

218.   After a long and sleepless night in the *hielera*, on July 26, 2018, immigration officers escorted M.R. to another room.   J.R. was waiting in the room. M.R. was overjoyed to hug her son again.   M.R. had not seen her son for two-and-a-half months during their forced separation.

219.   Immigration officials then transferred M.R. and J.R. to Dilley by bus.

220.    M.R. was constantly nervous when J.R. went anywhere without her at Dilley.   When he would leave for the children's classroom, M.R. worried that he would not return.   When a group of mothers, including M.R., went to an officer at Dilley and asked how much longer they would be detained, the officer responded by saying that they should stop asking or he would take their kids away again.

221.    During the time that the government detained M.R. and J.R. at Dilley, an asylum officer re-interviewed M.R. and determined that M.R. had a credible fear of persecution in Guatemala.   This threshold finding permits M.R. to pursue asylum before an immigration court.

222.    DHS finally released M.R. and J.R. from Dilley on November 30, 2018, after almost four months at Dilley and more than six months after they arrived in the United States.

### 4.    M.R. and J.R.'s Harms and Losses

223.    M.R. suffered severe emotional distress as a result of the forcible separation from her son by the government.   She continues to experience symptoms of distress to this day.

224.    Immigration officers failed to provide M.R. with information regarding her son's well-being or whereabouts during their months-long separation, which increased her acute anxiety and distress.

225.    Throughout M.R.'s detention, particularly during the extended periods in which she was unable to speak with J.R., she was extremely anxious.   M.R.

struggled to think clearly or concentrate on even basic tasks, and she was easily startled when anyone would try to speak to her.

226. Also during the time she and J.R. were separated, M.R. suffered from persistent insomnia, and the sleep deprivation and stress triggered excruciating headaches and pain in her eyes. She had no interest in eating and lost weight.

227. Even after being reunited with her son, M.R. continued to suffer from headaches and insomnia, and she had difficulty concentrating.

228. M.R. vomited regularly as a result of her acute anxiety.

229. A medical professional working at the medical clinic at Dilley told her that these were symptoms of stress and her continued anxiety and fear that she would be separated from her son again.

230. Following a mental health evaluation at Dilley, a psychologist diagnosed M.R. with PTSD, finding that after the forced separation from her son, M.R. lived "in a constant state of fear and worry." To this day, M.R. continues to experience symptoms consistent with PTSD, such as problems with memory and concentration, and painful headaches at least once or twice a week.

231. J.R. also manifests symptoms stemming from the trauma of his forced separation from his mother.

232. While at Dilley, J.R. often refused to eat and would become suddenly and inexplicably angry, sometimes storming out of the room when M.R. tried to talk to him about their separation.

233.   More than a year after their forced separation, J.R. still experiences severe emotional distress as a result of his separation from his mother.   J.R. is still unable to speak at length or in any detail with his mother about their separation or his time at Cayuga.   He becomes angry when asked to discuss the separation.   J.R. continues to have a decreased appetite and has lost weight.

234.   M.R. has also noticed that J.R. spends much more time indoors and he is angrier and more rebellious than before the separation.

**E.   O.A. and L.A.**

**1.   The Four-Month Separation of O.A. and L.A.**

235.   On or around May 11, 2018, O.A. entered the United States with her then-five-year-old daughter, L.A., after fleeing horrific violence and threats of further violence in Guatemala.

236.   After O.A. and L.A. entered Arizona, immigration officers apprehended them and took them into immigration custody.   The immigration officers escorted O.A. and L.A. to an *hielera* in or near Yuma, Arizona, where the officers locked them in a cell with approximately 30 mothers, plus their children.

237.   O.A. had a bag of clothing that would have helped keep her and L.A. warm, but the immigration officers confiscated the bag and gave them only aluminum foil sheets, which did not provide warmth.

238.   The only food O.A. and L.A. were given all day was two bowls of cold, instant soup that was barely edible.

239.   Shortly after arriving at the short-term detention center, immigration officers took O.A. and L.A. from the locked cell and ushered them into another room where they met with two other uniformed immigration officers, both men.   At this time, O.A. told the immigration officers that she feared for her and L.A.'s safety if they returned to Guatemala.

