David B. Rosenbaum, 009819
Emma J. Cone Roddy, 034285
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
(602) 640-0900
drosenbaum@omlaw.com
econe-roddy@omlaw.com

*Counsel for C.M. Plaintiffs*

[*Additional Counsel for Plaintiffs Listed on Signature Page*]

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| C.M., on her own behalf and on behalf of her minor child, B.M., et al., <br><br> Plaintiffs, <br><br> v. <br><br> United States of America, <br><br> Defendant. | No. CV-19-05217-PHX-SRB <br><br> **REPLY IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF RELEVANT DOCUMENTS** <br><br> **(Oral Argument Requested)** |
| A.P.F. on his own behalf and on behalf of his minor child, O.B., et al., <br><br> Plaintiffs, <br><br> v. <br><br> United States of America, <br><br> Defendant. | No. CV-20-00065-PHX-SRB |

Plaintiffs submit this reply in response to the government's opposition, *C.M.* ECF No. 97; *A.P.F.* ECF No. 94 ("Opp'n"), and in support of Plaintiffs' motion to compel relevant documents that the U.S. Department of Justice ("DOJ") Office of Inspector General ("OIG") relied upon during its review of DOJ's role in the separation of immigrant families at the Southwest border in 2017 and 2018, and in preparing its report ("OIG Report"), *C.M.* ECF No. 92; *A.P.F.* ECF No. 89 ( "Mot.").

Production should be compelled because (1) the documents sought relate to the government's awareness and intent in directing the separation of families and the resulting harm to families, which are highly relevant to Plaintiffs' claims and the government's asserted defenses, and (2) the government's concerns about proportionality and burden—which result from the government's failure to identify key DOJ custodians under the Mandatory Initial Discovery Pilot ("MIDP") program—will be alleviated by Plaintiffs' further proposed narrowing of their Request for Production of Documents ("Request"), as set forth in Section III, *infra*..

**ARGUMENT**

The government opposes Plaintiffs' Request as "not proportional to the needs of the case," Opp'n at 4, and raises three primary arguments: (1) that the documents sought are only "marginally relevant," *see id.* at 5, 6–12; (2) that "broad discovery" of DOJ has already taken place, *see id.* at 12–15; and (3) that identifying and producing certain categories of documents that Plaintiffs seek would be too burdensome, *see id.* at 5–6. All of these arguments lack merit. As explained below, the limited documents Plaintiffs seek are highly relevant to understanding the government's intent and negligence in separating Plaintiffs and causing them egregious harm. Further, Plaintiffs are seeking additional discovery of DOJ because the government failed to identify highly relevant DOJ custodians during the MIDP process. Moreover, in response to the government's declaration detailing, for the first time, the volume and organization of documents collected in connection with the OIG review, Plaintiffs will streamline their Request

further as outlined in Section III, *infra*. The revised Request will sufficiently reduce the burden on the government.

## I. The Documents Sought Are Relevant and Important to Resolve the Issues.

The government's opposition is based on two incorrect premises: (1) that Plaintiffs' Request "broadly seeks discovery of documents relating in any way to the former Attorney General's decision to adopt the Zero Tolerance Policy," Opp'n at 6; and (2) the Zero Tolerance policy "is, at best, marginally relevant to this case," *id.* at 5. In fact, Plaintiffs' current Request seeks only certain limited categories of documents that relate to DOJ's understanding of and involvement in the separations that occurred under the government's family separation pilot program in 2017, and the government's widescale family separation policy implemented along the Southwest border in May and June 2018. Even though Plaintiffs are not challenging the Zero Tolerance Policy itself, the government's separation of families is clearly related to the Zero Tolerance Policy. Notably, the *government* has relied on the Zero Tolerance Policy as a defense to Plaintiffs' claims. *See, e.g.,* Def.'s Mot. to Dismiss at 8–9, *C.M.* ECF No. 18.

