BRIAN M. BOYNTON
Acting Assistant Attorney General
JAMES G. TOUHEY, JR.
Director, Torts Branch
PHILIP D. MACWILLIAMS
D.C. Bar No. 482883
Trial Attorney
IRINA M. MAJUMDAR
D.C. Bar No. 252757
Trial Attorney
E-mail: phil.macwilliams@usdoj.gov
U.S. Department of Justice
Civil Division, Torts Branch
Benjamin Franklin Station, P.O. Box 888
Washington, DC 20044
Telephone: (202) 616-4285
Facsimile: (202) 616-5200

Attorneys for the United States of America

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| C.M., on her own behalf and on behalf of her minor child, B.M.; L.G., on her own behalf and on behalf of her minor child, B.G.; M.R., on her own behalf and on behalf of her minor child, J.R.; O.A., on her own behalf and on behalf of her minor child, L.A.; and V.C., on her own behalf and on behalf of her minor child, G.A., <br><br> Plaintiffs, <br><br> v. <br><br> United States of America, <br><br> Defendant. | No. 2:19-CV-05217-SRB <br><br> **OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL (ECF 93)** |

## INTRODUCTION

President Biden has "condemn[ed] the human tragedy that occurred when our immigration laws were used to intentionally separate children from their parents or legal guardians . . ., including through the use of the Zero-Tolerance Policy" during the Trump Administration.  Exec. Order No. 14011, 86 Fed. Reg. 8273 (Feb. 2, 2021) at § 1.  This Court will have an opportunity in this case to address whether those policies caused tortious injury to the Plaintiffs here.  But that issue is separate from the validity of the privileges that have been asserted in response to the motion to compel.  Those privileges protect important institutional interests in the decisionmaking process and the ability of a wide range of government employees to provide candid advice.  At the same time, the United States recognizes the significance of this matter and has substantially narrowed its privilege claims here.  This Court should preserve those much more limited privilege claims addressed in this opposition.

On December 31, 2020 and January 15, 2021, the United States produced to Plaintiffs a total of 3,234 documents from Department of Justice ("Department" or "DOJ") custodians pursuant to this District's Mandatory Initial Discovery Pilot ("MIDP") program.  These documents were collected from former Attorney General Jefferson Sessions and four other DOJ custodians in the Office of the Attorney General ("OAG") or the Office of the Deputy Attorney General ("ODAG"), the two highest offices within the Department.  The Department claimed the attorney-client privilege, the work product privilege, and the deliberative process privilege over certain documents produced on December 31 and January 15.  Additionally, the White House claimed the presidential communications privilege over certain DOJ documents produced on January 15.

Following these document productions, Plaintiffs sent letters to the United States on January 29, 2021 and February 19, 2021, contending that both productions contained multiple deficiencies with respect to the government's assertions of privilege.  The parties held two meetings and conference over Plaintiffs' privilege challenges, but were unable to reach agreement.  On March 11, 2021, the parties appeared before this Court.  At the hearing, the Court granted Plaintiffs' request for leave to file a motion to compel with

respect to the government's assertions of privilege on documents in the December 31 and January 15 productions.  *See* Case No. 2:19-cv-05217, Docket. No. 89; Case No. 20-cv-00065, Docket. No. 85.  Plaintiffs' motion to compel was filed on March 19, 2021.  *See* Case No. 2:19-cv-05217, Docket. No. 93; Case No. 20-cv-00065, Docket. No. 89, 90.

The government has taken a fresh look at the privilege claims made on the December 31 and January 15 productions.  The government has now decided not to invoke privilege over a substantial number of documents and has narrowed redactions on other documents.  This includes claims of the presidential communications privilege and the deliberative process privilege.[1]  Attached to this Opposition is a declaration from a Department of Justice Associate Deputy Attorney General (ADAG) invoking the deliberative process privilege and a declaration from a Deputy Counsel to the President invoking the presidential communications privilege.

The deliberative process, presidential communications, attorney-client, and work product privileges on the documents produced on April 9, 2021 are properly asserted in this litigation.  Plaintiffs' motion to compel the production of documents redacted on the basis of these privileges should be denied.

## STANDARD OF REVIEW

"A party may move under Rule 37 of the Federal Rules of Civil Procedure for an order compelling disclosure or discovery."  *Ocean Garden Prod. Inc. v. Blessings Inc.*, 2020 WL 4284383, at *2 (D. Ariz. July 27, 2020).  The party seeking to compel discovery bears the burden of establishing that the material it seeks is relevant to its claims.  *See Stevens v. Corelogic, Inc.*, 899 F.3d 666, 677 (9th Cir. 2018).  Once relevancy has been established, the proponent of the privilege "has the burden of establishing the existence and applicability of each of the privileges asserted in all respects."  *United States v. Hardrives, Inc.*, 1991 WL 12008395, at *2 (D. Ariz. Feb. 4, 1991)*.

## ARGUMENT

I.       **The Department of Justice's Assertions of the Deliberative Process**

---

[1] Versions of these documents with the redactions removed or narrowed are being produced to Plaintiffs on April 9.

**Privilege are Proper**

The deliberative process privilege is a "long recognized" privilege, designed to "prevent injury to the quality of agency decisions." *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975).  The privilege protects "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).  "The privilege has a number of purposes: it serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).  *Accord Assembly of State of Cal. v. U.S. Dep't of Comm.*, 968 F.2d 916, 920 (9th Cir. 1992) (stating that the central purpose of the deliberative process privilege is to "allow agencies freely to explore possibilities, engage in internal debates, or play devil's advocate without fear or public scrutiny").  At its core, "[t]he privilege is rooted in 'the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news.'" *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, No. 19-547, 2021 WL 816352, at *4 (U.S. Mar. 4, 2021) (quoting *Klamath Water Users*, 532 U.S. at 8–9).

