David B. Rosenbaum, 009819
Travis C. Hunt, 035491
BriAnne N. Illich Meeds, 036094
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
(602) 640-9000
drosenbaum@omlaw.com
thunt@omlaw.com
billichmeeds@omlaw.com
*Counsel for C.M. Plaintiffs*
*(Additional Counsel Listed on the Signature Page)*

Keith Beauchamp (012434)
D. Andrew Gaona (028414)
COPPERSMITH BROCKELMAN PLC
2800 N. Central Avenue, Suite 1900
Telephone: (602) 381-5493
Phoenix, AZ 85004
kbeauchamp@cblawyers.com
agaona@cblawyers.com
*Counsel for A.P.F. Plaintiffs*
*(Additional Counsel Listed on Signature Page*)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| C.M., on her own behalf and on behalf of her minor child, B.M.; L.G., on her own behalf and on behalf of her minor child, B.G.; M.R., on her own behalf and on behalf of her minor child, J.R.; O.A., on her own behalf and on behalf of her minor child, L.A.; and V.C., on her own behalf and on behalf of her minor child, G.A., | No. 2:19-cv-05217-SRB |
| Plaintiffs, | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL REVIEW OF DOCUMENTS *IN CAMERA*** |
| v. | |
| United States of America, | |
| Defendant. | |

1

A.P.F. on his own behalf and on behalf of his minor child, O.B.; J.V.S. on his own behalf and on behalf of his minor child, H.Y.; J.D.G. on his own behalf and on behalf of his minor child, M.G.; H.P.M. on his own behalf and on behalf of his minor child, A.D.; M.C.L. on his own behalf and on behalf of his minor child, A.J.; and R.Z.G. on his own behalf and on behalf of his minor child, B.P.,

                Plaintiffs,

     v.

United States of America,

                Defendant.

No. 2:20-cv-00065-SRB

## **INTRODUCTION**

Plaintiffs request that the Court review *in camera* 13 of the 16 documents now at issue,[1] which the government asserts are protected by the deliberative process privilege. Plaintiffs are entitled to any deliberative discussions within these documents under the *Warner* balancing test. *See* Order at 3-4 (Feb. 24, 2022), *C.M.* ECF 142; *A.P.F.* ECF No. 141 ( "Feb. 24 Order") (setting forth the *Warner* factors). The government makes two primary arguments in opposing Plaintiffs' motion to compel, both of which lack merit.

***First***, the government erroneously contends that the Category 1 and Category 2 documents[2]—which relate to a 2017 Department of Homeland Security (DHS) proposal

---

[1] The government once again revised its redactions in response to Plaintiffs' motion to compel, deciding not to "formally invoke" the deliberative process privilege as to seven documents and amending its redactions for four documents. *See* Opp'n. at 2, *C.M.* Dkt. 198; *A.P.F.* Dkt. 183 (hereinafter "Opp'n."). Given the revised redactions as to two of the three "Category 4" documents and the government's representation that the third document is "unrelated to the prosecution of adults in family units or separation of families," Plaintiffs withdraw the request for review of the "Category 4" documents.

[2] Both Category 1 and Category 2 documents concern a proposal to separate immigrant families by detaining parents in Immigration and Customs Enforcement (ICE) detention facilities, designating their children as unaccompanied, and transferring them to Office of Refugee Resettlement (ORR) custody. The government nevertheless suggests that

1    to separate immigrant families after apprehension at the border—are of "minimal

2    relevance" to Plaintiffs' claims because "the focus of these suits is the Zero Tolerance

3    Policy and the resulting separation of families." Opp. at 7. The government's argument

4    represents a stunning about-face. Mere months ago, the government took the opposite

5    position, arguing that the Zero Tolerance Policy is *not* relevant to Plaintiffs' claims

6    because "when you look at the decision to separate…that is a decision made by DHS"

7    and it is "DHS's decision to declare the child a UAC, an unaccompanied minor, which

8    necessitates separation, notwithstanding the fact that a prosecution did not happen."

