David B. Rosenbaum (009819)
Travis C. Hunt (035491)
BriAnne N. Illich Meeds (036094)
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
Telephone: (602) 640-9000
drosenbaum@omlaw.com
thunt@omlaw.com
billichmeeds@omlaw.com
*Counsel for C.M. Plaintiffs*
*(Additional Counsel Listed on Signature Page)*

*Counsel for Plaintiffs (Additional Counsel for Plaintiffs Listed on the Signature Page)*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| C.M., on her own behalf and on behalf of her minor child, B.M.; L.G., on her own behalf and on behalf of her minor child, B.G.; M.R., on her own behalf and on behalf of her minor child, J.R.; O.A., on her own behalf and on behalf of her minor child, L.A.; and V.C., on her own behalf and on behalf of her minor child, G.A., <br><br>        Plaintiffs, <br><br> v. <br><br> United States of America, <br><br>        Defendant. | No. 2:19-cv-05217-SRB <br><br> **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT UNITED STATES OF AMERICA'S MOTION TO COMPEL THE ADULT PLAINTIFFS TO SUBMIT TO RULE 35 PSYCHOLOGICAL EXAMINATIONS AND SECOND MOTION TO EXTEND EXPERT DISCOVERY DEADLINES** |

### **INTRODUCTION**

The United States has for the better part of two years explicitly acknowledged that its policy decisions that led to the separations of the five Plaintiff families in this action caused longstanding trauma and emotional harm for parents and children alike. Despite that acknowledgment, the United States has moved for permission to subject each of the adult Plaintiffs to day-long psychological examinations for the purported purpose of assessing the harms each Plaintiff suffered. It filed this motion on the second-to-last possible date for service of its expert reports, more than three months after it informed Plaintiffs' counsel of its plan to seek such examinations, and it seeks an additional 60 days to complete the examinations and serve reports.

Plaintiffs recognize that in a case like this one, where the alleged harm is severe and ongoing emotional distress, it is normal practice for a court to permit defendants to conduct their own psychological examinations under Fed. R. Civ. P. 35(a). In the circumstances of this case, however, where the government's highest officials have already acknowledged the psychological suffering experienced by each Plaintiff, and where the government has waited until the last possible moment to seek permission to conduct its own examinations, normal practices do not apply. Because the government cannot establish the requisite "good cause" under Fed. R. Civ. P. 35(a)(2)(A) that would justify this Court's exercise of discretion to permit the examinations to go forward, the motion should be denied in all respects. Alternatively, if the Court were to allow the examinations, the proposed examinations, and the timeframe for conducting them, should be significantly curtailed.

### **BACKGROUND**

**I.    Defendant's Acknowledgment of Plaintiffs' Severe Emotional Harm**

The five Plaintiff families have brought claims under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) *et seq.*, alleging that, among other things, employees of the federal government intentionally caused them extreme and life-altering harm when

2

those employees separated them from one another upon their entry to the country in and around May 2018, failed to track where each family member was sent after their separation, failed to provide opportunities for family members to communicate with one another, and failed to reunite them until a court ordered them to do so.  That Plaintiffs would suffer emotional harm was never in question.  More than a year before Plaintiffs entered the country, when plans to separate families were publicized, the government was warned about the traumatic impact of separation.  For example, on January 30, 2017, the American College of Physicians issued a public statement raising concerns "about the health consequences of policies that would split up families, including separating parents and children from each other."[1]  Similarly, on March 4, 2017, the American Academy of Pediatrics issued a statement focused on children, noting that the "additional trauma of being separated" from caregivers would exacerbate the stress children experience when seeking refuge in the United States.[2]

Despite these warnings, family separation practices were implemented—because the resulting harm was the entire point.  As the President's then-Chief of Staff confirmed in a press appearance on May 11, 2018, separations would be a "tough deterrent."[3]  Indeed, as discovery has shown in this case, the officials charged with implementing the separation policy spent May 2018 focused on preventing U.S. Border Patrol from reunifying parents and children, as doing so would undermine the entire effort to deter immigration by causing trauma to families.  ECF No. 210 at 5-9.

---

[1] Am. College of Physicians, *Immigration Position Statement* (Jan. 30, 2017), https://www.acponline.org/acp_policy/policies/immigration_position_statement_2017.pdf.

[2] Fernando Stein & Karen Remley, Am. Acad. Of Pediatrics, *AAP Statement Opposing Separation of Mothers and Children at the Border* (Mar. 4, 2017), https://www.aap.org/en/news-room/news-releases/pediatrics2/2017/immigrantmotherschildrenseparationv/.

