David B. Rosenbaum, 009819
Travis C. Hunt, 035491
BriAnne N. Illich Meeds, 036094
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
(602) 640-9000
drosenbaum@omlaw.com
thunt@omlaw.com
billichmeeds@omlaw.com
*(Additional Counsel Listed on the Signature Page)*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| C.M., on her own behalf and on behalf of her minor child, B.M.; L.G., on her own behalf and on behalf of her minor child, B.G.; M.R., on her own behalf and on behalf of her minor child, J.R.; O.A., on her own behalf and on behalf of her minor child, L.A.; and V.C., on her own behalf and on behalf of her minor child, G.A.,<br><br>Plaintiffs,<br><br>v.<br><br>United States of America,<br><br>Defendant. | No. 2:19-cv-05217-SRB<br><br>**MOTION FOR LEAVE TO CONDUCT THE DEPOSITION OF KIRSTJEN NIELSEN** |

**I.    INTRODUCTION**

Plaintiffs are asylum-seeking children and parents who were forcibly separated from their families as the result of intentional decisions made at the highest levels of the United States government. In this motion, Plaintiffs request leave to conduct the deposition of Former Secretary of the U.S. Department of Homeland Security ("DHS") Kirstjen Nielsen.

Plaintiffs were separated from their respective children pursuant to a policy and practice developed by high-ranking government officials to intentionally traumatize migrant families, in an effort to deter others from seeking asylum in the United States. This practice began in 2017 and was expanded after the Department of Justice's ("DOJ") announcement of the Zero Tolerance Policy in 2018. After the announcement of the Zero

Tolerance Policy, on May 4, 2018, Ms. Nielsen signed a Memorandum titled "Increasing Prosecutions of Immigration Violations," and thereby put into effect a formal policy that caused the separation of thousands of asylum-seeking families at the border (the "DHS Referral Policy").

Defendant separated families without telling them when—or even if—they would ever see each other again. Some children were sent thousands of miles away from their parents; others were abused and neglected while in the government's custody. All suffered physical, mental, and emotional harm as a result of the separation from their parent or child. These harms were intended, not incidental: the government inflicted terror on these families in a barbaric effort to deter others from migrating to the United States. As a result, Plaintiffs have asserted claims for negligence, intentional infliction of emotional distress ("IIED") and loss of consortium.

With respect to their negligence claim, Plaintiffs contend the government was negligent because, *inter alia*, it: had no system for tracking the existence of parent-child relationships; limited (or prevented altogether) communications between children and separated parents; implemented its mandate to separate families with no plan for reunifying children with their parents; and allowed certain of the children to be abused while in custody.

As for their IIED claim, Plaintiffs contend that federal officials—such as Ms. Nielsen—engaged in extreme and outrageous conduct and intended to cause emotional distress or acted in reckless disregard of that result. Plaintiffs contend that Ms. Nielsen and other policy decision makers were aware of operational limitations that would impact their ability to care for, track, and reunify separated families, as well as the physical, emotional, and psychological harm and trauma that would result from separating families, but nonetheless implemented the separation policy. Ms. Nielsen's intention in signing the DHS Referral Policy, as well as her knowledge regarding the government's inability to (1) adequately house and appropriately care for an enormous influx of children; (2) track parent-child relationships; (3) communicate with parents regarding the

whereabouts and wellbeing of their children; and (4) reunify families once separated, is highly relevant to Plaintiffs' claims. So, too, is Ms. Nielsen's understanding of the psychological harm and trauma the DHS Referral Policy would inflict on the parents and children that would be forcibly separated, and whether the government planned to provide services to address such harms.

Despite Plaintiffs' extensive efforts—including propounding numerous written discovery requests and deposing key DHS personnel involved in the development and implementation of the family separation policy—Plaintiffs have not received this highly relevant information. ███████████████████████████
███████

Pursuant to the *C.M.* and *A.P.F.* Amended Case Management Orders, Plaintiffs sought the government's consent to depose Ms. Nielsen, but the government refused. Accordingly, Plaintiffs seek the Court's leave to conduct this deposition. As discussed below, leave should be granted because the record makes clear that Ms. Nielsen has unique, first-hand knowledge of key facts at issue in this case, and Plaintiffs have exhausted other discovery methods to obtain this critical information.

