BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division
JAMES G. TOUHEY, JR.
Director, Torts Branch
PHILIP D. MACWILLIAMS
Trial Attorney
D.C. Bar No. 482883
E-mail: phil.macwilliams@usdoj.gov
U.S. Department of Justice
Civil Division, Torts Branch
Benjamin Franklin Station, P.O. Box 888
Washington, DC 20044
Telephone: (202) 616-4285
Attorneys for the United States of America

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| C.M., on her own behalf and on behalf of her minor child, B.M.; L.G., on her own behalf and on behalf of her minor child, B.G.; M.R., on her own behalf and on behalf of her minor child, J.R.; O.A., on her own behalf and on behalf of her minor child, L.A.; and V.C., on her own behalf and on behalf of her minor child, G.A., <br><br><br> Plaintiffs, <br><br> v. <br><br> United States of America, <br><br> Defendant. | Case No. 2:19-cv-05217-SRB <br><br> **STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## STATEMENT OF FACTS

1.     In 1996, the federal government entered into a settlement agreement referred to as the "*Flores* Settlement Agreement."  *See Flores v. Sessions*, No. 85-cv-4544 (C.D. Cal. Feb. 2, 2015) (ECF No. 101).

2.     The U.S. District Court for the Central District of California issued orders enforcing the *Flores* Settlement Agreement ("the *Flores* court orders"),[1] whose operational impact limited the ability of U.S. Immigration and Customs Enforcement ("ICE") to house children in a family residential center (FRC) for longer than 20 days. Ex. A Att. 1 (McAleenan 177, 345-348); Ex. A Att. 2 (Homan 71, 81-83, 180-182).

3.     Because immigration proceedings typically lasted for longer than 20 days, the operational impact of ICE's implementation of the *Flores* court order was that family units that were apprehended along the U.S.-Mexico border had to be released directly into the United States either immediately following their entry or following a brief stay at a family residential center.  Ex. A Att. 1 (McAleenan 95-96; 128-130, 345-348, 365); Ex. A Att. 2 (Homan 71,180-182); Ex. B Att. 1 at 9-11,17.

4.     On April 11, 2017, then-Attorney General Jefferson Sessions issued a memorandum titled "Renewed Commitment to Criminal Immigration Enforcement."  Ex. C Att. 1.

5.     On April 6, 2018, Attorney General Sessions issued a Memorandum For Federal Prosecutors Along the Southwest Border, titled "Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a)."  Ex. C Att. 2.

6.     In a memorandum dated April 23, 2018, titled "Increasing Prosecutions of Immigration Violations," the Commissioner of U.S. Customs and Border Protection ("CBP"), the Director of ICE, and the Director of U.S. Citizenship and Immigration Services ("USCIS") proposed three prosecution referral policy options to the Secretary of Homeland Security (the "DHS Referral Memorandum").  Ex. C Att. 3.

---

[1] *Flores v. Sessions*, 394 F.Supp.3d 1041 (C.D. Cal. 2017); *Flores v. Sessions*, 212 F.Supp.3d 907 (C.D. Cal. 2015).

7.    The drafting of the DHS Referral Memorandum was coordinated by CBP at the request of DHS Secretary Kirstjen Nielsen, and the DHS Referral Memorandum was transmitted to Secretary Nielsen through the Office of the Executive Secretary.  Ex. C Att. 3; Ex. A Att. 1 (McAleenan 48-52, 296).

8.    In the DHS Referral Memorandum, the option recommended by the Commissioner of CBP, the Director of ICE, and the Director of USCIS was Option 3, which stated:

> **Option 3- Refer all Amenable Adults, including those presenting as part of a FMUA [family unit]:** Work with DOJ, the Department of Health and Human Services, and other interagency partners to develop a quickly scalable approach to achieve 100% immigration violation prosecution referral for all amenable adults, including those initially arriving or apprehended with minors.

Ex. C Att. 3.

9.    The term "amenable to prosecution" as used in the DHS Referral Memorandum referred to adults who violated 8 U.S.C. § 1325 and were eligible to be prosecuted.  Ex. C Att. 3; Ex. A Att. 1 (McAleenan 61).

10.    Prior to a decision on the DHS Referral Memorandum, CBP Commissioner Kevin McAleenan and others participated in several meetings with Secretary Nielsen to discuss readiness and operational aspects of the implementation of the proposed options.  Ex. A Att. 1 (McAleenan 188-190, 263-265, 272-275, 368-372); Ex. B Att. 2 at 31.

11.    The agency heads who proposed the policy options in the DHS Referral Memorandum determined that criminal prosecutions were enforcement actions that were effective in reducing illegal border crossings.  Ex. C Att. 3; Ex. A Att. 1 (McAleenan 138, 263-265); Ex. A Att. 2 (Homan 68, 160); Ex. A Att. 3 (Hastings 294-295); Ex. A Att. 4 (Vitiello 220-221).

12.    The agency heads who proposed the policy options in the DHS Referral Memorandum determined that the prompt removal of inadmissible non-citizens who had been ordered removed were enforcement actions that were effective in reducing illegal

2

border crossings.  Ex. A Att. 1 (McAleenan 118, 201-202); Ex. A Att. 2 (Homan 47-48, 69-71, 160).

