David B. Rosenbaum, 009819
Travis C. Hunt, 035491
BriAnne N. Illich Meeds, 036094
OSBORN MALEDON, P.A.
2929 North Central Avenue, 20th Floor
Phoenix, Arizona 85012-2793
(602) 640-9000
drosenbaum@omlaw.com
thunt@omlaw.com
billichmeeds@omlaw.com

**Counsel for C.M. Plaintiffs**

[Additional counsel for Plaintiffs listed on the signature page]

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| C.M., on her own behalf and on behalf of her minor child, B.M.; L.G., on her own behalf and on behalf of her minor child, B.G.; M.R., on her own behalf and on behalf of her minor child, J.R.; O.A., on her own behalf and on behalf of her minor child, L.A.; and V.C., on her own behalf and on behalf of her minor child, G.A., <br><br> Plaintiffs, <br><br> v. <br><br> United States of America, <br><br> Defendant. | No. 2:19-cv-05217-SRB <br><br> **MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> **[ORAL ARGUMENT REQUESTED]** |

Plaintiffs seek partial summary judgment as to the liability elements of Count I (Intentional Infliction of Emotional Distress ("IIED")) and Count II (Negligence) of their Complaint. [Doc. 1].

## I.     INTRODUCTION

The government admits that its former practice of separating migrant families at the U.S.–Mexico border was unconscionable and caused separated parents and children severe emotional harm: President Biden "condemn[ed] the human tragedy that occurred when our immigration laws were used to intentionally separate children from their parents or legal guardians." Pls.' SOF ¶ 129. Department of Homeland Security Secretary Alejandro Mayorkas said it was "unconscionable to separate children from their parents as a means to deter migration" and acknowledged that separated families suffered "immense trauma." *Id*. ¶ 127. Attorney General Merrick Garland denounced family separation as "shameful" and said he "can't imagine anything worse than tearing parents from their children." *Id*. ¶ 128. The government thus has acknowledged that the only issue in this case is "whether those policies caused tortious injury to the Plaintiffs here." [Doc. 99]. Plaintiffs move for partial summary judgment because documents and deposition testimony in this litigation support the government's admissions.

With respect to the IIED claim, the undisputed facts establish that the government's conduct in carrying out the family separations at issue in this case was extreme and outrageous: the government cruelly separated Plaintiff families, refused to tell Plaintiff mothers where their children were being taken or if they would see them again, did not allow Plaintiffs to communicate with one another for weeks or months, taunted Plaintiff mothers by wishing them "Happy Mother's Day," told Plaintiff mothers they would be deported without their children, and failed to reunite Plaintiffs for months—despite never prosecuting the adult Plaintiffs. As courts have already found, these facts "shock the conscience." The undisputed facts further show that key government officials charged with implementing the policy were not warned that the policy was coming or given

guidance to ensure families were appropriately tracked, told each other's whereabouts, permitted to communicate while separated, or promptly reunited.

The undisputed facts likewise demonstrate that the government, at a minimum, recklessly disregarded the near certainty that severe emotional distress would result from its conduct. The American Academy of Pediatrics, immigration advocates, members of Congress, and officials throughout the government warned that the government was not ready to manage family separation on a large scale, and that family separations would "only further traumatize those already fleeing harm" and could significantly harm children's brain development through the onset of "toxic stress." Summary judgment thus should be entered for Plaintiffs on the first two elements of their IIED claim.[1]

Summary judgment also should be entered for Plaintiffs on the first two elements of their negligence claim—that the government (1) owed Plaintiffs a duty of care while Plaintiffs were in government custody, and (2) breached that duty. The undisputed facts establish that the government failed to provide Plaintiffs in its custody even a minimal level of care when it taunted Plaintiff mothers, failed to provide Plaintiff mothers with information about their children's whereabouts, failed to facilitate communication between Plaintiffs for weeks or months, and failed to reunite them until forced to do so by court order.

The motion should be granted, and the bench trial should be limited to an assessment of Plaintiffs' damages.[2]

---

[1]  The evidence reflects government officials' clear intent to cause the severe emotional distress experienced by Plaintiffs. Indeed, the facts show the very purpose of the family separation policy and the manner in which it was implemented was to inflict emotional distress that would deter other migrants from seeking asylum in the United States. *See, e.g.*, Ex. 79 (DHS statement describing family separation as "the prior administration's practice of intentionally separating families at the border to deter others from migrating to the United States."); *see also infra* at Section IV.A.2. But Plaintiffs need not establish that government officials intentionally inflicted emotional distress to succeed on this motion, as the undisputed evidence shows, at a minimum, that officials recklessly disregarded the severe emotional distress that implementation of the policy would cause.
[2]  While the record ultimately will establish that the government's conduct caused Plaintiffs to suffer extensive harm, Plaintiffs recognize there remain genuine disputes of material fact as to the nature and extent of Plaintiffs' harm. As such, Plaintiffs do not move for summary judgment on this element of their claims.

## II.    BACKGROUND

### A. The Government Was Repeatedly Warned That Separating Families Would Cause Severe Emotional Distress And That It Was Not Prepared To Manage Large-Scale Family Separations.

As early as February 2017, senior Department of Homeland Security ("DHS") officials, including Customs and Border Protection ("CBP") Commissioner Kevin McAleenan, considered separating parents and children who crossed the Southwest Border to deter migration. *See* Statement of Undisputed Material Facts in Support of Plaintiffs' Motion for Summary Judgment ("Pls.' SOF") ¶ 1. In March 2017, when asked if DHS was planning to separate families, DHS Secretary John Kelly confirmed: "Yes, I am considering [that], in order to deter more movement along this terribly dangerous network, I am considering exactly that." *Id*. ¶ 2.

In response, immigration advocates warned Kelly, Acting Immigration and Customs Enforcement ("ICE") Director Thomas Homan, and others, in March 2017, that separating children from parents would "only further traumatize those already fleeing harm," *id*. ¶ 3, that "DHS components and the Office of Refugee Resettlement lack the mechanisms to ensure . . . that communication between separated family members is coordinated," *id.* ¶ 4, and that the policy would "overwhelm the system and cause a crisis in care." *Id*. In March 2017, members of Congress told government officials the same: separating children from their parents would "further traumatize families, overwhelm our child welfare system and roll back years of humanitarian progress." *Id*. ¶ 5.

Ignoring these warnings, in July 2017, the government initiated a pilot program in which U.S. Border Patrol ("USBP") agents in the El Paso Sector presented for prosecution all adults who entered the country without inspection, including those traveling with children, for misdemeanor unlawful entry under 8 U.S.C. § 1325 ("El Paso Pilot" or "Pilot"). *See id*. ¶ 6. Under the Pilot, a parent was referred for prosecution, USBP agents separated the parent from their child, and the child was labeled an Unaccompanied Alien Child ("UAC") and sent to the custody of the Office of Refugee Resettlement ("ORR"), a component of the Department of Health and Human Services ("HHS"). *See id.* ¶ 7. The

purpose of the Pilot was to provide "a deterrent to parents" attempting to enter the United States without inspection. Exhibit ("Ex.") 82 to Declaration of Harry K. Fidler, at CD-US-00017119.

