David B. Rosenbaum, 009819
Travis C. Hunt, 035491
BriAnne N. Illich Meeds, 036094
OSBORN MALEDON, P.A.
2929 North Central Avenue, 20th Floor
Phoenix, Arizona 85012-2793
(602) 640-9000
drosenbaum@omlaw.com
thunt@omlaw.com
billichmeeds@omlaw.com

**Counsel for C.M. Plaintiffs**

[Additional counsel for Plaintiffs listed on the signature page]

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| C.M., on her own behalf and on behalf of her minor child, B.M.; L.G., on her own behalf and on behalf of her minor child, B.G.; M.R., on her own behalf and on behalf of her minor child, J.R.; O.A., on her own behalf and on behalf of her minor child, L.A.; and V.C., on her own behalf and on behalf of her minor child, G.A., <br><br> Plaintiffs, <br><br> v. <br><br> United States of America, <br><br> Defendant. | No. 2:19-cv-05217-SRB <br><br> **STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Local Rule 56.1(a) Plaintiffs set forth the following Statement of Material Facts ("Pls.' SOF") in Support of Plaintiffs' Motion for Summary Judgment. All exhibits ("Ex.") referenced herein are described in, and attached to, the accompanying Declaration of Harry K. Fidler.

## I.     THE GOVERNMENT CONSIDERS SEPARATING MIGRANT FAMILIES AND INITIATES A PILOT IN EL PASO

1.     As early as February 14, 2017, senior Department of Homeland Security ("DHS") officials, including Customs and Border Patrol ("CBP") Commissioner Kevin McAleenan, considered separating parents and children who crossed the Southwest Border in order to deter migration. *See* Ex. 86, McAleenan Dep. 106:8–114:2; Ex. 2, Swartz Dep. 10:15–16:13; *see also* Ex. 3, White Dep. 43:21–44:13.

2.     On March 6, 2017, DHS Secretary John Kelly informed the public that he was considering separating parents and children: "Yes, I am considering [that], in order to deter more movement along this terribly dangerous network, I am considering exactly that." Ex. 4 at CD-US-00016642; *see also* Ex. 5 at CD-US-0219621 (Kelly's notes: █████████████████████████████████████ ███████ ).

3.     In March 2017, immigration advocates, elected officials, and the American Academy of Pediatrics ("AAP") warned Kelly, Acting Immigration and Customs Enforcement ("ICE") Director Thomas Homan, and others, that separating children from parents would inflict trauma on the families. *See* Ex. 6 at CD-US-0047010 ("Family separation will only further traumatize those already fleeing harm . . . .") (citing statement from the AAP); Ex. 4 at CD-US-00016642; *see also* Ex. 7, Homan Dep. 91:7–92:5.

4.     Immigration advocates further warned that "DHS components and the Office of Refugee Resettlement lack the mechanisms to ensure . . . that communication between separated family members is coordinated." Ex. 6 at CD-US-0047011.

5.  Also in March 2017, members of Congress warned government officials that separating children from their parents would "further traumatize families, overwhelm our child welfare system and roll back years of humanitarian progress." Ex. 4 at CD-US-00016642.

6.  In July 2017, the government initiated a pilot program under which U.S. Border Patrol ("USBP") agents in the El Paso Sector presented for prosecution all adults who entered the country without inspection, including those traveling with children, for misdemeanor unlawful entry under 8 U.S.C. § 1325, (the "El Paso Pilot" or the "Pilot"). *See* Ex. 8; Ex. 9 at CD-US-0054281.

7.  Under the Pilot, a parent was referred for prosecution, USBP agents separated the parent from their child, and the child was labeled as an Unaccompanied Alien Child ("UAC") and sent to the custody of the Office of Refugee Resettlement ("ORR"), a component of the Department of Health and Human Services ("HHS"). *See* Ex. 10, Hastings Dep. 229:21–230:3.

8.  On November 1, 2017, in a case in the Western District of Texas, U.S. Magistrate Judge Miguel Torres stated that "[i]n a number of recent illegal entry cases over the last several months, the Court has repeatedly been apprised of concerns voiced by defense counsel and by defendants regarding their limited and often non-existent [ ] information about the well-being and whereabouts of their minor children from whom they were separated at the time of their arrest." Ex. 11 at 16.

9.  On November 18, 2017, the El Paso Sector ended the Pilot "until USBP-HQ leadership has had an opportunity to review all aspects of this program and brief up the chain at the appropriate level." Ex. 12 at CD-US-0024332.

10. During the Pilot, "CBP headquarters personnel [were] aware of the various system deficiencies related to tracking family separations." Ex. 13 at CD-US-0213932.

11. During the Pilot, "El Paso Sector agents requested assistance from CBP headquarters" in addressing these system deficiencies, "but the necessary system changes were not made" because the requested changes to help "track family

separations was not a high enough priority to warrant the time and resources required for system modifications." *Id.* at CD-US-0213932–33.

12. After the Pilot ended, the El Paso Sector submitted a memorandum to Brian Hastings, Chief of Law Enforcement Operations Directorate at USBP, requesting that the Pilot be reinstated, but the memorandum acknowledged that ██████ ███████████████████████████████ was needed so that ████ ████████████████████████████████████████████████████ Ex. 9 at CD-US-0054286.