240.   L.A. was asked to move about 10 steps away from O.A. so that she would not hear what the immigration officers were about to tell her mother.   The officers then informed O.A. that they would take L.A. away from her and send her to another facility for a couple of days.

241.   O.A. insisted that the officers could not take her daughter from her.   The officers responded that, in fact, they could take L.A. away because O.A. had committed a crime.   This caused O.A. tremendous anxiety and anguish.

242.   O.A. begged the officers not to separate L.A. from her.   Despite her fear for her and L.A.'s safety if they returned to Guatemala, the prospect of being separated from her daughter was so alarming that O.A. offered to leave the United States if she could do so with her daughter.   The officers refused and reacted to O.A.'s increasing distress by becoming hostile and screaming at her to be quiet.

243.   L.A. was not far away from the conversation and could hear the officers berating her mother.   She understood that the officers were going to take her away, and she began to cry.

244.   O.A. and L.A. were brought back to the locked cell with the other women and children.   O.A. tried to calm her daughter, but L.A. could not stop crying.

245.    That night, O.A. and L.A. barely slept.  There were no beds in the cell. There were some mats, but not enough for everyone.  There were no blankets, only the foil sheets that did not provide warmth.  O.A. slept on a trash bag, the only thing separating her from the cold, concrete floor.  L.A. laid on her mother's arm, the two nearly touching the strangers lying next to them in the packed cell.

246.    In the morning, O.A. and L.A. were still lying on the floor when O.A. heard the immigration officers open the door and begin calling out children's names. O.A. and L.A. were terrified.  When a child's name was called, O.A. and L.A. saw the child desperately clutch his or her mother as the two cried.

247.    The officers, both men, would then order the child to line up against the wall with the other children.  The officers said the children would be taken to shower. O.A. and L.A. watched and waited in horror for L.A.'s name to be called.  As they waited, O.A. tried to calm her daughter, telling her she would get to play with other kids and have something better to eat than the cold soup.

248.    L.A.'s name was called.  She grabbed O.A. tightly and begged her mother not to allow the strangers to take her away.  O.A. again tried to soothe her daughter, assuring her that the officers were just taking L.A. to play.

249.    The immigration officer called L.A.'s name again, this time yelling it angrily.  Two officers, both men, then approached O.A. and L.A.  They roughly grabbed L.A.'s arm and pulled her away from her mother.  O.A. begged the officers to let her give L.A. some juice before they took her away because her lips were dry from

54

thirst.  The officers refused to let her, yelling that they needed to hurry up because an airplane was waiting for the children.

250.   Until that moment, O.A. had assumed L.A. would be moved to a facility nearby.  It was the first time she realized that her five-year-old daughter, who did not speak English and had never been on an airplane, would be taken so far away from her.  O.A. asked where L.A. was being sent.  The officers did not answer her.

251.   Shortly after the officers forcibly ripped L.A. from her mother's arms, a woman, whom O.A. believed to be a social worker, brought L.A. to the showers.  A few moments later, an officer called O.A. from the cell and explained that L.A. had refused to let anyone but her mother shower her.  O.A. went into the showers, washed her daughter, quietly gave her some juice, and said good-bye.

252.   Once the children were showered, a man and a woman, whom O.A. understood to be social workers, told a group of mothers that they would now be taking the children away.  The social workers told the mothers not to worry because the children would be taken care of and given toys to play with.

253.   The female social worker also told the mothers that their children would be boarding an airplane.  O.A. asked her where the children were going, but the woman did not tell her.

254.   During this conversation with the social worker, the children were in the area, off to the side.  It was the last time O.A. saw L.A. before the social workers took L.A. away.  O.A. would not see L.A. again for four months and one day.

255.   After officers forcibly separated O.A. and L.A., O.A. spent two more days at the short-term detention center, sleeping on the floor at night.  She asked immigration officers several times about her daughter, but they gave her no answers.