### A. Plaintiffs Request Only Certain, Limited Zero Tolerance Policy-Related Documents That Are Relevant to Plaintiffs' Claims

The OIG Report's findings concern—and trace a clear connection between—the government's family separation pilot program in 2017; DOJ's efforts, starting in late 2017, to urge DHS to change its prosecution referral policies; the April 2018 announcement and implementation of DOJ's Zero Tolerance Policy; DHS' May 4, 2018 decision to begin referring family unit adults for prosecution at DOJ's request; and the significant increase in family separations on the Southwest border that followed in May and June 2018. The OIG Report also discusses DOJ's coordination with other federal agencies, particularly DHS, related to family separation. Such findings are highly relevant to the government's intent and negligence in causing egregious harm to Plaintiffs, and Plaintiffs seek only the documents supporting such findings.

2

For example, the OIG Report details the family separation "pilot program" in the El Paso Sector from approximately March to November 2017, under which U.S. Customs and Border Patrol significantly increased the number of adults in family units apprehended for improper entry who were referred to the U.S. Attorneys' Offices ("USAOs") for the Western District of Texas and the District of New Mexico for criminal prosecution. *See* Mot. Ex. 4, OIG Report at 13–17, *C.M.* ECF No. 92-4, *A.P.F.* ECF No. 89-1.  The Report explains that numerous stakeholders, including prosecutors, public defenders, federal court judges, and ultimately senior officials within the U.S. Department of Health and Human Services ("HHS") were aware of the harms of family separation and put government officials on notice about their concerns with the initiative, including a concern about reports of government officers "taking breast feeding defendant moms away from their infants," and the inability to track separated parents and children. *Id.* at 15–17.

The OIG Report also explains that, despite being put on notice of serious concerns about the El Paso initiative, DOJ continued to push for increased prosecutions of adults in family units, with the goal of deterring future migrants.  For example, the report includes an excerpt of a December 16, 2017 document titled "Policy Options to Respond to Border Surge of Illegal Immigration," that the then-DHS Chief of Staff sent to then-Counselor to the Attorney General, Gene Hamilton, at Hamilton's request.  The first proposed policy option outlined a plan similar to what ultimately occurred in 2018, and clearly states that the goal of such a policy was to deter other migrants:

> **Increase Prosecution of Family Unit Parents**:  Instruct [CBP] and [ICE] to work with DOJ to significantly increase the prosecution of family unit parents when they are encountered at the border.  The parents would be prosecuted . . . and the minors present would be placed in HHS custody as UACs. . . . This would require close coordination with DOJ, to ensure there are sufficient prosecutors at the border and sufficient U.S. Marshal's detention space.  Because of the large number of violators, not all parents could be criminally prosecuted.  However, the increase in prosecutions would be reported by the media and *it would have substantial deterrent effect.*

*Id.* at 11 (emphasis added).

Consistent with the December 2017 "Policy Options" memorandum, the OIG Report found that top DOJ and DHS officials knew that not all migrants whom DHS apprehended after crossing the border unlawfully could or would be prosecuted, and that these officials caused families to be separated even when no criminal charges were brought, as was the case with Plaintiffs. Mot. Ex. 4, OIG Report at 27–29, *C.M.* ECF No. 92-4, *A.P.F.* ECF No. 89-1. Such information is relevant and supports Plaintiffs' claims that the government's prosecution policy was pretextual and that the government's true goal was to inflict harm through family separation. *See C.M.* Compl. ¶ 34, ECF No. 1; *A.P.F.* Am. Compl. ¶ 67, ECF No. 34. The statistical and resource reports Plaintiffs now seek will likely shed further light on this issue.