## A.  The Deliberative Process Privilege Applies in this Litigation

As a threshold matter, Plaintiffs assert that the deliberative process privilege is categorically unavailable in this litigation because "the government's intent, misconduct, and decisionmaking process are central to Plaintiffs' claims and the government's defense."  MTC at 3.  In support of this contention, Plaintiffs rely upon the D.C. Circuit's decision in *In re Subpoena Duces Tecum Served on Office of Comptroller of Currency*, 145 F.3d 1422, 1424 (D.C. Cir. 1998), *on reh'g in part*, 156 F.3d 1279 (D.C. Cir. 1998),

4

1    and its progeny.  These cases are not binding upon this Court, are inconsistent with

2    binding Ninth Circuit law, and should not be followed.  MTC at 3-5.

3          Although the D.C. Circuit and some others have held that the deliberative process

4    privilege is unavailable in suits challenging governmental intent, the Ninth Circuit has

5    analyzed the issue differently.  In *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019), the

6    plaintiffs challenged the Trump Administration's policy banning transgender individuals

7    from serving in the military.  The plaintiffs, pointing to *In re Subpoena*, argued in the

8    district court that the deliberative process privilege was unavailable because the policy was

9    created with discriminatory intent.  *Id*. at 1195.  Rather than conclude that the deliberative

10   process privilege was unavailable, the district court employed the Ninth Circuit's well-

11   established balancing test to determine whether the plaintiffs' need for the documents

12   could overcome the government's assertion of the privilege.  *Id*. at 1196.

13         On appeal, the Ninth Circuit concluded that the district court "correctly recognized"

14   that this Circuit applies a balancing test to the government's assertions of the deliberative

15   process privilege.  *Id*. at 1206.  Although the plaintiffs' claims centered on governmental

16   intent, the Ninth Circuit did not hold the deliberative process privilege was categorically

17   unavailable to the government; rather, the court of appeals conducted a full inquiry into

18   whether the plaintiffs were able to demonstrate that their professed need for the documents

19   overcame the privilege.  *Id*.  The Ninth Circuit's decision in *Karnoski* makes clear that the

20   deliberative process privilege is available in cases involving governmental intent in this

21   Circuit.  *Karnoski*, 926 F.3d at 1206.[2]  Accordingly, Plaintiffs' argument ignores

22   _____

          [2]  Plaintiffs cite two cases from district courts within the Ninth Circuit that state (with
23   citation to *In re Subpoena*) that the deliberative process privilege is unavailable in cases in which
     the agency's decisionmaking process is itself at issue.  *See* MTC at 4.  However, both of these
24   decisions were issued years before the Ninth Circuit's decision in *Karnoski*.  Notably, even prior
     to *Karnoski*, this District consistently considered governmental intent a *factor* in determining
25   whether a party has *overcome* the government's interest in non-disclosure, rather than it providing
     a threshold basis to preclude assertion of the privilege.  *See Arizona Dream Act Coal. v. Brewer*,
26   2014 WL 171923, at *3 (D. Ariz. Jan. 15, 2014) (applying balancing test to assess claims of
     deliberative process privilege in litigation concerning government's intent in issuing a
27   discriminatory driver's license policy).  *See also Elgamal v. Bernacke*, 2015 WL 12942086, at
     *1,3 (D. Ariz. Oct. 2, 2015) (applying balancing test to claims involving alleged government
28   "wrongdoing").

controlling case law and must be rejected.

**B.  The Deliberative Process Privilege has been Properly Invoked**

In order for the deliberative process privilege to apply, the government bears the initial burden of showing that the documents it seeks to withhold or redact are both predecisional and deliberative.  *See F.T.C. v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984).  A document is predecisional if it is "prepared in order to assist an agency decisionmaker in arriving at his decision and may include recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency."  *Assembly of the State of Cal.*, 968 F.2d at 920 (quoting *Formaldehyde Inst. v. Dep't of Health & Human Servs.*, 889 F.2d 1118, 1122 (D.C. Cir. 1989) (internal citations omitted)).  "A predecisional document is a part of the deliberative process, if the disclosure of the materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions."  *Id.*  (quoting *Formaldehyde Inst.*, 889 F.2d at 1122) (internal quotation marks omitted).

The documents with assertions of the deliberative process privilege should be considered in categories.  The documents over which the Department of Justice formally invokes the deliberative process privilege are encompassed within three broad categories: (1) drafts of agency reports and executive orders, as well as substantive e-mails relating thereto; (2) substantive predecisional meeting agendas and meeting summaries; and (3) e-mails and other documents which discuss decisions to be made in implementation of the Zero Tolerance Policy.[3]

[3] The United States' arguments in this Opposition are made only with respect to the documents in the December 31 and January 15 productions that have been challenged by Plaintiffs.  The documents in these two productions originated from Department of Justice custodians and therefore it is the Department of Justice's formal invocation of the deliberative process privilege.  The Department of Justice does not possess authority to invoke the deliberative process privilege on behalf of other federal agencies.  *See, e.g., Pacific Gas & Elec. Co. v. United States*, 70 Fed. Cl. 128, 134, *modified on reconsideration*, 71 Fed. Cl. 205 (2006) (stating that deliberative process privilege must be invoked by a high-ranking official within the agency asserting the privilege).  Consequently, the United States reserves the right to invoke the

### 1.  Draft Reports and Executive Orders

Drafts of three primary documents form the core of this first category: (1) "Report on Ending 'Catch and Release' at the Border of the United States"; (2) "Report on Securing the Southern Border of the United States"; and (3) Executive Order 13841, "Affording Congress an Opportunity to Address Family Separation."  Multiple versions of these draft documents, and substantive e-mail discussions relating to them, are in the December 31 and January 15 productions.[4]  *See* attached Declaration of G. Bradley Weinsheimer (Weinsheimer Declaration) at 5-6.