9    Hr'g Tr. at 39:25-41:16-23 (Jan. 27, 2022).[3]

10        As set forth below, documents and testimony obtained through discovery in this

11   litigation have confirmed that the 2017 administrative separation proposal, the Zero

12   Tolerance Policy, and the May 4, 2018 DHS memorandum directing Customs and

13   Border Patrol (CBP) to refer all adults in family units for misdemeanor prosecutions

14   were all part of an interrelated chain of events to develop and implement a policy that

15   would result in large-scale family separation at the Southwest border, regardless of

16   whether the parent was prosecuted. Although the government told the public that family

---

22   there were two different policy proposals: an ICE detention proposal ("Category 1")
     and a DHS proposal aimed at "'stem[ming] the flow of illegal entry," including entry
23   by family units ("Category 2"). *See* Opp'n. at 4. Category 1 includes drafts of a memo
     containing the ICE proposal, which the government seeks to claw back and is discussed
24   in Plaintiffs' Reply to the Motion for Judicial Determination.

25   [3] The government's position that "the Family Separation Policy as plaintiffs have stated
     it never really existed," Hr'g Tr. 10:6-11 (June 2, 2022), is also inconsistent with
26   President Biden's Executive Order condemning "the human tragedy that occurred when
     our immigration laws were used to intentionally separate children from their parents or
27   legal guardians (families), including through the use of the Zero-Tolerance Policy."
     Establishment of Interagency Task Force on the Reunification of Families, Exec. Order
28   No. 14011, 86 Fed Reg. 8273 (Feb. 2, 2021).

separation was merely a byproduct of a "prosecution" policy,[4] in fact it implemented a far broader policy of separating *all* families apprehended at the border *regardless of whether the parents were prosecuted or even referred for prosecution*. In other words, the policy that was implemented looked exactly like the one DHS had advocated for and tested in various initiatives throughout 2017. Indeed, as the Court itself recently noted, *see* Hr'g Tr. at 11:10-12:6 (June 2, 2022), the *C.M.* and *A.P.F.* adult plaintiffs were separated from their children for months even though they were never in criminal custody. These documents are therefore highly relevant to Plaintiffs' claims, and the Court should order their disclosure.

**Second**, the government argues that the five Category 3 documents—which it admits relate to the Zero Tolerance Policy—should not be disclosed because they "concern resource and manpower constraints relating to the implementation of the Zero Tolerance Policy." Opp. at 8. Yet these documents are likely highly relevant to Plaintiffs' negligence claims and allegations that the government was reckless in initiating a policy resulting in the separation of thousands of families without ensuring it had adequate resources to do so. Accordingly, *in camera* review is warranted.

## ARGUMENT

Even if the deliberative process privilege were properly asserted,[5] Plaintiffs' need for the redacted information outweighs the government's interest in non-

---

[4] *See, e.g.*, PBS Newshour, *WATCH: DHS Secy. Nielsen speaks at Nat'l Sheriffs Assoc. conference,* YouTube.com at 10:07-10:53 (Jun. 18, 2018), https://bit.ly/3Q5sy9J (then DHS Secretary Nielsen stating that law enforcement had "only two options": either to release the family at the border or "the adult and the minor will be separated *as a result of prosecuting the adult*.") (emphasis added); Elliot Spagat, *Sessions: Zero-tolerance policy may split families at border*, AP News (May 7, 2018) (quoting then Attorney General Sessions: "We don't want to separate families, but we don't want families to come to the border illegally...if we do our duty and prosecute those cases, then children inevitably for a period of time might be in different conditions.").

[5] As Plaintiffs anticipated, the government submitted declarations offering a post hoc justification of the government's privilege assertions. The Court should review these declarations critically. *See* Mot. at 5, note 2 (citing *United States ex rel. Poehling v. UnitedHealth Grp., Inc.*, 2018 WL 8459926, at *12 (C.D. Cal. Dec. 14, 2018)).

1   disclosure. All four factors of the applicable *Warner* balancing test favor Plaintiffs, and

2   the government's arguments to the contrary mischaracterize the facts and the law.