[3] *Transcript: White House Chief of Staff John Kelly's Interview with NPR*, NPR (May 11, 2018), https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

As this litigation has progressed, the government has fully acknowledged that its practices had their intended effect.  Its recent statements on this point have been numerous, but they have all had the same unassailable theme: that separating parents and children caused significant trauma.  That recognition started before the current administration took office, with the President, then a candidate, declaring that family separation was "criminal," "abhorrent," and "violates every notion of who we are as a nation."[4]  The government echoed this position in this litigation, informing the Court that "President Biden has 'condemn[ed] the human tragedy that occurred when our immigration laws were used to intentionally separate children from their parents or legal guardians . . . including through the use of the Zero-Tolerance Policy.'"  ECF No. 99 at 2.  Department of Homeland Security (DHS) Secretary Alejandro Mayorkas has referred to family separation as "unconscionable,"[5] and "way outside the bounds of what we as a civilized and humane country would ever countenance."[6]  Based on his personal meetings with separated families, the Secretary described the "immense trauma they have suffered" due to their separations.[7]  The Secretary, likewise, confirmed the administration's understanding of the harm's longevity.  In testimony before the Senate Judiciary Committee three-and-a-half years after most families were separated (including Plaintiffs), the Secretary stated that "tragically the trauma of that

---

[4] Jonathan Blitzer, *Why Biden Refused to Pay Restitution to Families Separated at the Border*, The New Yorker (Dec. 22, 2021), https://www.newyorker.com/news/news-desk/why-biden-refused-to-pay-restitution-to-families-separated-at-the-border.
[5] DHS Press Release, *DHS to Request Public Input on How the U.S. Government Can Prevent Family Separations at the U.S. Border* (Dec. 9, 2021), https://www.dhs.gov/news/2021/12/09/dhs-request-public-input-how-us-government-can-prevent-family-separations-us-border.
[6] Caitlin Dickerson, *The Secret History of the U.S. Government's Family-Separation Policy*, The Atlantic (Aug. 7, 2022), https://www.theatlantic.com/magazine/archive/2022/09/trump-administration-family-separation-policy-immigration/670604/.
[7] *Supra* note 5.

4

separation, even though they are now physically reunited, continues."[8]

Indeed, as a result of a settlement in another case, the government is providing mental health services to families separated at the border under the prior administration's policies.[9]  It has pursued a publicity campaign fully endorsing the concept that separations caused longstanding emotional harm.  A flyer regarding the services, which is posted on the DHS website,[10] asks:

> Were you separated from your children when you came to the U.S.?
>
> Are you or your children experiencing anxiety, fear, anger, sadness, or difficulty sleeping since being reunified?

The flyer advises that people who continue to suffer the effects of their separation are "entitled to receive help" and can arrange for services free of charge.[11]

## II.   The History of Defendant's Request for Psychological Examinations

### A.  The Parties' Early Contemplation of Expert Disclosures

Since the outset of this case, the government has known about Plaintiffs' claims that they suffered the same severe and longstanding emotional harm described above.  The government recognizes as much in the instant motion.  *See* ECF No. 288 at 5-6 (highlighting Plaintiffs' allegations of emotional harm).  The government was, likewise, aware from the earliest stage of the case that Plaintiffs would prove their damages with expert testimony.  The parties' joint case management plan proposed

---

[8] *Oversight of the Depart. of Homeland Security: Hearing Before the S. Comm. on the Judiciary*, 117th Cong. 45:19 (Nov. 16, 2021) (statement of Alejandro N. Mayorkas, Secretary, U.S. Dept. of Homeland Security), https://www.judiciary.senate.gov/meetings/10/20/2021/oversight-of-the-department-of-homeland-security.
[9] The services are provided by the Seneca Family of Agencies.  *See* https://senecafoa.org/todopormifamilia/. The services were arranged following an injunction entered in *J.P. v. Sessions*, No. 18-6081, 2019 WL 6723686 (C.D. Cal. Nov. 5, 2019).
[10] *See* Ex. 1, https://www.dhs.gov/sites/default/files/publications/21_1004-todopormifamiliainfographic_english_0.pdf.
[11] *Id.*

5

deadlines for affirmative, rebuttal, and supplemental expert disclosures.  ECF No. 42 at 13.  In light of the parties' proposal, the Court's first Case Management Order imposed deadlines for the parties to serve expert reports.  ECF No. 47 at 2.