## II. BACKGROUND

### A. Factual Background

Plaintiffs assert claims of IIED and negligence under the Federal Tort Claims Act, and seek damages for the harm they suffered when the United States government separated the Plaintiff parents from the Plaintiff children, failed to ensure that the Plaintiff parents could adequately communicate with the Plaintiff children, and failed to reunite the Plaintiff parents and the Plaintiff children for months, until a Court order required the government to do so.[1] Ms. Nielsen was intimately involved in the decision-making process, and, in fact, made the ultimate decision to implement the policy that led to widescale separation of asylum-seeking families.

---

[1] *A.P.F.* Plaintiffs also bring related claims for loss of child's consortium.

- 3 -

1    In the spring of 2017, when then-Secretary of DHS John Kelly, first announced a
2 possible family separation policy, Ms. Nielsen was his Chief of Staff.  At that time, Ms.
3 Nielsen was involved in internal discussions about family separation, and she responded
4 to concerns from Congress about ████████████████████████████████████████
5 ████████████████████████████████████████████████████████████████████████
6 ██████████████████. *See, e.g.,* Ex. A (CD-US-0051475A); Ex. B (CD-US-00016653A).
7 After Ms. Nielsen was confirmed as the Secretary of DHS in December 2017, ██████
8 ████████████████████████████████████████████████████████████████████████
9 ████████████████████████████████████████████████████████████ Numerous
10 deponents testified that Ms. Nielsen ██████████████████████████████████████
11 ████████████████████████████████████████████████████████████████████████
12 ████████████████████████████████████ On April 6, 2018, Attorney General
13 Jeff Sessions issued the Zero Tolerance Initiative. ████████████████████████████
14 ████████████████████████████████████████████████████████████████████████
15 ████████████████████████████████████████████████████████████████████████
16 ████████████████████████████████████████████████████████████████ Ex. F
17 (CD-US-0049413).
18    On April 23, 2018, Ms. Nielsen received a memorandum from Thomas Homan
19 (Director of U.S. Immigration and Customs Enforcement ("ICE")), L. Francis Cissna
20 (Director of U.S. Citizenship and Immigration Services), and Kevin McAleenan
21 (Commissioner of U.S. Customs and Border Protection ("CBP")), ████████████
22 ████████████████████████████████████ *See* Ex. G (CD-US-0024043–47). ███
23 ████████████████████████████████████████████████████████████████████████
24 ████████████████████████████████████████████████████████████████████████
25 ████████████████████████████████████████████████████████████████████████
26 ██████████████████████████ *Id.* at CD-US-0024045. ██████████████████████
27 ████████████████████████████████████████████████████████████████████████
28 *Id.*

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at CD-US-0024047. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ms. Nielsen drafted and issued a memorandum on May 11, 2018 to certain agency leads that clarified the government's directions for implementing the DHS Referral Policy. *See* Ex. H (CD-US-0050303) (Memorandum from Kirstjen Nielsen, "Referral for Prosecution under 8 U.S.C. 1325(a), Improper Entry by Alien," (May 11, 2018)). Ms. Nielsen's decision to implement the DHS Referral Policy ultimately resulted in the government separating thousands of asylum-seeking families, whether or not they were prosecuted for illegal entry, including the Plaintiffs in this Action.