13.    The agency heads who proposed the policy options in the DHS Referral Memorandum determined that the detention of adult non-citizens pending removal proceedings was an effective tool to ensure that the removal proceedings for the non-citizen were completed promptly and removal if ordered could be effectuated. Ex. A Att. B (Homan 79, 178-180); Ex. A Att. 1 (McAleenan 102-104, 335-337, 348).

14.    The agency heads who proposed the policy options in the DHS Referral Memorandum determined that unlawful entries across the Southwest Border, including by family units, had increased from March to April 2018 as part of a trend of increasing border crossings by family units beginning in 2017.  Ex. A Att. 1 (McAleenan 96, 365-367); Ex. C Att. 3.

15.    On May 4, 2018, Secretary Nielsen approved Option 3 in the DHS Referral Memorandum: to refer all amenable adults who unlawfully cross the Southwest border for criminal prosecution, including those who arrive as part of a family unit ("Option 3" or the "DHS Referral Policy").  Ex. C Att. 3; Ex. C Att. 4 ("May 11, 2018 Secretary Memorandum").

16.    The DHS Referral Policy did not constrain or otherwise change ICE's statutory authority or processes relating to the detention of non-citizens pending removal proceedings, including as applied to adult non-citizens who were transferred to ICE custody following separation from their children.  Ex. C Att. 3.

17.    There was no prescribed specific course of action for reunification applicable to all adult non-citizens and their children who were separated as a result of enforcement actions taken in furtherance of the DHS Referral Policy.  Ex. C Att. 3; Ex. A Att. 1 (McAleenan 87-90); Ex. A Att. 2 (Homan 202).

18.    It was not Secretary Nielsen's purpose in adopting the DHS Referral Policy to use separations of parents and children to inflict harm as a deterrent to non-citizens seeking entry into the United States. Ex. B Att. 1 at 46-47; Ex. B Att. 2 at 18-19); Ex. A Att. 1 (McAleenan 367-376).

19.    The policy objectives of the DHS Referral Policy articulated by DHS officials were to deter and provide criminal consequences for illegal Southwest Border crossings; to prevent harm inflicted on non-citizens through the dangerous journey to the Southwest border of the United States which is coordinated by and enriches criminal networks; to reduce the operational strain on U.S. Border Patrol resources created by unlawful entries by family units, which diverts limited law enforcement resources from border security operations; and to ensure that immigration proceedings were promptly completed, and final orders of removal could be effectuated following completion of immigration proceedings.  Ex. C Att. 3; Ex. A Att. 1 (McAleenan 87, 95-99, 199-202, 242-246, 263-265, 281-282, 344-361); Ex. A. Att. 2 (Homan 43-48, 68, 160); Ex. A Att. 3 (Hastings 294-295, 297-301); Ex. B Att. 1 at 46; Ex. B. Att. 2 at 18-19.

20.    Separations of family units as a result of law enforcement actions taken pursuant to the DHS Referral Policy were expected to be temporary, lasting for the duration of the parent's immigration proceedings if the parent was not granted release sooner.  Ex. A Att. 1 (McAleenan 87-89, 142-144); Ex. A Att. 2 (Homan 178-79).

21.    Prior to submitting the DHS Referral Memorandum to Secretary Nielsen, multiple other policy options to address illegal border crossings, including by family units, were discussed and considered – including safe third country agreements and proposed legislation to address the *Flores* Agreement and allow DHS to maintain custody of family units through the pendency of their immigration proceedings – but it was determined that they would not come to fruition in time to address the illegal border crossings anticipated during the Spring and Summer of 2018.  Ex. A Att. 1 (McAleenan 97-98, 361-364).

22.    Prior to implementation of the DHS Referral Policy in May 2018, CBP (including U.S. Border Patrol), HHS, DOJ, and ICE engaged in planning meetings to discuss agency resources and readiness.  Ex A Att. 1 (McAleenan 222-224, 231-233, 366-367); Ex. A Att. 3 (Hastings 60-62, 75-76).

23.    On May 4, 2018, U.S. Border Patrol Headquarters sent to the U.S. Border Patrol Sector Chiefs and Deputy Chiefs of the Southwest Border Sectors a Concept of Operations ("ConOp") regarding the implementation of the DHS Referral Policy and

4

notified the Southwest Border Sectors that they were "authorized to implement increased Southwest Border Prosecutions, as outlined in the [ConOp], **effective May 5, 2018.**" Ex. C Att. 5 (emphasis in original).

24.    CBP Commissioner McAleenan directed that parents traveling with children under the age of five (5) were exempt from the DHS Referral Policy for first time violations of 8 U.S.C. § 1325(a).  Ex. A Att. 1 (McAleenan 87).

25.    CBP's National Standards on Transport, Escort, Detention, and Search ("TEDS") sets forth the "nationwide standards which govern CBP's interaction with detained individuals" and was in place while the DHS Referral Policy was in effect.  Ex. C Att. 6; Ex. A Att. 3 (Hastings 303-304).