The Pilot was alarming to judges. For example, on November 1, 2017, U.S. Magistrate Judge Miguel Torres "expressed concern" about the separations, noting that "[i]n a number of recent illegal entry cases over the last several months, the Court has repeatedly been apprised of concerns voiced by defense counsel and by defendants regarding their limited and often non-existent [ ] information about the well-being and whereabouts of their minor children from whom they were separated at the time of their arrest." Pls.' SOF ¶ 8.

On November 18, 2017, the El Paso Sector ended the Pilot "until USBP-HQ leadership has had an opportunity to review all aspects of this program and brief up the chain at the appropriate level." *Id*. ¶ 9. The problems with the Pilot were well known to those implementing it, as "CBP headquarters personnel had been aware of the various system deficiencies related to tracking family separations." *Id*. ¶ 10. Indeed, "El Paso Sector agents requested assistance from CBP headquarters, but the necessary system changes were not made" because the requested changes to help "track family separations was not a high enough priority to warrant the time and resources required for system modifications." *Id*. ¶ 11. While the El Paso Sector subsequently submitted a memorandum to Brian Hastings, Chief of Law Enforcement Operations Directorate at USBP, requesting that the Pilot be reinstated, it recognized there were serious implementation issues that needed to be addressed including ███████████████████████ ███████ so that ████████████████████████████████████ ████████ *Id*. ¶ 12.

In December 2017, after public attention regarding the Pilot, immigration advocates sent a complaint to the DHS Office of Civil Rights and Civil Liberties ("CRCL") and the DHS Acting Inspector General "on behalf of numerous family members who have been separated while in federal custody at the U.S. border." *Id*. ¶ 13.

1    The complaint documented that separations "deprive[] family members the ability, given

2    their detention, to locate each other and be reunited" and that "family members are given

3    little to no information on what happens to those from whom they are separated, including

4    how to locate, contact, or reunite with them." *Id.* Similarly, on January 11, 2018, the

5    American Academy of Pediatrics ("AAP") urged DHS Secretary Kirstjen Nielsen "in the

6    strongest possible terms" not to institute "a policy that would separate children from their

7    parents at the border" and asked to meet with Nielsen at her "earliest convenience" to

8    explain why such a policy "would be detrimental to the health, safety and well-being of

9    children." *Id.* ¶ 14. The AAP noted that separating families would cause "additional

10   trauma" to children seeking refuge in the country and could harm brain development

11   through the onset of "toxic stress." *Id.* On March 2, 2018, this information was reiterated

12   to Nielsen and also sent to McAleenan and Homan. *Id.* ¶ 15. Around this time, CBP and

13   ICE informed Nielsen of concerns raised by non-governmental organizations that a policy

14   necessarily resulting in family separation "would be detrimental to the health, safety, and

15   well-being of children" and that there were conversations within DHS about "the effect

16   [separating] would have not only on children but the parents." *Id.* ¶ 16.

17       **B.    Secretary Nielsen Approves The DHS Referral Policy, Necessarily**
18   **Resulting In The Separations Of Thousands Of Families.**

19       On April 6, 2018, Attorney General Jeff Sessions directed "each United States

20   Attorney's Office along the Southwest Border—to the extent practicable, and in

21   consultation with DHS—to adopt immediately a zero-tolerance policy for all offenses

22   referred for prosecution under [8 U.S.C. §] 1325(a)" ("Zero Tolerance Policy"). *Id.* ¶ 17.

23   On April 23, 2018, McAleenan, Homan, and Francis Cissna, Director of U.S. Citizenship

24   and Immigration Services ("USCIS"), sent Nielsen a memorandum titled "Increasing

25   Prosecutions of Immigration Violations," which proposed three options for implementing

26   the Zero Tolerance Policy and evaluated each option in terms of its "feasibility," "legal

27   risk," and predicted "deterrent impact." *Id.* ¶ 18. Options 1 and 2 would have increased

28   the referral of single adults who crossed the border between ports of entry to the

Department of Justice ("DOJ") for prosecution for misdemeanor illegal entry, either "in accordance with [U.S. Attorney's Offices'] capacity" to accept the referrals for prosecution or to "100%." *Id.* ¶ 19. Option 3 proposed that DHS "[w]ork with DOJ, the Department of Health and Human Services, and other interagency partners to develop a quickly scalable approach to achieve 100% immigration violation prosecution referral for all amenable adults, including those initially arriving or apprehended with minors," meaning DHS "would pursue prosecution of all amenable adults who cross our border illegally, including those presenting with a family unit, between ports of entry in coordination with DOJ," *id.* ¶ 20.

Despite McAleenan, Homan, and Cissna's acknowledgment that Option 3 would "require significant resources and present[ ] increased legal risk," they recommended that Nielsen select it. *Id.* ¶ 21. In fact, McAleenan knew the U.S. Attorneys' Offices would be unable to accept for prosecution all adults referred by USBP under Option 3 at current capacity levels. *See id.* ¶ 22. McAleenan, Homan and Cissna made this recommendation based, in part, on the purported "effectiveness" of the El Paso Pilot. *Id.* ¶ 23. The memorandum did not reference the tracking, communication and reunification problems encountered during the Pilot. *See Id.* ¶¶ 10–12, 24; *see also supra* Section II.A.

Nielsen understood adopting Option 3 would mean ███████████████ ████████ *Id.* ¶ 25. Yet the memorandum recommending Option 3 contained no plan for how to track separated families, how to ensure separated family members could communicate, or how to reunite families. *See id.* ¶ 26. The memorandum also did not address ICE's concern—raised in a prior draft—that separating families ██████ ███████████████████████████████████████████████████████████ e ███████████████ *Id.* ¶ 27. Nevertheless, on May 4, 2018, Nielsen approved Option 3 ("DHS Referral Policy" or "Policy") and, within days, USBP officers began to separate parents and children, including in the Yuma Sector. *Id.* ¶ 28.