13. In December 2017, immigration advocates sent a complaint to the DHS Office of Civil Rights and Civil Liberties ("CRCL") and to the DHS Acting Inspector General "on behalf of numerous family members who have been separated while in federal custody at the U.S. border." *See* Ex. 14 at CD-US-0056422. The complaint documented that separations "deprive[] family members the ability, given their detention, to locate each other and be reunited," *id*. at CD-US-0056423, and that "[f]amily members are given little to no information on what happens to those from whom they are separated, including how to locate, contact, or reunite with them," *id.* at CD-US-0056427.

14. On January 11, 2018, the AAP urged DHS Secretary Kirstjen Nielsen "in the strongest possible terms" not to institute "a policy that would separate children from their parents at the border" and asked to meet with Nielsen at her "earliest convenience" to explain why such a policy "would be detrimental to the health, safety and well-being of children." Ex. 15 at CD-US-00016509A. The AAP noted that separating families would cause "additional trauma" to children seeking refuge in the country and highlighted that the separations could harm brain development through the onset of "toxic stress." *Id.*; *see also* Ex. 16, Wolf Dep. 195:8–196:24, 323:12–324:18.

15. On March 2, 2018, this information was reiterated to Nielsen and sent to McAleenan and Homan. *See* Ex. 17.

16.  Around this same time, CBP and ICE informed Nielsen of concerns raised by non-governmental organizations that a policy necessarily resulting in family separation "would be detrimental to the health, safety, and well-being of children" and that there were conversations among DHS officials about "the effect [separating] would have not only on the children but the parents." Ex. 16, Wolf Dep. 195:8–198:10.

## II.  SECRETARY NIELSEN APPROVES THE DHS REFERRAL POLICY, NECESSARILY RESULTING IN THE SEPARATIONS OF THOUSANDS OF FAMILIES

17.  On April 6, 2018, Attorney General Jeff Sessions directed "each United States Attorney's Office along the Southwest Border—to the extent practicable, and in consultation with DHS—to adopt immediately a zero-tolerance policy for all offenses referred for prosecution under [8 U.S.C. §] 1325(a)" (the "Zero Tolerance Policy"). Ex. 18 at CD-US-0049452.

18.  McAleenan, Homan, and Francis Cissna, Director of U.S. Citizenship and Immigration Services ("USCIS"), sent Nielsen a memorandum, date-stamped April 23, 2018, titled "Increasing Prosecutions of Immigration Violations," which proposed three options for implementing the Zero Tolerance Policy and evaluated each option in terms of its "feasibility," "legal risk," and predicted "deterrent impact." Ex. 19.

19.  Options 1 and 2 would have increased the referral of single adults who crossed the border between ports of entry to the Department of Justice ("DOJ") for prosecution for misdemeanor illegal entry, either "in accordance with [U.S. Attorney's Offices'] capacity" to accept referrals for prosecution or to "100%." *Id.* at CD-US-0027297.

20.  Option 3 proposed that DHS "[w]ork with DOJ, the Department of Health and Human Services, and other interagency partners to develop a quickly scalable approach to achieve 100% immigration violation prosecution referral for all amenable adults, including those initially arriving or apprehended with minors,"

4

*id.*, meaning DHS "would pursue prosecution of all amenable adults who cross our border illegally, including those presenting with a family unit, between ports of entry in coordination with DOJ," *id.* at CD-US-0027299.

21. McAleenan, Homan, and Cissna acknowledged that Option 3 would "requir[e] significant resources and present[ ] increased legal risk," *id.* at CD-US-0027297, but they recommended that Nielsen select it, *id.* at CD-US-0027299.

22. McAleenan knew the U.S. Attorneys' Offices would be unable to accept for prosecution all adults referred by USBP under Option 3 at current capacity levels. *See* Ex. 1, McAleenan Dep. 236:21–240:5.

23. McAleenan, Homan and Cissna recommended Option 3 based, in part, on the purported "effectiveness" of the El Paso Pilot. Ex. 19 at CD-US-0027298.

24. The memorandum did not reference the tracking, communication, and reunification problems encountered during the Pilot. *See id.*; *see also* Ex. 13 at CD-US-0213936 ("On May 4, 2018, the DHS Secretary approved the adoption of the *Zero Tolerance Policy* based on the outcome of the 2017 El Paso initiative, which CBP claimed had reduced family apprehensions by 64 percent. However, DHS did not first confirm whether the various technology-related challenges documented and reported from the El Paso initiative had been resolved.").

25. Nielsen understood adopting Option 3 would mean ██████████████████ █████████ *See* Ex. 20.

26. The memorandum recommending Option 3 contained no plan for how to track separated families, how to ensure separated family members could communicate with one another, or how to reunite families. *See* Ex. 19.

27. The memorandum did not address ICE's concern—raised in a prior draft—that separating families ████████████████████████████████ ███████████████████████████████████████ *See* Ex. 21 at CD-US-0102696TAA.