256.   O.A. was moved to the Santa Cruz County Detention Center in Arizona ("Santa Cruz"), where she was held for approximately one to two weeks.

257.   During her time at Santa Cruz, despite O.A.'s repeated inquiries, no one told her anything about L.A.'s whereabouts or well-being.

258.   O.A. was next transferred to the Nevada Southern Detention Center in Pahrump, Nevada ("Nevada Southern"), where immigration officers held her for approximately two months.  O.A. regularly asked officers at Nevada Southern about her daughter, but they gave her no information.

259.   While detained at Nevada Southern, O.A. had a conversation with a woman who had been separated from her granddaughter.  The woman gave O.A. the telephone number of a social worker at a shelter in New York where immigration authorities had taken her granddaughter.  O.A. gave the number to her brother, who was living in Florida, and asked him to contact the social worker, in hopes that the social worker might be able to locate L.A.  O.A.'s brother contacted the social worker, who was able to locate L.A. at Cayuga.

260.   Weeks after immigration authorities forcibly separated them, O.A. and L.A. were finally able to speak to each other on the telephone.  L.A. cried and said she did not want to be there.  She asked her mother where she was, too young to understand that she was thousands of miles away.

261.   From the time that immigration authorities forcibly separated O.A. and L.A. until the time of their first telephone call weeks later, no immigration officer provided O.A. with any information about her daughter's whereabouts or well-being, or assisted her in locating L.A.

262.   Instead, O.A., from her detention center in Nevada, located L.A. based on information from another detained woman and the help of her brother in Florida and a social worker in New York.

263.   A social worker at Cayuga informed O.A. that if the government deported O.A., L.A. might remain at Cayuga.  Frightened at the idea of L.A. being left alone in a shelter, O.A. arranged to have her brother apply to ORR for permission to sponsor L.A. and bring her to live with him in Florida.

264.   In late June 2018, an asylum officer conducted an initial screening of O.A's asylum claim by conducting a credible fear interview in English through an interpreter.  The interview ended before O.A. finished explaining her claim.  The asylum officer then determined that O.A. did not establish a credible fear of persecution in Guatemala.

265.   In early July, immigration authorities released L.A. to O.A.'s brother, who brought L.A. to live with him in Florida.

266.   In mid-July 2018, an immigration judge, limited to the record before the asylum officer, sustained the asylum officer's determination that O.A. had not established a credible fear of persecution, therefore subjecting O.A. to expedited removal.

267.    One night in mid-August, immigration officers woke O.A. in her cell and instructed her to pack her belongings.  The officers informed her that she was being transferred to Arizona for immediate deportation.

268.    The officers shackled O.A.s' hands and ankles and put her on a bus with other detained individuals.

269.    O.A. was initially brought to a facility in Las Vegas, Nevada.  There, she pleaded with a male officer not to deport her because her daughter was still in the country.  The officer responded by scolding O.A. for bringing her daughter to the United States.

270.    An officer handed O.A. documents with her picture attached and asked if it was her.  After O.A. said yes, the officer told her to sign the documents.  An officer removed O.A.'s handcuffs so that she could sign the documents, but O.A. refused because she did not know what the documents said, as they were written in English.

271.    A female officer, armed with a taser, pushed O.A., still shackled at the ankles, against a wall and threatened to tase her if she did not sign.

272.    Not wanting to sign a document she could not read, O.A. drew a line above the signature line instead of her signature.  Officers then put O.A. on a bus to the airport where she was escorted onto a flight to Arizona.

273.    When O.A. arrived in Arizona, immigration officers transported her to the Eloy Detention Center and then, shortly after, to the Florence Correctional Center.

274.   At the Florence Correctional Center, officers brought O.A. and other detained individuals to a trailer and told them they would spend the night there before being deported in the morning.  Again, O.A. pleaded with the officers not to deport her without L.A.

275.   After O.A.'s persistent pleas, one of the immigration officers finally allowed her to call her brother in Florida.   O.A.'s brother contacted O.A.'s immigration attorney, who promptly sought  a stay of O.A.'s removal in court.