The OIG Report ultimately concludes that DOJ was a "driving force" behind DHS's May 4, 2018 decision to refer family unit adults for prosecution, evidenced by DOJ's "urging and support for this change to DHS policy between December 2017 and May 2018," including through regular calls between the Attorney General and the DHS Secretary. Mot. Ex. 4, OIG Report at 33, 27–34, *C.M.* ECF No. 92-4, *A.P.F.* ECF No. 89-1. Indeed, the DHS OIG characterized DHS's policy decision memorandum as "DHS's implementation of the zero tolerance policy." *Id.* at 32 (citing U.S. Dep't of Homeland Security, Office of Inspector Gen., *DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families* at 18 (Nov. 25, 2019)). These findings underscore the extent to which DOJ's Zero Tolerance Policy was related to DHS's decision to refer adult members of family units for prosecution and the separation of families at the Southwest border in 2017 and 2018. The categories of documents Plaintiffs now seek, such as the written submissions of Gene Hamilton and handwritten notes of relevant meetings, are relevant because they will shed further light on the government's motivation for separating families and willingness to inflict emotional distress on detainees to support the goal of deterrence.

The government argues that because Plaintiffs do not "claim" that the Zero Tolerance Policy is the reason for their separations, Plaintiffs are not entitled to

4

discovery concerning the Zero Tolerance Policy that squarely relates to the government's decision to separate families. Opp'n at 3. In doing so, the government asserts that Plaintiffs "conflate[]" two "separate" policies: DOJ's April 6, 2018 decision to adopt the Zero Tolerance Policy and DHS's May 4, 2018 decision to refer all violations of 8 U.S.C. § 1325 to the U.S. Attorneys' Offices for prosecution, including family unit adults. *Id.* at 11. This argument should be rejected.

First, Plaintiffs are entitled to discovery on the reasons the government separated Plaintiffs, including on the extent to which the Zero Tolerance Policy was, as alleged, pretext for separating families in order to traumatize Plaintiffs to deter other migrants from seeking asylum. *See, e.g.*, *C.M.* Compl. ¶ 34, ECF No. 1; *A.P.F.* Am Compl. ¶ 67, ECF No. 34. Second, the government's assertion that there were "two separate policy decisions made by two separate federal agencies," Opp'n at 6, is flatly contradicted by former Deputy Attorney General Rod Rosenstein's statements to the OIG. Rosenstein stated that the coordination between DOJ and DHS during the implementation of the Zero Tolerance Policy (including family separation) was "tremendous," that "it's unlikely that ever in American history there has been more coordination about enforcement," and that "the level of coordination, of the communication, was really significant." Mot. Ex. 4, OIG Report at 52, *C.M.* ECF No. 92-4, *A.P.F.* ECF No. 89-1. This admission alone entitles Plaintiffs to discovery to determine the connection between the two policies.

Similarly, the government's suggestion that Plaintiffs are "shifting positions" and challenging the Zero Tolerance Policy is unpersuasive. *See* Opp'n at 10. Plaintiffs challenge the government's intentional (or reckless) infliction of emotional distress by separating families and its negligence in carrying out family separations. *C.M.* Compl. ¶¶ 387–393, ECF No. 1; *A.P.F.* Am. Compl. ¶¶ 527–548, ECF No. 34. Plaintiffs need not be "directly challenging" the Zero Tolerance Policy for documents and information related to the Zero Tolerance Policy to be highly relevant. As the OIG Report makes clear, DOJ's Zero Tolerance Policy is intertwined with the government's overarching

5

policy of separating families at the Southwest border in 2017 and 2018, and therefore is relevant. *See, e.g.*, *Ross v. UKI Ltd.*, 2004 WL 67221, at *7 (S.D.N.Y. Jan. 15, 2004) (explaining discovery "is certainly not limited . . . to information directly supporting or contradicting the ultimate question in a case, narrowly formulated" and compelling discovery regarding the "relationships among the various defendants").