The two draft reports were created as part of an inter-agency effort to develop agency policies that would effectuate President Trump's April 6, 2018 Memorandum, entitled "Ending 'Catch and Release' at the Border of the United States and Directing Other Enhancements to Immigration Enforcement."[5]  The draft reports were prepared for the specific purpose of coordinating border security and immigration enforcement policy and providing advice to President Trump and top agency officials regarding policy changes to effectively implement the presidential memorandum through the development of new agency policies.  Weinsheimer Declaration at 5.  *See Maricopa Audubon Soc. v. U.S. Forest Serv.,* 108 F.3d 1089, 1094 (9th Cir. 1997) (determining documents prepared to advise agency decisionmaker's response to be predecisional).

These draft reports are predecisional because they were not finalized by agency heads and therefore do not "reflect[] a final agency decision." *Fish and Wildlife Service*, 2021 WL 816352, at *4.  In determining whether a document is predecisional, the Supreme Court recently stated that "courts must consider whether the agency treats the document as its final view on the matter."  *Id*. at 5.  This language from *Fish and Wildlife Service* establishes that the principal factor in determining whether a document is

---

deliberative process privilege with respect to documents that were collected from employees of other agencies, should Plaintiffs challenge the government's assertion of privilege for those documents.

[4]  *See, e.g.*, CD-US-00007804A, CD-US-00007230A, and CD-US-0015164A.

[5]  *See* Ending "Catch and Release" at the Border of the United States and Directing Other Enhancements to Immigration Enforcement, 83 Fed. Reg.16179 (Apr. 13, 2018).

predecisional is whether the agency *itself* characterizes the document as final.  *Id*.  One indication is whether the document is marked as a draft or as predecisional because "[a] draft, is by definition, a preliminary version of a piece of writing subject to feedback and change."  *Id*.

Here, the pages of the draft reports have been marked "[p]re-decisional" and that designation must be afforded deference.  *See id*.  The draft reports and the policy proposals and recommendations contained within them were not final and had not yet been decided upon by agency decisionmakers.  *See* Weinsheimer Declaration at 5.  The draft documents thus were subject to change and required inter-agency approval before they could be finalized.  *See Fish and Wildlife Service*, 2021 WL 816352, at *5 (considering it a "logical inference" that documents prepared by one agency that require approval by another are predecisional).[6]

The predecisional draft reports also are deliberative.  This prong of the analysis looks to whether the release of the documents would reveal the agency's mental process in its decisionmaking.  *Assembly of State of Cal*., 968 F.2d at 921.  Providing Plaintiffs unredacted versions of these draft reports certainly would do so.  Many of the draft reports contain edits, highlights, and comments, revealing which aspects of the reports were deemed especially important and which parts required further consideration or change.  *See* Weinsheimer Declaration at 5-6.   Such edits and comments represent the "personal opinions of the writer rather than the policy of the agency."  *Maricopa Audubon*, 108 F.3d at 1095 (quoting *Coastal States*, 617 F.2d at 866).   Additionally, because the draft reports—and related substantive e-mails discussing them—contain recommendations, proposals, and considered options from multiple agencies, these documents reveal not only the internal decisionmaking process of each agency, but also the role each agency played in creating a coordinated multi-agency executive branch policy, including the level of engagement each agency had in the policy's creation.  *See* Weinsheimer Declaration at 5-

---

[6]  In considering whether a document is predecisional, the Supreme Court recently pronounced, "A document is not final solely because nothing else follows it.  Sometimes a proposal dies on the vine."  *Fish and Wildlife Service*, 2021 WL 816352, at *4.

1   6.  Allowing Plaintiffs access to these documents would be injurious to open and honest

2   collaboration between agencies.  *See id.*  Further, disclosure would discourage candid

3   inter- and intra- agency considerations and recommendations, the core of what the

4   deliberative process privilege was explicitly designed to protect.[7]  *Maricopa Audubon*, 108

5   F.3d at 1094-95.

6       Drafts of Executive Order 13841, and e-mails containing or reflecting substantive

7   discussions thereof, are predecisional to the issuance of the Executive Order and the

8   Trump Administration's policy reflected therein.  Exec. Order No. 13841, 83 Fed. Reg.

9   29435 (June 25, 2018).  These documents are deliberative and contain preliminary analysis

10  and opinions from Department of Justice employees intended to assist decisionmakers in

11  formulating policy.  *See Assembly of State of Cal.*, 968 F.2d at 921 ("The key to the

12  inquiry is whether revealing the information exposes the deliberative process.").  Like the

13  draft reports discussed herein, drafts of the Executive Order also contain redline edits and

14  comments.  *See* Weinsheimer Declaration at 5.  Revealing such deliberative information

15  would hinder the candor of communications between the Department of Justice and the

16  Executive Office of the President with respect to setting prosecution and immigration

17  policies, amongst others.  *Dowling v. Arpaio*, 2011 WL 1456732, at *5 (D. Ariz. Apr. 15,

18  2011) (D. Ariz. Apr. 15, 2011) (considering policies involving prosecution decisions to be

19  particularly "unique" and holding that a decisionmaking process free from public scrutiny

20  is especially important).