### A.   The Category 1 and 2 Documents Are Highly Relevant

4       The first *Warner* factor, which considers the relevance of the evidence, strongly

5   favors disclosure of documents relating to the 2017 DHS administrative separation

6   proposal. A few weeks into the new administration, high-ranking officials from DHS

7   and its component agencies, ICE and CBP, met with representatives from other

8   agencies to discuss an immigration "deterrence initiative." The proposal involved

9   separating families at the Southwest border as a deterrent to other would-be migrants

10  by detaining adults in adult ICE detention centers, designating their children as

11  Unaccompanied Alien Children (UACs), and referring the children to the custody of

12  ORR.[6] Officials in DHS, CBP, and ICE discussed this proposal throughout 2017.[7]

13      In late 2017 DHS, ICE, and CBP pivoted to a policy to prosecute adults in family

14  units, which would serve as a pretext for achieving their desired goal: systematic family

15  separation to deter migration. DHS communications from December 2017 discussing

16  "options to respond to the border crisis" emphasized achieving family separation

17  through prosecuting adults in family units:

---

[6] *See, e.g.*, Ex. 1 (Feb. 16, 2017 email noting that "DHS proposes separating children in family units from their parents and referring them to ORR as [UACs]…as a deterrent to families who have not yet entered the U.S."); Ex. 2 (summarizing a "verbal brief by DHS on 14FEB" proposing to "separate children from parents in Family Unit apprehensions and refer them to HHS as [Unaccompanied Children]" for the "STATED PURPOSE" of "[d]eterrence of Family Unit migration").

[7] Contemporaneous communications in late 2017 showed uncertainty as to whether a family separation policy could be lawfully implemented, at least as it was then framed. *See, e.g.*, Ex. 3 (HHS official describing December 13, 2017 call where CBP conveyed that DHS "received the complaint letter about family separation from their OIG and was discussing the injunction (I assume this is the RILR case injunction) […] They don't know if/how they can proceed.").

1
2
3
4
5

> *Instruct CBP and ICE to significantly increase the prosecution of family units when they are encountered at the border.* The parents would be prosecuted for illegal entry…and the minors with them would be placed in HHS custody as UACs. […] Not all parents could be criminally prosecuted because of the large number of families illegally entering, but the increase would be reported and it would have a deterrent effect. […] This is already being done by CBP on a limited scale.[8]

6   Ex. 4 (Dec. 15, 2017) (emphasis added).

7          On April 6, 2018, then Attorney General Sessions issued the Zero Tolerance

8   memorandum and, on May 4, 2018, Secretary Nielsen signed the DHS policy directing

9   CBP to refer for prosecution adults in family units.[9] Under these policies, CBP

10  designated all family unit adults who crossed the border between ports of entry as

11  "amenable to prosecution," classified their children as UACs, and referred the children

12  to ORR custody. Despite public statements to the contrary, *supra* note 4, separations

13  were not based on a decision to prosecute the parent, or the parent's transfer to U.S.

14  Marshals Service (USMS) custody. Instead, U.S. Border Patrol (USBP) separated

15  children from their parents *regardless* of whether their parent was referred for

16  prosecution, transferred to USMS custody, actually prosecuted, or sentenced to any

17  period of imprisonment. In fact, USBP designated every family unit adult who crossed

18  the border between ports of entry as "amenable for prosecution," and separated them

19  from their children *before* any decision was made whether to actually prosecute.[10] Even

20  where the U.S. Attorney's Office declined to prosecute a parent, USBP nevertheless

21
22
23
24
25
26
27
28

---

[8] *See also* Ex. 5 (Dec. 11, 2017 presentation of "DHS Initiated Solutions" citing statistics from the "pilot initiative" in El Paso in support of the "Prosecution of Criminal Parents in FMUA" proposal).

[9] *See DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families,* DHS OIG at 18 (Nov. 25, 2019), https://bit.ly/3NzHISE.