The parties engaged in preliminary discovery until April 19, 2021, when, at the government's instigation, the parties jointly moved to hold the case in abeyance to allow for efforts to negotiate a global settlement of all family separation cases.  ECF No. 101.  Those negotiations lasted eight months until the government terminated them without explanation, leading Plaintiffs to file on December 21, 2021, a motion to lift the Court's previous Order staying the case.  ECF No. 118.

The Court granted that motion and, on March 1, 2022, issued an Amended Case Management Order.  ECF No. 144.  The Amended Order implemented the same scheduling structure as the initial order with respect to experts, providing deadlines of August 25, 2022, for Plaintiffs' disclosures; September 23, 2022, for the government's disclosures; and October 24, 2022, for rebuttal disclosures.  *Id.* at 4.

### B.  Information Provided to the Government Regarding Plaintiffs' Traumatic Emotional Harms

As the parties conducted discovery, the government received extensive evidence of the harms Plaintiffs suffered when they were separated—harms that were unsurprisingly consistent with what the government expected.  Much of this information was provided through the depositions of each adult Plaintiff that the government conducted between June 28, 2022, and July 14, 2022.  For example, Plaintiff L.G. testified with painstaking detail over 18 pages of transcript how she sobbed when her seven-year-old daughter was taken from her; how, after the separation, she spent nine days in a cell with other women whose children had been taken from them; how she was transported around the country to different detention facilities, in fear she would be deported without her daughter; and how when she finally had a phone call with her daughter weeks later, the call lasted just minutes and

the only thing her daughter said to her was "mommy, I miss you."  Ex. 2 at 81-98; *see also* https://immigrantjustice.org/cm-v-us-deposition-testimony-separated-mother (video excerpt of L.G.'s deposition testimony).[12]

The government also received substantial documentary evidence outlining Plaintiffs' ongoing harms. Three of the adult Plaintiffs had mental health evaluations conducted while they were detained in late 2018 after reunification with their children, and records of those evaluations have been in the government's possession since then. Additionally, for Plaintiff V.C. and her son G.A., the government received at least 70 pages of records from a mental health clinician who has provided services through the Seneca Family of Agencies.[13]  *See* Ex. 3 (filed under seal).  The records describe regular counseling sessions and provide definitive diagnoses.  For Plaintiff V.C., the records show the clinician's diagnosis of "excessive anxiety, worry for [G.], w[ith] grief (after loss and trauma) symptoms."  *Id.* at 3.  For Plaintiff G.A., who was six at the time of his separation and ten when he started treatment, the records report that he had "been crying, avoiding school for 3 years," was "sleeping a lot," had headaches, and was fatigued.  *Id.*  The clinician diagnosed him with Separation Anxiety disorder, noted his symptoms of Post-Traumatic Stress Disorder, and concluded that he had "Stockholm Syndrome" due to "trauma bond[ing]" with the foster mother responsible for his care after he was taken from his mother.  *Id.*

Significantly, the government learned through its deposition questioning about the Plaintiffs' evaluations with an expert forensic psychiatrist, Dr. Annie Steinberg.[14]

---

[12] For several other of the adult Plaintiffs, counsel for the government asked few, if any, questions about the Plaintiffs' experiences at the time of their separations.

[13] See supra note 9.

[14] Dr. Steinberg is a child and adolescent psychiatrist and Clinical Professor in the Department of Psychiatry at the Perelman School of Medicine at the University of Pennsylvania.  She directs the Child Forensic Psychiatry track in the Forensic Psychiatry Fellowship at the University of Pennsylvania and supervises adult and

1  *See* Ex. 4 at 98-100 (O.A. testimony regarding meetings with "Annie" and counsel's

2  explanation that O.A. was referring to an expert witness); Ex. 2 at 124-25 (L.G.

3  testimony referencing evaluation arranged by her attorneys and counsel's

4  confirmation that L.G. had met with an expert witness); Ex. 5 at 121-22 (M.R.

5  testimony regarding meeting arranged by her attorneys with "Annie").

### C.  The Three-Month Lead-Up to the Government's Motion for Rule 35 Examinations

On June 14, 2022, the government informed Plaintiffs' counsel that it intended

to serve Fed. R. Civ. P. 35 Notices of psychological examinations for all Plaintiffs—

adults and children—to take place between July 20, 2022, and September 7, 2022.