### B. Procedural History

Throughout fact discovery, Plaintiffs made extensive efforts to ascertain highly relevant information related to:

- Why DHS implemented the DHS Referral Policy, including the purpose of the policy and the intended impact of the policy;
- Ms. Nielsen's intention in signing the DHS Referral Policy, including whether families who were not prosecuted should be separated;
- Ms. Nielsen's knowledge of the harms or risk of harms associated with separating families, including the trauma that would result, and any actions she took or considered to mitigate those risks, when she signed the DHS Referral Policy;
- Ms. Nielsen's knowledge of how DHS would physically separate the families when she signed the DHS Referral Policy;

- Ms. Nielsen's knowledge of DHS's ability to track separated families, facilitate communication among separated family members, and reunite families after separation, when she signed the DHS Referral Policy; and

- Ms. Nielsen's intention, in signing the DHS Referral Policy, relating to reunification and whether families should have been reunited immediately after any criminal sentence had concluded.

To discover this information, Plaintiffs jointly deposed 15 current and former officials ███ including Mr. McAleenan (former CBP Commissioner), Mr. Homan (former Acting Director of ICE), Mr. Wolf (Chief of Staff to Ms. Nielsen), Michael Dougherty (DHS Office of Policy), Mr. Short (former DHS Immigration Counselor), and conducted a Rule 30(b)(6) deposition of DHS. ███

In addition to depositions, Plaintiffs jointly served 18 Requests for Production ("RFP"), 21 Interrogatories, and 29 Requests for Admission ("RFA"), many of which sought information about the adoption and implementation of the DHS Referral Policy. The government's responses to these requests failed to explain Ms. Nielsen's decision to implement the DHS Referral Policy. Instead, in response to many of Plaintiffs' interrogatories, the government simply cited previously produced documents and prior testimony—none of which explains Ms. Nielsen's intent in signing the DHS Referral Policy on May 4, 2018.

Plaintiffs' exhaustive discovery efforts make clear that Ms. Nielsen has both highly relevant and unique, first-hand knowledge and information related to Plaintiffs' claims that could not be obtained through less intrusive means. Accordingly, on

- 6 -

September 27, 2022, Plaintiffs requested the deposition of Ms. Nielsen. On September 29, 2022, Defendant informed Plaintiffs that they would not agree to a deposition of Ms. Nielsen. Ms. Nielsen has made herself available for a number of public appearances and interviews regarding her role in the family separation policy, including articles published as recently as September 2022. *See, e.g.*, Ex. J (Caitlin Dickerson, *An American Catastrophe: The secret history of the U.S. government's family-separation policy*, THE ATLANTIC (Sept. 2022), *available at* https://www.theatlantic.com/magazine/archive/2022/09/trump-administration-family-separation-policy-immigration/670604/ [hereinafter Dickerson, *An American Catastrophe: The secret history of the U.S. government's family-separation policy*]; Ex. K (Amanda Holpuch, *"I don't regret enforcing the law": Nielsen defends family separation at summit*, THE GUARDIAN (Oct. 2019), *available at* https://www.theguardian.com/us-news/2019/oct/22/kirstjen-nielsen-summit-family-separation-policy (discussing Ms. Nielsen's interview at Fortune's Most Powerful Women Summit)); Ex. L (*Written testimony of DHS Secretary Kirstjen Nielsen for a House Committee on the Judiciary hearing titled "Oversight of the Department of Homeland Security"* (Dec. 2018), *available at* https://www.dhs.gov/news/2018/12/20/written-testimony-dhs-secretary-nielsen-house-committee-judiciary-hearing-titled).

### III. LEGAL STANDARD

A party may "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense-including the existence, description, nature, custody, condition, and location of any documents or other tangible things." Fed.R.Civ.P. 26(b)(1). "Relevancy is construed broadly to encompass 'any matter that bears on, or that reasonably could lead to other matter[s] that could bear on any issue that is or may be in the case.'" *K.C.R. v. County of Los Angeles*, 2014 WL 3434257, at *2 (C.D. Cal., July 11, 2014) (citation omitted). "Even when information is not directly related to the claims

or defenses identified in the pleadings, the information still may be relevant to the broader subject matter at hand and meet the rule's good cause standard." *Id.*

When a party seeks the deposition of a high-level government official, the apex doctrine applies. *See, e.g., id.* at *3. Under the apex doctrine, "courts consider (1) whether the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods." *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 282 F.R.D. 259, 263 (N.D. Cal. 2012); *see also Coleman v. Schwarzenegger*, 2008 WL 4300437, at *3 (N.D. Cal. 2008) (to meet their burden, plaintiffs must show that proposed high-ranking deponents "possess personal knowledge of facts critical to the outcome of the proceedings and that such information cannot be obtained by other means").