26.    Prior to and while the DHS Referral Policy was in effect, there had been no directives issued to the U.S. Border Patrol Sectors prescribing precisely (1) when a non-citizen child—whose non-citizen parent was to be referred for criminal prosecution—should be designated an unaccompanied alien child ("UAC") under the Trafficking Victims Protection Reauthorization Act of 2008, or (2) when a placement request with the Department of Health and Human Services' Office of Refugee Resettlement ("ORR") should be made.  Ex A Att. 1 (McAleenan 65-66, 71, 91-94, 217-222); Ex. A Att. 5 (DHS 30(b)(6) 140); Ex. Att. 3 (Hastings 306-307).

27.    Prior to and while the DHS Referral Policy was in effect, as a matter of operational practice, U.S. Border Patrol agents would make a placement request with ORR as expeditiously as possible to obtain placement of the child as soon as possible following the apprehension of the child designated as a UAC.  Ex. A Att. 1 (McAleenan 65-68, 71, 291-293); Ex. A Att. 3 (Hastings 44-45, 303-307); Ex. A Att. 4 (Vitiello 170).

28.    When a parent and child were separated while in Border Patrol custody and the adult non-citizen was transferred to the custody of ICE, ICE Enforcement and Removal Operations ("ICE-ERO") would proceed with custody decisions pursuant to its existing processes relating to the detention of adult non-citizens.  Ex. A Att. 2 (Homan 21-22); Ex. A Att. 6 (Albence 64-65, 68- 69).

5

29.    When a parent and child were transferred by Border Patrol to ICE as a family unit, ICE-ERO would proceed with custody decisions pursuant to its existing processes relating to family units.  Exhibit A Att. 6 (Albence at 68-69).

30.    As a matter of pre-existing operational practice, and while the DHS Referral Policy was in effect, when a non-citizen child was transferred to the custody of ORR and the parent was transferred to ICE custody: (1) the separated parent and child could be reunified at the parent's request to be repatriated together upon removal of the parent, through coordination between ICE and HHS; (2) or, if the parent was released from ICE custody, the parent could seek release of the child from ORR.  Ex. A Att. 1 (McAleenan 87-91, 287-290, 300- 301); Ex. A Att. 2 (Homan 151-152).

31.    Implementation of the DHS Referral Policy utilized pre-existing processes and practices related to: processing non-citizen parents and children upon apprehension by Border Patrol; referring an adult for prosecution by Border Patrol to the U.S. Attorney's Office; requesting placement of a UAC with ORR and transferring custody of a child from Border Patrol to ORR; transferring adults to ICE custody from Border Patrol; detaining adults in ICE custody pending immigration proceedings; locating an appropriate placement for a child by ORR; establishing communications between a separated parent and child; and coordinating between ICE and ORR regarding reunification of a parent and child.  Ex. A Att. 1 (McAleenan 214-217, 307 -310); Ex. A Att. 2 (Homan 151-152); Ex. A Att. 6 (Albence 281-283); Ex. A Att. 4 (Vitiello 179-182).

32.    On May 7, 2018, the U.S. Border Patrol Yuma Sector (1) notified its Patrol Agents-In-Charge ("PAICs") to "immediately begin identifying and processing all eligible adult aliens for prosecution, regardless of accompanying family members or nationality"; (2) advised PAICs: "For the purposes of identifying adults eligible for prosecution, those accompanied by tender age children, age 4 and younger, will not be processed for prosecution"; and (3) provided guidance to document in the Form I-213, Record of Deportable/Inadmissible Alien, that a parent and child separation occurred and the names and Alien Registration Numbers of the parent and child.  Ex. C Att. 7.

33.   The electronic system through which U.S. Border Patrol agents would make a request to ORR for placement of a UAC contained a feature in which Border Patrol agents could include information about the child's relatives, including the name and Alien Registration Number of the parent from whom the child had been separated.  Ex. A Att. 7 (Comella 228-229, 238, 244-245, 408-411).

34.   In May 2018, the U.S. Border Patrol Yuma Station had a unit of Border Patrol agents referred to as the Processing, Screening and Transportation Unit ("PST Unit"), which handled, among other things, record checks of non-citizens encountered by Border Patrol agents, determinations of whether an adult non-citizen would be processed for a referral for criminal prosecution, placement requests for UACs with ORR, and processing of non-citizens.  Ex. D; Ex. Att. 7 (Comella 171-175, 250).

35.   During implementation of the DHS Referral Policy, when a Yuma Sector Border Patrol agent in the PST Unit identified an adult non-citizen in a family unit as amenable to prosecution and designated to be processed for prosecution, a request to ORR for placement of the child was made as soon as possible, consistent with practices in place prior to the DHS Referral Policy.  Ex. D.

36.   Following the completion of the processing of the adult non-citizen identified as amenable to prosecution and to be processed for a referral for prosecution, the adult non-citizen's case file would be transferred to the Yuma Sector Prosecutions Unit.  Ex. A Att. 7 (Comella 171-175); Ex. A Att. 8 (Ramirez 58-59).