C.    **The Government Implements The DHS Referral Policy Recklessly Disregarding Necessary Planning**.

The DHS Referral Policy was a significant policy change. *Id.* ¶ 29. Before the Policy, the government had never separated parents and children at anywhere near the scale of separations under the Policy. *Id.* ¶ 30. Yet the government implemented the Policy without notifying key officials it was coming. USBP agents responsible for separating parents and children received no guidance or training on how to care for separated children. *Id.* ¶ 31 (citing testimony from Agents ████ ("Agent R."), ████ ("Agent C."), and ████ ("Agent A")); *see generally id.* ¶¶ 36. U.S. Attorneys responsible for prosecuting parents were not given advance warning. *See, e.g.*, *id.* ¶ 32 (citing testimony from U.S. Attorney Bash). ORR personnel responsible for the care of separated children were not informed the Policy would be implemented. *Id.* ¶ 33 (Tricia Swartz, the Associate Deputy Director of ORR, did not recall any planning discussions about how the Policy would impact ORR's operations.). ICE officials who detained and tracked the parents after the separations were not told about the Policy. *See id.* ¶ 34 (Robert Guadian, a Senior ICE officer, testified he did not learn of the Policy until "everyone else found out" and that "[t]here was no proactive like email to my knowledge or memo or a heads-up that this was going to be occurring."); *id.* ¶ 35 (Mellissa Harper, ICE Unit Chief of the Juvenile & Family Residential Management Unit, which "advise[s] on policy; operational issues for everything related to unaccompanied children, and family units," did not "remember any specific meetings or emails" discussing the Policy and learned of the Policy through a DOJ press release or slightly before.); *see generally id.* ¶¶ 29-37. CRCL personnel were "inappropriately frozen out" of discussions involving the Policy, despite its open investigation into serious concerns arising during the Pilot. *Id.* ¶ 37.

Despite the lack of information and training, USBP officers forged ahead, separating an estimated 3,014 children from their parents, including Plaintiffs, in the six-week period the Policy was in effect. *Id.* ¶ 38. During this period, there was a disconnect between how the Policy was presented publicly (and how some in government understood

it would be carried out), and the manner in which it was implemented. Although Nielsen, ICE Executive Associate Director Matthew Albence, and others informed Congress and the public that the government was separating parents from their children because the parents were being prosecuted and the children could not accompany their parents into criminal custody, *see id*. ¶ 39, in practice, families were being separated *regardless* of whether the parents were prosecuted for misdemeanor illegal entry or placed in criminal custody, and families were not being reunited after the completion of the criminal process.[3] *See id*. ¶ 40-41.

In the Yuma Sector, USBP agents were directed to refer for prosecution all parents who crossed the border without inspection, even if USBP agents knew the referrals were flawed and would not be accepted by the U.S. Attorney's Office. *See id*. ¶ 42. Yuma USBP agents "w[ould] not try to reunite [parents and children] if prosecution [was] denied for [the] parent." *Id*. ¶ 43. Similarly, if a parent returned from criminal custody while their child was still detained at Yuma, "the [child] [ ] remained a UAC and [was] placed at a juvenile facility while the adult continue[d] into removal proceedings." *Id*. ¶ 44.

The government also implemented the Policy without developing a tracking system that would allow parents to locate their children and facilitate regular communication between parents and children, and without a plan to ensure reunification. *See id*. ¶ 45 (as of July 6, 2018, two months after implementing the Policy, ICE was still attempting to build processes to facilitate communication between separated parents and children and was still developing a reunification process, as there had been "no unified record of what parent went where and what child went where"); *see also id*. ("Prior to Zero Tolerance implementation, the Department did not establish a plan for how CBP, ICE, and HHS would successfully reunify separated family members.").

---

[3] Government officials' public statements falsely claiming that family separation was merely a byproduct of prosecution when, in fact, they implemented a far broader policy of separating *all* families apprehended at the border *regardless of whether the parents were prosecuted or even referred for prosecution, see supra* Section II.C., will support Plaintiffs' claim at trial that the government intentionally inflicted severe emotional distress on separated families to deter migration. To succeed on this motion, however, Plaintiffs need only establish that government officials acted recklessly. *See supra* note 1.

**D.      The Government Continues The DHS Referral Policy For Six Weeks Despite Knowing About Serious Implementation Problems.**

On May 10, 2018, senior government officials, including Albence, were told Yuma USBP was separating families regardless of whether the parents were accepted for prosecution. *Id*. ¶ 46 ("Yuma Sector has presented FAMU adults for prosecution but all have been declined. However, it appears after the declination that the adults are not being reunited with the children and they have not cancelled the placement requests for the children in the ORR portal."). That same day, Tae Johnson, then a senior ICE official, noted that parents would not be reunited with their children after they were prosecuted, "particularly when the child ha[d] already been placed with ORR," and acknowledged that much of the information related to reunification was "unknown" and that "[m]ore internal discussion between ICE and CBP is needed on [reunification]." *Id*. ¶ 47.[4]

On May 12, 2018, CRCL officials raised ████████████████████ regarding the Policy. *Id*. ¶ 51. And on June 12, 2018, CRCL concluded that "CBP and ICE lack[ed] clear, cohesive, comprehensive, and readily accessible policy and procedure covering family separation." *Id*. ¶ 52. On June 16, 2018, Homan received notice that there were "790 kids in our shelters who are not able to contact their parents." *Id*. ¶ 53.[5] On June 19, 2018, Johnson emailed Albence that "[w]hile ICE does not track the number of

---

[4]   Documents show that the government *intentionally* kept families separated after the parent completed their time in criminal custody, demonstrating that prosecution was simply a pretext for the separation. *See, e.g.*, Pls.' SOF ¶ 48 (email from Albence to Homan expressing "concern . . . that adults that were separated from their children due to prosecution will be returned to USBP immediately after the guilty plea is accepted by the Court, as the local District Court generally only imposes time-served. This will result in a situation in which the parents are back in the exact same facility as their children - possibly in a matter of hours - who have yet to be placed into ORR custody," and proposing ways to *prevent* parents who had completed the criminal process from being reunited with their children.); *id*. ¶¶ 49-50 (email from Johnson to Albence: "CBP is Reuniting adults with kids after prosecution in McAllen. My guess is there is no place to house the adult, so they are bringing them back to the station and since the exact child is still there, they are joining them. . . . What a fiasco," and Albence's response: "[t]his obviously undermines the entire effort and the Dept is going to look completely ridiculous if we go through the effort of prosecuting only to send them to a [Family Residential Center] and out the door."). But Plaintiffs need only establish recklessness to succeed on this motion, *see supra* note 1.
[5]   Commander Jonathan White, Deputy Director for Children's Programs at ORR, testified that this failure to facilitate communication "poses significant psychological risk to the child, because it interrupts the caring relationship." Ex. 3, White Dep. 281:11-17.

9

1   individuals that have been reunified following prosecution, we believe there are far more
2   individuals who are separated (not reunified) following a prosecution as evidenced by the
3   over 1,500 parents that are in ICE detention facilities today, who were initially part of a
4   family unit." *Id*. ¶ 54. Despite these obvious flaws in implementation, the government
5   continued to separate families, and took no steps to reunite many of the families, including
6   Plaintiffs.