28. On May 4, 2018, Nielsen approved Option 3 (the "DHS Referral Policy" or the "Policy"), *see* Ex. 19 at CD-US-0027299, and, within days, USBP officers began to separate parents and children, including in the Yuma Sector*, see* Ex. 22; Ex. 23 at CD-US-0049911–12; Ex. 24, Agent C. Dep. 25:7–19, 180:16–182:7; *see also infra* Section V (detailing the separation of Plaintiff families in May, after the adoption of the DHS Referral Policy).

### III. THE GOVERNMENT IMPLEMENTS THE DHS REFERRAL POLICY RECKLESSLY DISREGARDING NECESSARY PLANNING

29. The DHS Referral Policy was a significant policy change. *See* Ex. 25, Guadian Dep. 88:13–16.

30. Before the DHS Referral Policy, the United States government had never separated parents and children in USBP stations at the scale of the separations that took place under the Policy. *See* Ex. 7, Homan Dep. 49:13–50:1.

31. USBP Agents ▮▮▮▮▮▮▮ ("Agent R."), ▮▮▮▮▮▮▮ ("Agent C."), and ▮▮▮▮▮▮ ("Agent A."), all of whom were agents in the Yuma Sector involved in the process of separating families, did not receive any specific guidance or training on how to care for children the government separated from their parents. Ex. 26, Agent R. Dep. 34:6–17; Ex. 24, Agent C. Dep. 221:14–223:5; Ex. 27, Agent A. Dep. 262:18–265:21.

32. United States Attorneys for the Southwest border regions who were responsible for overseeing prosecutions of separated parents, were not told of the Policy in advance of its implementation. Ex. 28, Bash Dep. 213:4–214:4; Ex. 29 (May 4, 2018 email exchange between Southwest border U.S. attorneys stating that the "policy starts at midnight tonight," "a change they didn't share with us until the email just worked it's [*sic*] way up to me").

33. Tricia Swartz, the Associate Deputy Director of ORR, did not recall any planning discussions about how the Policy would impact ORR's operations. Ex. 30, Swartz Dep. 193:14–194:24.

34. Robert Guadian, the Acting Deputy Assistant Director, Domestic Operations Division, Western Operations Enforcement and Removal for ICE, did not learn of the Policy until it was implemented. Ex. 25, Guadian Dep. 60:25–62:7 ("I don't recall how I learned about [the Policy]. I think – I think we found out about it – at least my division found out about it the same time the media found out about it. There was no proactive like email to my knowledge or memo or a heads-up that this was going to be occurring. I think we found out at the same time that everyone else found out. And this – we is my division in ICE.").

35. Mellissa Harper, the ICE Unit Chief of the Juvenile & Family Residential Management Unit, learned of the Policy through a DOJ press release or slightly before the Policy was announced publicly. Ex. 31, Harper Dep. 109:21–110:9 ("I think DOJ put out a press release about it. But I don't know if I knew about [the Policy] slightly before or not.").

36. The DHS OIG concluded that "Border Patrol and ICE headquarters did not provide adequate guidance to field personnel to ensure successful implementation of the *Zero Tolerance Policy*." Ex. 13 at CD-US-0213939; *see also id.* at CD-US-0213941 ("ICE headquarters confirmed it did not broadcast information on *Zero Tolerance Policy* implementation to the field because it believed the policy would only affect CBP operations.").

37. CRCL personnel were "inappropriately frozen out" of discussions involving the Policy, despite its open investigation into serious concerns that arose during the El Paso Pilot. *See* Ex. 32; Ex. 33.

38. In the six-week period that the DHS Referral Policy was in effect, USBP officers separated an estimated 3,014 children from their parents, including Plaintiffs. Ex. 13 at CD-US-0213942; *see infra* Section V.

39. Nielsen told Congress and the public that the government was separating parents from their children because the parents were being prosecuted and the children could not accompany their parents into criminal custody. *See* Ex. 34 at 20

(Statement of Secretary Nielsen) ("Again, we do not have a policy to separate children from their parents. Our policy is, if you break the law we will prosecute you."); Ex. 35 at 44 (in response to questions about family separations, Nielsen testified: "Just like when parents break the law in the United States of America, we do not put the children in jail with the parents[,]" and "[t]he consequence of any adult going to jail in this country is they are separated from their child"); *see also* Ex. 36 at 3 ("[W]hen adults are transferred to the U.S. Marshals Service custody pending prosecution, their children become UAC . . . .").

40.   In practice, the government separated parents and children regardless of whether the parents were prosecuted or placed in criminal custody. *See* Ex. 37, Lokey Dep. 110:15–111:9 (testifying that Border Patrol separated families before the U.S. Attorney's Office has any input on whether there would be a prosecution); Ex. 24, Agent C. Dep. 178:20–182:7 (Yuma Border Patrol agents knew that the U.S. Attorney's Office might not prosecute adults referred for prosecution); *see also* Ex. 13 at CD-US-0213951 [CD-US-0213914–74] ("During the Zero Tolerance period, many adults were only sentenced to time served and quickly returned to CBP custody or were not referred for prosecution at all."); *see also* Ex. 38, Hamilton Dep. 279:21–280:9; Ex. 28, Bash Dep. 286:9–287:3.