276.   The court temporarily stayed O.A.'s deportation.

277.   In late August or early September, O.A. was transferred back to the Eloy Detention Center in Arizona.  She stayed there for approximately one week before she was transferred to the Henderson Detention Center in Henderson, Nevada.

278.   In addition to housing individuals on behalf of ICE, Henderson also houses individuals charged with criminal offenses.

279.   O.A. was terrified and treated harshly at Henderson.  At one meal, an inmate pushed her causing her to drop her tray.  A prison guard told O.A. that she would be tased if she dropped her tray again.

280.   At Henderson, after a visit from her immigration attorney, a jail guard strip-searched O.A., ordering her to remove all her clothing—including her underwear—bend over, and cough.  O.A. was humiliated.

## 2.    L.A.'s Separation From Her Mother

281.   While her mother was suffering traumatic experiences in a variety of detention centers, L.A. experienced her own trauma on the other side of the country.

After immigration officers forcibly separated L.A. from her mother on or about May 12, 2018, government employees took five-year-old L.A. to Cayuga in New York.

282.   L.A. arrived at Cayuga after midnight on May 15, 2018.  Cayuga staff started their intake interview of L.A. at approximately 2:30 a.m.  L.A. was crying and asked for her mother.  No one at Cayuga told her where her mother was or when she would see her again.

283.   During her time at Cayuga, L.A. became extremely ill.  On or about June 13, 2018, L.A. was sent to an onsite medical clinic because she had a rash on her face, a bloody nose and a cough.  The notes from the visit indicate that L.A. "continues to express discomfort and is not adjusting well to the program."  The staff also noted that L.A. "misses her mother and wants to be with her."  Staff also recorded that it "attempted to help [L.A.] contain her emotions, but minor is not coping well," and that L.A. did not appear "stable and engaged when discussing all the questions asked, because she is in distress and cries for her mother."  Observations by Cayuga staff also included references to L.A. crying often.

284.   On June 15, 2018, L.A. told Cayuga staff that she was still feeling pain and discomfort.  Cayuga staff escorted L.A. back to the medical clinic.  Records reflect that Cayuga staff noted the same observations from her June 13, 2018 visit to the clinic, namely that L.A. did not appear "stable and engaged," that she cried often for her mother, and was in a state of distress.  During her June 15, 2018 visit to the clinic, L.A. was prescribed antibiotics.

285.   On or about June 18, 2018, Cayuga staff noted that L.A. had not been given the antibiotics prescribed to her on June 15, 2018.  Cayuga staff again brought L.A. to the clinic because staff "observed minor bleeding through her nose, pus coming out of her ear, and crying."   On June 18, 2018, L.A. finally was given ibuprofen, Amoxicillin and other antibiotics.  This was five days after the clinic first became aware of her symptoms.

286.   On or about June 26, 2018, an insect bit L.A.  L.A. did not receive proper treatment and an infection developed on her arm, requiring her to be taken to an urgent care facility.

### 3.     L.A. and O.A.'s Reunification

287.   On or about September 13, 2018, DHS transferred O.A. to Dilley.

288.   The same day O.A. arrived at Dilley, O.A.'s brother brought L.A. to be with her.  Four months and one day after the government forcibly separated them, O.A. and L.A. were finally reunited and able to hug each other.

289.   When L.A. entered the room, she turned to an officer and said, "please don't take my mommy away."

290.   In October 2018, immigration authorities agreed to re-screen O.A.'s asylum claim.  After having the opportunity to tell her entire story, the asylum officer determined that O.A. had established a credible fear of persecution.

291.   DHS released O.A. and L.A. from Dilley on or about November 15, 2018, after more than two months there, and more than six months after they arrived in the United States.

#### 4.   O.A.'s and L.A.'s Harms and Losses

292.   As a result of the government's actions described above, O.A. suffered, and continues to suffer, severe emotional distress.

293.   The terrifying circumstances of the forced separation, not knowing L.A.'s whereabouts or about her well-being for weeks, the very limited communication with her daughter, and the four-month separation—during which she narrowly escaped being deported without L.A.—have tormented O.A.