      B.    <u>The Limited Zero Tolerance Policy-Related Documents That Plaintiffs Request are Relevant to the Government's Defenses</u>

Ironically, at earlier stages of these cases, it was the *government* that argued that the Zero Tolerance Policy was highly relevant to the parties' claims and defenses. *See, e.g.*, Def.'s Mot. to Dismiss at 8–9, *C.M.* ECF No. 18 ("Consistent with . . . the Attorney General's Zero Tolerance Memorandum, DHS referred for prosecution to [DOJ] adult aliens – including those traveling with children – who unlawfully entered the United States on the Southwest border in violation of § 1325 or other criminal immigration statutory provisions. Plaintiffs' alien minor children were transferred to ORR.") (citations omitted); Def.'s Mot. to Dismiss at 8–9, *A.P.F.* ECF No. 21 ("Consistent with . . . the Zero Tolerance Memorandum, DHS referred for prosecution adult aliens – including those traveling with children – who unlawfully entered the United States on the Southwest border in violation of § 1325 or other criminal immigration statutory provisions. Alien minor children of those adults were transferred to ORR custody as UACs.") (citations omitted); Def.'s Opp'n to Pls.' Mot. for Leave to File a 1st Am. Compl. at 5, *A.P.F.* ECF No. 30 ("Plaintiffs' claims arise out of the government's direction to adopt a 'zero tolerance' policy for criminal immigration offences for unlawful entry in the spring of 2018 and the government's consequent separation of families."). Given that the government's primary argument to dismiss these cases was that Plaintiffs were separated as an unfortunate consequence of the Zero Tolerance

Policy, the government cannot credibly claim the policy is irrelevant to this case. *See* Mot. at 10. The government's opposition tellingly fails to address this point.[1]

## II. The Government's MIDP Responses and Response to RFP No. 2 Are Inadequate for the Needs of the Case.

The government's claim that further discovery is unnecessary in light of its MIDP responses and its response to a separate Request for Production ("RFP No. 2") is baseless. Of note, the government does not claim that it actually produced documents responsive to Plaintiffs' revised narrowed Request pursuant to MIDP or RFP No. 2. Nonetheless, the government argues that producing documents in response to Plaintiffs' revised narrowed Request would be "additional burdensome discovery." Opp'n at 14–15. But the government fails to recognize *why* such additional discovery is required, or to acknowledge the obvious gaps in its productions to date. In short, any "additional burden" of which the government now complains is a problem of its own making.

As to the government's MIDP productions, the MIDP productions from DOJ custodians are inadequate. Pursuant to MIDP, the parties attempted to negotiate search terms and custodians in good faith. The government, however, failed to identify numerous key figures, such as Rod Rosenstein, former Chief of Staff to the Attorney General Matthew Whitaker, U.S. Attorneys John Bash, Elizabeth Strange, Richard Durbin, and many others within DOJ who (we now know) were highly involved in implementing the El Paso pilot program and the government's family separation policy.

---

[1] The government misleadingly quotes Plaintiffs' motion to suggest that Plaintiffs deemed the specific documents cited in the OIG Report as the "most relevant," and have conceded the documents sought with this Motion are of limited relevance. *See* Opp'n at 2, 3, 11, 14. Plaintiffs said no such thing. The government quotes Plaintiffs' statement that, during a meet and confer after the release of the OIG Report, Plaintiffs "offered to narrow their Request now that they could identify the specific documents *relied upon* or cited in the report that were most relevant to the claims and defenses in this action." Mot. at 4 (emphasis added), *C.M.* ECF No. 92; *A.P.F.* ECF No. 89. Plaintiffs' narrowed request of most relevant documents included one list with a selection of documents cited in the OIG report *and* a second list that identified a subset of materials described in Appendix 1 of the OIG Report. *Id*. The subject of this Motion is an even narrower subset of the materials included on that second list.

It was the government's obligation to identify these custodians and others who may have relevant information *before* the parties negotiated custodians and search terms.