21      [7] Plaintiffs argue that these documents "almost certainly contain factual information that
    should have been left unredacted."  MTC at 7.  The United States does not contest that purely
22  factual information untethered to an agency decision is not shielded by the deliberative process
    privilege, but factual information is protected where its disclosure "may . . . expose the
23  deliberative process within an agency."  *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114,
    1119 (9th Cir. 1988) (adopting a "process-oriented" or "functional" test that exempts "[f]actual
24  materials ... to the extent that they reveal the mental processes of decisionmakers").  Any factual
    information contained in the redacted reports is so "inextricably intertwined with policy making
25  processes" that it itself is part of the deliberative process.  *See id.* (internal quotation marks
    omitted).  In creating the draft reports, agency employees continually needed to "cull the relevant
26  [information], extract pertinent facts, organize them to suit a specific purpose, and [] identify the
    significant issues they encountered along the way."  *Mapother v. Dep't of Justice*, 3 F.3d 1533,
27  1538 (D.C. Cir. 1993).  Revealing this information would allow Plaintiffs access to the agency
28  decisionmaking process.

9

### 2.   Draft Substantive Meeting Agendas and Meeting Summaries

This second category of documents includes substantive draft meeting agendas created for the now-former Attorney General and now-former Deputy Attorney General in preparation for meetings with other federal agencies and the White House.  *See* Weinsheimer Declaration at 6-7.  These documents contain more than a bare list of topics for discussion.  Rather, they contain substantive analysis and proposals on the subjects to be discussed during the meetings.  *See id*. at 6.  These draft agendas are predecisional for two reasons.  First, because the documents are *stamped* as "drafts" and were created to advise the meeting attendees about how to participate with respect to proposed discussion topics, they are predecisional.  *See Fish and Wildlife Service*, 2021 WL 816352, at *5.  Second, the documents *contain* predecisional deliberative information because they include proposals and policy changes to be discussed and decided upon at the meetings.  *See Ctr. for Pub. Integrity v. Fed. Election Comm'n*, 332 F. Supp. 3d 174, 180 (D.D.C. 2018) ("A meeting agenda prepared before the meeting is necessarily predecisional and inherently deliberative in that staff are suggesting the topics to be discussed at the meeting.");  *Nat'l Right to Work Legal Def. & Educ. Found., Inc. v. U.S. Dep't of Labor*, 828 F. Supp. 2d 183, 190–91 (D.D.C. 2011) (holding the same).  The draft meeting summaries in this category (2) also are predecisional as they are non-final and were subject to changes from the Attorney General or Deputy Attorney General.  *See Fish and Wildlife Service*, 2021 WL 816352, at *5.  Additionally, they memorialize the proposals and recommendations during the meetings, again rendering them predecisional and deliberative and thus shielded by the deliberative process privilege.  *See Assembly of the State of Cal.*, 968 F.2d at 920.  *See also* Weinsheimer Declaration at 6.

### 3.   Documents Relating to the Implementation of the Zero Tolerance Policy

On April 6, 2018, Attorney General Sessions' issued a memorandum entitled "Zero Tolerance of Offenses Under 8 U.S.C. § 1325(a)" ("Zero Tolerance Memorandum")[8] which in effect, created a "zero tolerance"—or "100 percent" rate of referral—policy of

---

[8] *See* U.S. Department of Justice, News Release: Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry (April 6, 2018), DOJ 18-417, 2018 WL 1666622 (hereinafter referred to as "Zero Tolerance Memorandum").

criminal enforcement for immigration violations.  Although the e-mails and documents within this category (3) were generated after the Zero Tolerance Memorandum was issued, and thus are not predecisional to it, they are predecisional to other agency policies and decisions that were required to implement the Zero Tolerance Policy.  *See Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 736 F. Supp. 2d 202, 208 (D.D.C. 2010) (recognizing that multiple decisions may be required in agency decisionmaking).  *See also* Weinsheimer Declaration at 7-8.  These documents contain recommendations and proposals on topics including, amongst others, decisions regarding plea deals in cases brought as a result of the Zero Tolerance Policy, budget and funding decisions, and decisions regarding the conversion and use of Bureau of Prison facilities to increase detention space.  *See*, *e.g.*, CD-US-00011106A, CD-US-00011128A, CD-US-00008574A   As such, they are predecisional to *those* agency decisions.  *See* Weinsheimer Declaration at 7-8.  Additionally, as discussed in more detail above, because these documents reflect the mental processes by which the agency decisionmakers created sensitive border security policies and initiatives, they are deliberative and thus protected from disclosure by the deliberative process privilege.  *See* Weinsheimer Declaration at 8.

### C. Plaintiffs' Alleged Need Does not Outweigh the Government's Interest in Non-Disclosure

The government has met its initial burden of establishing that the deliberative process privilege protects the documents that Plaintiffs seek to compel.  This Court must next consider whether the Plaintiffs' claimed need for disclosure overrides the government's interest.  *Warner*, 742 F.2d at 1161.  Plaintiffs may only obtain the "deliberative materials if [their] need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure."  *Id*.