[10] *See, e.g.*, Ex. 6 (May 24, 2018 USBP flow chart showing that family units were separated before the adult went through the criminal or administrative process); Ex. 7 (May 10, 2018 USBP email stating that during the Zero Tolerance Policy "[a]ll adults are amenable to prosecution – 100%"); *see also* Ex. 20 (Confidential).

separated that parent from their child, and declined to cancel the child's placement in ORR custody, notwithstanding the elimination of the purported justification for the separation.[11] Consistent with that practice, Plaintiffs were never prosecuted—for example, two *C.M.* Plaintiffs were never even *referred* for prosecution—yet they were separated from their children and kept apart for months.[12] Plaintiffs' prolonged separations in 2018, therefore, were not the byproduct of a prosecution policy, but rather reflected the government's implementation of a broader policy to separate all parents and children for deterrent purposes—just as DHS officials had discussed throughout 2017.

Moreover, as part of the broader family separation policy, the government deliberately prolonged prosecuted parents' separation from their children by taking active steps to avoid reuniting families after completion of criminal proceedings. For example, on May 10, 2018, Matthew Albence, then head of ICE Enforcement and Removal Operations (ERO), wrote Acting ICE Director Thomas Homan, expressing his "concern" that adults:

> separated from their children due to the prosecution will be returned to the USBP immediately after the guilty plea is accepted by the Court, as the local District Court generally only imposes time-served. This will result in a situation in which the parents are back in the exact same facility as their children--possibly in a matter of hours--who have yet to be placed into ORR custody.

Ex. 11 (May 10, 2018). In other words, Albence was *concerned* that because Phoenix courts were imposing time-served sentences for the parents' § 1325(a) misdemeanor

---

[11] *See* Ex. 8 (May 10, 2018 email explaining "Yuma Sector has presented [family unit] adults for prosecution but all have been declined" and that "after the declination …adults are not being reunited with the children and they have not cancelled the placement requests for the children in the ORR portal"); Ex. 9 (May 10, 2018 memorandum stating that "Local ERO has been advised that once a child has been separated YUM will not try to reunite if prosecution is denied for parent").

[12] *See* Compl. ¶¶ 70-98, 350-354 (C.M. and B.M., and V.C. and G.A., were separated for two and half months); *see also* Ex. 10, E-mail from P. MacWilliams (Mar. 30, 2022 at 8:43 AM) (stating that "[f]or V.C. and C.M., prosecution disposition forms…were not found in E3).

convictions, parents would return to the USBP facility while their children were still there, allowing them to be reunited promptly after the parent completed their sentence. This, according to Albence, undermined the government's objective. In order to *prevent* reunifications in such circumstances, Albence identified "asks" of different agencies, writing that CBP:

> need to remain flexible and work with the [Field Office Director] *to prevent this from happening*. This may mean transporting the UACs to an ORR facility themselves, at an accelerated pace, bringing the adults to ERO after the prosecution is completed, as opposed to back to the USBP station, or any other number of new processes that may need to be established.

*Id.* (emphasis added).[13] As for DHS, Albence wrote that it was "[p]robably a good idea to just give [DHS] visibility that this issue exists, *and confirm that the expectation is that we are NOT to reunite families and release* (either pre or post [family residential center]." *Id.* (emphasis added).[14]

Several weeks later, Tae Johnson—then head of ICE's Custody Management division—described reports that CBP was reunifying families after prosecution as a

---

[13] *See also* Ex. 12 (May 26, 2018 email from CBP official noting that "'time served' is not exactly a consequence we had in mind"); Ex. 13 (May 25, 2018 email from CBP official recommending that "we cease the reunification process when a family member is given time served and sent back to CPC" and directing that "[i]f you are concerned with appearances then do not return the family unit adult back to the CPC. Take them back to an alternate temporary holding facility[.]"); Ex. 14 (May 9, 2018 email in which an ICE official wrote: "ICE will be required to house the adults after they have served their sentences […] *It is not clear whether [families] will be reunited after prosecution, but I suspect not, particularly when the child has already been placed with ORR*.") (emphasis added); Ex. 20 (Confidential), ███████████████████████████████████████████████████████