Ex. 7 at 7.  After Plaintiffs' counsel asked a series of questions about the parameters

of the government's proposed examinations, *id.* at 5-7, on June 29, the government

stated that it planned to seek a Court Order authorizing the examinations by the end of

the following week (that is, by July 8, 2022).  *Id.* at 6.  During the parties' meet and

confer on July 1, 2022, Plaintiffs' counsel asked for information about the proposed

examiners, the length of their proposed examinations, and details about the tests the

examiners would conduct.  The government informed counsel that its two examiners,

one for the adult Plaintiffs and one for the child Plaintiffs, would conduct eight-hour

examinations of each adult and child, and that the examiners would not permit the

adult Plaintiffs to be present during the children's examinations.  *Id.* at 2, 4-5.  After

the meet and confer, the government informed Plaintiffs' counsel that it would not

disclose information about the testing to be conducted on the Plaintiffs.  *Id.* at 4.

In an exchange of emails on July 5 and July 6, Plaintiffs' counsel informed the

government that Plaintiffs would not consent to the examinations.  *Id.* at 2-3.  Five

days later, on July 11, the government asked for Plaintiffs' consent to the filing of its

child psychiatry residents.  Dr. Steinberg's private practice focuses on post-traumatic
disorders in children and adults.  *See* Ex. 6 at 1.

motion regarding the examinations under seal.  *Id.* at 1.  Plaintiffs' counsel responded later that day that Plaintiffs did not consent to a sealed filing and noted that the motion could reference Plaintiffs by initials and seal only any necessary exhibits.  *Id.* at 1.

The government did not file its promised motion on July 11.  Nor did it file it any time in the following two weeks.  The next time the government raised the issue of Rule 35 examinations with Plaintiffs' counsel was on July 27, 2022, when it requested Plaintiffs' consent to a 60-day extension of the government's expert disclosure deadline to allow for the government to review Plaintiffs' expert disclosures and "make determinations on whether we will go forward with seeking Rule 35 examinations," Ex. 8 at 6, a change in position from the government's earlier, definitively stated intention to seek examinations.  This proposal came one month before Plaintiffs' expert disclosures were due.  Counsel exchanged a series of proposals and counterproposals regarding the timing of expert disclosures, *id.* at 1-5, leading to Plaintiffs' August 9 proposal that the government extend its expert disclosure deadline by 30 days in return for an extension of time for Plaintiffs to disclose potential expert reports on liability issues.  *Id.* at 1.  Thereafter, on August 12, the government moved the Court for a 60-day extension of its expert disclosure deadline, contending that the additional time would allow it to "review Plaintiffs' expert reports before determining whether to seek Rule 35 examinations by the United States' experts."  ECF No. 268 at 4.  The Court denied the motion on August 18, ruling that the requested extension was premature.  ECF No. 276 at 2.

On August 25, 2022, Plaintiffs disclosed to the government Dr. Steinberg's expert reports for each Plaintiff.  The reports for each Plaintiff consisted of two portions: (1) a report dated January 15, 2020, addressing the then-extant medical literature on the impact of separation on parents and children and an evaluation of each adult and child Plaintiff's psychiatric functioning and (2) a supplemental report dated August 25, 2022, providing an update on both recent medical literature and each

1    adult and child Plaintiff's psychiatric functioning.

2        **D. The Government's Current Request for Rule 35 Examinations**

3        More than two weeks after Plaintiffs' disclosed Dr. Steinberg's reports,[15] on

4    September 9, 2022, the government informed Plaintiffs' counsel that it wished to

5    revisit the issue of Rule 35 examinations.  Ex. 9 at 8-9.  The government's request

6    was not based on anything learned from its review of Dr. Steinberg's reports.  Instead,

7    it was based on "recent developments," namely the fact that in another case, in

8    another jurisdiction, counsel for a separated family agreed to an eight-hour

9    examination of the adult plaintiff and, after a dispute over the child plaintiff, the court

10   ordered a six-hour examination of that child plaintiff with permission for the parent to

11   be present during the examination.  *Id.*

12       Plaintiffs' counsel responded to the request by noting that the government had

13   provided no information about why it now sought examinations despite its previous

14   representations that it would base its decision on its review of Plaintiffs' expert

15   reports.  *Id.* at 7.  Plaintiffs informed the government, further, that there did not appear

16   to be any justification for the requested examinations given Dr. Steinberg's reports

17   finding that each Plaintiff suffered harm substantially similar to that described in the

18   government's public statements.  *Id.*  Finally, because it was not clear to Plaintiffs

19   what the government intended to accomplish in the proposed examinations (given that

20   it previously refused to provide details regarding its intended examinations, *see* Ex. 7

21   _____

22   [15] In the intervening time, on August 29, the government requested information about

23   standard instruments and questionnaires to which Dr. Steinberg's reports made
     passing reference.  Dr. Steinberg had used those materials to ensure comprehensive

24   questioning during the narrative interviews she conducted with each Plaintiff.  On
     September 13 (with the short delay occasioned by Dr. Steinberg's work and vacation

25   related travel), Plaintiffs provided 66 pages of questionnaires and documents used by

26   Dr. Steinberg.  As noted, the government initiated its latest request for Rule 35
     examinations before it had received this information—confirming that this

27   information did not factor into the government's decision to file the instant motion.