Courts have the "discretion to limit discovery where the discovery sought 'can be obtained from some other source that is more convenient, less burdensome, or less expensive,'" *Apple, Inc.*, 282 F.R.D. at 263 (quoting Fed.R.Civ.P. 26(b)(1)), but "courts may allow depositions of top government officials 'where the official has first-hand knowledge related to the claim being litigated,'" *Andrich v. Dusek*, 2019 WL 2775472, at *2 (D. Ariz., July 2, 2019) (quoting *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007)); *see also, e.g., Union Sav. Bank of Patchogue, N.Y. v. Saxon*, 209 F. Supp 319, 319–20 (D.D.C. 1962) (directing the Comptroller of Currency to submit to deposition where plaintiff alleged, on information and belief, that he was personally involved in the challenged agency decision); *Am. Broad. Cos. v. US. Info. Agency*, 599 F. Supp. 765, 769 (D.D.C. 1984) (ordering Director of United States Information Agency to sit for a deposition for questioning regarding relevant documents the Director himself created).[2]

---

[2] The Ninth Circuit recently issued a decision in *In re U.S. Dep't of Educ.*, 25 F.4th 692 (9th Cir. 2022), in which the underlying action was brought pursuant to Section 706 of the Administrative Procedure Act ("APA"). *Id.* at 696. The analysis in that case involved the boundaries of the judicial branch's review of an agency action under the APA, which is generally limited to the administrative record, unless there is a showing of agency bad faith. *Id.* at 700. Specifically, the court was faced with whether separation of powers allowed for the extra-record deposition of an agency secretary when reviewing an agency

While "[h]eads of government agencies are not normally subject to deposition" under the apex doctrine, *Kyle Eng'g Co. v. Kleppe*, 600 F.2d 226, 231 (9th Cir. 1979), "[t]he apex doctrine does not . . . protect high-ranking officials from deposition in all circumstances," *K.C.R.*, 2014 WL 3434257, at *3.  In fact, the apex doctrine applies "with *less force* when the proposed deponent is not currently serving in office.  For instance, there is no longer a concern that requiring the person to sit for a deposition will pull them away from other duties of public service." *Givens v. Newsom*, 2021 WL 65878, at *8 (E.D. Cal. Jan. 7, 2021) (emphasis added); *see also Sec. & Exch. Comm'n v. Comm. on Ways & Means of the U.S. House of Repres.*, 161 F. Supp. 3d 199, 249 (S.D.N.Y.

---

action under the APA.  *Id.* at 702.  The court determined that to depose the Secretary of the Department of Education, the 9th Circuit required: "(1) a showing of agency bad faith; (2) the information sought from the secretary is essential to the case; and (3) the information sought from the secretary cannot be obtained in any other way."  *Id.*  However, the court noted that "[t]hese rules rest on a constitutional foundation, and we see our analysis in this opinion as distinct from the 'apex doctrine.'" *Id.* at 700 n.1; *see also Franklin Sav. Corp. v. United States*, 180 F.3d 1124, 1139–40 (10th Cir. 1999) ("The APA's purpose is to authorize judicial scrutiny of executive-branch decisionmaking, with two narrow exceptions; it created a 'basic presumption of judicial review.'  The FTCA's purpose, by contrast, is to remove sovereign immunity as a bar to compensating people hurt by federal employees' garden-variety common-law torts. Its purpose is not to facilitate judicial second-guessing of executive decisionmaking. Such second-guessing is, instead, the point of the APA, which Congress enacted in the same year as the FTCA.  Given the statutes' diametrically opposed yet complementary purposes, it is sensible to allow judicial inquiry into bad faith and subjective decisionmaking in a few exceptional cases under the APA, but to ban all FTCA suits that necessitate that peculiarly disruptive inquiry.") (citations omitted).  Although this test is inapplicable here, Plaintiffs also meet this standard as Plaintiffs' have alleged intentional misconduct on the part of the government, that the information sought is essential to the case, and that the information sought cannot be obtained through other depositions or means of discovery. *Compare C.M.* Compl. (E.C.F. 1) ¶ 27 (alleging that the government instituted the family separation policy "to deter individuals from seeking asylum or otherwise coming to the United States" and "to deter immigration by harming families through the forcible separation of parents and children) *with State v. United States Dep't of Com.*, 333 F. Supp. 3d 282, 289 (S.D.N.Y. 2018) (finding that a deposition of then-Secretary of Commerce Wilbur Ross was appropriate where plaintiffs "plausibly allege[d] that an invidious discriminatory purpose was a motivating factor in the challenged decision" to add a citizenship question to the decennial census and that such a motive would be indicative of bad faith or improper behavior), *vacated as moot*, 351 F. Supp. 3d 502 (S.D.N.Y. 2019), *aff'd in part, rev'd in part and remanded sub nom. Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019).