37.   The Prosecutions Unit in Border Patrol's Yuma Sector was responsible for making prosecution referrals to the U.S. Attorney's Office for the District of Arizona for a decision by the U.S. Attorney's Office to accept or decline the prosecution.  Ex. A Att. 8 (Ramirez 58-59, 125, 333); Ex. A Att. 9 (USAO 30(b)(6) 78-79).

38.   Following notification from the U.S. Attorney's Office that a prosecution referral had been accepted or declined, the Prosecutions Unit would record the disposition and the case file would be returned to the PST Unit.  Ex. A Att. 8 (Ramirez 273-275).

39.   On June 20, 2018, pursuant to Executive Order 13841, U.S. Border Patrol Headquarters issued instructions to the U.S. Border Patrol Southwest Border Sectors,

7

which was further updated on June 21, 2018, to suspend Section 1325 prosecution referrals for adult members of family units.  Ex. C Att. 8.

40.    On June 26, 2018, the U.S. District Court for the Southern District of California issued a preliminary injunction enjoining the separation of non-citizen parents and children following their entry into the United States, absent certain circumstances set forth by the court, and ordering the reunification of class members with their children by certain dates.  *Ms. L. v. ICE*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018).

41.    During implementation of the DHS Referral Policy from May 5, 2018 until the Executive Order on June 20, 2018, the majority of family units who unlawfully crossed the U.S.-Mexico border were not separated.  Ex. A Att. 1 (McAleenan 279-282).

42.    Prior to and during the time period the DHS Referral Policy was in effect, CBP and ICE encountered situations where they made the discretionary determination on a case-by-case basis to separate a non-citizen adult from a non-citizen minor child following their entry into the United States together by transferring the non-citizen child to the custody of ORR and the non-citizen adult to ICE custody, on such grounds as: criminal prosecution of the adult; criminal history of the adult; threats to the safety of the public or child welfare concerns; an outstanding warrant for the adult; illness or other medical issues impacting the adult's ability to care for the child; and concerns relating to parentage.  Ex. A Att. 2 (Homan 221- 226); Ex. A Att. 1 (McAleenan 216); Ex. A Att. 6 (Albence 66); Ex. Att. 4 (Vitiello 59-60, 216-219); Ex. A Att. 3 (Hastings 44-45).

***C.M. and B.M***.

43.   On May 9, 2018, at approximately 7:22 pm, U.S. Border Patrol agents apprehended C.M. and B.M. following their unlawful entry into the United States between ports of entry.  Ex. D Att. 1 (0037-39, 0043-45).

44.   Following their apprehension, C.M. and B.M. were transported to and booked into the Yuma Border Patrol Station for processing.  Ex. D Att. 1 (0037-39, 0043-45, 00031-35, 0040-42).

45.    C.M. was identified as an adult amenable to prosecution and to be processed for

prosecution, and a placement request for B.M. was made with ORR.  Ex. D Att. 1 (0037-39,0043-45, 0040-42).

46.     On May 10, 2018, at 12:24 pm, the confirmation email for B.M.'s ORR placement at Lutheran Social Services in New York ("LSSNY") was sent by an Intakes Specialist with General Dynamics Information Technology ("GDIT"), a contractor with ORR, and received by ICE Phoenix Field Office personnel, U.S. Border Patrol Yuma Station personnel, and staff members of LSSNY.  The email confirmation contained the full names and Alien numbers for C.M. and B.M, and noted the relationship between C.M. and B.M.  Ex. D Att. 6 (3778-3779A); Ex. E, Att. 1 (3778-3779A).

47.     The separation, family relationship, and name and Alien numbers of C.M. and B.M. were documented in both C.M. and B.M.'s I-213s.  Ex. D Att. 1 (0037-39, 0043-45).

48.     The separation, family relationship, and name and Alien numbers of C.M. and B.M. also were documented in the Encounter Summary in ICE's EARM database, which contained the information about the separation from the I-213 narratives.  Ex. E Att. 1 (1528, 1541-1542).

49.     On May 11, 2018, at approximately 1:01 am, B.M. was booked out of the Yuma Station and transferred to ORR custody with placement at LSSNY in Bronx, New York.  Ex. D Att. 1 (0040-42, 0052).

50.     On May 11, 2018, B.M. arrived at LSSNY.  Ex. D Att. 1 (0474-476).

51.     LSSNY staff generated a report dated May 12, 2018 noting that B.M. had been separated from his mother while in DHS custody.  The report contained C.M.'s full name and Alien number, and noted that the separation was also listed by DHS "in the intake tab of the UAC Portal."  Ex. F Att. 1 (0710-711).

52.     On May 13, 2018 at approximately 11:45 p.m. the processing of C.M. was complete.  Ex. D Att. 1 (0031-35, 0037-39).

53.     C.M. was served a Notice to Appear, and criminal charges for violation of 8 U.S.C. § 1325 were included in the I-213.  Ex. D Att. 1 (0031-35, 0037-39).