7       **E.  The Government Separates Plaintiffs.**

8           The U.S. government separated the five Plaintiff families in May 2018 under the
9   DHS Referral Policy. They were not reunited for months.[6]

10          **1.  V.C. and her son, G.A.**

11          Plaintiff V.C. crossed the border in or near Yuma, Arizona on May 8, 2018, with
12  her six-year-old son, G.A. *Id*. ¶ 55. USBP agents took V.C. and G.A. to Yuma Station, a
13  USBP detention facility, where officers told V.C. that the government was going to lock
14  her up for years and take her son away. *Id*. ¶ 56. That night, officers took G.A. away from
15  his mother, terrifying V.C. *Id*. ¶ 57. The next day, officers returned G.A. to his mother. *Id*.
16  On the morning of May 10, 2018, officers told V.C. and other detained mothers to get in
17  line and bathe their children because they were going to be taken away that day. *Id*. ¶ 58.
18  V.C. and G.A. stood in line with many other parents and children, who were crying,
19  prompting an officer to laugh and loudly say in Spanish: "Don't cry, today is a happy day.
20  It's Mother's Day." *Id*. ¶ 59. V.C. understood the officer was taunting her and the others.
21  *Id*. Officers then began calling children for separation and directed parents and children
22  to line up on opposite walls. *Id*. ¶ 60. As V.C. and G.A. watched while families were
23  physically torn apart, G.A. clung to his mother. *Id*. ¶ 61. An officer called G.A.'s name,
24  he lined up with other children, and was led away sobbing. *Id*. A person V.C. believed to
25  be a social worker told her that G.A. would be sent to New York, but agents refused to tell
26  V.C. where in New York, or if she would see or speak to G.A. again. *Id*. ¶ 62. G.A. was
27  put on a plane to Cayuga Centers in the Bronx, New York. *Id*. ¶ 63.

28  ―――――――――――――――
[6] The government has no record of which officials separated Plaintiffs. Pls.' SOF ¶ 120.

10

While separated, V.C. cried every day, barely ate or slept, had headaches and toothaches, and was terrified she would be deported without her son. *Id*. ¶ 64. The government did not allow V.C. to speak to G.A. for almost two months, when she was permitted a short phone call. *Id*. ¶ 65. G.A. cried during that call and the call they had a week later. *Id*. ¶ 66. G.A. turned seven while separated from V.C. *Id*. ¶ 67. V.C. was not referred for prosecution or placed in criminal custody. *Id*. ¶¶ 68-69.

### 2.  M.R. and her son, J.R.

Plaintiff M.R. crossed the border in or near Yuma, Arizona on or about May 8, 2018, with her twelve-year-old son, J.R. *Id*. ¶ 70. Immediately after crossing, a USBP agent told M.R. and other mothers that they came to the United States at a "very bad time" because "now they want to take away your children." *Id*. ¶ 71. USBP agents brought M.R. and her son to Yuma Station. *Id*. ¶ 72. When they arrived, an officer told M.R. and the other parents they were going to jail and their children would be sent to a shelter. *Id*. An officer yelled at the mothers, asking "why did you bring your children here?" *Id*. Agents put M.R. and J.R. in a room with crying children and J.R. started to cry. *Id*. ¶ 73. M.R. tried to comfort J.R., saying they might not be separated for long. *Id*. The officers called children from a list of names, starting with the youngest children, ordered the children to bathe, and dressed them in blue outfits. *Id*. ¶ 74. After one or two days, while J.R. was sleeping, M.R. heard an officer call his name. *Id*. ¶ 75. M.R. woke him and he started to cry. *Id.* J.R. said he did not want to go, and M.R. tried to soothe him. *Id*. She watched through glass as J.R. and ten or twelve other children were led away. *Id*.

After J.R. was taken, M.R. cried and did not want to eat. *Id*. ¶ 76. She asked the USBP agents where they would take J.R., but they would not tell her. *Id*. An agent told M.R. that she would be deported, and her son would stay in the United States. *Id*. M.R. and other women were then shackled and brought to a detention center in Arizona. *Id*. ¶ 77. While detained in Arizona, M.R. cried all the time, had trouble sleeping, and experienced regular, severe headaches. *Id*. M.R. tried to call her son every day, using a phone card she had to add money to, but could not reach him. *Id*. ¶ 78. One time a woman

answered but said no children were there. *Id*. After approximately one month, M.R. finally was allowed to speak to her son, for only a few minutes. *Id*. ¶ 79. J.R. cried while M.R. explained they could not be together and asked him to be patient. *Id*. ¶ 80. Immigration officers nearby laughed and shook their heads listening to M.R. and J.R. cry. *Id*. M.R. and J.R. were only able to speak one more time while separated. *Id*. ¶ 81. During the second call, J.R. told his mother he was going to be adopted, cried, and asked when they would be together. *Id*. ¶ 82. After M.R. got off the phone, she cried so much that she vomited. *Id*.

The U.S. Attorney's Office for the District of Arizona declined to prosecute M.R. shortly after the government flew J.R. to Cayuga Centers in the Bronx, New York. *Id*. ¶ 83.

### 3.   C.M. and her son, B.M.

Plaintiff C.M. crossed the border in or near Yuma, Arizona on May 9, 2018, with her five-year-old son, B.M. *Id*. ¶ 84. Shortly after crossing, USBP agents took C.M. and B.M. to Yuma Station where an immigration officer told C.M. the government was going to take B.M. away and send her back to Guatemala without him. *Id*. ¶ 85. C.M. was horrified. *Id*. Upon seeing C.M.'s reaction, the officer laughed and said "Happy Mother's Day." *Id*. Officers then placed C.M. and B.M. in a cell with other migrant families, including mothers crying because the government had taken away their children. *Id*.

Early on May 11, 2018, an immigration officer told C.M. to wake B.M. because they were going to take him away. *Id*. ¶ 86. B.M. started crying. *Id*. The officer tried to take B.M. to another room to bathe but told C.M. that B.M. was crying too much and ordered her to bathe and dress him. *Id*. When the officer again tried to take her son, C.M. begged the officer not to do so. *Id*. ¶ 87. She told the officer her son only spoke Mam, and he would not be able to understand anyone. *Id*. The officer laughed at C.M. and made fun of her indigenous accent. *Id*. When C.M. continued to hold B.M., another officer told her they would lock B.M. in a cell without her if she did not let go. *Id*. ¶ 88. B.M. sobbed and

clung to his mother as officers pulled him away by force. *Id*. ¶ 89. C.M. had to watch while officers led B.M. and other children away. *Id*.

Nobody gave C.M. information about B.M.'s whereabouts or wellbeing. *Id*. ¶ 90. C.M. was heartbroken, could not stop crying, could not eat, and could only ask over and over again, to no avail, where B.M. was. *Id*. ¶ 91. Contact between C.M. and B.M. was sparse after their separation. *Id*. ¶ 92. C.M. spoke to her son a week after the separation but was only for a few minutes; during that call, her son kept asking when she was coming to get him and telling her he did not understand anyone speaking to him. *Id*. It was several weeks before C.M. was allowed to speak with B.M. again. *Id*. ¶ 93. During the period between calls, B.M.'s shelter case manager told him that she could not find his mother and thus could not arrange a call, upsetting B.M. *Id*. ¶ 94. During their few phone calls, both C.M. and B.M. were "very emotional" and "crying." *Id*. ¶ 95. While separated, C.M. suffered weight loss, sleeplessness, and headaches due to the stress of losing her son. *Id*. B.M. turned six in a shelter thousands of miles away from his mother. *Id*. ¶ 96.