41.   USBP referred children to ORR without waiting until the parent's prosecution referral was accepted or the parent was scheduled for transfer to criminal custody (if applicable). Ex. 1, McAleenan Dep. 63:23–65:17; *see also* Ex. 10, Hastings Dep 44:24–46:16.

42.   In the Yuma Sector, USBP agents were directed to refer for prosecution all parents who crossed the border without inspection, even if USBP agents knew the referrals would not be accepted by the U.S. Attorney's Office. *See* Ex. 26, Agent R. Dep. 181:13–22 (agreeing that "instructions back in May 2018 [were], if you noticed a problem with a criminal case, your instructions were . . . to still refer those cases to the U.S. Attorney's Office but to highlight the areas of concern for the U.S.

Attorney's Office to review."); *see also. id.* at 140:11–142:21, 178:19–182:17, 184:2–7, 187:9–188:24, 295:10–296:17.

43. Yuma USBP agents "w[ould] not try to reunite [parents and children] if prosecution [was] denied for [the] parent." Ex. 39 at CD-US-0080522; Ex. 40 at CD-US-0028320; Ex. 24, Agent C. Dep. 199:2–12 (testifying that USBP agents would not try to track down a child after learning prosecution had been denied for the parent because ERO should have the parent and child's information).

44. If a parent returned from criminal custody while their child was still detained at Yuma, "the [child] [] remained a UAC and [was] placed at a juvenile facility while the adult continue[d] into removal proceedings." Ex. 40 at CD-US-0028320; Ex. 24, Agent C. Dep. 191:5–193:24.

45. As of July 6, 2018, ICE was still attempting to build processes to facilitate communication between separated parents and children and still developing a reunification process for separated families, as there had been "no unified record of what parent went where and what child went where." Ex. 25 at Guadian Dep. 40:3–43:7, *see also* Ex. 41 at CM-US-OIG-0000116; Ex. 19 (omitting a plan to track and reunify separate families); Ex. 13 at CD-US-0213941 ("Prior to Zero Tolerance implementation, the Department did not establish a plan for how CBP, ICE, and HHS would successfully reunify separated family members."); *id.* at CD-US-0213926–42 (detailing tracking issues and concluding that "[i]ssues with tracking separated children and reunification procedures prompted the creation of a joint ICE-HHS working group in early 2018" and, "[a]s of March 2019, the working group still did not have a formal reunification plan in place"); Ex. 3, White Dep. 304:23–309:20 (testifying that ICE did not maintain the information required to reunify families).

**IV.    THE GOVERNMENT CONTINUES THE DHS REFERRAL POLICY FOR SIX WEEKS DESPITE KNOWING ABOUT SERIOUS IMPLEMENTATION PROBLEMS**

46.    On May 10, 2018, six days after Nielsen signed the DHS Referral Policy, senior government officials, ICE Executive Associate Director Matthew Albence, were told that Yuma USBP officers were separating families regardless of whether the parents were accepted for prosecution. Ex. 42 ("Yuma Sector has presented FAMU adults for prosecution but all have been declined. However, it appears after the declination that the adults are not being reunited with the children and they have not cancelled the placement requests for the children in the ORR portal.").

47.    Also on May 10, Tae Johnson, then a senior ICE official, noted that adults would not be reunited with their children after they were prosecuted, "particularly when the child ha[d] already been placed with ORR," and acknowledged that much of the information related to reunification was "unknown," and that "[m]ore internal discussion between ICE and CBP is needed on [reunification]." Ex. 43 at CD-US-0117568–69; *see also* Ex. 13 at CD-US-0213951–52 (a majority of parents receiving minimal or no jail-time were not reunified at CBP facilities).

48.    On May 10, Albence emailed Homan expressing "concern . . . that adults that were separated from their children due to prosecution will be returned to USBP immediately after the guilty plea is accepted by the Court, as the local District Court generally only imposes time-served" and noting that "[t]his will result in a situation in which the parents are back in the exact same facility as their children - possibly in a matter of hours - who have yet to be placed into ORR custody." Ex. 44 at CD-US-0167960. Albence additionally proposed ways to *prevent* parents who had completed the criminal process from being reunited with their children. *Id*.

49.    On May 25, 2018, Johnson emailed Albence and told him "CBP is Reuniting adults with kids after prosecution in McAllen. My guess is there is no place to

house the adult, so they are bringing them back to the station and since the child is still there, they are joining them. . . . What a fiasco." Ex. 45 at CD-US-0024669.

50. On May 26, 2018, Albence replied that "[t]his obviously undermines the entire effort and the Dept is going to look completely ridiculous if we go through the effort of prosecuting only to send them to a [Family Residential Center] and out the door." *Id.*

51. On May 12, 2018, officials at CRCL raised ███████████████████ regarding the Policy. Ex. 33.

52. On June 12, 2018, CRCL concluded that "CBP and ICE lack[ed] clear, cohesive, comprehensive, and readily accessible policy and procedure covering family separation." Ex. 46 at CD-US-0052940.