294.   O.A. was so consumed with worry while she was detained that she was frequently unable to sleep and suffered nightmares when she did.

295.   While detained, O.A.'s appetite diminished, and she lost weight.

296.   O.A. also suffered from chronic headaches, experienced dizzy spells, and started losing her hair during her detention.

297.   O.A. received occasional physical check-ups from detention center medical staff; however, on at least two occasions she filled out paperwork to see a doctor about her symptoms, and no one at the detention center ever answered those requests.

298.   L.A. also has experienced severe emotional distress, fear, and mental anguish as a result of being forcibly separated from her mother for over four months.

299.   During the approximately two months that she was separated from her mother while detained at Cayuga, L.A. received no information about her mother. L.A. had no idea what would happen to her or her mother.

300.   L.A. also received inadequate medical care while detained at Cayuga, which exacerbated her already distressed state.

301.   L.A. has continued to suffer severe emotional distress since her release from detention.

302.   L.A. experiences nightmares.  O.A. is often woken by her daughter in the middle of the night, still asleep and sweating, screaming, "mama, mama."

303.   On occasion, L.A. will say to her mother, unprompted, "don't let them take me away again."

F.     V.C. and G.A.

1.     The Two-And-A-Half Month Separation of V.C. and G.A.

304.   On or around May 8, 2018, V.C. entered the United States with her then six-year-old son, G.A., after fleeing horrific violence and threats of violence in Guatemala.

305.   When V.C. and G.A. crossed the border from Mexico into Arizona, immigration officials apprehended them and brought them to one of the short-term detention facilities, an *hielera*, in Florence, Arizona.

306.   Shortly after V.C. and G.A. arrived at the *hielera*, immigration officers told V.C. that because she did not enter through an official port of entry, the U.S. government would detain her for years, take G.A. away from her, and send him to a shelter.

307.   The immigration officers put V.C. in a cell with other women, and put G.A. in a different cell with other young children.

308.   V.C. was terrified.  She could not see or hear G.A. from her cell.

309.   At night, the immigration officers brought the parents to the children's cell.

310.   V.C. and G.A. spent two days and nights like this—apart during the day and together only at night.

311.   During those two nights, V.C. tried to explain to G.A. that immigration officers would take him to a shelter for a while, and that she would see him again soon.  G.A. cried hearing the news.

312.   On their second morning in the *hielera*, on or around May 10, an immigration officer told V.C. and the other mothers to get up because they were sending their children to a shelter that day.

313.   V.C. witnessed immigration officers take groups of approximately 10 parents and 10 children to another room.

314.   When an immigration officer called their names, V.C. and G.A. joined a small group of other mothers, fathers, and children.  The immigration officer took them to a room with a shower and told the parents to line up to bathe their children.

315.   V.C. witnessed parents and children crying as they waited in line to use the shower.

316.   The immigration officer said laughingly: "Don't cry today, today is a happy day.  It's Mother's Day."

317.   V.C. knew the officer was taunting the parents about taking their children away.  V.C. was upset and traumatized by the officer's mockery.

318.   After bathing G.A., V.C. dressed him and waited for the other parents to do the same.

319.   The immigration officer then led the parents and children back to the children's cell, where he told the parents to say good-bye.

320.   The officer called the children's names one by one and told them to line up against the wall of the cell.

321.   Officers told the parents to remain in a line against the other wall.  V.C. and G.A. clung to each other and cried.

322.   V.C. watched as an officer forcibly ripped a child from his mother's arms.

323.   V.C. tried to comfort G.A., but she was sobbing so much she could barely speak.

324.   A woman who identified herself as a social worker told V.C. not to worry, that her son was going to a shelter in New York, and that she should get a lawyer and fight her case in order to stay in the country with her son.

325.   The social worker's comments provided little comfort to V.C.  She could not afford a lawyer and had no idea how long it would be before she saw G.A. again.

326.   G.A. did not want to leave his mother.  The immigration officer called his name, and, sobbing, G.A. got into line with the other children.