The government failed to do so, and Plaintiffs only learned of the role of these individuals and others from public reporting and the OIG Report. Had the government conducted a diligent inquiry under MIDP and identified these individuals in the first place, presumably the relevant documents Plaintiffs now seek would have been identified as part of MIDP. Plaintiffs are not "going down every single path" of discovery, as the government contends. Opp'n at 4. The OIG documents produced thus far have proved to be highly relevant to Plaintiffs' claims, which strongly indicates that the additional documents Plaintiffs seek will be similarly relevant. That Plaintiffs now seek a separate source of documents outside of MIDP is a product of the government's failure to meet its MIDP obligations.[2]

That the government's MIDP searches and custodians included a number of other agencies and officials is inapposite. The government's agreement to search key officials at other agencies involved in the separation of families did not eliminate the government's obligation to perform a reasonable inquiry to identify the key DOJ documents and personnel relevant to the parties claims and defenses. The key question is whether the MIDP productions from *DOJ* were adequate—and they were not.[3]

---

[2] The government's opposition mischaracterizes Plaintiffs' position concerning MIDP, claiming "[i]t is unreasonable to expect the government to seek to obtain documents and other information from the OIG while the review was still active." Opp'n at 3–4, n.3. But Plaintiffs' point is not that, during MIDP, DOJ should have collected documents from the OIG investigation directly from the OIG. Rather, the documents collected by the OIG demonstrate that there is a significant number of relevant DOJ documents that the government did not collect directly from the Office of Attorney General, the Office of the Deputy Attorney General, the Executive Office of U.S. Attorneys, and the Southwest border USAOs, as it should have under MIDP.

[3] The government also contends that the government's "policy level" discovery exceeds what is necessary for this case, relying on an edited quotation from the Court's order granting *A.P.F.* Plaintiffs' motion to add plaintiffs. Opp'n at 13. As the full quotation makes clear, the Court was not addressing the scope of "policy level" discovery, but was rejecting the government's contention that two potential plaintiffs should not be joined because they entered the country at ports of entry, unlike other Plaintiffs apprehended between ports of entry. *See A.P.F.* ECF No. 33 at 4 ("Resolution of the legal issues in this case—whether the government intentionally inflicted

Similarly, the government's production in response to RFP No. 2—which Plaintiffs were also required to issue because the government failed to identify appropriate custodians during the MIDP process—is insufficient because it did not include documents from key DOJ officials involved in developing and implementing the family separation policy. The custodians whose documents were collected in response to RFP No. 2 were limited to individuals working in USAOs on the Southwest border; no custodians from DOJ headquarters were searched in connection with that request. *See* Ex. 7, Email from P. MacWilliams to T. Fulham et al. (Feb. 12, 2021), *C.M.* ECF No. 92-7, *A.P.F.* ECF No. 89-1 at 157. As such, the RFP No. 2 production fails to capture documents collected from DOJ headquarters officials who played key roles in the government's separation of families, such as Rosenstein and Whitaker.

### III. Plaintiffs Will Further Narrow Their Request to Reduce Potential Burden.

Despite receiving Plaintiffs' initial request for documents related to the OIG Report over five months ago in October 2020, the government's opposition provided Plaintiffs for the first time with information on the volume of data collected by the OIG for its review and the manner in which such data is organized. *See* Opp'n at 5.

In light of this new information, Plaintiffs are willing to further accommodate the government's concerns about burden and streamline their Request to the following categories of documents identified at Appendix 1 of the OIG Report (the "April 9 revised Request"): (1) written submissions of Gene Hamilton, Rod Rosenstein, and the ODAG in response to their review of the draft OIG report; (2) statistical and resource reports and assessments from the DOJ, DOJ components, and the CBP; (3) any handwritten notes provided to the OIG by DOJ and its components relating to the planning, implementation, and coordination of the Zero Tolerance Policy; and (4)

---

emotional distress, acted negligently, or caused the loss of a child's consortium—will not turn on M.C.L. and R.Z.G.'s entry point. Rather, it will turn on events occurring after M.C.L. and R.Z.G. entered the country—namely, the government's treatment of Plaintiffs and Proposed Plaintiffs at and after the time of separation.").