To make this determination, the Ninth Circuit employs a four factor balancing test and considers: "1) the relevance of the evidence; 2) the availability of other evidence; 3) the government's role in the litigation; and 4) the extent to which disclosure would hinder

frank and independent discussion regarding contemplated policies and decisions." *Id*.[9]

Plaintiffs bear the burden of establishing that the evidence they seek is relevant. *See Alexander v. F.B.I.*, 186 F.R.D. 185, 187 (D.D.C. 1999) ("[T]he movant filing a motion to compel must first demonstrate the relevance of the material sought before the burden shifts to the [government] to prove an applicable privilege."). "The weight of the relevance factor is likely to play a significant, although not necessarily determinative, role" where, as here, the documents Plaintiffs seek to disclose are numerous and peripheral to their case. *See Noel v. City of N.Y.*, 357 F. Supp. 3d 298, 303-04 (S.D.N.Y. 2019).

Plaintiffs allege that the government's decision to engage in separations of family units was negligent and intentionally caused emotional distress. As the United States noted above, although portions of documents that discuss family separations arguably may be relevant to Plaintiffs' claims, a significant number of the documents Plaintiffs seek contain information about the Trump Administration's broader immigration enforcement and border security policies that are unrelated—or at most peripheral—to Plaintiffs' claims. *See Convertino v. U.S. Dep't of Justice*, 669 F. Supp. 2d 1, 4 (D.D.C. 2009) (considering documents that did not involve plaintiff's exact claim to be "collateral" and not relevant). *See also* Weinsheimer Declaration at 4. The DOJ has removed its claims of the deliberative process privilege over all documents in the December 31 and January 15 productions that are predecisional and deliberative to the issuance of the Zero Tolerance Memorandum.

Plaintiffs cite a particular document—CD-US-00007118, re-produced on April 9, 2020[1] as CD-US-00007118A—in purported support of their relevancy argument. *See* MTC at 9 and Exhibit 7. Yet this document actually illustrates the United States' point about the irrelevance of the information Plaintiffs seek to compel. While the cited document contains some discussion of implementation of the Zero Tolerance Policy, it

---

[9] Courts within this Circuit may also take into consideration "the interest of the litigant, and ultimately society, in accurate judicial fact finding, the seriousness of the issues involved in the litigation, the presence of issues involving alleged governmental misconduct, and the federal interest in the enforcement of federal law." *Unknown Parties v. Johnson*, 2016 WL 8199308, at *3 (D. Ariz. July 21, 2016)

1    also contains (predecisional and deliberative) information on a wide array of topics

2    relating to border security and broader immigration policies, including detention of aliens

3    pending immigration proceedings, proposed changes to asylum-related regulations, and

4    civil enforcement mechanisms with respect to unauthorized noncitizens. *See* CD-US-

5    00007118A. None of this information is relevant to Plaintiffs' claims in this litigation.

6    Further, ordering disclosure of this irrelevant, sensitive material would chill candor in the

7    government's decisionmaking process. In short, Plaintiffs cannot use discovery in this tort

8    action to obtain predecisional and deliberative information with no relevance to their

9    claims. *See Convertino*, 669 F. Supp. 2d at 4. Therefore, this factor, with respect to

10    information on topics other than family separation, weighs in favor of non-disclosure.[10]

11        Plaintiffs next claim that they are "unable to obtain comparable information about

12    the deliberations that led to the family separation policy" because "all of the relevant

13    information is in the government's possession." MTC at 10. But Plaintiffs' contention

14    disregards the hundreds of pages of publicly available information about the family

15    separations. For instance, the Inspector Generals for the Department of Justice, the

16    Department of Homeland Security, and the Department of Health and Human Services, as

17    well as the Government Accountability Office and the U.S. House of Representatives'

18    Judiciary Committee Majority Staff, have released reports on the family separations,

19    totaling over 800 pages.[11] These public reports provide Plaintiffs with information related

20    to their claims, including emails and documents of Department of Justice leadership. This

21    Court has made clear that this factor does not look at "whether the [other evidence

22         [10] The government believes that in camera review of several documents may illuminate the
23    United States' point. These documents include draft versions of the "Report on Securing the
Southern Border of the United States," and the "Report on Ending 'Catch and Release' at the
24    Border of the United States," as well as the draft meeting agenda for the May 3, 2018 White
House meeting, referenced above. If this Court should agree, the United States respectfully
requests permission to file these documents as an ex parte submission under seal.

25         [11]  *See* U.S. Dep't of Homeland Sec., DHS Lacked Technology Needed to Successfully
26    Account for Separated Minor Families OIG 20-06 (Nov. 2019); U.S. Dep't of Health and Human
Servs., Office of the Inspector General, Separated Children Placed in Office of Refugee
27    Resettlement Care, OEI-BL-18-00511 (Jan. 2019); U.S. Gov't Accountability Off., GAO 19-163,
Unaccompanied Children: Agency Efforts to Reunify Children Separated from Parents at the
28    Border (Oct. 2018); U.S. House of Representatives Comm. on the Jud., Majority Staff Report, The
Trump Administration's Family Separation Policy: Trauma, Destruction, and Chaos (Oct. 2020).

available to plaintiffs] is the '*best*' evidence that can be found." *Ariz. Dream Act Coal. v. Brewer,* 2014 WL 171923, at \*3 (D. Ariz. Jan. 15, 2014) (D. Ariz. Jan. 15, 2014) (emphasis added).  Rather, this factor weighs against disclosure, where, as here, there is other evidence available to plaintiffs, such as final executive orders, public statements, and investigatory reports. *Id.*

Moreover, on March 25, 2021, the United States produced to Plaintiffs approximately 170 documents specifically referenced in the Department of Justice's Office of the Inspector General Report, "Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Department of Homeland Security and Health and Human Services," 21-028 (January 2021), which Plaintiffs describe as being the documents from the OIG's review and report "most relevant to the claims and defenses in this action." *C.M.* ECF 92 at 4.  The United States also notes that pursuant to the MIDP, the United States is in the process of reviewing tens of thousands of "policy-level" documents from DHS, CBP, ICE, and HHS.