[14] Even *after* the June 20, 2018 Executive Order purporting to end the separation of families, ICE had no intention of reuniting families except for purposes of removal. *See* Ex. 15 (June 23, 2018 email from Albence stating, "[HHS] will want to know what can be done to facilitate immediate reunification. I told them that wasn't going to happen unless we are directed by the Dept to do so. *We are moving forward w[ith] reunifications only for the purposes of removal*") (emphasis added); *see also id.* (June 23, 2018 email from Nathalie Asher, then deputy ERO director, stating, "What needs to be abundantly clear is that aside from the communication piece, *any efforts for reunification is for removal only*…").

"fiasco." *See* Ex. 16 (May 25, 2018). Albence was similarly troubled, expressing that reuniting families after prosecution "obviously undermines the entire effort." Ex. 17 (May 26, 2018).

Thus, in practice, the government implemented a sweeping administrative family separation policy—the exact DHS proposal discussed throughout 2017— under the guise of a prosecution policy, which was merely pretext for the ultimate goal: separating families to deter immigration. *See supra* at 4-8; *see also C.M.* Compl. ¶ 34. Indeed, in May 2018, John Kelly, then White House Chief of Staff and the former DHS Secretary, made the government's objective clear, explaining that "[a] big name of the game is deterrence" and "[f]amily separation stands as a pretty tough deterrent." *See Transcript: White House Chief of Staff John Kelly's Interview with NPR*, NPR (May 11, 2018). Accordingly, documents concerning the DHS administrative separation proposal are critical to understanding the government's knowledge, intent, and motivation for the separations, *see* Hr'g Tr. at 11:24-12:05 (June 2, 2022), and are highly relevant to both Plaintiffs' claims and the government's defenses.

The government's assertion that the 2017 DHS proposal was not officially adopted further supports disclosure. Documents indicate that serious concerns were raised about the DHS proposal and related ICE detention proposal.[15] To the extent that the government understood and officially rejected the administrative separation proposal based on those concerns, yet implemented a similar proposal, that is highly relevant evidence for Plaintiffs' intentional infliction of emotional distress claim. Category 1 and 2 documents are also relevant to the government's knowledge of the

---

[15] *Supra* note 7 and Ex. 18 (Mar. 15, 2017 draft memorandum detailing problems with a potential family separation policy, including ORR capacity, "a myriad of international legal issues," and that it "could be considered a human rights abuse").

harms that would result from family separation and widespread communication and tracking problems, and its reckless or knowing disregard of those issues.[16]

### B.  Category 3 Documents Are Relevant to Plaintiffs' Claims

The government's contention that documents concerning "resource and manpower constraints" are not relevant to Plaintiffs' claims is similarly flawed. Such documents are likely highly relevant to, among other things, Plaintiffs' negligence claim and allegations that the government recklessly separated families without ensuring that the agencies involved had adequate personnel and resources to responsibly execute it. This litigation concerns not only the act of separation itself, but also the government's failures, among others, to plan and execute the policy to ensure that: parents were only separated from their children if they were, in fact, prosecuted; the government could track separated families so that they could be promptly reunited; and families could communicate throughout any period of separation. *See C.M.* Compl. ¶¶ 5, 50-58; *A.P.F.* Am. Compl. ¶¶ 71, 480, 489.

### C.  All Other *Warner* Factors Favor Disclosure

The other three *Warner* factors—the availability of other evidence, the government's role in the litigation, and the extent to which disclosure would hinder frank and independent discussion—likewise favor disclosure.