28                                        10

1    at 4), Plaintiffs' counsel asked the government to inform Plaintiffs why it was seeking

2    evaluations and what type of testing it would perform.  Ex. 9 at 7.

3         After a meet and confer on September 15, the government provided some

4    additional details regarding the examinations it proposed to conduct for both the adult

5    Plaintiffs and child Plaintiffs.  *Id.* at 3-5.  On September 19, the government requested

6    Plaintiffs' position on an "initial" 30-day extension of the deadline for the

7    government's expert disclosures, without any indication of what additional extensions

8    it might request.  *Id.* at 3.  Plaintiffs' counsel did not agree to that request.  *Id.* at 2.

9         On September 22, the government informed Plaintiffs that it intended to move

10   for permission to conduct examinations of the adult Plaintiffs and for an extension of

11   time to serve its expert disclosures—for 60 days from any Order granting leave to

12   conduct the examinations or 30 days from any Order denying leave to conduct the

13   examinations.  *Id.* at 1-2.  Plaintiffs' counsel again declined to agree to the

14   government's requests.  *Id.* at 1.  The government then filed its motion. ECF No. 288.

15        The government's September 22 correspondence referenced only an intent to

16   seek the Court's permission to conduct examinations of the adult Plaintiffs, conveying

17   the impression that it would not seek examinations of the child Plaintiffs. Ex. 9 at 1.

18   In its motion, however, the government indicates that it still might seek permission to

19   conduct examinations of the child Plaintiffs at some undetermined future time. ECF

20   No. 288 at 3-4 n.1.[16]

21                              **ARGUMENT**

22   **I.    The Court Should Not Permit the Government to Conduct the Requested
         Psychological Examinations.**

23        Under Rule 35(a)(1)-(2), a request to subject a party to a psychological

24   examination must establish that the "party's mental condition is 'in controversy' and

25   _____

26   [16] Plaintiffs oppose examinations of the child Plaintiffs for additional reasons not
     addressed here. Should the government seek those examinations, Plaintiffs would

27   seek leave for further briefing.

28                                    11

the movant has shown 'good cause' for the requested examination." *Clark v. City of Tucson*, No. CV-08-300, 2009 WL 10673474, at *1 (D. Ariz. July 14, 2009). Plaintiffs do not dispute the first point and acknowledge that they have placed their mental condition "in controversy" by "alleging serious and permanent psychological injury and damage." *Id.* at *4. That element of the analysis is not, however, dispositive. The question of "good cause" remains firmly within the Court's discretion. Accordingly, "requests for examination under Rule 35(a) must be decided on a case by case basis under all relevant circumstances and 'are only to be ordered upon a discriminating application by the district judge of the limitations prescribed by the Rule.'" *Id.* at *1 (quoting *Schlagenhauf v. Holder*, 379 U.S. 104, 118, 121 (1964)). The Court must carefully consider "the interest of the party to be examined in avoiding unnecessary invasion of privacy balanced against the moving party's right to a fair trial." *Id.* (quoting *Haqq v. Stanford Hospital and Clinics*, No. C 06-5444, 2007 WL 1593224, at *1 (N.D. Cal. June 1, 2007)).

This balancing test places a substantial burden on the party seeking the examination. "'Good cause' for a mental examination requires a showing that the examination could adduce specific facts relevant to the cause of action and *necessary* to the defendant's case." *Ragge v. MCA/Universal Studios*, 165 F.R.D. 605, 609 (C.D. Cal. 1995) (quoting Lindemann & Kadue, *Sexual Harassment In Employment Law,* 560 (BNA 1993)) (emphasis added). Put differently, good cause is "established by a showing that the defendant has no other method to discover relevant information; there is simply no less intrusive means." *Id.*; *see also Vangieson v. Austin*, No. 20cv1033, 2021 WL 3908618, at *5 (S.D. Cal. Aug. 16, 2021) (quoting *Conforto v. Mabus*, No. 12-cv-1316, 2014 WL 3407053, at *3 (S.D. Cal. July 10, 2014) (discussing factors relevant to good cause analysis including "the possibility of obtaining desired information by other means"). Courts apply this standard strictly and generally require a compelling showing. For example, in *Lahr v. Fulbright &*

12

*Jaworski, L.L.P*, 164 F.R.D. 196, 200-01 (N.D. Tex. 1995), the court allowed the defendants to conduct an examination of the plaintiff because, besides taking deposition testimony and receiving various counselors' reports, the defendants had only been provided with a portion of a *single* page of the plaintiff's medical records.