2015) ("[T]he fact that [the party is] not [a] current high-ranking official[] is a factor when considering whether the information can be obtained through less burdensome means and whether the deposition will interfere with the official's government duties.").

Finally, "[t]he district court enjoys broad discretion when resolving discovery disputes, which should be exercised by determining the relevance of discovery requests, assessing oppressiveness, and weighing these factors in deciding whether discovery should be compelled." *K.C.R.*, 2014 WL 3433925, at *2 (citation omitted). "The party resisting discovery bears the burden of demonstrating that its objections should be sustained." *Id.* (citation omitted).

## IV.   ARGUMENT

Plaintiffs' claims entitle them to discovery regarding the purpose of the DHS Referral Policy and how the DHS Referral Policy was formulated and implemented, including the operational considerations taken into account before the DHS Referral Policy was implemented, and the government's understanding of the psychological harm and trauma that the DHS Referral Policy would inflict on the parents and children being separated. The Court should grant Plaintiffs' request to depose Ms. Nielsen because (a) she has unique, first-hand knowledge of these key facts, and is the only person who can provide information related to her decision to authorize the DHS Referral Policy, and (b) Plaintiffs have exhausted all less burdensome means to acquire this information, yet have been unable to do so. These arguments are particularly salient here because Ms. Nielsen resigned more than three years ago and regularly makes herself available for public appearances and interviews regarding her role in the family separation policy, both of which undercut the rationales for applying the apex doctrine. *See e.g.*, *Givens*, 2021 WL 65878, at *8.

### A.   Ms. Nielsen Has Unique First-Hand, Non-Repetitive Knowledge Of The Facts At Issue In The Case.

In her position at DHS, Ms. Nielsen ███████████████████████ ████████████████████████████████████ *See* Ex. G (Memorandum From Kevin

- 10 -

McAleenan, L. Francis Cissna, and Thomas Homan, "Increasing Prosecutions of Immigration Violations," (May 4, 2018); Ex. H (Memorandum From Kirstjen Nielsen, "Referral for Prosecution under 8 U.S.C. 1325(a), Improper Entry by Alien," (May 11, 2018)). While others may have been involved at various levels, Ms. Nielsen made the decision to effectuate the policy that is central to the claims in these cases. The reasons underlying her final decision, and her awareness of the operational limitations that would impact the government's ability to care for, track, and reunify separated families, as well as her awareness of the physical, emotional, and psychological harm and trauma that would result from separating families, go to the heart of Plaintiffs' case. *See, e.g., Fish v. Kobach*, 320 F.R.D. 566, 579 (D. Kan. 2017) (authorizing deposition of the Kansas Secretary of State where "[o]nly he can explain his thought processes . . . and his subsequent related actions"); *Sherrod v. Breitbart*, 304 F.R.D. 73, 76 (D.D.C. 2014) (authorizing deposition of Secretary of Agriculture where "[i]t is clear . . . [he] has personal knowledge that is directly relevant to the claims and defenses"). Hence, Ms. Nielsen's knowledge and involvement is "so intertwined with the issues in controversy that fundamental fairness requires the discovery of factual information held by the official by way of deposition." *United States v. Sensient Colors, Inc.*, 649 F. Supp. 2d 309, 327 (D.N.J. 2009) (citation omitted); *see also, e.g., United States v. City of New York*, 2009 WL 2423307, at *2–3 (E.D.N.Y. Aug. 5, 2009) (authorizing Mayor's deposition where his congressional testimony "suggest[ed] direct involvement in the events at issue").