54.     C.M. was referred to the U.S. Attorney's Office for criminal prosecution, and on

9

May 14, 2018, the U.S. Attorney's Office declined to prosecute.  Ex. D Att. 1 (10981-982); Ex. A Att. 9 (USAO 30(b)(6) 20, 152-153, 159-161).

55.     On May 15, 2018, at approximately 3:54 pm, C.M. was booked out of the Yuma Border Patrol Station, transferred from U.S. Border Patrol custody to ICE custody, and transported to the Florence detention center in Florence, Arizona.  Ex. D Att. 1 (0031-36); Ex. E Att. 1 (1540).

56.     From May 15, 2018 to July 26, 2018, C.M. was detained in adult detention facilities until transferred to the South Texas Family Residential Center where she was reunited with B.M.  Ex. E Att. 1 (1540).

57.     On June 19, 2018, an immigration judge ordered C.M. removed to Guatemala. Ex. G Att. 1 (0294).

58.     On June 26, 2018, C.M. signed a Reunification and Repatriation Request form requesting to be reunited with B.M. and returned to Guatemala.  Ex. G Att. 1 (0340).

59.     B.M. remained in care with LSSNY until July 26, 2018, when he was transferred to the South Texas Family Residential Center and reunited with C.M.  Ex. E Att. 1 (1526).

60.     While in custody separately (from May 11 to July 26, 2018), C.M. and B.M. had communications on at least the following occasions:  May 17, 2018, May 31, 2018, June 20, 2018, and June 27, 2018.  Ex. E Att. 1 (0006-07); Ex. F Att.1 (0299-303).  B.M. was also provided telephone calls with his cousin, grandmother, and/or grandfather from May 29, 2018 until B.M.'s discharge and reunification.  Ex. F Att.1 (0299-303).

### *L.G. and B.G.*

61.     On May 16, 2018, at approximately 8:10 pm, U.S. Border Patrol agents apprehended L.G. and B.G. following their unlawful entry into the United States between ports of entry.  Ex. D Att. 2 (0086-88, 0094-96).

62.     Following their apprehension, L.G. and B.G. were transported to and booked into the Yuma Border Patrol Station for processing.  Ex. D Att. 2 (0086-88, 0094-96, 0091-93, 0079-84).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

63.    L.G. was identified as an adult amenable to prosecution and to be processed for prosecution, and a placement request for B.G. was made with ORR.  Ex. D Att. 2 (0086-88, 0094-96, 0091-93, 0079-84).

64.    On May 17, 2018 at approximately 11:22 am, the processing of L.G. was complete.  Ex. D Att. 2 (00079-84).

65.    L.G. was served with an order of Expedited Removal with Credible Fear, and criminal charges for violation of 8 U.S.C. § 1325 were included in the I-213.  Ex. D Att. 2 (0086-88).

66.    On May 17, 2018 at 2:52 pm, the confirmation email for B.G.'s placement at Southwest Key was sent by an Intakes Specialist with GDIT, a contractor with ORR, and was received by ICE Phoenix Field Office personnel, U.S. Border Patrol Yuma Station personnel, and staff members of Southwest Key.  The confirmation email contained the name and Alien number for both L.G. and B.G., and noted the relationship between L.G. and B.G.  Ex. D Att. 6 (3562A-3563A); Ex. E Att. 1 (3562A-3563A).

67.    The separation, family relationship, and names and Alien numbers for L.G. and B.G.'s were documented in both L.G.'s and B.G.'s I-213s.  Ex. D Att. 2 (0086-88, 0094-96).

68.     The separation, family relationship, and names and Alien numbers for L.G. and B.G. were also documented in the Encounter Summary in ICE's EARM database, which contained the information about the separation from the I-213 narratives.  Ex. E Att. 2 (01511-1512, 1635-1636).

69.    On May 17, 2018, at approximately 2:58 pm, B.G. was booked out of the Yuma Station and transferred to ORR custody with placement at Southwest-Key Hacienda Del Sol ("Southwest Key") in Arizona.  Ex. D Att. 2 (0091-93, 0103).

70.    On May 17, 2018, at approximately 7:00 pm, B.G. arrived at Southwest Key.  Ex. E Att. 2 (1509); Ex. F Att. 1 (0320-322).

71.     Southwest Key staff generated a report dated May 18, 2018 noting that B.G. had traveled to the United States with her mother, that they had been separated, and that her mother was in ICE custody.  The report also noted L.G.'s full name and Alien number.

11

Ex. F Att. 1 (0364-370).

72.     L.G. was referred to the U.S. Attorney's Office for criminal prosecution, and on May 18, 2018 the United States Attorney's Office declined to prosecute B.G.  Ex. D Att. 2 (0089-90); Ex. A Att. 9 (USAO 30(b)(6) 20, 152-153).

73.     On May 25, 2018, at approximately 3:20 am, L.G. was booked out of the Yuma Border Patrol Station, transferred from U.S. Border Patrol custody to ICE custody, and transported to the Eloy Detention Center in Eloy, Arizona.   Ex. D Att. 2 (0079-84, 0085).