The U.S. Attorney's Office for the District of Arizona declined to prosecute C.M. shortly after the government sent B.M. to Lutheran Social Services in the Bronx, New York. *Id*. ¶ 97. C.M. was never transferred into criminal custody. *Id*. ¶ 98.

### 4.  O.A. and her daughter, L.A.

Plaintiff O.A. crossed the border in or near Yuma, Arizona on or about May 11, 2018, with her five-year-old daughter, L.A. *Id*. ¶ 99. Shortly after crossing, USBP agents brought O.A. and her daughter to Yuma Station and placed them in a cell with other mothers and children. *Id*. ¶ 100. The next morning, O.A. watched in terror as officers called out children's names and took them from their mothers. *Id*. O.A. and L.A. watched as children clinging to mothers were separated. *Id*. ¶ 101. Eventually an officer called L.A.'s name and told O.A. they were going to bathe L.A., but they returned to ask O.A. to intervene because L.A. was crying and refusing to bathe. *Id*. ¶ 102. After the bath, officers told O.A. it was time for L.A. to leave. *Id*. ¶ 103. L.A. started crying and asking where she was being taken, but O.A. did not know how to answer. *Id*. L.A. grabbed O.A.

and refused to let go. *Id*. O.A. begged the officers not to take her daughter, but the officers led L.A. away. *Id*. Despite her pleas, no one told O.A. where they were taking L.A. *Id*. ¶ 104.

During the separation, O.A. suffered weight and hair loss, had headaches and dizziness, and had difficulty eating and sleeping. *Id*. ¶ 105. O.A. was held at two different detention centers; none of the officers at either facility would tell O.A. where L.A. was or how to contact her. *Id*. ¶ 106. O.A. finally located her daughter through a contact number provided by another detained mother, which she asked her brother to call. *Id*. ¶ 107. It took about a month before O.A. was able to speak with L.A. *Id*. ¶ 108. L.A. was crying and scared and asked O.A. where she was and why she had left L.A. alone. *Id*. O.A. avoided deportation without her daughter only because an attorney intervened. *Id*. ¶ 109.

The U.S. Attorney's Office for the District of Arizona declined to prosecute O.A. shortly after the government flew L.A. to Cayuga Centers in the Bronx, New York. *Id*. ¶ 110. O.A. was never transferred into criminal custody. *Id*. ¶ 111.

### 5. L.G. and her daughter, B.G.

Plaintiff L.G. crossed the border in or near Yuma, Arizona on May 16, 2018, with her six-year-old daughter, B.G. *Id*. ¶ 112. That night, USBP agents took L.G. and B.G. to Yuma Station. *Id*. ¶ 113. The officers placed L.G. and B.G. in a room with other mothers and children. *Id*. The mothers told L.G. the government was going to take B.G. away. *Id*. A few hours later, the officers confirmed they would take B.G. *Id*. L.G. cried and told her daughter she would be taken; B.G. was scared and asked "how am I going to communicate with you" and whether the officers would return her. *Id*. ¶ 114. L.G. waited eight hours in a room with her daughter before officers separated them. *Id*. L.G. watched as officers led B.G. away. *Id*. The officers did not tell L.G. where her daughter was going. *Id*. ¶ 115. L.G. did not speak with her daughter for forty days. *Id*. ¶ 116. When L.G. finally heard B.G.'s voice she began to cry; the call was only six minutes long. *Id*. L.G. only was allowed to speak to B.G. once more before they were reunited. *Id*. ¶ 117.

1    The U.S. Attorney's Office for the District of Arizona declined to prosecute L.G.

2    shortly after the government sent B.G. to Southwest Key-Hacienda Del Sol in Phoenix,

3    Arizona. *Id*. ¶ 118. L.G. was never transferred into criminal custody. *Id*. ¶ 119.

4    **F. The DHS Referral Policy Is Terminated And A Court Orders The Government To Reunite The Families.**

5

6    On June 20, 2018, then-President Trump signed an executive order directing DHS

7    to keep families together and revoking the DHS Referral Policy. *Id*. ¶ 121. After the

8    executive order, however, Nielsen, McAleenan, and Homan did not direct that parents in

9    ICE custody and children in ORR custody be reunited, except for removal. *Id*. ¶ 122 ("We

10   are moving forward w [sic] reunification only for the purposes of removal").

11   The government did not reunify Plaintiffs and many other families until it was

12   ordered to do so by a federal court on June 26, 2018. *Id*. ¶ 123. Because there was no

13   reunification plan, locating separated parents and children for purposes of reunification

14   required assembling a 375-person emergency response team. *Id*. ¶ 124. Several months

15   after they were separated, Plaintiffs were finally reunited. *Id*. ¶ 125.

16   **III.   LEGAL STANDARD**

17   Plaintiffs need only "produce sufficient evidence to persuade the court that there is

18   no genuine issue of material fact" to prevail on summary judgment. *Zhou v. Villa de Paz*

19   *Apartments, LLC*, 339 F. Supp. 3d 910, 912 (D. Ariz. 2018). Pursuant to Federal Rule of

20   Civil Procedure 56(a), a party need not move for summary judgment on the entirety of a

21   claim, but may identify a part of each claim upon which summary judgment is sought.

22   Fed. R. Civ. P. 56(a); *see Rsch. Corp. Techs. Inc. v. Eli Lilly & Co.*, No. 16-CV-191, 2021

23   WL 4861403, at *16 (D. Ariz. Oct. 19, 2021) (granting summary judgment as to liability

24   on certain counts and ordering a trial solely on damages for those counts).

25

26

27

28

1

## IV.   ARGUMENT

2

3

    **A. Defendant's Conduct Was Extreme And Outrageous And Done With Reckless Disregard Of The Near Certainty Of Causing Severe Emotional Distress To Separated Families Including Plaintiffs.**

4

   "The required elements of the tort of intentional infliction of emotional distress

5

are '*first*, the conduct by the defendant must be extreme and outrageous; *second*, the

6

defendant must either intend to cause emotional distress or recklessly disregard the near

7

certainty that such distress will result from his conduct; and *third*, severe emotional

8

distress must indeed occur as a result of defendant's conduct.'" *Shields v. Frontier Tech.,*

9

*LLC*, No. 11-CV-1159, 2012 WL 12538963, at *2 (D. Ariz. Jan. 30, 2012) (Bolton, J.)

10

(emphasis in original) (quoting *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (Ariz. 1987)).