53. On June 16, 2018, Homan received notice that there were "790 kids in our shelters who are not able to contact their parents." Ex. 47 at CD-US-0190277; *see also* Ex. 48 (chart outlining cases involving difficulties in communication with parents).

54. On June 19, 2018, Johnson emailed Albence that "[w]hile ICE does not track the number of individuals that have been reunified following prosecution, we believe there are far more individuals who are separated (not reunified) following a prosecution as evidenced by the over 1,500 parents that are in ICE detention facilities today, who were initially part of a family unit." Ex. 49 at CD-US-0199090.

## V.  THE GOVERNMENT SEPARATES PLAINTIFFS

### A.  V.C. and her son, G.A.

55. Plaintiff V.C., seeking asylum, crossed the border in or near Yuma, Arizona on May 8, 2018, with her then-six-year-old son, G.A. Ex. 50 at CM-US-CPB-U-0000155, CM-US-CPB-U-0000162; Ex. 51, V. C. Dep. 50:23–51:23.

56. USBP agents took V.C. and G.A. to Yuma Station, a USBP detention facility, where officers told V.C. that the government was going to lock her up for years and take her son away. Ex. 52, V.C. Decl. ¶ 2.

57.   That night, the officers took G.A. away from his mother, terrifying V.C. Ex. 51, V.C. Dep. 79:3–13; Ex. 52, V.C. Decl. ¶ 4. The next day officers returned G.A. to his mother. Ex. 51, V.C. Dep. 97:14–17.

58.   On the morning of May 10, 2018, officers told V.C. and the other detained mothers to get in a line and bathe their children because they were going to be taken away that day. Ex. 52, V.C. Decl. ¶ 5; Ex. 51, V.C. Dep. 79:18–23.

59.   V.C. and G.A. stood in line with many other parents and children, who were crying, prompting an officer to laugh and loudly say, in Spanish: "Don't cry, today is a happy day. It's Mother's Day." Ex. 52, V.C. Decl. ¶¶ 6–7. V.C. understood that the officer was taunting her and the other parents. *Id.* ¶ 8.

60.   Officers then began calling children for separation and directed parents and children to line up on opposite walls. *Id.* ¶ 10; Ex. 51, V.C. Dep. 83:17–23.

61.   V.C. and G.A. watched as families were physically torn apart. Ex. 52, V.C. Decl. ¶¶ 11–12. G.A. clung to his mother before being called for separation. *Id.* ¶ 11. An officer called G.A.'s name and he got into line with the other children, and was led away sobbing. *Id.* ¶¶ 14–15.

62.   A person V.C. believed to be a social worker told her that G.A. would be sent to New York, but agents refused to tell her where in New York, or if she would see or speak to G.A. again. *Id.* ¶¶ 13, 16.

63.   G.A. was put on a plane to Cayuga Centers in the Bronx, New York. Ex. 53 at GMC000189–90.

64.   Following the separation, V.C. cried every day, barely ate or slept, had headaches and toothaches, and was terrified that she would be deported without her son. Ex. 52,  V.C. Decl. ¶ 18; *see* Ex. 51, V.C. Dep. 85:13–14.

65.   The government did not allow V.C. to speak to her son for almost two months, when she was permitted a short phone call with him. Ex. 52, V.C. Decl. ¶ 21.

66.   G.A. cried during the call, and the call they had a week later. *Id.* ¶¶ 22–23.

67.   G.A. turned seven while separated from V.C. *Id.* at ¶ 19.

68.  V.C. was never referred for prosecution. Ex. 26, Agent R. Dep. 240:7–241:7; Ex. 54.

69.  V.C. was never taken into criminal custody. Ex. 55 at No. 21.

**B.   M.R. and her son, J.R.**

70.  Plaintiff M.R., seeking asylum, crossed the United States border in or near Yuma, Arizona on or about May 8, 2018, with her twelve-year-old son, J.R. *See* Ex. 56 at CM-US-CPB-U-0000108, CM-US-CPB-U-0000118; Ex. 57, M.R. Dep. 55:17–56:6.

71.  Immediately after crossing, a USBP agent told M.R. and other mothers that they came to the United States at a "very bad time" because "now they want to take away your children." *Id.* at 80:13–16.

72.  USBP agents brought M.R. and her son to Yuma Station. *Id.* at 80:9–81:2. When they arrived, an officer told M.R. and the other parents that they were going to jail and their children would be sent to a shelter. *Id.* at 81:12–14. An officer yelled at the mothers, asking "why did you bring your children here?" Ex. 58, M.R. Decl. ¶ 2.

73.  Agents put M.R. and J.R. in a room with crying children and J.R. started to cry. Ex. 57, M.R. Dep. 83:3–8. M.R. tried to comfort J.R., saying perhaps they would not be separated for long. *Id.*

74.  The officers called children from a list of names, starting with the youngest children, and ordered the children to bathe and then dressed them in blue outfits. *Id.* at 83:10–17.

75.  After one or two days, while J.R. was sleeping, M.R. heard an officer call his name. *Id.* at 83:22–84:1. M.R. woke him and he started to cry. *Id*. J.R. said he did not want to go, and M.R. tried to soothe him. *Id.* at 84:1–7. She watched through glass as J.R. and ten or twelve other children were led away. *Id.* at 84:9–10, 85:13–21.