327.    Without any words of comfort and without the slightest show of compassion, the immigration officer led G.A. and the other children out of the room and closed the door.

328.    After taking their children, the immigration officer did not give V.C. and the other parents any information about where their children were going or when the parents would speak to their children again.

329.    Instead, the immigration officer took the parents back to the holding cells as if nothing had happened.

330.    V.C. remained in the holding cell with nearly 80 other women for approximately four more days. The cell was over-crowded.  It had no beds, and the women slept on the floor with only sheets of aluminum for warmth.  There was only one toilet and one sink for all of the women.

331.    On or around May 14, four days after the government took away V.C.'s son, immigration officers put V.C. and the other women in handcuffs and shackles and took them on a bus to the Santa Cruz County Jail.

332.    Upon arrival at the jail, officers forced V.C. and the other women to strip naked and submit to a search.  While V.C. was naked, a female officer at the center told V.C. to bend over and cough three times.  V.C. did as she was told, but felt distraught and humiliated.

333.    Approximately four days later, immigration officers again put V.C. and the other women in shackles and made them board another bus.

334.    The officers told the women that they were going to an airport to be deported.  Everyone began crying.  V.C. was terrified that she was being sent back to Guatemala without G.A.

335.    When the women protested, an officer said callously, "So, why did you come into this country?"

336.    At the airport, V.C. and the other women, still in shackles, boarded the plane, along with the immigration officers.

337.    During the flight, a woman on the plane who may have worked for the airline, told the women not to cry, that the plane was going to Las Vegas, not Guatemala.  She told the women that she understood their fear because she was a mother herself.

338.    While V.C. wanted to believe the woman, she thought she was just trying to make them feel better.  It was not until the plane was landing and she saw a sign on the ground with the words "Las Vegas" that V.C. realized they were still in the United States.

339.    In Las Vegas, the immigration officers loaded V.C. and the other women, still in handcuffs and shackles, onto another bus and took them to the Nevada Southern Detention Center.

340.    When V.C. arrived there, immigration officers told her and the other women that they would go before a judge and that if they won their cases, they could remain in the United States, but if they lost, they would be deported.

341.   On or about June 5, immigration officers took V.C. to a room in the detention center where she spoke to a judge via videoconference.  V.C. begged the judge not to deport her without her son.  Nevertheless, the judge told her that he was ordering her deportation.

342.   When V.C. returned to her cell, she received a paper in English from an immigration officer.  A woman in the cell who spoke English told V.C. that it was her deportation order.  V.C. was certain that the U.S. government would send her back to Guatemala without G.A., and that she would never see her son again.

343.   Approximately a week after V.C.'s immigration hearing, a member of the Guatemalan consulate contacted her and told her that she was scheduled to board a plane back to Guatemala that afternoon.  When V.C. asked about her son, the Guatemalan official told her that it might take as long as six months for the U.S. government to locate G.A. and send him back to Guatemala.

344.   The consular official told V.C. that if she stayed in the United States, she would have to spend six more months in jail.  Because V.C. was so fearful of being deported without G.A., she readily agreed to stay in detention for six months.

345.   The consular official, however, replied that V.C. did not have a choice and she would be deported that day.  V.C. was terrified.

346.   For reasons unknown to V.C., she was not deported as planned, and she remained in the detention center for a total of approximately two months.

347.   While in detention, V.C. cried every day.  She barely ate or slept.  She had headaches and toothaches.  During this time, other mothers detained with V.C.

were deported without their children.  V.C. was constantly terrified that she would be deported without her son.

348.   During her two months in Nevada, V.C. repeatedly asked for information about G.A.  A caseworker in the detention center spoke Spanish, and she helped V.C. and other women draft a petition asking the immigration officers to let them speak to their children.   The petition, which the women presented to immigration officers at the detention center, had no impact.

349.   G.A. turned seven while V.C. was in Nevada.  He spent his seventh birthday separated from his mother.

350.   On G.A.'s birthday, V.C. was beside herself.  She spent the day crying at the thought that her little boy was somewhere turning seven, all by himself.