9

documents collected from Rod Rosenstein and Matthew Whitaker that fall within the categories of documents sought in Plaintiffs' revised narrowed Request.[4]

The April 9 revised Request sufficiently reduces the government's burden and addresses the clear gaps in the documents produced to date. And the limited document categories now sought should be easily identifiable. For example, given that the vast majority of the documents are either "organized by source" or included in a searchable Relativity database, identifying documents collected from Rosenstein and Whitaker should not be unduly burdensome. *See* Decl. of Aundrea Baker ¶¶ 5–7, *C.M.* ECF No. 97-1, *A.P.F.* ECF No. 94-1. Similarly, the three requested written submissions, which are "stored elsewhere," should be readily located. *See id.* ¶ 5.

### IV. Plaintiffs Are Entitled to a Privilege Log To the Extent Documents Are Withheld on the Basis of Privilege.

The government's opposition claims that Plaintiffs seek to create a "premature" dispute over privilege. Opp'n at 15–17. While the government now states that "it objects insofar as the information sought also contained privileged information," *id.* at 15, the government's discovery responses made no distinction between the bases on which the government refused to produce the requested documents. *See* Mot. Ex. 3, Def.'s Resps. to 1st Sets of Requests for Production at 5, *C.M.* ECF No. 92-3, *A.P.F.* ECF No. 89-1; Ex. 7, Email from P. MacWilliams to T. Fulham, et al. (Feb. 12, 2021), *C.M.* ECF No. 92-7, *A.P.F.* ECF No. 89-1. Instead, the government made improper blanket assertions of various privileges in response to the Request. *See DeSilva v. Allergan USA, Inc.*, No. 8-19-CV-01606-JLS, 2020 WL 5947827, at *2 (C.D. Cal. Sept. 1, 2020) ("[B]oilerplate objections or blanket refusals inserted into a response to a Rule 34 request for production of documents are insufficient to assert a privilege."). Plaintiffs thus challenged the government's conclusory references to various privileges as insufficient to justify the withholding of responsive materials. *See* Mot. at 12–14.

---

[4] The "revised narrowed Request" is defined in the Motion at pages 5-6.

1    Regardless, Plaintiffs have not asked the government to "sift through . . . a
2  massive volume of documents and prepare a privilege log for documents it does not
3  believe are even discoverable," as the government suggests. *See* Opp'n at 16. Plaintiffs
4  only request an order requiring that, to the extent that any documents responsive to this
5  Request are withheld or redacted on the basis of privilege, the government produce a
6  privilege log meeting the requirements of the parties' established Agreement Regarding
7  the Format for Production of Documents and Related Matters. *See* Mot. at 14. Such a
8  requirement is consistent with the Federal Rules and the Court's March 11, 2021 order.
9  *See* Mot. Ex. 8, Tr. of March 11, 2021 Discovery Hearing at 23, *C.M.* ECF No. 92-8;
10 *A.P.F.* ECF No. 89-1 (ordering production of documents cited in OIG Report and
11 requiring privilege log "for any that are not produced").[5]

## CONCLUSION

For the reasons discussed above, Plaintiffs request that the Court order Defendant to (1) produce the documents responsive to Plaintiffs' April 9 revised Request as set forth on pages 9–10, *supra*, and (2) provide a privilege log meeting the requirements of the parties' Agreement Regarding the Format for Production of Documents and Related Matters, to the extent that any documents responsive to this request are withheld or redacted on the basis of privilege.

Respectfully submitted this 9th day of April, 2021.

ARNOLD & PORTER KAYE SCHOLER LLP

By /s/ Diana Reiter

---

[5] In its opposition, the government identifies one type of document requested by Plaintiffs that it asserts may be privileged: the written submissions of DOJ officials in response to a draft OIG report. *See* Opp'n at 15–16. The single case cited to support this assertion of the deliberative process privilege concerns an action under the Freedom of Information Act ("FOIA") and is thus distinguishable. Moreover, as explained in Plaintiffs' Motion to Compel Discovery Withheld by the Government Based on Improper Privilege Assertions ("Privilege Motion"), the deliberative process privilege does not apply where, as here, the government's conduct and intent are at issue. *See* Privilege Motion at 3–5, *C.M.* ECF No. 93, *A.P.F.* ECF No. 90. Nor does the privilege apply to any factual information contained within these documents. *Id.* at 6. Finally, the government has not properly invoked the privilege because it has not been asserted by an agency head. *Id.* at 5 n.4.