To be sure, the third factor weighs against upholding the privilege, as the United States is a party to this litigation.  However, this factor is not dispositive and courts often find that the balancing of the equities favors non-disclosure even in instances in which the government is a party.  *See Ctr. for Biological Diversity v. Wolf*, 447 F. Supp. 3d 965, 975-76 (D. Ariz. 2020) (concluding that although government entities were defendants in the litigation the "balancing of the factors tips in favor of upholding the deliberative process privilege").[12]

---

[12] To the extent that this Court considers governmental intent a factor in assessing whether Plaintiffs' claimed need overcomes the government's interest in non-disclosure, the United States maintains that the decisionmakers' subjective intent in deciding on a "zero tolerance" approach to criminal immigration enforcement is not central to Plaintiffs' claims.  The Zero Tolerance Memorandum instructed federal prosecutors along the Southwest border to prosecute all offenses of illegal entry referred by the DHS.  A month later, the DHS directed that all unauthorized adults amenable to prosecution for illegal entry violations be referred for prosecution.  Around that time, DHS also made efforts to subject parents to immigration detention pending immigration proceedings, rather than releasing them upon their arrival in the United States—ending a practice sometimes referred to as "catch-and-release."  Plaintiffs do not—and cannot—challenge the federal government's decision to enforce its immigration statutes. *Cf.*, *Arizona Dream Act Coalition*, 2014 WL 171923, at \*3 (intent at issue because plaintiffs sought documents relating to

The fourth factor—"the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions," *Warner*, 742 F.2d at 1161—almost always weighs in favor of the government and certainly does so in this suit. A finding for the government on this prong, "weigh[s] heavily against disclosure." *Wolf*, 447 F. Supp. 3d at 975. Compelling disclosure of the documents Plaintiffs' seek would "[chill] frank discussion and deliberation in the future among those responsible for making governmental decisions." *Warner*, 742 F.2d at 1162. Notably, because these documents involve predecisional deliberations amongst the most senior Department of Justice officials, including the Attorney General, the Deputy Attorney General, and their immediate counselors and staff, particular deference to the government's assertion of the privilege is required. *See Karnoski*, 926 F.3d at 1206 ("Documents involving the most senior executive branch officials, for example, may require greater deference."). Moreover, the disclosure of predecisional deliberative documents should be avoided particularly when plaintiffs are attempting to utilize such documents in pursuit of money damages against the government. *See Wilson v. Maricopa Cnty.*, 2006 WL 1312934, at *2 (D. Ariz. May 12, 2006) ("To permit resulting deliberative documents to be used against the County in damages actions would surely chill the candor of the deliberations.").

Finally, contrary to Plaintiffs' assertions, *see* MTC at 6, 10, the protective order in this litigation, *see* Case No. 2:19-cv-05217, Docket. No. 58; Case No. 2:20-cv-00065, Docket. No. 45, does not obviate the government's concerns that disclosure would chill honest discussion and impede informed agency decisionmaking. "The existence of a protective order is relevant to balancing the needs of the plaintiffs against the potential harm to the government, but it does not defeat an assertion of the deliberative process

---

a constitutionally challenged decision to deny drivers licenses to individuals with specific immigration statuses); *N. Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1124 (N.D. Cal. 2003) (intent at issue because plaintiff sought documents relating to the city's constitutionally challenged decision to impose a condition of approval on a condominium project). Accordingly, the government's intent with respect to its decisions to enforce federal immigration law is not a factor in Plaintiffs' favor in overcoming the government's assertion of the deliberative process privilege.

1 privilege." *In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs*, 2021

2 WL 287913, at *8 (Fed. Cl. Jan. 28, 2021) (denying plaintiffs' motion to compel with

3 respect to deliberative materials in draft report even though protective order was in place).

4 Therefore, this fourth factors favors the government in its assertion of the privilege.

5       Taken together, the four *Warner* factors weigh in favor of the government and

6 Plaintiffs have not demonstrated that their claimed need for the documents overcomes the

7 government's interest in non-disclosure.[13]  This is especially true with respect to

8 documents that address immigration and border security policies unrelated to Zero

9 Tolerance.  This Court should conclude that the deliberative process privilege has been

10 properly invoked by the Department of Justice.

### II.    Presidential Communications Privilege

12       "The presidential communications privilege, a presumptive privilege for

13 presidential communications, preserves the President's ability to obtain candid and

14 informed opinions from his advisors and to make decisions confidentially." *Karnoski*, 926

15 F.3d at 1203 (quoting *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (internal

16 quotation marks and citations omitted)).  This privilege is "fundamental to the operation of

17 Government and is inextricably rooted in the separation of powers under the Constitution"

18 because it "relates to the effective discharge of a President's powers[.]" *United States v.*

---

19     [13] If this court chooses to consider the additional factors discussed above, *see Unknown

20 Parties*, 2016 WL 8199308, at *3, the government's interest in non-disclosure still outweighs
Plaintiffs' need.  Both factors concerning the seriousness of the litigation and the federal interest