As to the second factor, the government incorrectly argues that the availability of other evidence weighs against disclosure because "Plaintiffs have obtained voluminous discovery going to the heart of their claims—that is, discovery regarding the Zero Tolerance Policy and resulting family separations." Opp. at 8. As discussed above, Plaintiffs were not prosecuted, and thus their separations could not have resulted purely from implementation of a Zero Tolerance *prosecution* policy. Documents related to Zero Tolerance do not provide information about deliberations that led to a policy or

---

[16] *Supra* note 15; *see also* Ex. 19 (Jan. 24, 2018 DHS CRCL memorandum with recommendations for a joint DHS/HHS "family separation work group," noting "[i]nadequate protocols" and the need for policies and procedures "to ease communication among separated family members" and facilitate reunification).

practice of separating families where the parent was *not* prosecuted, the continued separation of families long after the parent's prosecution and sentence, or the government's intent in developing and implementing the administrative separation policy.[17] *See, e.g.*, *Toomey v. Arizona*, 2022 WL 1452747, at *2-*5 (D. Ariz. May 9, 2022) (finding disclosure favored under *Warner* because "even if not specifically related" to the policy at issue, they could be relevant to the government's intent).

With respect to the third factor, the government concedes that its role in the litigation favors disclosure. Opp. at 9. This factor weighs strongly in Plaintiffs' favor where, as here, the government itself is accused of wrongdoing. *See* Mot. at 8, n. 4.

Concerning the fourth factor, many of the documents at issue are draft memoranda, which are particularly unlikely "to chill speech, even though such documents might be used to recreate the course of the decisionmaking process." *Ctr. for Envtl. Health v. Perdue*, 2019 WL 6114513, at *3 (N.D. Cal. Nov. 18, 2019). Further, courts in this Circuit (including this Court) routinely hold that this factor favors disclosure when a protective order is in place. *See* Feb. 24 Order at 10; *see also* Mot. to Compel at 8 (citing cases). The government's bare assertion that the protective order does not "reduce the potential that disclosure…would chill candor" among agency employees, and thus does not sufficiently protect the government's interests in "informed and frank discourse," Huffman Decl. ¶¶ 6-8; Price Decl. ¶¶ 6-8, is insufficient. *See Karnoski v. Trump*, 2020 WL 2405442, at *3 (W.D. Wash. May 12, 2020) (characterizing a declaration's boilerplate assertions as "so generic and non-specific as to be worthless. […] If this generic language and nothing more suffices, then under what circumstances could any claim of the deliberative process privilege in any

---

[17] While the government has produced some documents discussing the DHS administrative separation proposal, those documents reflect "only a partial picture of what occurred," *Coleman v. Sterling*, 2011 WL 13176814, at *4 (S.D. Cal. June 13, 2011), and are a poor substitute for the Category 1 and 2 documents. *Cf. L.H. v. Schwarzenegger*, 2007 WL 2009807, at *7 n. 9 (E.D. Cal. Jul. 6, 2007).

case be overcome?").[18] Like other district courts in this Circuit,[19] this Court has previously ordered disclosure of similar, sensitive deliberative materials, including "candid thoughts" and discussions because the potential "impact on frank and independent discussion" was outweighed by the other *Warner* factors. *See* Feb. 24 Order at 10. Further, "insofar as disclosure of the documents would reveal any governmental misconduct…the public's interest in honest, effective government would overcome the governmental interest in hiding such misconduct." *Doe 2 v. Esper*, 2019 WL 4394842, at *9-*10 (D.D.C. Sept. 13, 2019) (citing *In re Sealed Case*, 121 F.3d 729, 738 (D.C. Cir. 1997)).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court direct the government to produce for *in camera* review the 13 documents listed in **Attachment A** within 7 days of the Court's Order.

RESPECTFULLY SUBMITTED this 7th day of June, 2022.

Diana E. Reiter*
Erik Walsh*
Lucy McMillan*
Harry K. Fidler*
Mark Osmond*
Kaitlyn Schaeffer*
Arnold & Porter Kaye Scholer LLP
250 West 55th Street

*s/ BriAnne N. Illich Meeds*
BriAnne N. Illich Meeds, 036094
David B. Rosenbaum, 009819
Travis C. Hunt, 035491
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
(602) 640-9000
billichmeeds@omlaw.com
drosenbaum@omlaw.com