Importantly, even if a moving party can demonstrate good cause for an examination, the Court is under no mandatory obligation to allow the examination. "Regardless of the outcome of the 'good cause' inquiry, courts have discretion in ordering a mental examination." *Mueller v. Cnty. of San Bernardino*, No. EC CV 18-151, 2019 WL 9050998, at *5 (C.D. Cal. Dec. 19, 2019) (citing *Bucher v. Krause*, 200 F.2d 576, 583 (7th Cir. 1952); *Nguyen v. Qualcomm, Inc.*, No. CIV 09-1925, 2013 WL 3353840, at *4 (S.D. Cal. July 3, 2013)); *Silva v. Mercado Food Enter., Inc.*, No. 1:10-cv-02368, 2012 WL 174926, at *3 (E.D. Cal. Jan. 20, 2012) ("Nevertheless, even where the mental condition is in controversy and good cause for the examination has been shown, it is still within the [c]ourt's discretion to refuse to order an examination.").

Upon application of these standards, the government's request for psychological examinations of the adult Plaintiffs should be denied.  The government has failed to meet its burden of demonstrating good cause to support its request.  Even if it had met this burden, though, the facts and circumstances of this case justify the Court using its discretion not to allow the examinations to proceed.  Two reasons support such a ruling.

First, the government does not require the examinations because it already *knows* how Plaintiffs have been traumatized.  As recounted above:

- Outside experts publicly warned the government that trauma and its related long-term consequences would result from its separation practices;
- The government proceeded with its plans to separate parents and children because causing emotional harm was the entire point of those practices;

13

- The government has repeatedly acknowledged, including in filings in this litigation, that parents and children were harmed due to their separations;

- High ranking officials have confirmed their understanding that the harm caused by separations is longstanding and severe;

- The government has acknowledged the need for intensive treatment by funding free mental health services for families who were separated; and

- The government has received an abundance of information about Plaintiffs' specific harms through documentary discovery (including, for Plaintiff V.C., records of government-funded treatment), Plaintiffs' deposition testimony, and expert reports.

While the government's motion emphasizes that Rule 35 evaluations are permitted in the normal course, none of the cases cited in support of that proposition involved the rare set of circumstances present here where the requesting defendant intentionally caused harm, acknowledged that harm and that it was intentionally caused, offered treatment for that harm, obtained specific information about the plaintiffs' harm, and then asked for *even more* information through invasive examinations and testing.[17]  In short, this history precludes any finding that the requested examinations are "necessary to the [government's] case."  *Ragge*, 165 F.R.D. at 609.

Second, the government's lengthy delay and changing reasons for seeking psychological examinations undermines its claimed good cause.  The government has known from the outset of the litigation that Plaintiffs' case would rely on expert testimony—and, if it had any doubts, they were resolved through Plaintiffs'

---

[17] The closest analogy to the government's request in this matter is found in cases involving defense requests to conduct repeat examinations.  Courts have uniformly rejected such requests.  *See, e.g., Melhorn v. N.J. Transit R. Ops., Inc.*, 203 F.R.D. 176, 177–78 (E.D. Pa. 2001) (rejecting request for independent medical examinations where defendant's medical experts had already conducted examinations of plaintiff for company policy reasons before litigation).

14

deposition testimony referring to evaluations with Dr. Steinberg.  The government, likewise, knew of its September 23, 2022 deadline for expert disclosures for more than six months following the Court's issuance of an Amended Case Management Order.  Though it gave every indication during the parties' discussions in July 2022 that it would imminently seek examinations, it inexplicably declined to file any motion in that timeframe after Plaintiffs communicated their opposition to filing a motion under seal.  The government, instead, delayed by reporting that it would review Plaintiffs' expert reports before deciding whether to proceed with examinations, but, when it reinitiated its request that Plaintiffs consent to the examinations, it mentioned nothing about those reports, instead basing its request on the strategic decisions made by other lawyers, in another case, in another jurisdiction.[18]  Given that the government has the burden to convince the Court that its need for examinations outweighs Plaintiffs' interests, *Clark*, 2009 WL 10673474, at *1, shifting justifications seriously undermines the government's claims.  Indeed, even now, the government has further shifted its position, first informing Plaintiffs prior to filing its motion that it would seek examinations of the adult Plaintiffs without mention of the children, but then indicating that it still might seek permission to conduct examinations of the child Plaintiffs.