None of Ms. Nielsen's subordinates nor any other government officials can access the "critical information exist[ing] only inside [her] head" about "why [s]he implemented policies as [s]he did." *Smith v. City of Stockton*, 2017 WL 11435161, at *7 (E.D. Cal. Mar. 24, 2017). ████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████

- **James McCament (Deputy Under Secretary of DHS)** testified on behalf of DHS during the DHS 30(b)(6) deposition on September 20, 2022. ███████ ███████ *See* Ex. I (DHS 30(b)(6) Tr. at 126:9–21). ███████ ███████ *Id.* at 98:23–99:1.

- **Chad Wolf (former Chief of Staff to Ms. Nielsen)** was deposed on June 7, 2022. ███████. *See* Ex. C (Wolf Tr. at 310:3–6). ███████ ███████ ███████ ███████ *Id.* at 236:6–15.

- **Thomas Homan (former Acting Director of ICE)** was deposed on September 9, 2022. ███████ ███████ ███████ ███████ ███████ *See* Ex. E (Homan Tr. at 58:19–25). ███████ ███████ ███████ ███████ ███████ *Id.* at 54:15–55:11.

- **Kevin McAleenan (former CBP Commissioner)** was deposed on September 13, 2022. ███████ ███████ *see* Ex. M (McAleenan Tr. at 234:23–

235:1), ███████████████████████████████████

███████████████████████████████████, *id.* at 297:20–298:5. ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████ *Id.* at 298:13–18.

- **Tracy Short (former ICE Principal Legal Advisor)** was deposed on July 15, 2022. ███████████████████████████

███████████████████████████████████████

████████████ *See* Ex. D (Short Tr. at 139:1–4).

Discovery has made it irrefutable that Ms. Nielsen was responsible for the policy at the center of this case and is the only one who can testify to her understanding of the intended implementation and desired effect of the policy. *See Detoy v. City and Cnty. of San Francisco*, 196 F.R.D. 362, 370 (C.D. Cal. 2000) (high-ranking government official "took *personal action* to withdraw charges") (emphasis added). ████████

███████████████████████████████████████

████████ For instance, Ms. Nielsen told a reporter from The Atlantic that Mr. Homan and Mr. McAleenan minimized the significance of the policy and dismissed her concerns about whether the logistics and resources necessary to implement it were in place. *See* Ex. J (Dickerson, *An American Catastrophe: The secret history of the U.S. government's family-separation policy*) at 62. ███████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████ In this same interview, Ms. Nielsen stated that she did not think she had enough information to make a decision on the family separation proposal, including because her questions about whether Border Patrol stations had capacity to house additional migrants, whether the Justice Department had enough