74.     From May 26, 2018 to July 24, 2018, L.G. was detained in adult detention facilities until transferred to the South Texas ICE Family Residential Center where she was reunited with B.G.  Ex. E Att.1 (1633-1634,1628-1630, 1503-1504).

75.     On June 15, 2018, an immigration judge ordered L.G. to be removed to Guatemala.  Ex. G Att. 2 (0759); Ex. E Att. 2 (01628-1630).

76.     B.G. remained in care through Southwest Key until July 23, 2018, when she was discharged and transferred to the South Texas ICE Family Residential Center where she was reunited with L.G. on July 24, 2018.  Ex. E Att. 2 (1509).

77.     While in custody separately (from May 17 to July 24, 2018), B.G. and L.G. had communications on at least the following occasions: June 26, 2018, July 10, 2018, and July 12, 2018.   Ex. E Att. 2 (1628-1630); Ex. F Att. 2 (0431-434, 0392, 0397). B.G. was also provided video calls with her maternal grandmother and two of her aunts, beginning on June 21, 2018.  Ex. F Att. 1 (0431-434, 0390, 0393, 0399-400).

### *M.R. and J.R*.

78.     On May 8, 2018, at approximately 3:45 pm and 3:50 pm, respectively, U.S. Border Patrol agents apprehended M.R. and J.R. following their unlawful entry into the United States between ports of entry.  Ex. D Att. 3 (0108-111, 0118-120).

79.     Following their apprehension, M.R. and J.R. were transported to and booked into the Yuma Border Patrol Station for processing.  Ex. D Att. 3 (0108-111, 0118-120, 0104-106, 0114-116).

80.     M.R. was identified as an adult amenable to prosecution and to be processed for

prosecution, and a placement request for J.R. was made with ORR.  Ex. D Att. 3 (0108-111, 0118-120, 0104-106, 0114-116).

81.     On May 9, 2018 at 2:38 pm, the confirmation email for J.R.'s placement at Cayuga Centers in New York was sent by an Intakes Specialist with GDIT, a contractor with ORR, and was received by ICE Phoenix Field Office personnel, U.S. Border Patrol Yuma Station personnel, and staff members of Cayuga Centers.  The confirmation email contained the full names and Alien numbers for M.R. and J.R., and noted the relationship between M.R. and J.R.  Ex. D Att. 6 (3719A-3720A); Ex. E Att. 3 (3719A-3720A).

82.     The separation, family relationship, and names and Alien numbers of J.R. and M.R. were documented in both M.R. and J.R.'s I-213s.  Ex. D Att. 3 (0108-111, 0118-120).

83.     The separation, family relationship, and names and Alien numbers of J.R. and M.R. also were documented in the Encounter Summary in ICE's EARM database, which contained the information about the separation from the I-213 narratives.  Ex. E Att. 3 (1584-1585, 1642-1643).

84.     On May 10, 2018, at approximately 7:21 am, J.R. was booked out of the Yuma Station and transferred to ORR custody with placement at Cayuga Centers in Bronx, New York.  Ex. D Att. 3 (0114-116, 0117).

85.     On May 10, 2018, at approximately 6:56 pm, the processing of M.R. was complete. Ex. D Att. 3 (0104-106).

86.     M.R. was served with a Notice to Appear, and criminal charges for violation of 8 U.S.C. § 1325 were included in the I-213.  Ex. D Att. 3 (0108-111).

87.     M.R. was referred to the U.S. Attorney's Office for criminal prosecution and, on May 11, 2018 at approximately 8:53 am, was transferred to the custody of the U.S. Marshal's Service; on May 11, 2018 the U.S. Attorney's Office declined to prosecute and M.R. was booked back into the Yuma Station.  Ex. D Att. 3 (10996-998, 0112-113, 0104-106); Ex A Att. 9 (USAO 30(b)(6) 20, 152-153).

88.     On May 11, 2018, J.R. arrived at Cayuga Centers.  Ex. F Att. 3 (0994-996).

89.     Cayuga Centers staff generated a report dated May 12, 2018 noting that J.R. had

13

been separated from his mother at the border and that the "[s]eparation was also confirmed by ORR."  Ex. F Att. 3 (1187-1188).

90.    On May 12, 2018, at approximately 12:29 am, M.R. was booked out of the Yuma Border Patrol Station, transferred from U.S. Border Patrol custody to ICE custody, and transported to the Eloy Detention Center in Eloy, Arizona.  Ex. D Att. 3 (0104-106, 0107).

91.    From May 12, 2018 to July 26 2018, M.R. was detained in adult detention facilities until transferred to the South Texas ICE Family Residential Center where she was reunited with J.R.  Ex. E Att. 3 (1641).

92.    J.R. remained in care through Cayuga Centers until July 26, 2018, when he was transferred to the South Texas Family Residential Center where he was reunified with M.R.  Ex. E Att. 3 (1576-1577, 1582).

93.    On June 21, 2018, an immigration judge ordered M.R. to be removed to Guatemala.  Ex. G Att. 3 (0954-956).

94.    On June 27, 2018, M.R. signed a Reunification and Repatriation Request form stating that she would like to be reunited with J.R. and returned to Guatemala.  Ex. G Att. 3 (1013); Ex. E Att. 3 (1576-1577).