11

Plaintiffs seek summary judgment as to the first and second elements of their IIED claim.

12

    Conduct is extreme and outrageous when it is "atrocious and beyond all possible

13

bounds of decency so that an average member of the community would regard it as

14

outrageous." *Doe v. Oesterblad*, No. 13-CV-1300, 2015 WL 12940181, at *5 (D. Ariz.

15

June 9, 2015) (Bolton, J.) (quoting *Lucchesi v. Frederic N. Stimmell, M.D., Ltd.*, 716 P.2d

16

1013, 1015 (Ariz. 1986)). Courts consider the "position occupied by the defendant,"

17

including that "which gives him actual or apparent authority over the other, or the power

18

to affect his interests" when determining whether conduct is extreme and outrageous.

19

*Coffin v. Safeway, Inc.*, 323 F. Supp. 2d 997, 1003 (D. Ariz. 2004) (quoting Restatement

20

(Second) of Torts § 46 cmt. e (Am. L. Inst. 1965)). To establish an IIED claim, it is enough

21

that the government acted with reckless disregard of the near certainty that its conduct

22

would cause severe emotional distress. *See Ford v. Revlon, Inc.*, 734 P.2d at 585. If the

23

government knew or should have known that by engaging in the extreme and outrageous

24

conduct there was a near certainty it would cause severe emotional distress, the element

25

is satisfied. *See Pankratz v. Willis*, 744 P.2d 1182, 1187 (Ariz. Ct. App. 1987); *see also*

26

Restatement (Second) of Torts § 46 cmt. i (Am. L. Inst. 1965).

27

    Here, the government acted in an extreme and outrageous manner by: (1) adopting

28

a policy under which migrant parents and children would be separated for months or

longer, without any plan to track separated families, provide information to parents about their children's whereabouts or wellbeing, facilitate regular communication between separated families, or ensure families could be reunited; and (2) separating Plaintiffs in an inhumane manner, despite being warned that doing so would cause them trauma and toxic stress. In both respects, the government's conduct was undertaken with reckless disregard for the near certainty of causing severe emotional distress.

### 1. The Government's Actions Were Extreme And Outrageous.

#### a. The Government's Adoption Of A Policy Necessarily Resulting In Family Separations Without Ensuring Families Could Communicate Or Be Reunited Was Outrageous.

The undisputed facts demonstrate that the government's conduct in adopting and implementing the DHS Referral Policy was "beyond all possible bounds of decency so that an average member of the community would regard it as outrageous." *Doe*, 2015 WL 12940181, at *5; *see also* Pls.' SOF ¶¶ 127-29 (family separations were "a human tragedy" (President Biden), "unconscionable" (Secretary Mayorkas), and "shameful" (Attorney General Garland)).

Courts have long held that there are "few acts more calculated to engender a sense of outrage in both the victim and the average member of the community" than the act of separating children from their parents. *See Pankratz*, 744 P.2d at 1189 (affirming jury verdict finding IIED where a child's grandparents aided the mother in separating the child from her father and compiling cases finding that "unilateral separation of a child from a parent can be extreme and outrageous conduct") (internal citations omitted).

The undisputed facts show that:

- The government instituted the El Paso Pilot, which resulted in the separation of parents and children and demonstrated that the government did not have the resources and systems in place to ensure parents and children would be tracked, able to communicate, and reunited. *See* Pls.' SOF ¶¶ 6-12.

- Months before the Policy was adopted, Nielsen, McAleenan, Homan, and others were warned about the lack of information provided to separated family

17

members concerning each other's whereabouts and DHS's inability to track familial relationships to facilitate reunification. *See id.* ¶¶ 3-5, 13-16.

- Despite the warnings, the government implemented the Policy and separated families, including Plaintiffs. *See id.* ¶¶ 28, 61, 75, 89, 103, 114.

- Prior to implementing the Policy, the government did not warn officials responsible for separating, prosecuting, caring for, and/or housing separated family members that the Policy, a fundamental shift in established practices, would be enacted. *See id.* ¶¶ 31-37.

- Although Nielsen and other high-level officials claimed that families were being separated because parents were prosecuted and taken into criminal custody, many parents, including Plaintiffs, were never prosecuted. *See id.* ¶¶ 39-40, 68, 83, 97, 110, 118.

- Regardless of whether the parents were prosecuted, the government sent separated children to ORR shelters around the country, including the Plaintiff children. *See id.* ¶¶ 40-41, 68, 83, 97, 110, 118.

- Separations lasted far longer than hours or days (as would be the case for a parent charged with a misdemeanor generally resulting in a time-served sentence), and instead lasted weeks, months, or longer. *See, e.g., id.* ¶¶ 40, 125.

- The government implemented the Policy without a plan that would ensure that families, including Plaintiffs, received information about their family members' whereabouts and regularly communicated while separated. *See id.* ¶¶ 24, 26, 45, 53, 62, 65, 76, 78–81, 90–93, 104, 106–108, 114–117.[7]

---

[7] *See also Ms. L. v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1144 ("[T]he practice of separating these families was implemented without any effective system or procedure for (1) tracking the children after they were separated from their parents, (2) enabling communication between the parents and their children after separation, and (3) reuniting the parents and children after the parents are returned to immigration custody following completion of their criminal sentence. This is a startling reality. The government readily keeps track of personal property of detainees in criminal and immigration proceedings . . . . Yet, the government has no system in place to keep track of, provide effective communication with, and promptly produce alien children.").

- The government implemented the Policy without a plan to reunify families. *See id*. ¶¶ 24, 26, 45, 47, 54, 124.[8]

- While the Policy was in effect, senior government officials were aware that parents and children were unable to communicate, including receiving notice that there were "790 kids in our shelters who are not able to contact their parents," yet they did not rescind the Policy or order reunification of separated families. *See id*. ¶¶ 53.

- The government failed to reunify many separated families, including Plaintiffs, until a federal court ordered it to do so, months after the Policy was implemented. *See id*. ¶¶ 121-125.[9]

Courts addressing the government's implementation of family separation have concluded that separating parents from their children and failing to reunify them "combined with the manner in which that practice [was] implemented, *e.g.*, the lack of any effective procedures or protocols for notifying the parents about their children['s] whereabouts or ensuring communication between the parents and children," "shocks the conscience." *Ms. L.*, 310 F. Supp. 3d at 1142-46 (S.D. Cal. 2018) (finding that separated parents were likely to succeed on their substantive due process claims because "[a] practice of this sort implemented in this way is likely to be 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience'" and "is so 'brutal' and 'offensive' that it [does] not comport with traditional ideas of fair play and decency"); *W.S.R. v. Sessions* 318 F. Supp. 3d 1116, 1126 (N.D. Ill. 2018) ("Without any further explanation by the government on what objective is being served—and served legitimately—by separation, the government's insistence on keeping these boys from their fathers can only be deemed arbitrary and conscience shocking.").