76.  After J.R. was taken, M.R. cried and did not want to eat. *Id.* at 87:15–16. She asked the USBP agents where they would take J.R., but they would not tell her. Ex. 58,

M.R. Decl. ¶ 4. An agent told M.R. that she would be deported, and her son would stay in the United States. *Id.* ¶ 5.

77.  M.R. and other women were then shackled and brought to a detention center in Arizona. Ex. 57, M.R. Dep. at 87:22–88:4. While detained in Arizona, M.R. cried all the time, had trouble sleeping, and began to experience regular, severe headaches. *Id.* at 90:25–91:1, 92:18–22, 98:24–99:2, 99:7–9.

78.  M.R. tried to call her son every day, using a phone card she had to add money to, but could not reach him. *Id.* at 95:5–24. One time a woman answered but said that there were no children there. *Id.* at 96:1–5.

79.  After approximately one month, M.R. finally was allowed to speak to her son, for only a few minutes. *Id.* at 94:12–16, 96:18–19.

80.  J.R. cried while M.R. explained that they could not be together and asked him to be patient. *Id.* at 97:8–14. Immigration officers nearby laughed and shook their heads listening to M.R. and J.R. cry. Ex. 58, M.R. Decl. ¶ 7.

81.  M.R. and J.R. were only able to speak to each other one more time while separated. Ex. 57, M.R. Dep. 94:23–25.

82.  During the second call, J.R. told his mother he was going to be adopted, cried, and asked when they would be together. *Id.* at 118:25–120:1. After M.R. got off the phone with her son, she cried so much that she vomited. *Id.* at 120:2–23.

83.  The United States Attorney's Office for the District of Arizona declined to prosecute M.R. shortly after the government sent J.R. to Cayuga Centers in the Bronx, New York. Ex. 56 at CM-US-CPB-U-0000112–13, CM-US-CPB-U-0000117.

**C.    C.M. and her son, B.M.**

84.  Plaintiff C.M., seeking asylum, crossed the United States border in or near Yuma, Arizona on May 9, 2018, with her five-year-old son, B.M. Ex. 59 at CM-US-CPB-U-0000037, CM-US-CPB-U-0000043; Ex. 60, C.M. Dep. 26:10–27:10.

85.   Shortly after crossing, Border Patrol agents took C.M. and B.M. to Yuma Station where, upon arrival, an immigration officer told C.M. that the government was going to take B.M. away and send her back to Guatemala without him. Ex. 61, C.M. Decl. ¶ 2. C.M. was horrified. *Id.* ¶ 3. Upon seeing C.M.'s reaction, the immigration officer laughed and told her "Happy Mother's Day." *Id.* Officers then placed C.M. and B.M. in a cell with other migrant families, including mothers crying because the government had taken away their children. *Id.* ¶ 4.

86.   Early on May 11, 2018, an immigration officer told C.M. to wake B.M. because they were going to take him away. *Id.* ¶ 5. B.M. started crying. *Id.* The officer then tried to take B.M. to another room to bathe but told C.M. that B.M. was crying too much and ordered her to bathe and dress him. *Id.* ¶ 6.

87.   When the officer again tried to take her son, C.M. begged the officer not to do so. *Id.* ¶ 7. She also told the officer that her son only spoke Mam and that he would not be able to understand anyone. *Id.* The officer laughed at C.M. and made fun of her indigenous accent. *Id.* ¶ 8.

88.   When C.M. continued to hold B.M., another officer came over and told her that they would lock B.M. up in a cell without her if she did not let go. *Id.* ¶ 9.

89.   B.M. sobbed and clung to his mother as the officers pulled him away by force. *Id.* ¶ 11. C.M. had to watch while officers led B.M. and other children away. *Id.*

90.   Nobody gave C.M. information about B.M. or his whereabouts. *Id.* ¶ 12.

91.   C.M. was heartbroken, could not stop crying, could not eat, and could only ask over and over again, to no avail, where he was. *Id.*

92.   Contact between C.M. and B.M. was sparse after their separation. *Id.* ¶¶ 14–18. C.M. spoke to her son a week after the separation, but was only allowed to do so for a few minutes; during that call, her son kept asking when she was coming to get him and telling her he did not understand anyone speaking to him. *Id.* ¶ 14.

93.   It was several weeks before C.M. was allowed to speak with B.M. again. *Id.* ¶ 17.

94. During the period between calls, B.M.'s shelter case manager told him that she could not find his mother and so could not arrange a call, which upset B.M. Ex. 62, Case Manager C. Dep. 136:9–20.

95. During their few phone calls, both C.M. and B.M. were "very emotional" and "crying." *See id.* at 128:3–25. While separated, C.M. suffered weight loss, sleeplessness, and headaches due to the stress of losing B.M.. Ex. 61, C.M. Decl. ¶ 16.

96. B.M. turned six in a shelter thousands of miles away from his mother. *Id.* ¶ 19.

97. The United States Attorney's Office for the District of Arizona declined to prosecute C.M. shortly after the government sent B.M. to Lutheran Social Services in the Bronx, New York. Ex. 63; Ex. 59 at CM-US-CPB-U-0000052.