351.   By early July, V.C. had been separated from G.A. for almost two months.  She had not spoken to G.A., and she had no idea where he was.  Finally, on July 6, an immigration officer called V.C.'s name and took her to a telephone to speak to G.A.

352.   As soon as G.A. heard his mother's voice, he started to cry.  He cried throughout the phone call, which lasted about ten minutes.

353.   During the call, V.C. also spoke to the social worker at Cayuga, the facility in New York where immigration authorities had transferred G.A.   V.C. understood from the social worker that G.A. was not eating and would not get out of bed, and that he spent all his time crying.  This report from the social worker made V.C. more distressed.

354.   About a week later, immigration officers allowed V.C. to call G.A. a second time.  Again, G.A. cried for the duration of the call.

### 2.   G.A.'s Separation From His Mother

355.   After immigration officials forcibly separated G.A. from his mother, G.A. was put on an airplane for the first time in his life and flown to New York, thousands of miles away from his mother.

356.   G.A. spent two and a half months in ORR custody.  Immigration authorities  placed G.A. at Cayuga.

357.   ORR staff sent G.A to stay with a foster family on weekends, even though his mother was in the United States and desperately asking to be reunited with him.

358.   G.A. waited almost two months before he was permitted to speak to his mother.  He cried when he heard her voice on the phone.

### 3.   V.C. and G.A.'s Reunification

359.   The government was forced to reunite V.C. and G.A. after Judge Sabraw issued the injunction in *Ms. L.* on June 26, 2018.  To that end, on or around July 18, immigration officers took V.C. from the detention center in Nevada and sent her to Port Isabel in Texas.  Again, the immigration officers handcuffed and shackled V.C. during the transfer.  In Port Isabel, immigration officers told V.C. that she would be reunited with her son.

360.   Finally, a week later, on or around July 25, after two and half months of separation from his mother, G.A. arrived in Port Isabel.

361.    V.C. and G.A. were so relieved to be reunited that they both cried.

362.    Immigration officers then transferred V.C. and G.A. to Dilley.

363.    During the time that the government detained V.C. and G.A. at Dilley, an asylum officer interviewed G.A. and determined that G.A. had a credible fear of persecution in Guatemala.  This threshold finding allowed G.A. to pursue his asylum claim before an immigration court.

364.    Following the credible fear interview, DHS finally released V.C. and G.A. at the end of November 2018, after four months in Dilley and more than six months in detention.

4.    **V.C. and G.A.'s Harms and Losse**s

365.    V.C. suffered severe emotional distress as a result of the forcible separation from her son by the government, and she continues to experience symptoms of distress to this day.

366.    Immigration officers failed to provide V.C. with information regarding her son's well-being or whereabouts for months, which increased her acute anxiety and distress.

367.    V.C. worried about her child constantly.

368.    V.C. cried all the time.

369.    V.C. was so overwhelmed by feelings of loss, despair, fear, and grief that she was unable to sleep, had no appetite, and suffered from chronic headaches.

370.    V.C. even lost her ability to recall words and speak normally, which increased her feelings of helplessness.

71

371.    During her time at Dilley, V.C. continued to experience headaches and wanted to sleep all day.  She did not have energy to do anything else.

372.    V.C.'s emotional distress was, and is, all the more severe because the separation inflicted long-term harm on her son, and on V.C. and G.A.'s relationship.

373.    During their time at Dilley, G.A. told V.C. on several occasions that she was not his mother anymore because V.C. allowed G.A. to be taken away from her.

374.    V.C. was heartbroken when she heard this; she did not believe that she would ever be happy again, or that her son would ever again feel safe.

375.    Medical personnel at Dilley examined V.C. and prescribed medication. No one provided V.C. with the name of the medication.

376.    Eventually, the medication helped lessen the severity of V.C.'s headaches and lack of energy; however, she still suffers from headaches caused by the stress she experienced in immigration detention.