|  |  |
|---|---|
|  | Diana Reiter*<br>Arnold & Porter Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019-9710<br>212-836-8000<br>diana.reiter@arnoldporter.com |
| David B. Rosenbaum, 009819<br>Emma J. Cone Roddy, 034285<br>Osborn Maledon, P.A.<br>2929 North Central Avenue, 21st Floor<br>Phoenix, Arizona 85012-2793<br><br>Erik Walsh*<br>Lucy McMillan*<br>Harry Fidler*<br>Mark Osmond*<br>Kaitlyn Schaeffer*<br>Arnold & Porter Kaye Scholer LLP<br>250 West 55th Street | New York, New York 10019-9710<br>212-836-8000<br>erik.walsh@arnoldporter.com<br>lucy.mcmillan@arnoldporter.com<br>harry.fidler@arnoldporter.com<br>mark.osmond@arnoldporter.com<br>kaitlyn.schaeffer@arnoldporter.com | Jonathan H. Feinberg*<br>Kairys, Rudovsky, Messing, Feinberg<br>  & Lin LLP<br>The Cast Iron Building<br>718 Arch Street, Suite 501 South<br>Philadelphia, PA 19106<br>215-925-4400<br>jfeinberg@krlawphila.com<br><br>Mark Fleming*<br>National Immigrant Justice Center<br>224 S. Michigan Ave., Suite 600<br>Chicago, IL 60604<br>312-660-1370<br>mfleming@heartlandalliance.org<br><br>Trina Realmuto*<br>Mary Kenney*<br>National Immigration Litigation Alliance<br>10 Griggs Terrace<br>Brookline, MA 02446<br>617-819-4447<br>trina@immigrationlitigation.org<br>mary@immigrationlitigation.org |
| R. Stanton Jones*<br>Emily Reeder*<br>Arnold & Porter Kaye Scholer LLP<br>601 Massachusetts Avenue, NW<br>Washington, DC 20001<br>202-942-5000<br>stanton.jones@arnoldporter.com<br>emily.reeder@arnoldporter.com | Katherine Melloy Goettel*<br>Emma Winger*<br>American Immigration Council<br>1331 G Street NW, Suite 200<br>Washington, DC 20005<br>202-507-7552<br>kgoettel@immcouncil.org<br>ewinger@immcouncil.org |

*Attorneys for CM Plaintiffs*

*Additional Counsel for Plaintiffs listed on following page.*

| | | |
|---|---|---|
| 1 | SOUTHERN POVERTY LAW CENTER | COVINGTON & BURLING LLP |
| 2 | Norma Ventura* | Matthew Schlesinger* |
|   | Gillian Gillers | Jason Carey* |
| 3 | James Knoepp* | Teresa Park* |
|   | P.O. Box 1287 | Terra White Fulham* |
| 4 | Decatur, GA 30031 | One CityCenter, 850 Tenth Street, NW |
|   | Telephone: (404) 521-6700 | Washington, DC 20001-4956 |
| 5 | norma.ventura@splcenter.org | Telephone: (202) 662-5581 |
| 6 | gillian.gillers@splcenter.org | mschlesinger@cov.com |
|   | jim.knoepp@splcenter.org | jcarey@cov.com |
| 7 | | tpark@cov.com |
|   | SOUTHERN POVERTY LAW | tfulham@cov.com |
| 8 | CENTER | COVINGTON & BURLING LLP |
|   | Paul R. Chavez* | Jessica R. Hanson* |
| 9 | P.O. Box 370037 | 1999 Avenue of the Stars, Suite 3500 |
|   | Miami, FL 33137 | Los Angeles, CA 90067-4643 |
| 10 | Telephone: (786) 347-2056 | Telephone: (424) 332-4800 |
| 11 | paul.chavez@splcenter.org | jhanson@cov.com |

*Attorneys for A.P.F. Plaintiffs*