21 in the enforcement of federal law look to whether "substantial" constitutional claims are at issue,
and in particular, whether the litigation involves discrimination against a protected class.  *See N.*

22 *Pacifica,* 274 F. Supp. 2d at 1123–24 (finding seriousness of litigation was "somewhat lessened"
when allegations of a violation of equal protection did not involve a suspect class);  *Stott Outdoor*

23 *Advert. v. Cnty. of Monterey*, 2007 WL 460647, at *3 (N.D. Cal. Feb. 7, 2007) ("Finally, there are
federal constitutional claims at stake in this case, and it is in the federal interest to see

24 constitutional norms enforced");  *N. Pacifica*, 274 F. Supp. 2d at 1123-24 (holding the same).
*Accord Swanston v. City of Plano, Texas*, 2020 WL 4732214, at *9 (E.D. Tex. Aug. 14, 2020).

25 While Plaintiffs have brought constitutional claims in other venues, the claims in this case are not
constitutional claims and they do not allege discrimination of a protected class; they are state law

26 tort claims for money damages.  *See* Case No. 2:19-cv-05217, Docket. No. 1; Case No. 2:20-cv-

27 00065, Docket. No. 1. Accordingly, both factors cut against Plaintiffs and taken with the *Warner*

28 factors weigh against non-disclosure.

*Nixon*, 418 U.S. 683, 708, 711 (1974).  The presidential communications privilege applies not only to "communications directly involving and documents actually viewed by the President," but also to those documents "solicited and received by the President or his immediate White House advisers with broad and significant responsibility for investigating and formulating the advice to be given to the President."  *Karnoski*, 926 F.3d at 1203 (quoting *Loving*, 550 F.3d at 32 (internal quotation marks and citations omitted)).  Because the privilege protects not only predecisional documents and materials, but also final and postdecisional ones, it is a "broader privilege that provides greater protection against disclosure" than the deliberative process privilege.  *Jud. Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1114 (D.C. Cir. 2004).

　　　The Office of the President has asserted the presidential communications privilege over 9 unique documents, and 60 total documents including duplicates and variants of the 9 unique documents.  As mentioned above, the White House has chosen not to invoke the presidential communications privilege over a substantial number of documents and narrowed the redactions on other documents.  The documents over which the White House has invoked the presidential communications privilege fall within two categories: (1) draft Summaries of Conclusions or agendas regarding Principals Committee meetings, and e-mails containing or reflecting information about the same and (2) invitations and references to White House meetings, including those with former President Trump.  *See* attached Declaration of Stuart F. Delery (Delery Declaration) at 4-7.  These documents are protected by the presidential communications privilege because they involve communications with close advisers to the President and "reflect presidential decisionmaking and deliberations . . . that the President believes should remain confidential."  *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997).

　　　All of these documents contain or reference communications with either the President or his "immediate White House advisers."  *Id*. at 752.  These advisers include, amongst others, the Deputy Chief of Staff, Press Secretary, Stephen Miller, an Assistant to the President and Senior Advisor for Policy, Andrew Bremberg, an Assistant to the President and Director of the Domestic Policy Council, and members of the White House

Counsel's Office.[14]  Courts have considered individuals occupying these positions as undoubtedly close advisors to the president, and have held that their communications qualify for the protection of the presidential communications privilege.  *See id.* (considering the White House Chief of Staff, members of the White House Counsel's Office, and the Press Secretary to be advisors with significant responsibility for advising the President).  *See also Prop. of the People, Inc. v. Off. of Mgmt. & Budget*, 394 F. Supp. 3d  39, 45 (D.D.C. 2019) (individuals that chair Principals Committee meetings "easily qualif[y]" as immediate White House advisors).

With respect to category (1) these documents contain direct communications between these senior White House advisors and officials from DOJ and other agencies. *See* Delery Declaration at 4-6.  Because the documents in these categories were actually sent from or to the President or his immediate advisors, there can be no dispute that these documents were actually solicited or received by qualifying members of the White House, and thus meet the first requirement of the presidential communications privilege.  *See Jud. Watch, Inc.*, 365 F.3d at 1117 (holding that "documents, reports, or recommendations" created by the DOJ and actually *sent* to the Office of the President, as well as "direct communications" with "immediate presidential advisers will remain protected"). Additionally, documents that fall within category (2) originated within DOJ and may not have been provided to the White House, they still are afforded the protections of the presidential communications privilege because they memorialize communications from White House advisors or discuss meetings with former President Trump.  Delery Declaration at 7; *see Jud. Watch, Inc. v. U.S. Dep't of Def.*, 913 F.3d 1106, 1112 (D.C. Cir. 2019) ("[N]otes taken to memorialize meetings and telephone calls involving top White House advisers . . . were protected from disclosure by the presidential communications privilege because the notes reflected those advisers' communications."); *see also Property*

---

[14] Many redactions on documents produced on January 15 have been removed for the April 9 production.  Although e-mail addresses and names were reflected in the "Author" and "Recipient" fields on the January 15 privilege log, the removal of redactions for the April 9 production will allow Plaintiffs to view the names of the individuals on various e-mails and documents.

*of the People*, 394 F, Supp. 3d at 47-48 (holding that meeting invites for Principals Committee meetings were protected by presidential communications privilege).

Furthermore, these documents reflect communications with the President or his advisors, and were used to inform President Trump's decisionmaking process. *See id*. The meetings between senior White House advisors and agency officials served the logical purpose of helping to assist, inform, or guide presidential determinations on immigration and border security policy. Delery Declaration at 3-7. Accordingly, these documents are protected from disclosure by the presidential communications privilege.