---

[18] *Trevino v. Jones*, 2009 U.S. Dist. Lexis 124206 (S.D. Ohio May 26, 2009), and *Perry v. Schwarzenegger*, 591 F.3d 1147 (9th Cir. 2010), Opp'n. at 10, are inapposite. *Trevino* concerned a motion to compel certain documents from ICE, a *third party* to the litigation. The court denied plaintiff's motion to compel, emphasizing that plaintiff "d[id] not allege any misconduct" by ICE and distinguishing "cases where serious allegations such as civil rights violations…are alleged [and] Courts generally find that the balancing test favors disclosure" because "a defendant cannot hide evidence of their own misconduct by asserting the deliberative process privilege." *Trevino*, 2009 U.S. Dist. Lexis 124206 at *25. *Perry* did not consider deliberative process privilege *at all*.
[19] *See* Mot. at 6 (Jan. 4, 2022), *C.M.* Dkt. 120; *A.P.F.* Dkt. 119 (citing cases).

New York, New York 10019-9710
212-836-8000
diana.reiter@arnoldporter.com
erik.walsh@arnoldporter.com
lucy.mcmillan@arnoldporter.com
harry.fidler.arnoldporter.com
mark.osmond@arnoldporter.com
kaitlyn.schaeffer@arnoldporter.com

Katherine Melloy Goettel*
Emma Winger*
Gianna Borroto*
American Immigration Council
1331 G Street NW, Suite 200
Washington, DC 20005
202-507-7512
kgoettel@immcouncil.org
ewinger@immcouncil.org
gborroto@immcouncil.org

Jonathan H. Feinberg*
Kairys, Rudovsky, Messing, Feinberg
& Lin LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
215-925-4400
jfeinberg@krlawphila.com

Trina Realmuto*
Mary Kenney*
National Immigration Litigation Alliance
10 Griggs Terrace
Brookline, MA 02446
617-819-4447
trina@immigrationlitigation.org
mary@immigrationlitigation.org

*Attorneys for C.M. Plaintiffs*
*Admitted Pro Hac Vice*

thunt@omlaw.com

Emily Reeder-Ricchetti*
R. Stanton Jones*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
202-942-5000
emily.reeder-ricchetti@arnoldporter.com
stanton.jones@arnoldporter.com

Mark Fleming*
Mark Feldman*
National Immigrant Justice Center
224 S. Michigan Ave., Suite 600
Chicago, IL 60604
312-660-1370
mfleming@heartlandalliance.org
mfeldman@heartlandalliance.org

1

2   *s/ Keith Beauchamp*
    Keith Beauchamp (012434)                      Matthew J. Schlesinger*
3   D. Andrew Gaona (028414)                      Jason A. Carey*
    COPPERSMITH BROCKELMAN PLC                    Jennifer Saulino*
4   2800 N. Central Avenue, Suite 1900            Terra White Fulham*
    Telephone: (602) 381-5493                     Teresa S. Park*
5   Phoenix, AZ 85004                             Kristin M. Cobb*
    kbeauchamp@cblawyers.com                      Shadman Zaman*
6   agaona@cblawyers.com                          COVINGTON & BURLING LLP
                                                  One City Center, 850 Tenth Street, NW
7                                                 Washington, DC 20001-4956
    Norma Ventura*                                Telephone: (202) 662-5581
8   James Knoepp*                                 mschlesinger@cov.com
    Sharada Jambulpati*                           jcarey@cov.com
9   SOUTHERN POVERTY LAW CENTER                   jsaulino@cov.com
    P.O. Box 1287                                 tfulham@cov.com
10  Decatur, GA 30031                             tpark@cov.com
    Telephone: (404) 521-6700                     kcobb@cov.com
11  norma.ventura@splcenter.org                   szaman@cov.com
    jim.knoepp@splcenter.org
12  sharada.jambulpati@splcenter.org

13  Paul R. Chavez*
14  SOUTHERN POVERTY LAW CENTER
    P.O. Box 370037
15  Miami, FL 33137
    Telephone: (786) 347-2056
16  paul.chavez@splcenter.org

17

18  *Attorneys for A.P.F. Plaintiffs*
19  *\* Admitted pro hac vice*

20

21

22

23

24

25

26

27

28