Further, Plaintiffs' interests in not being subjected to the examinations are significant and extend well beyond the general interest in avoiding an invasive and re-traumatizing experience.  Specifically, in bringing this action Plaintiffs have committed to seeking accountability for the harms they suffered.  They have answered

---

[18] That the government sought to negotiate the parameters of evaluations with Plaintiffs does not excuse this delay.  Plaintiffs' counsel made clear to the government throughout discussions between July and September that they had significant objections to subjecting Plaintiffs to the examinations the government proposed. Given those discussions and the government's longstanding knowledge of its September 23 deadline, it was aware of the need to file a timely motion.

discovery requests, authorized the release of detailed personal health information, and testified in depositions—all after an eight-month delay occasioned by the government's instigation of settlement negotiations that it later unilaterally terminated without explanation.  Requiring Plaintiffs to attend day-long evaluations—and the associated tasks of arranging time away from work or for childcare—imposes significant costs and burdens *after* the time provided for discovery when Plaintiffs could have expected any Court-ordered examinations to occur.[19]

Plaintiffs' strong interests in not participating in the examinations, therefore, substantially outweigh the government's lack of need to conduct the examinations, and the Court should exercise its discretion to deny the government's request.

## II.   If the Court Permits the Requested Examinations, It Should Place Careful Limits on the Parameters and Timeframe of the Examinations.

In the event the Court permits the government to conduct the examinations it requests, those examinations should be narrowly tailored to avoid undue burden on, and harm to, the Plaintiffs.  Plaintiffs make requests in the following five areas:

*Duration*: Although courts often defer to the judgment of the relevant examiner on the length and nature of an examination,[20] given the circumstances outlined above regarding the government's lack of any need for detailed examinations and the government's delay, limitations on the duration are appropriate in this case. *See Shadix-Marasco v. Austin Reg'l Clinic P.A.*, No. A-09-CA-0891, 2011 WL 2011483, at *6 (W.D. Tex. May 20, 2011) (limiting the examination in a sexual harassment case to one hour where defense counsel had previously asked plaintiff

---

[19] The government's assertion that allowing examinations to take place will not require an adjustment of the Court's schedule for dispositive motions misses the mark, as the harm to Plaintiffs of conducting examinations in the manner the government requests has little to do with when dispositive motions are litigated.

[20] Plaintiffs do not at this stage of the case, object to the government's use of Dr. Ricardo Winkel.  Plaintiffs expressly reserve the right to seek to exclude Dr. Winkel's testimony on *Daubert* grounds or other bases at a later stage.

16

multiple deposition questions about plaintiff's past sexual abuse); *Hirschheimer v. Associated Metals & Minerals Corp.,* No. 94 CIV 6155, 1995 WL 736901, at *5 (S.D.N.Y. Dec. 12, 1995) (limiting examinations to two 90-minute sessions where expert had access to personality testing data and deposition testimony).  Plaintiffs request that the Court limit any examinations of Plaintiffs to no more than four hours.

*Language*: Although the government represents that Dr. Winkel conducts evaluations in Spanish, an adult Plaintiff in this matter speaks an Indigenous language and will require interpretation.  Further, at least one Plaintiff is unable to read in her native language and will not be able to participate in any testing that requires reading or writing.  Any examinations of Plaintiffs should, therefore, make allowances for appropriate interpretation and avoid the necessity of reading and writing.

*Recording*: Given Plaintiffs' concerns regarding the language and literacy issues noted above, the Court should require the video recording of the examinations.  *See Schaeffer v. Sequoyah Trading & Transp.,* 273 F.R.D. 662, 664 (D. Kan. 2011) (requiring videotaping of the examination where Plaintiff had demonstrated difficulty remembering everyday events and would be unable to recount to his counsel what occurred during the examination).  Alternatively, the Court should require audio recording of the evaluation; in prior cases, the government's proposed examiner, Dr. Winkel, has agreed to such recording.  *Halliday v. Spjute,* No. 1:07-cv-00620, 2015 WL 3988903, at *4 (E.D. Cal. June 30, 2015).