- 13 -

1  lawyers to take on extra cases, and what would happen to the children while the
2  prosecutions were being carried out, were not answered. *Compare* Ex. J (Dickerson, *An*
3  *American Catastrophe: The secret history of the U.S. government's family-separation*
4  *policy*) at 63, ███████████████████████████████████
5  ████████████████████████████████████████████████
6  ████████████████████████████████████████████████
7  ████████████████████████████████████████████████
8  ████████████████████████████████████████████████
9  ████████████████████████████████████████████████
10 ██████████████████████████████. Additionally, Ms. Nielsen
11 stated that Mr. McAleenan pressured her to authorize the DHS Referral Policy, and that
12 she ultimately trusted Mr. McAleenan's assurances about the policy and, in retrospect,
13 wishes she had not done so. *See* Ex. J (Dickerson, *An American Catastrophe: The secret*
14 *history of the U.S. government's family-separation policy*) at 74. ████████
15 ████████████████████████████████████████████████
16 ████████████████████████████████████████████████
17 ████████████████████████████████████████████████
18 ████████████████████████████████████████████████
19 ████████████████ Ms. Nielsen's public statements demonstrate that she has unique,
20 non-repetitive knowledge regarding the concerns she had about DHS's ability to
21 implement the policy; the factors that led her to ultimately sign the policy; and her
22 understanding of the risks associated with implementing the family separation policy,
23 including the risk of psychological harm that would result from separating families.
24      The dispute before the Court here is no different than the dispute that was before
25 the court in *Karnoski v. Trump*, 2020 WL 5231313 (W.D. Wash. Sept. 2, 2020). There,
26 the plaintiffs sought to depose General Paul J. Selva who was "personally involved in the
27 decision to delay implementation" of a policy concerning transgender individuals in the
28 military. *Id.* at *2. The court in *Karnoski* allowed the deposition to proceed because the

documents did not answer the plaintiffs' questions and other witnesses could not speak to General Selva's role and ultimate decisions—only General Selva could testify to those facts. *Id.* at *5. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See United States Dep't of Com.*, 333 F. Supp. 3d at 289 ("Notably, Secretary Ross's three closest and most senior advisors who advised on the citizenship question—his Chief of Staff, the Acting Deputy Secretary, and the Policy Director/Deputy Chief of Staff—testified repeatedly that Secretary Ross was the only person who could provide certain information central to Plaintiffs claims."). Given that extensive discovery has confirmed that Ms. Nielsen has unique first-hand, non-repetitive knowledge of the facts at issue in these cases, Plaintiffs' request to depose her should be granted.

        **B.**        **Plaintiffs Have Exhausted Other Less Intrusive Discovery Methods.**

The second prong of the apex doctrine requires the party seeking the deposition to have "exhausted other less intrusive discovery methods." *See, e.g., Apple, Inc.*, 282 F.R.D. at 263. Courts have held that other less intrusive discovery methods include "interrogatories or depositions of lower-ranking employees." *Groupion, LLC v. Groupon, Inc.*, 2012 WL 359699, at *4 (N.D. Cal. Feb. 2, 2012); *WebSideStory, Inc. v. NetRatings, Inc.*, 2007 WL 1120567, at *3 (S.D. Cal. Apr. 6, 2007) (requiring "other less intrusive discovery methods, such as interrogatories and depositions of lower level employees."). Here, Plaintiffs burden to exhaust other less intrusive discovery methods has been more than satisfied through both written discovery and depositions. As noted above, Plaintiffs jointly propounded 18 RFPs, 21 Interrogatories, 29 RFAs, and took 15 policy depositions, including a 30(b)(6) deposition of DHS. Yet, Plaintiffs have been unable to obtain the highly relevant information that is indisputably in the possession of Ms. Nielsen.

In *Karnoski*, the court allowed the deposition of General Selva because, like here, plaintiffs exhausted all other means of discovery where defendants failed to produce

materials that answer plaintiffs questions, and depositions of other individuals would similarly not provide the information plaintiffs sought. 2020 WL 5231313, at *5. Here, as explained above, the United States' responses to Plaintiffs' written discovery have failed to explain Ms. Nielsen's decision to implement the DHS Referral Policy in the May 4, 2018 memorandum, and simply directed Plaintiffs to previously produced documents and prior testimony—none of which explains why Ms. Nielsen selected the DHS Referral Policy on May 4, 2018. *See supra* Section II.B. Further, Plaintiffs have not received this relevant information through the numerous depositions they conducted. *See supra* Section IV.A.