95.    While in custody separately (from May 9 to July 26, 2018), M.R. and J.R. had communications on at least the following occasions: on May 16, May 22, June 27, July 11, and July 18.  Ex. F Att. 3 (1136, 01126-1131).  In addition to these calls with his mother, J.R. spoke to his aunt in Guatemala on at least the following dates: May 30, June 7, June 19, June 28, July 3, and July 12.  *Id.*

### *O.A. and L.A.*

96.    On May 11, 2018, at approximately 5:40 pm, U.S. Border Patrol agents apprehended O.A. and L.A. following their unlawful entry into the United States between ports of entry.  Ex. D Att. 4 (0131-134, 0141-143).

97.    Following their apprehension, O.A. and L.A. were transported to and booked into the Yuma Border Patrol Station for processing. Ex. D Att. 4 (0131-134, 0141-143 0127-

14

129, 0137-139).

98.    O.A. was identified as an adult amenable to prosecution and to be processed for prosecution, and a placement request for L.A. was made with ORR.  Ex. D Att. 4 (0131-134, 0141-143).

99.    On May 12, 2018, at 12:30 p.m., the confirmation email for L.A.'s placement at Cayuga Centers in New York was sent by an Intakes Specialist with GDIT, a contractor with ORR, and was received by ICE Phoenix Field Office personnel, U.S. Border Patrol Yuma Station personnel, and staff members of Cayuga Centers.  The confirmation email contained the Alien number of O.A. and the full name of and Alien number of L.A., and noted the relationship between O.A. and L.A.  Ex. D Att. 6 (7460A-7462A); Ex. E Att. 4 (7460A-7462A).

100.   The separation, family relationship, and names and Alien numbers of O.A. and L.A. were documented in both O.A. and L.A's I-213s.  Ex. D Att. 4 (0131-134, 00141-143).

101.   The separation, family relationship, and names and Alien numbers of O.A. and L.A. also were documented in the Encounter Summary in ICE's EARM database, which contained the information about separation from the I-213 narratives.  Ex. E Att. 4 (1604-1606, 1658-1659).

102.   On May 12, 2018, at approximately 4:19 pm, the processing of O.A. was complete. Ex. D Att. 4 (0127-129).

103.   O.A. was served an order of Expedited Removal, and criminal charges for violation of 8 U.S.C. § 1325 were included in the I-213.  Ex. D Att. 4 (0131-134).

104.   On May 13, 2018, at approximately 9:14 am, L.A. was booked out of the Yuma Station and transferred to ORR custody with placement at Cayuga Centers in Bronx, New York. Ex. D Att. 4 (0137-139, 0140).

105.   O.A. was referred to the U.S. Attorney's Office for criminal prosecution, and on May 14, 2018, the U.S. Attorney's Office declined to prosecute.  Ex. D Att. 4 (0135-136); Ex. A Att. 9 (USAO 30(b)(6) 20, 152-153).

106.   On May 14, 2018, at approximately 3:27 pm, O.A. was booked out of the Yuma

Border Patrol Station, transferred from U.S. Border Patrol custody to ICE custody, and transported to the Florence Staging Facility in Florence, Arizona.  Ex. D Att. 4 (0127-129, 0130).

107.   On May 15, 2018, shortly after midnight, L.A. arrived at Cayuga Centers.  Ex. F Att. 4 (0009-11).

108.   Cayuga Centers staff generated a report noting that L.A. had been separated from her mother at the border.   Ex. F Att. 4 (0210-211).

109.   From May 14, 2018 to September 13, 2018, O.A. was detained in adult detention facilities until transferred to the South Texas ICE Family Residential Center where she was reunified with L.A.  Ex. E Att. 4 (01656-1657).

110.   On July 17, 2018, an immigration judge ordered the removal of O.A. to Guatemala.  Ex. G Att. 4 (1079).

111.   L.A. remained in care through Cayuga Centers until July 2, 2018, when she was released to her uncle in Miami, Florida.  Ex. E Att. 4 (1593-1594, 1644-1646).

112.   On September 13, 2018, O.A. and L.A. were reunited at South Texas ICE Family Residential Center.   Ex. E Att. 4 (01593-1594, 1601, 1644-1646).

113.   While in custody separately (from May 13 to July 2, 2018), O.A. and L.A. had communications on at least the following occasions: on May 29, May 31, June 7, June 13, June 21, and June 27, 2018. Ex. F Att. 4 (0177-180, 0152-158).  In addition to calls with her mother, L.A. had calls with her grandmother on May 25, May 28, May 30, June 5, June 12, June 13, and June 27, 2018, and calls with her uncle (L.A.'s sponsor) on June 5, June 6, June 7, June 12, June 18, and June 21.  *Id.*  Additionally, O.A. spoke with L.A.'s case manager at Cayuga Centers on at least the following occasions:  May 29, May 31, June 12, and July 2.  *Id*.