---

[8] *See also Ms. L.*, 310 F. Supp. 3d at 1137 ("There was no reunification plan in place, and families have been separated for months.").

[9] *See also Ms. L.*, 310 F. Supp. 3d at 1139.

**b. The Manner In Which The Government Separated Plaintiffs Was Outrageous.**

The manner in which the government separated Plaintiffs was extreme and outrageous. The undisputed facts show that:

- USBP told Plaintiff mothers that the government would take away their children and send the mothers to jail or deport them without their children (V.C., M.R., C.M), *see* Pls.' SOF ¶¶ 56, 72, 76, 85;

- USBP did not provide any information at all to other Plaintiff mothers (O.A. and L.G.), and they had to learn what would happen to their children from other mothers whose children had already been separated or by watching USBP officers separate other families, *id.* ¶¶ 107, 113;

- USBP separated Plaintiffs by calling out the children's names, forcing the children to bathe, forcing the children to leave their mothers and line up along a wall, and, in some cases, separating the children by physical force, *id.* ¶¶ 58, 60, 61, 74, 86, 89, 102, 103, 114;

- USBP agents then forced the Plaintiff children, two of whom were only five, to walk out of the detention centers and away from their mothers, *id.* ¶¶ 61, 75, 89, 103, 114;

- Before, during and after the separations, instead of comforting Plaintiff mothers by providing information about where their children were going, or how long they would be separated, government officials mocked Plaintiff mothers, including by saying "Happy Mother's Day," *id.* ¶¶ 59, 71, 72, 80, 85, 87;

- After Plaintiffs were separated, the government continued to engage in outrageous conduct. Four Plaintiff children were put on airplanes and flown thousands of miles away, while one Plaintiff child was driven several hours away, *id.* ¶¶ 63, 83, 97, 110, 118;

- Although Plaintiffs continued to ask about their children, government officials did not provide them with any information about their children's whereabouts or wellbeing, *id*. ¶¶ 62, 76, 90, 104, 115;

- Plaintiffs were unable to speak to their children for weeks and, in some cases months, *id*. ¶¶ 65, 79, 92, 108, 116;

- Plaintiffs were not reunified for more than two months, and, in the case of O.A., almost four months, even though four Plaintiff Mothers (C.M., L.G., O.A., and M.R.) had their prosecutions declined by the U.S. Attorney's Office for the District of Arizona, while the fifth (V.C.) was never even referred for prosecution, *id*. ¶¶ 68, 83, 97, 110, 118, 125.

These facts—particularly when taking into account "the position occupied by" the agents, "which g[ave them] actual or apparent authority over" Plaintiffs—would lead an average member of the community "to exclaim, 'Outrageous!'" *Coffin*, 323 F. Supp. 2d at 1003. The officers' cruel conduct served no legitimate purpose and therefore "can only be deemed arbitrary and conscience shocking." *W.S.R. v. Sessions*, 318 F. Supp. 3d at 1126; *Pankratz*, 744 P.2d at 1187; *D.J.C.V. v. United States*, 605 F. Supp. 3d 571 (S.D.N.Y. 2022) (denying dismissal of FTCA claim by separated parent and finding allegations the government separated plaintiffs to deter migration and failed to give parents information about where their children were going or to facilitate communication with them "easily" satisfied the IIED claim's extreme and outrageous conduct element).

**2. The Government Recklessly Disregarded The Near Certainty That Separated Parents And Children Would Suffer Severe Emotional Harm.**

The undisputed facts also demonstrate that the government recklessly disregarded the near certainty that parents and children separated under the Policy would suffer severe emotional harm. Nielsen, McAleenan, Homan and others were repeatedly warned by medical professionals, NGOs, immigration advocates, and members of Congress that separating families would cause parents and children to suffer severe and lasting trauma.

*See* Pls.' SOF ¶¶ 3-5, 13-16, 51. Specifically, beginning in March 2017, government officials were warned that:

- Separating children from parents would "only further traumatize those already fleeing harm," *id*. ¶ 3;
- "[A] policy that would separate children from their parents at the border" "would be detrimental to the health, safety and well-being of children," *id*. ¶ 14;
- Separating families would cause "additional trauma" to children seeking refuge in the country, *id*.; and
- Separations could significantly harm children's brain development through the onset of "toxic stress," *id*.

Nonetheless, Nielsen adopted the DHS Referral Policy, recklessly disregarding that months-long separations of parents and children, without notifying the parents about their children's whereabouts or ensuring communication between parents and children, and without any plan for reunification, would inflict severe emotional trauma on the separated families.

The USBP officers who separated Plaintiffs also recklessly disregarded that separating Plaintiffs in an unnecessarily cruel manner and without providing Plaintiff mothers and children with any information about where the children were going, or when—or if—they would see each other again, would inflict severe emotional trauma on Plaintiffs. *See Pankratz*, 744 P.2d at 1187; *see also Kajtazi v. Kajtazi*, 488 F. Supp. 15, 20 (E.D.N.Y. 1978) (finding it "difficult to conceive of intentional conduct more calculated to cause severe emotional distress than the outrageous conduct of the defendant" in separating child from mother); *Carranza v. United States*, No. 3:12-CV-2255, 2013 WL 3333104, at *8 (D. Or. July 1, 2013) (a mother sufficiently stated an IIED claim where ICE officers threatened to send her to Mexico and place her daughters in a foster home where she would not see them again).

***

Because the undisputed evidence establishes that government officials engaged in extreme and outrageous conduct and acted with reckless disregard for the near certainty of causing Plaintiffs to suffer severe emotional distress the Court should grant partial summary judgment for Plaintiffs on their IIED claim.

**B.  The Government's Conduct Breached Its Duty Of Care To Plaintiffs.**

"To establish a claim for negligence, a plaintiff must prove four elements: (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." *Certain Underwriters at Lloyds v. Dowdy*, No. 13-CV-1814, 2015 WL 12592103, at *4 (D. Ariz. Apr. 6, 2015) (Bolton, J.) (quoting *Gibson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007)).

The government owed a duty of care to the migrant families it took into custody, and it breached that duty to Plaintiffs (and other separated families) when it forcefully separated Plaintiff mothers from their children, sent them to facilities far away from one another, failed to facilitate communication between them for weeks or months at a time, and failed to devise any plan for reuniting them until forced by court order. *See supra* Section IV.A.2. Summary judgment should be entered for Plaintiffs on the liability elements of their negligence claim—*i.e.*, the government (1) owed Plaintiffs a duty of care while in government custody, and (2) breached that duty.