98. C.M. was never taken into criminal custody. Ex. 55 at No. 21.

**D.     O.A. and her daughter, L.A.**

99. Plaintiff O.A., seeking asylum, crossed the United States border in or near Yuma, Arizona on or about May 11, 2018, with her five-year-old daughter, L.A. Ex. 59 at CM-US-CPB-U-0000131, CM-US-CPB-U-0000141; Ex. 64, O.A. Dep. 51:13–20.

100. Shortly after crossing, USBP agents brought O.A. and her daughter to Yuma Station and placed them in a cell with many other mothers and children. Ex. 65, O.A. Decl. ¶ 4. The next morning, O.A. watched in terror as the officers called out names of children and separated them from their mothers. *Id.* ¶ 5.

101. O.A. and L.A. watched as children clinging to mothers were separated. *Id.*

102. Eventually an officer called L.A.'s name and told O.A. they were going to bathe her daughter, but they came back to ask O.A. to intervene because L.A. was crying and refusing to bathe. Ex. 64, O.A. Dep. 75:10–23.

103. After the bath, officers told O.A. that it was time for L.A. to leave. L.A. started crying and asking where she was being taken, but O.A. didn't know how to answer her. *Id.* at 76:4–17. L.A. grabbed O.A. and refused to let go. *Id.* at 76:19–23; Ex.

65, O.A. Decl. ¶ 6. O.A. begged the officers not to take her daughter, but the officers led L.A. away. Ex. 64, O.A. Dep. 78:6–8; Ex. 65, O.A. Decl. ¶ 7.

104. Despite her pleas, no one told O.A. where they were taking L.A. *Id.* ¶¶ 7–8.

105. During the separation, O.A. suffered weight and hair loss, had headaches, dizziness, and trouble eating and sleeping. Ex. 64, O.A. Dep. 100:9–101:1; Ex. 65, O.A. Decl. ¶ 10.

106. O.A. was held at two different detention centers, but none of the officers at either facility would tell O.A. where L.A. was or how to contact her. *Id.* ¶¶ 9, 11.

107. O.A. located her daughter through a contact number provided by another detained women, which she asked her brother to call. *Id.* ¶ 12.

108. It took about a month before O.A. was finally able to speak with L.A. Ex. 64, O.A. Dep. 84:1–3; Ex. 65, O.A. Decl. ¶ 13. L.A. was crying and scared and asked O.A. where she was and why she had left L.A. alone. Ex. 64, O.A. Dep. 84:8–15.

109. O.A. avoided deportation without her daughter only because an attorney intervened. *Id.* at 86:1–89:8.

110. The United States Attorney's Office for the District of Arizona declined to prosecute O.A. shortly after the government sent L.A. to Cayuga Centers in the Bronx, New York. Ex. 66 at CM-US-CPB-U-0000135–36, CM-US-CPB-U-0000140; Ex. 67 at CM-US-HHS-U-0000009–11.

111. O.A. was never taken into criminal custody. Ex. 55 at No. 21.

**E.      L.G. and her daughter, B.G.**

112. Plaintiff L.G., seeking asylum, crossed the United States border in or near Yuma, Arizona on May 16, 2018, with her six-year-old daughter, B.G. Ex. 68 at CM-US-CPB-U-0000086, CM-US-CPB-U-0000088, CM-US-CPB-U-0000094.

113. That night, Border Patrol agents took L.G. and B.G. to Yuma Station. Ex. 69, L.G. Dep. 62:3–6. The officers placed L.G. and B.G. in a room with other mothers and children. *Id.* at 66:10–17. The mothers told L.G. that the government was going to

take B.G. away. *Id.* at 66:18–67:2. A few hours later, the officers confirmed they would take B.G. *Id.* at  67:6–14.

114.   L.G. cried and told her daughter she would be taken; her daughter was scared and asked "how am I going to communicate with you" and whether the officers would return her. *Id.* at 68:11–21. L.G. waited eight hours in a room with her daughter before officers separated them. *Id.* at 81:1–6. L.G. watched as officers led B.G. away. *Id*. at 81:8–16, 82:1–7.

115.   The officers did not tell L.G. where her daughter was going. *Id.* at 83:19–84:1, 90:3–5.

116.   L.G. did not speak with her daughter for forty days. Ex. 70 at SWK-0000051. When L.G. finally heard her daughter's voice she began to cry, and the call was only six minutes long. Ex. 69, L.G. Dep. 94:12–95:21.

117.   L.G. only was allowed to speak to her daughter one more time before they were reunited. *Id.* at 94:21–95:6.

118.   The United States Attorney's Office for the District of Arizona declined to prosecute L.G. shortly after the government sent B.G. to Southwest Key-Hacienda Del Sol in Phoenix, Arizona. Ex. 68 at CM-US-CPB-U-0000089–90, CM-US-CPB-U-0000103.