377.    A clinical social worker conducted a psychological evaluation of V.C. at Dilley and confirmed that V.C. suffered trauma as a result of the separation from G.A., as well as from the accompanying misinformation and lack of information concerning G.A.'s safety, well-being, and whereabouts after the immigration officers took G.A. from her.

378.    The clinical social worker further concluded that V.C. exhibited symptoms consistent with PTSD.

379.    Medical personnel at Dilley also examined G.A. because he appeared angry and easily frustrated.

380.   The medical personnel told V.C. that G.A. was acting out because he was traumatized by their separation.

381.   Prescription medications eventually made G.A. calmer.   No one informed V.C. what medication G.A. was prescribed.

382.   V.C. continues to be concerned about G.A.'s well-being and worries that her relationship with her son may never recover.

383.   Since being reunited, G.A. has continued to experience severe emotional distress resulting from the separation.

384.   G.A. becomes angry more easily and frequently than before immigration officers took him away from his mother, and he continues to blame V.C. for the separation.

385.   For several months after V.C. and G.A. were released from detention, G.A. never wanted to be apart from his mother, especially when he went to school. During those months, he was constantly nervous, and he cried whenever V.C. took him to school.

386.   V.C. believes that her son lives in fear of someone taking him away again.

## COUNT I
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

387.   By engaging in the acts described in this Complaint, the federal officers and officials referenced above engaged in extreme and outrageous conduct with an

intent to cause, or a reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress.

388.    As a direct and proximate result of that conduct, Plaintiffs suffered severe emotional distress.

389.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for intentional infliction of emotional distress.

## COUNT II
## NEGLIGENCE

390.    The federal officers referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.

391.    By engaging in the acts alleged herein, the federal officers referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiffs.

392.    As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages.

393.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for negligence.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request:

A.      Compensatory damages;

B.      Attorneys' fees and costs pursuant to, among other provisions, the Equal Access to Justice Act, 28 U.S.C. § 2412; and

74

1

      C.      Such other and further relief as the Court deems just and appropriate.

2

      RESPECTFULLY SUBMITTED this 19th day of September, 2019.

3

/s/ *David B. Rosenbaum*

4

David B. Rosenbaum
OSBORN MALEDON, P.A.

5

2929 North Central Avenue,
21st Floor

6

Phoenix, Arizona 85012-2793

7

R. Stanton Jones*
Daniel Jacobson*

8

Emily Reeder*

9

Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, NW

10

Washington, DC 20001
202-942-5000

11

stanton.jones@arnoldporter.com

12

daniel.jacobson@arnoldporter.com
emily.reeder@arnoldporter.com

13

14

Lucy McMillan*
Diana Reiter*

15

Erik Walsh*
Tanya Kalivas*

16

Kaitlyn Schaeffer*

17

Arnold & Porter Kaye Scholer LLP
250 West 55th Street | New York,

18

New York 10019-9710
212-836-8000

19

lucy.mcmillan@arnoldporter.com

20

diana.reiter@arnoldporter.com
erik.walsh@arnoldporter.com

21

tanya.kalivas@arnoldporter.com
kaitlyn.schaeffer@arnoldporter.com

22

23

24

25

26

27

* *Pro hac vice application forthcoming*

28

Jonathan H. Feinberg*
Kairys, Rudovsky, Messing, Feinberg
  & Lin LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
215-925-4400
jfeinberg@krlawphila.com

Mark Fleming*
Katherine Melloy Goettel*
National Immigrant Justice Center
224 S. Michigan Ave., Suite 600
Chicago, IL 60604
312-660-1370
mfleming@heartlandalliance.org
kgoettel@heartlandalliance.org

Trina Realmuto*
Emma Winger*
American Immigration Council
1318 Beacon Street, Suite 18
Brookline, MA 02446
857-305-3600
trealmuto@immcouncil.org
ewinger@immcouncil.org

Mary Kenney*
Claudia Valenzuela*
American Immigration Council
1331 G Street NW, Suite 200
Washington, DC 20005
202-507-7512
202-742-5619
mkenney@immcouncil.org
cvalenzuela@immcouncil.org

*Attorneys for Plaintiffs*