### III.   **Attorney-Client Privilege and Work Product Doctrine**

Plaintiffs also contend that the privilege logs for the December 31 and January 15 productions are deficient with respect to claims of the attorney-client privilege and work product doctrine. With respect to the attorney-client privilege, Plaintiffs argue that the privilege logs are inadequate because they do not identify the attorney providing the advice or the client to whom the advice was supplied, and do not sufficiently describe the communication as containing legal advice. MTC at 16-17. With respect to the work-product doctrine, Plaintiffs note that the privilege log entries do not specifically reference that the documents were created in anticipation of litigation. *Id*. at 19-20. The United States is providing a revised privilege log with its document production on April 9, thus in all likelihood rendering moot—or at a minimum substantially limiting—Plaintiffs' challenges to the earlier privilege logs.

The documents in the December 31 and January 15 productions were collected from five DOJ employees or officials—all of whom are attorneys. Certain documents collected from these custodians contain or reflect legal advice sent or received by counsel in OAG, ODAG, and other components of DOJ.[15] Contrary to Plaintiffs' contention, the United States did not claim the attorney-client privilege and work-product doctrine on

---

[15] Plaintiffs erroneously contend that the government improperly asserted the attorney-client privilege when DOJ attorneys were deliberating *policy* options, rather than offering legal advice. The government endeavored to provide sufficient detail in its privilege logs when legal advice was provided and thus the attorney-client privilege was claimed; the government cannot provide more information with respect to the content of the redacted portions of the document if doing so would reveal the legal advice provided.

1   documents in these productions merely because an attorney was listed as an author or

2   recipient of a document.

3        Plaintiffs next argue that the government's privilege logs are deficient because the

4   "client" is not specifically identified.  MTC at 16-17.  However, it is well-established that

5   "'an agency can be a 'client' and agency lawyers can function as 'attorney' within the

6   relationship contemplated by the privilege.'" *Rein v. U.S. Pat. & Trademark Off.*, 553 F.3d

7   353, 376 (4th Cir. 2009) (quoting *Coastal States Gas Corp.*, 617 F.2d at 863); *see also Tax*

8   *Analysts v. IRS*, 117 F.3d 607, 618 (D.C .Cir.1997).  As such, there was no need to

9   specifically identify on the logs the "client" to whom the legal advice was supplied.

10       Plaintiffs also misconstrue the nature of the attorney-work product doctrine in the

11  context of federal agencies.  The Ninth Circuit has squarely rejected Plaintiffs' contention

12  that the government must state the document was prepared in anticipation of litigation:

13       *We have never held, either within the FOIA context or in litigation generally,*

14       *that attorney work product must be prepared in anticipation of specific*
         *litigation to be privileged, and we decline to do so here.* Like attorneys

15       preparing for a specific case, agency attorneys anticipating potentially
         recurring legal issues must be free to 'work with a certain degree of privacy,

16       free from unnecessary intrusion by opposing parties and their counsel.

17  *A.C.L.U. of Northern California v. Dep't of Justice*, 880 F.3d 473, 486-87 (9th Cir. 2018)

18  (quoting *Hickman v. Taylor*, 329 U.S. 495, 510 (1947)) (emphasis added).  The recurring

19  legal issues associated with the various criminal and civil immigration enforcement and

20  border security-related matters of the sort reflected in the DOJ documents are of the very

21  sort the Ninth Circuit intended for federal agencies to be able to protect under the work-

22  product doctrine. [16]

23

---

24     [16] Should this Court find that the government's privilege logs are insufficient, the remedy
25  is for the government to amend them—not to make a finding of waiver, as Plaintiffs suggest.  *See*
    *Evanston Insurance Company*, 2020 WL 6048206, at *3 (ordering party to submit amended
26  privilege log); *Carl Zeiss Vision Int'l Gmbh v. Signet Armorlite Inc.*, No. CIV 07CV-0894DMS
    POR, 2009 WL 4642388, at *3 (S.D. Cal. Dec. 1, 2009) (noting rejection of a *per se* waiver rule
27  in the Ninth Circuit) (citing *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Court for Dist. of*
    *Mont.*, 408 F.3d 1142, 1149 (9th Cir. 2005).

28

1  Submitted this 9th day of April, 2021.

2                                    BRIAN M. BOYNTON
                                     Acting Assistant Attorney General
3
                                     JAMES G. TOUHEY, JR.
4                                    Director, Torts Branch

5                                    *s/ Phil MacWilliams*
                                     PHILIP D. MACWILLIAMS
6                                    Trial Attorney
                                     D.C. Bar No. 482883
7                                    IRINA M. MAJUMDAR
                                     Trial Attorney
8                                    D.C. Bar No. 252757
                                     E-mail: phil.macwilliams@usdoj.gov
9                                    U.S. Department of Justice
                                     Civil Division, Torts Branch
10                                   Benjamin Franklin Station, P.O. Box 888
                                     Washington, DC 20044
11                                   Telephone: (202) 616-4285

12                                   Attorneys for the United States of America

13                          **CERTIFICATE OF SERVICE**

14
         I hereby certify that on April 9, 2021, I electronically transmitted the attached
15
    document to the Clerk's Office using the CM/ECF System for filing and transmittal of a
16
    Notice of Electronic Filing to all CM/ECF registrants.
17

18  *s/ Phil MacWilliams*
    PHILIP D. MACWILLIAMS
19  Attorney for United States of America

20

21

22

23

24

25

26

27

28