*Travel*: The government suggests in its motion that Plaintiffs may be required to travel to account for its expert's licensing issues.  As described above, any delays in obtaining appropriate licensing arrangements are a problem of the government's own making given its delay in seeking approval for the proposed examinations.  The adult Plaintiffs are employed in low wage jobs with no paid time off.  They have young children and require childcare in their absence. They should not be subjected to an additional burden requiring travel far from their homes.  *See Alvarado v. Nw. Fire*

17

1  *Dist.*, No. 19-cv-0198, 2020 WL 2199240, at *3 (D. Ariz. May 6, 2020) (ruling that it

2  was not reasonable to require Plaintiff to travel to Phoenix for evaluation).

3        ***Time Frame***: The government's second request for relief in addition to an

4  Order requiring Plaintiffs to submit to psychological examinations is for a period of

5  60 days to complete its examinations and disclose its reports.  For the same reasons

6  discussed above regarding the government's delays in seeking leave to conduct the

7  examinations, the Court should limit the time for conducting the examinations to 30

8  days.  The government has already delayed this portion of the case by (1) failing to

9  file this motion in July when it represented to Plaintiffs that it would do so and

10  changing its position only after Plaintiffs disputed the need for filing under seal; and

11  (2) filing the instant motion the day before its expert reports were due.  Plaintiffs

12  further request that the Court deny the government any additional time to consider

13  whether to conduct examinations of the child Plaintiffs.

14  **CONCLUSION**

15        For the foregoing reasons, the Court should deny the government's motion to

16  conduct psychological examinations of the adult Plaintiffs under Fed. R. Civ. P. 35(a).

17  In the event the Court allows the examinations to proceed, it should place strict

18  limitations in order to minimize the burdens placed on Plaintiffs.

19        Respectfully submitted, this 6th day of October 2022.

20

21  /s/ BriAnne N. Illich Meeds

22  OSBORN MALEDON, P.A.
23  David B. Rosenbaum (009819)
   Travis C. Hunt (035491)
24  BriAnne N. Illich Meeds (036094)

25

26

27

28  18

ARNOLD & PORTER KAYE SCHOLER LLP
Diana Reiter*
Erik Walsh*
Lucy McMillan*
Harry Fidler*
Kaitlyn Schaeffer*
Brian Auricchio*
Julia Kindlon*
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
diana.reiter@arnoldporter.com
erik.walsh@arnoldporter.com
lucy.mcmillan@arnoldporter.com
harry.fidler@arnoldporter.com
kaitlyn.schaeffer@arnoldporter.com
brian.auricchio@arnoldporter.com
julia.kindlon@arnoldporter.com

ARNOLD & PORTER KAYE SCHOLER LLP
R. Stanton Jones*
David Hibey*
Emily Reeder-Ricchetti*
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 942-5000
stanton.jones@arnoldporter.com
david.hibey@arnoldporter.com
emily.reeder-ricchetti@arnoldporter.com

ARNOLD & PORTER KAYE SCHOLER LLP
Sean Morris*
777 South Figueroa Street
Los Angeles, CA 90017-5844
sean.morris@arnoldporter.com

KAIRYS, RUDOVSKY, MESSING, FEINBERG & LIN LLP
Jonathan H. Feinberg*
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
Telephone: (215) 925-4400
jfeinberg@krlawphila.com

NATIONAL IMMIGRANT JUSTICE CENTER
Mark Fleming*
Mark Feldman*
224 S. Michigan Ave., Suite 600
Chicago, IL 60604
Telephone: (312) 660-1370
mfleming@heartlandalliance.org
mfeldman@heartlandalliance.org

19

1

NATIONAL IMMIGRATION LITIGATION ALLIANCE
Trina Realmuto*

2

Mary Kenney*
10 Griggs Terrace

3

Brookline, MA 02446
Telephone: (617) 819-4447

4

trina@immigrationlitigation.org
mary@immigrationlitigation.org

5

6

AMERICAN IMMIGRATION COUNCIL
Katherine Melloy Goettel*
Emma Winger*

7

Gianna Borroto*
1331 G Street NW, Suite 200

8

Washington, DC 20005
Telephone: (202) 507-7512

9

Telephone: (202) 742-5619
kgoettel@immcouncil.org

10

ewinger@immcouncil.org
gborroto@immcouncil.org

11

12

*Attorneys for Plaintiffs C.M. et al.*
*\* Admitted pro hac vice*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

20