Moreover, Ms. Nielsen is no longer the Secretary of DHS; she resigned on April 7, 2019. Thus, sitting for a deposition would not intrude on her governmental responsibilities—as she has none. Moreover, she has voluntarily spoken at public events and given interviews about the precise topics for which Plaintiffs seek her testimony, undercutting any claim that the requested deposition would be "intrusive." *See, e.g.*, *Givens*, 2021 WL 65878, at *8; *Sec. & Exch. Comm'n*, 161 F. Supp. 3d at 249.

Because Plaintiffs have exhausted all other less intrusive discovery methods for obtaining the unique, non-repetitive information in the possession of Ms. Nielsen, the Court should grant Plaintiffs' request to depose her.[3]

## V.    CONCLUSION

Based on the aforementioned reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' motion for leave to conduct the deposition of Ms. Nielsen.

Respectfully submitted this 31st day of October, 2022.

---

[3] Any suggestion by the United States that discovery of Ms. Nielsen take place by other means should be rejected. *See Shiferaw v. City and Cnty. of San Francisco*, 2021 WL 827575, at *2 (N.D. Cal. Mar. 4, 2021) (allowing plaintiffs to depose a mayor, despite not having propounded interrogatories or engaged in other less intrusive discovery methods, because the information sought regarding the mayor's role in a decision was "not well-suited for written interrogatories" where plaintiff claimed that the bidding process for a venue was a "sham" and that the mayor "used [her] position to personally involve herself in the fate of the [venue]").

By  s/ *BriAnne N. Illich Meeds*

OSBORN MALEDON, P.A.
David B. Rosenbaum
Travis C. Hunt
BriAnne N. Illich Meeds

ARNOLD & PORTER KAYE SCHOLER LLP
Diana Reiter*
Erik Walsh*
Lucy McMillan*
Harry Fidler*
Kaitlyn Schaeffer*
Brian Auricchio*
Julia Kindlon*
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
diana.reiter@arnoldporter.com
erik.walsh@arnoldporter.com
lucy.mcmillan@arnoldporter.com
harry.fidler@arnoldporter.com
kaitlyn.schaeffer@arnoldporter.com
brian.auricchio@arnoldporter.com
julia.kindlon@arnoldporter.com

ARNOLD & PORTER KAYE SCHOLER LLP
Sean Morris*
777 South Figueroa Street
Los Angeles, CA 90017-5844
sean.morris@arnoldporter.com

ARNOLD & PORTER KAYE SCHOLER LLP
R. Stanton Jones*
David Hibey*
Emily Reeder-Ricchetti*
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 942-5000
stanton.jones@arnoldporter.com
david.hibey@arnoldporter.com
emily.reeder-ricchetti@arnoldporter.com

KAIRYS, RUDOVSKY, MESSING, FEINBERG & LIN LLP
Jonathan H. Feinberg*
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
Telephone: (215) 925-4400
jfeinberg@krlawphila.com

1  NATIONAL IMMIGRANT JUSTICE CENTER
   Mark Fleming*
2  Mark Feldman*
   224 S. Michigan Ave., Suite 600
3  Chicago, IL 60604
   Telephone: (312) 660-1370
4  mfleming@heartlandalliance.org
   mfeldman@heartlandalliance.org
5
   NATIONAL IMMIGRATION LITIGATION ALLIANCE
6  Trina Realmuto*
   Mary Kenney*
7  10 Griggs Terrace
   Brookline, MA 02446
8  Telephone: (617) 819-4447
   trina@immigrationlitigation.org
9  mary@immigrationlitigation.org

10 AMERICAN IMMIGRATION COUNCIL
   Katherine Melloy Goettel*
11 Emma Winger*
   Gianna Borroto*
12 1331 G Street NW, Suite 200
   Washington, DC 20005
13 Telephone: (202) 507-7512
   Telephone: (202) 742-5619
14 kgoettel@immcouncil.org
   ewinger@immcouncil.org
15 gborroto@immcouncil.org

16 *Attorneys for Plaintiffs C.M. et al.*
   * *Admitted pro hac vice*
17

18

19

20

21

22

23

24

25

26

27

28