**_V.C. and G.A_**.

114.   On May 8, 2018, at approximately 2:35 pm, U.S. Border Patrol agents apprehended V.C. and G.A. following their unlawful entry into the United States between ports of entry.  Ex. D Att. 5 (0155-157, 0162-164).

115. Following their apprehension, V.C. and G.A. were transported to and booked into the Yuma Border Patrol Station for processing.  Ex. D Att. 5 (0155-157, 0162-164, 0150-153, 0158-160).

116. V.C. was identified as an adult amenable to prosecution and to be processed for prosecution, and a placement request for G.A. was made with ORR.  Ex. D Att. 5 (0155-157, 0162-164).

117. On May 9, 2018, at 4:29 pm, the confirmation email for G.A.'s placement at Cayuga Centers in Bronx, New York was sent by an Intakes Specialist with GDIT, a contractor with ORR, and was received by ICE Phoenix Field Office personnel, U.S. Border Patrol Yuma Station personnel, and staff members of Cayuga Centers.  The confirmation email contained the full names and Alien numbers for G.A. and V.C., and noted the relationship between V.C. and G.A.  *Id*.  Ex. D Att. 6 (3709A-3711A); Ex. E Att. 6 (3709A-3711A).

118. The separation, family relationship, and names and Alien numbers of V.C. and G.A. were documented in V.C. and G.A.'s I-213s.  Ex. D Att. 5 (0155-157, 0162-164).

119. The separation, family relationship, and names and Alien numbers of V. C. and G.A. also were documented in the Encounter Summary in ICE's EARM database, which contained the information about the separation from the I-213 narratives.   Ex. E Att. 5 (1671-1672, 1555-1557).

120. On May 10, 2018 at approximately 7:21 am, G.A. was booked out of the Yuma Station and transferred to ORR custody with placement at Cayuga Centers in Bronx, New York. Ex. D Att. 5 (0158-160, 0161).

121. On May 10, 2018, at approximately 4:08 pm, the processing of V.C. was complete. Ex. D Att. 5 (0150-153).

122. V.C. was served with a Notice to Appear, and criminal charges for violation of 8 U.S.C. § 1325 were included in the I-213.  Ex. D Att. 5 (0155-157).

123. On May 11, 2018, G.A. arrived at Cayuga Centers.  Ex. F Att. 5 (0792-794).

124. Cayuga Centers staff generated a report dated May 12, 2018 noting that G.A. had been separated at the border from his mother.  Ex. F Att. 5 (0970-971).

17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

125.   On May 14, 2018, at approximately 12:05 am, V.C. was booked out of the Yuma Border Patrol Station, transferred from U.S. Border Patrol custody to ICE custody, and transported to the Florence Staging Facility in Florence, Arizona.  Ex. D Att. 5 (0150-153, 0154); Ex. E Att. 5 (1670).

126.   From May 14, 2018 to July 26, 2018, V.C. was detained in adult detention facilities until transferred to the South Texas ICE Family Residential Center where she was reunited with G.A. on July 26, 2018.  Ex. E Att. 5 (1670).

127.   On May 30, 2018, V.C. wrote a letter, which was notarized on that same date, authorizing G.A.'s deportation to Guatemala and asking that she (V.C.) be deported as soon as possible.  Ex. F Att. 5 (0978).

128.   On June 5, 2018, an immigration judge ordered V.C. to be removed to Guatemala. Ex. G Att. 5 (1389-1390).

129.   On June 26, 2018, V.C. signed a Reunification and Repatriation Request form requesting to be reunited with G.A. and returned to Guatemala.  Ex. G Att. 5 (1453). (Reunification and Repatriation Request form, dated June 26, 2018).

130.   G.A. remained in care through Cayuga Centers until July 25, 2018, when he was transferred to the South Texas ICE Family Residential Center where he was reunited with V.C. on July 26, 2018. Ex. E Att. 5 (1552, 1544-1545).

131.   While in custody separately (from May 10 to July 26, 2018), V.C. and G.A. had communications on at least the following occasions: on July 6 and July 11.  Ex. F Att. 1 (0925-931).  In addition, G.A. had calls with his father on at least the following occasions: June 4, twice on June 6, June 11, June 14, June 27, June 29, July 3, July 5, July 12, July 17, and July 18.  *Id.*  Additionally, V.C. spoke with G.A.'s case manager on at least one other occasion on May 29, 2018.  *Id.*

Dated: March 9, 2023                              Respectfully Submitted,


                                                   BRIAN M. BOYNTON
                                                   Principal Deputy Assistant Attorney General

18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JAMES G. TOUHEY, JR.
Director, Torts Branch

*s/ Phil MacWilliams*
PHILIP D. MACWILLIAMS
Trial Attorney
D.C. Bar No. 482883
E-mail: phil.macwilliams@usdoj.gov
U.S. Department of Justice
Civil Division, Torts Branch
Benjamin Franklin Station, P.O. Box 888
Washington, DC 20044
Telephone: (202) 616-4285
Attorneys for the United States of America

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on March 9, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

*s/ Phil MacWilliams*
PHILIP D. MACWILLIAMS
Attorney for United States of America

20