**1.  The Government Owed A Duty Of Care To Plaintiffs.**

The Court may determine whether the government owed Plaintiffs a duty on summary judgment because the issue "is a legal matter to be determined *before* the case-specific facts are considered." *Quiroz v. ALCOA Inc.*, 416 P.3d 824, 828 (Ariz. 2018). A duty exists when "the relationship of the parties [is] such that the defendant [is] under an obligation to use some care to avoid or prevent injury to the plaintiff." *Cobler v. United States*, No. 19-CV-348, 2022 WL 625710, at *8 (D. Ariz. Jan. 12, 2022) (quoting *Markowitz v. Ariz. Parks Bd.*, 706 P.2d 364, 368 (Ariz. 1985)) (alteration in original).

23

1   "[D]uty in Arizona is based on either recognized common law special relationships or

2   relationships created by public policy." *Quiroz*, 416 P.3d at 829. A special relationship

3   can exist when one "is required by law to take or . . . voluntarily takes the custody of

4   another under circumstances such as to deprive the other of his normal opportunities for

5   protection." *DeMontiney v. Desert Manor Convalescent Ctr. Inc.*, 695 P.2d 255, 260

6   (Ariz. 1985) (quoting Restatement (Second) of Torts § 314A (Am. L. Inst. 1965); *see also*

7   *Fleming v. State Dep't of Pub. Safety,* 352 P.3d 446, 448 (Ariz. 2015) ("[U]nder our

8   common law, when DPS takes custody of someone in a manner that deprives the person

9   of the opportunity for self-protection, it assumes a duty to protect that person against

10   unreasonable risk of physical harm."); *Est. of Smith v. Shartle*, No. 18-CV-323, 2020 WL

11   1158552, at *2 (D. Ariz. Mar. 10, 2020) ("BOP has a duty to ensure the safety of the

12   persons who reside at the facility.").

13   As this Court found in denying the government's motion to dismiss, "Federal

14   immigration officials too, are tasked with the care and custody of those they detain, and

15   owe detainees at least a minimal level of care." [Doc. 31] (citing *Flores v. Sessions*, No.

16   85-CV-4544 (C.D. Cal. Feb. 2, 2015) [Doc. 101] ("Flores Settlement Agreement")). There

17   is no dispute that Plaintiffs were detained by the government after crossing the border

18   seeking asylum. Pls.' SOF ¶¶ 55, 70, 84, 99, 112. As such, the government was "tasked

19   with the care and custody" of Plaintiffs and owed Plaintiffs "at least a minimal level of

20   care." [Doc. 31].

21   **2.   Defendant Breached Its Duty Of Care To Plaintiffs.**

22   In assessing whether a duty of care is breached in negligence cases, the question is

23   whether there was "reasonable care under the circumstances." *Markowitz v. Arizona Parks*

24   *Bd.*, 146 Ariz. 352, 356 (1985). Furthermore, "[f]oreseeability can also be used to

25   determine whether the defendant breached the relevant standard of care or caused the

26   plaintiff's injury." *Quiroz*, 243 Ariz. at 564.

27   As set forth above, the government failed to exercise even a minimal level of care

28   to Plaintiffs when it separated Plaintiffs in a manner that was unnecessarily cruel, failed

to provide information to Plaintiff mothers about their children's whereabouts and wellbeing, failed to facilitate communication between Plaintiffs for weeks or months, and did not reunite them until required by court order to do so, even where Plaintiff mothers were not prosecuted. *See supra* Section IV.A.[10] *See D.J.C.V.*, 605 F. Supp. 3d at 602-02 (denying motion to dismiss FTCA claim brought by separated family in part because plaintiffs adequately "alleged that Government agents violated their duty to act with ordinary care towards them by separating parent and child and preventing them from communicating"). These failures were not only reasonably foreseeable, but the government was explicitly warned that it was not prepared to separate parents and children on a large scale, and it failed to reunite families even as those warnings came to fruition. *See supra* Section IV.A. *See Watson v. United States*, 133 F. Supp. 3d 502, 526 (E.D.N.Y. 2015) ("If the USCIS were a private entity and had knowledge of a condition which it could eliminate and which would foreseeably cause harm to a specific individual, then its failure to avoid the harm by reasonable means would be actionable negligence.").

## V.    CONCLUSION

For the foregoing reasons, the Court should grant partial summary judgment to Plaintiffs and find that, with respect to Count I (IIED), (i) the government engaged in extreme and outrageous conduct (ii) with reckless disregard of the near certainty of causing, severe emotional distress, and with respect to Count II (Negligence), (i) the government had a duty to Plaintiffs to act with "at least a minimal level of care" and (ii) breached that duty.

---

[10] The government also violated its own standards for the treatment of detained migrants, as well as standards set forth in a Court-ordered settlement agreement. *See* Ex. 83, § 1.9 (CBP should maintain family unity "to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation."); *id.* § 4.3 ("Family Units: Generally, family units with juveniles should not be separated. . . ."); *id.* § 5.6 (same); Ex. 84, § 5.6(V)(E)(3) ("[u]pon a detainee's request, facility staff shall make special arrangements to permit the detainee to speak by telephone with an immediate family member detained in another facility"); Ex. 85, ¶ 12 (government required to provide "contact with family members who were arrested with the minor.").

Respectfully submitted this 9th day of March, 2023.

OSBORN MALEDON, P.A.

By  s/Travis C. Hunt
     David B. Rosenbaum
     Travis C. Hunt
     BriAnne N. Illich Meeds
     2929 North Central Avenue, 21st Floor
     Phoenix, Arizona  85012-2793

ARNOLD & PORTER KAYE SCHOLER LLP
     Diana Reiter*
     Erik Walsh*
     Lucy McMillan*
     Harry Fidler*
     Kaitlyn Schaeffer*
     Brian Auricchio*
     Julia Kindlon*
     250 West 55th Street
     New York, NY 10019-9710

ARNOLD & PORTER KAYE SCHOLER LLP
     R. Stanton Jones*
     David Hibey*
     Emily Reeder-Ricchetti*
     601 Massachusetts Avenue, NW
     Washington, DC 20001

ARNOLD & PORTER KAYE SCHOLER LLP
     Sean Morris*
     777 South Figueroa Street
     Los Angeles, CA 90017-5844

KAIRYS, RUDOVSKY, MESSING, FEINBERG & LIN LLP
     Jonathan H. Feinberg*
     The Cast Iron Building
     718 Arch Street, Suite 501 South
     Philadelphia, PA 19106

NATIONAL IMMIGRANT JUSTICE CENTER
     Mark Fleming*
     Mark Feldman*
     224 S. Michigan Ave., Suite 600
     Chicago, IL 60604

NATIONAL IMMIGRATION LITIGATION ALLIANCE
     Trina Realmuto*

26

Mary Kenney*
10 Griggs Terrace
Brookline, MA 02446

AMERICAN IMMIGRATION COUNCIL
Katherine Melloy Goettel*
Emma Winger*
Gianna Borroto*
1331 G Street NW, Suite 200
Washington, DC 20005

**Attorneys for Plaintiffs C.M. et al.**

**\* Admitted *pro hac vice***