119.   L.G. was never taken into criminal custody. Ex. 55 at No. 21.

**       **       **

120.   The government has no record of which officials separated Plaintiffs. Ex. 71 at No. 1.

**VI.   THE DHS REFERRAL POLICY IS TERMINATED AND A COURT ORDERS THE GOVERNMENT TO REUNITE THE FAMILIES**

121.   On June 20, 2018, then-President Trump signed an executive order directing DHS to keep families together, thus revoking the DHS Referral Policy. Ex. 72.

122.   After the executive order, the directive from DHS officials was to only reunify the parents in ICE custody and children in ORR custody at the time of removal. *See* Ex. 73 at CD-US-0169164 ("We are moving forward w [sic] reunification only for

1    the purposes of removal); Ex. 74 at CD-US-019467 ████████████

2    ████████████████████████████████████████████

3    ████████████████████████████████████ *see also*

4    Ex. 75 at CD-US-0091036A ████████████████████

5    ████████████████████████████████████████ n,

6    ████████████████████████████████████

7    123.  On June 26, 2018, a federal court ordered the reunification of separated families.

8          *See Ms. L. v. U.S Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018),

9          *modified*, 330 F.R.D. 284 (S.D. Cal. 2019); *see also* Ex. 13 at CD-US-0213920.

10   124.  A 375-person emergency response team was assembled to locate separated parents

11         and children for purposes of reunification because there was no plan for reunifying

12         families. *See* Ex. 25, Guadian Dep. 37:16–44:16; Ex. 3, White Dep. 314:17–

13         315:14, 292:17–294:13.

14   125.  Several months after they were separated, Plaintiffs were reunited. *See* Ex. 53 at

15         GMC000143 (showing G.A.'s discharge from Cayuga Center approved on July

16         22, 2018 for reunification with his mother pursuant to *Ms. L* class); Ex. 76 at

17         JLR000107 (J.R. (Cayuga) Case Review noting that "[m]inor was discharged from

18         the program on 7/27/18"); Ex. 77 at LSS_0000481 (B.M.'s discharge Notice from

19         Lutheran Social Services (LSS) and ORR custody dated July 26, 2018 at 1:00 AM

20         stating that he is being released to separated parent pursuant to *Ms. L* order); Ex.

21         70 at SWK-0000001, SWK-0000087–88 (shelter case file summary noting B.G.'s

22         ORR placement date as May 17, 2018, termination at the shelter as July 23, 2018,

23         and length of stay as 69 days); Ex. 64, O.A. Dep. 90:3–22 (O.A. describing

24         reunification with L.A. about six months after separation).

25   126.  The government's failure to maintain adequate records of children separated from

26         their parents was "a marriage of cruelty and shambles of organizational work." Ex.

27         78  (quoting Secretary Alejandro Mayorkas).

28

127. The separation of families was "unconscionable" and "cruel" and resulted in "immense trauma" to those separated. Ex. 79 (quoting Secretary Mayorkas).

128. Attorney General Merrick Garland called the Policy "shameful" and said, "I cannot imagine anything worse than tearing parents from their children." Ex. 80 at 146.

129. The separation of families, including Plaintiffs, was a "human tragedy." Doc. 99 at 2 (quoting Exec. Order No. 14011, 86 Fed. Reg. 8273 (Feb. 2, 2021) at § 1); *see also* Ex. 81.

Respectfully submitted this 9th day of March, 2023.

1

OSBORN MALEDON, P.A.

2

3

By  s/Travis C. Hunt

4

David B. Rosenbaum
Travis C. Hunt

5

BriAnne N. Illich Meeds

6

2929 North Central Avenue, 21st Floor
Phoenix, Arizona  85012-2793

7

ARNOLD & PORTER KAYE SCHOLER LLP

8

Diana Reiter*
Erik Walsh*

9

Lucy McMillan*
Harry Fidler*

10

Kaitlyn Schaeffer*
Brian Auricchio*

11

Julia Kindlon*
250 West 55th Street

12

New York, NY 10019-9710

13

ARNOLD & PORTER KAYE SCHOLER LLP
R. Stanton Jones*

14

David Hibey*
Emily Reeder-Ricchetti*

15

601 Massachusetts Avenue, NW
Washington, DC 20001

16

ARNOLD & PORTER KAYE SCHOLER LLP

17

Sean Morris*
777 South Figueroa Street

18

Los Angeles, CA 90017-5844

19

KAIRYS, RUDOVSKY, MESSING,
FEINBERG & LIN LLP

20

Jonathan H. Feinberg*
The Cast Iron Building

21

718 Arch Street, Suite 501 South
Philadelphia, PA 19106

22

NATIONAL IMMIGRANT JUSTICE CENTER

23

Mark Fleming*
Mark Feldman*

24

224 S. Michigan Ave., Suite 600
Chicago, IL 60604

25

26

NATIONAL IMMIGRATION LITIGATION
ALLIANCE

27

Trina Realmuto*
Mary Kenney*

28

10 Griggs Terrace
Brookline, MA 02446

21

AMERICAN IMMIGRATION COUNCIL
Katherine Melloy Goettel*
Emma Winger*
Gianna Borroto*
1331 G Street NW, Suite 200
Washington, DC 20005

**Attorneys for Plaintiffs C.M. et al.**

**\* Admitted *pro hac vice***

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28