BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division
JAMES G. TOUHEY, JR.
Director, Torts Branch
PHILIP D. MACWILLIAMS
Trial Attorney
D.C. Bar No. 482883
E-mail: phil.macwilliams@usdoj.gov
U.S. Department of Justice
Civil Division, Torts Branch
Benjamin Franklin Station, P.O. Box 888
Washington, DC 20044
Telephone: (202) 616-4285
Attorneys for the United States of America

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| C.M., on her own behalf and on behalf of her minor child, B.M.; L.G., on her own behalf and on behalf of her minor child, B.G.; M.R., on her own behalf and on behalf of her minor child, J.R.; O.A., on her own behalf and on behalf of her minor child, L.A.; and V.C., on her own behalf and on behalf of her minor child, G.A., | Case No. 2:19-cv-05217-SRB **UNITED STATES' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| Plaintiffs, | |
| v. | |
| United States of America, | |
| Defendant. | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND .................................................................................................. 2

    A.   STATUTORY BACKGROUND ................................................................ 2
    B.   THE POLICIES CHALLENGED IN THIS CASE ........................................ 4
    C.   PLAINTIFFS' DETENTION AND SEPARATION ...................................... 4

ARGUMENT ....................................................................................................... 5

    I.   SOVEREIGN IMMUNITY HAS NOT BEEN WAIVED FOR PLAINTIFFS' CLAIMS ..................... 5
        A.   Plaintiffs' Claims Are Impermissible Institutional or Systemic Tort Claims ............. 5
        B.   Plaintiffs' Claims Are Barred by the Discretionary Function Exception ................... 7
    II.   PLAINTIFFS CANNOT ESTABLISH CLAIMS FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER APPLICABLE STATE LAW .................................................. 17
        A.   Law Enforcement Privilege Prevents Plaintiffs from Establishing "Extreme and Outrageous" Behavior ................................................................... 17
        B.   Plaintiffs Have Not Established the Element of Intent ............................... 20
    III.   PLAINTIFFS CANNOT ESTABLISH CLAIMS FOR NEGLIGENCE .......................... 22

CONCLUSION .................................................................................................. 25

i

1

## <u>TABLE OF AUTHORITIES</u>

2

**Statutes:**

3

6 U.S.C. § 279(a) ............................................................................................... 3

4

6 U.S.C. § 279(b)(1)(A) ..................................................................................... 3

6 U.S.C. § 279(b)(1)(C) ..................................................................................... 3

5

6 U.S.C. §§ 279(g)(2) ........................................................................................ 3

6

8 U.S.C. § 1182(d)(5) ........................................................................................ 3

7

8 U.S.C § 1225(b) .............................................................................................. 3

8 U.S.C § 1226 ................................................................................................... 3

8

8 U.S.C. § 1231 .................................................................................................. 3

9

8 U.S.C. § 1232 .................................................................................................. 3

8 U.S.C § 1325 .......................................................................................... 2, 4, 5, 6, 8

10

8 U.S.C § 1326 ................................................................................................... 3

11

8 U.S.C § 1357 ................................................................................................... 3

28 U.S.C. § 2680 ............................................................................................... 2

12

8 C.F.R. § 235.3(b)(2)(iii), ................................................................................ 3

13

8 C.F.R. § 235.3(b)(4)(ii) .................................................................................. 3

14

**Cases:**

15

*Alfrey v. United States,*
16
   276 F.3d 557 (9th Cir. 2002) ....................................................................... 12

17

*Barton v. Barr,*
18
   140 S. Ct. 1442 (2020) ................................................................................. 2

19

*Bell v. Wolfish,*
20
   441 U.S. 520 (1979) ..................................................................................... 12

21

*Bodett v. CoxCom, Inc.,*
   366 F.3d 736 (9th Cir. 2004) ....................................................................... 18

22

*Calderon v. United States,*
23
   123 F.3d 947 951 (7th Cir. 1997) ................................................................ 12

24

*Campos v. United States,*
   888 F.3d 724 (5th Cir. 2018) ....................................................................... 16

25

*Carranza v. United States,*
26
   No. 3:12-cv-02255, 2013 WL 3333104 (D. Or. July 1, 2013) .................... 18

27

*County of Sacramento v. Lewis,*
   523 U.S. 833 (1998) ..................................................................................... 23

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Cruz v. United States*,
    684 F. Supp. 2d 217 (D.P.R. 2010) ................................................................. 16

*Daurio v. Arizona Department of Child Safety*,
    No. CV-18-03299, 2020 WL 6940812 (D. Ariz. Nov. 25, 2020) ....................... 24

*Demetrulias v. Wal-Mart Stores Inc.*,
    917 F. Supp. 2d 993 (D. Ariz. 2013) ................................................................. 18

*E.L.A. v. United States*,
    No. 2:20-cv-1524, 2022 WL 2046135 (W.D. Wash. June 3, 2022) .................... 23

*FDIC v. Meyer*,
    510 U.S. 471 (1994) .......................................................................................... 24

*Franklin Sav. Corp. v. United States*,
    180 F.3d 1124 (10th Cir. 1999) ........................................................ 9, 10, 11, 12

*Gipson v. Kasey*,
    150 P.3d 228 (Ariz. 2007) ................................................................................. 23

*Guerrero v. United States*,
    No. CV-12-00370, 2012 WL 12842348 (D. Ariz. Dec. 19, 2012) ..................... 12

*Harris v. United States*,
    No. CV-19-0024, 2021 WL 2334385 (D. Ariz. June 8, 2021) ........................... 25

*Harrison v. Fed. Bureau of Prisons*,
    464 F. Supp. 2d 552 (E.D. Va. 2006) ............................................................... 17

*Johnson v. McDonald*,
    3 P.3d 1075 (Ariz. 1995) ................................................................................... 17

*Kajtazi v. Kajtazi*,
    488 F. Supp. 15 (E.D.N.Y. 1978) ..................................................................... 18

*Keates v. Koile*,
    883 F.3d 1228 (9th Cir. 2018) .......................................................................... 24

*Lerner v. John Hancock Life Ins.*,
    No. cv-09-01933, 2011 WL 13185713 (D. Ariz. Mar. 21, 2011) ....................... 17

*Lewis v. Dirt Sports LLC*,
    259 F. Supp. 3d 1039 (D. Ariz. 2017) .............................................................. 23

*Matson v. Safeway*,
    No. 12-8206, 2013 WL 6628257 (D. Ariz. Dec. 17, 2013) ............................... 18

*Mintz v. Bell Atl. Sys. Leasing Intern., Inc.*,
    905 P.2d 550 (Ariz. Ct. App. 1995) .................................................................. 17

*Mitchell v. United States*,
   149 F. Supp. 2d 1111(D. Ariz. 1999) ................................................................. 12

*Nurse v. United States*,
   226 F.3d 996 (9th Cir. 2000) ............................................................................... 12

*Pankratz v. Willis*,
   744 P.2d 1182 (Ariz. Ct. App. 1987) ................................................................. 18

*Pereyra v. United States*,
   No. CV 03-267, 2008 WL 11394371 (D. Ariz. Sept. 26, 2008) ......................... 13

*Petty v. Arizona*,
   No. CV-15-0133, 2018 WL 2220665 (D. Ariz. May 15, 2018) ..................................... 24-25

*Ramirez v. Glendale Union High Sch. Dist. No. 205*,
   No. 03-0060, 2006 WL 8439630 (D. Ariz. Sept. 20, 2006) ............................... 24

*S.E.B.M. v. United States*,
   No. 1:21-cv-00095, 2023 WL 2383784 --- F. Supp. 3d --- 2023 ............................. 16, 20, 25

*Savage v. Boise*,
   272 P.2d 349 (Ariz. 1954) ............................................................................... 17, 18

*Sloan v. H.U.D.*,
   236 F.3d 756 (D.C. Cir. 2001) ........................................................................... 16

*U.S. v. Gaubert*,
   499 U.S. 315 (1991) ............................................................................................. 9

*Washington v. Reno*,
   35 F.3d 1093 (6th Cir. 1994) ............................................................................. 17

*Watts v. Golden Age Nursing Home*,
   127 Ariz. 255 (1980) ......................................................................................... 17

**Restatements:**

Restatement (Second) of Torts
   § 46, comment g ................................................................................... 17, 18, 21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

In May of 2018, Plaintiffs – five adults and their children – were apprehended for unlawfully crossing the Southwest Border of the United States between ports of entry.  The adults and children were separated pursuant to the Department of Homeland Security ("DHS") referral policy—which directed U.S. Border Patrol Sectors along the Southwest Border, to the extent practicable, to refer for prosecution all amenable adults regardless of family unit status—and ICE's existing statutory authority to detain adult noncitizens through their removal proceedings.

President Biden has denounced the prior practice of separating children from their families at the United States-Mexico border, and the United States does not defend that policy here.  But Plaintiffs filed this action under the Federal Tort Claims Act ("FTCA"), seeking monetary damages from the United States, arguing that the federal policy decisions and conduct that resulted in their separations constituted actionable torts under Arizona law.  Plaintiffs now move for partial summary judgment ("Pls MSJ") on certain elements of their claims for intentional infliction of emotional distress ("IIED") and negligence. ECF Nos. 378,379.  With respect to their claim for IIED, Plaintiffs first contend they have established as a matter of law that the government's conduct was "extreme and outrageous" based on the decision to separate the adult Plaintiffs and their children, Pls. MSJ 18, and the conduct during the separation, including the amount of time that the adult Plaintiffs and their children had to say goodbye, how quickly the adult Plaintiffs were provided with the location within the Department of Health and Human Services' Office of Refugee Resettlement ("ORR") custody to which their children would be transferred, how often the parents and children communicated while in separate custody, and that Plaintiffs and their children were not reunified until required by court order.  Pls. MSJ 19-21. Second, Plaintiffs argue that they have established that the government recklessly disregarded the near certainty of severe emotional distress because it was aware that separations could cause emotional distress but nevertheless adopted the DHS Referral Policy.  Pls. MSJ 21-23.  And with respect to their negligence claims, Plaintiffs assert that

1

the government owed a duty of care to them while they were in federal custody and breached that duty largely on the same grounds that form the basis for their IIED claims. Pls. MSJ 23-25.

Plaintiffs fall short of the showing needed to grant summary judgment in their favor.  Plaintiffs' arguments principally rest on facts which the United States disputes and which, in any event, are not material to their claims.  Even if these facts are accepted, though, as the United States explained in its motion for summary judgment ("U.S. MSJ") and statement of facts in support ("U.S. MSJ SOF"), the Court lacks jurisdiction because: (1) Plaintiffs' claims for institutional or systematic torts are not cognizable under the FTCA; and (2) Plaintiffs' claims are barred by the FTCA's discretionary function exception, 28 U.S.C. § 2680(a).  ECF Nos. 371, 372.  Nor can such disputed facts overcome the privileges under applicable State law that preclude liability for Plaintiffs' claims.  Moreover, the asserted facts do not establish the elements of the tort claims brought by Plaintiffs, and thus are not legally sufficient to grant judgment as a matter of law for Plaintiffs.  Accordingly, summary judgment for Plaintiffs must be denied.

## BACKGROUND

### A.   Statutory Background

When a noncitizen enters the United States between official ports of entry, he or she may be prosecuted for criminal immigration violations, including entering the United States "at any time or place other than as designated by immigration officers" and eluding "examination or inspection by immigration officers."[1]  8 U.S.C § 1325(a).  Section 1325(a) is a misdemeanor that is punishable by a fine and "imprison[ment] not more than 6 months" for a first infraction.  A subsequent violation is a felony and may result in imprisonment of not more than two years.  *Id.*  Additionally, a noncitizen who has previously been removed and unlawfully re-enters the United States can be prosecuted for

---

[1] This brief uses the term "noncitizen" as equivalent to the statutory term "alien." *See Barton v. Barr*, 140 S. Ct. 1442, 1446 n.2 (2020) (*quoting* 8 U.S.C. § 1101(a)(3)).

a violation of 8 U.S.C § 1326, which is a felony and carries a potential term of imprisonment of up to two years.  Violations of these federal criminal immigration statutes are prosecuted by the U.S. Attorneys' Offices, which are offices within the U.S. Department of Justice.

Noncitizens arriving in or present in the United States who, following inspection, are deemed inadmissible are subject to removal from the United States and subject to detention during the pendency of their removal proceedings.  *See id*. §§ 1225(b); 1226; 1357.  Further, noncitizens with final orders of removal are subject to detention pursuant to 8 U.S.C. § 1231(a).  DHS possesses statutory authority to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal."  8 U.S.C. § 1231(g)(1).  In some cases, DHS may exercise its discretion to release a noncitizen from custody.  *See, e.g.*, *id.* §§ 1182(d)(5), 1226(a)(2).  Those determinations are made on a "case-by-case basis" pursuant to federal statutory and regulatory authorities.  *Id.* § 1182(d)(5); 8 C.F.R. §§ 235.3(b)(2)(iii), (b)(4)(ii).

When an agency takes custody of a noncitizen child for whom "there is no parent or legal guardian in the United States [or] no parent or legal guardian in the United States is available to provide care and physical custody," 6 U.S.C. § 279(g)(2), the agency must designate that child as an "unaccompanied alien child" ("UAC") pursuant to the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), and transfer custody of the child to ORR.  *Id.*[2]

---

[2] ORR has responsibility for "the care and placement of unaccompanied alien children who are in federal custody by reason of their immigration status." 6 U.S.C. §§ 279(a), (b)(1)(A), (b)(1)(C); *see also* 8 U.S.C. § 1232(b)(1).  The term "UAC" is defined as a child who: (1) "has no lawful immigration status in the United States"; (2) "has not attained 18 years of age"; and (3) "with respect to whom…there is no parent or legal guardian in the United States [or] no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2).  Under the TVPRA, any federal agency shall "transfer the custody of such child to [ORR] not later than 72 hours after determining that such child is" a UAC except in the case of exceptional circumstances.  8 U.S.C. § 1232(b)(3).  ORR seeks to place UACs "in the least restrictive setting that is in the best interest of the child." *Id.* § 1232(c)(2)(A).  ORR "shall not release such children upon their own recognizance." 6 U.S.C. § 279(b)(2).  Once a minor is in ORR custody, statutory and regulatory provisions govern release of the minor to an approved sponsor.  *See* 8 U.S.C. § 1232(c)(3).

**B.     The Policies Challenged in this Case**

On April 6, 2018, Attorney General Jefferson Sessions issued a memorandum that directed "each United States Attorney's Office along the Southwest Border—to the extent practicable, and in consultation with DHS—to adopt immediately a zero tolerance policy for all offenses referred for prosecution under" 8 U.S.C. § 1325(a), which prohibits unlawful entry into the United States.  U.S. MSJ SOF 5.  About two weeks later, in a memorandum titled "Increasing Prosecutions of Immigration Violations," senior officials at DHS proposed three prosecution referral policy options to the Secretary of Homeland Security (the "DHS Referral Memorandum").  U.S. MSJ SOF 6.  On May 4, 2018, Secretary Kirstjen Nielsen approved Option 3 in the DHS Referral Memorandum, initiating a policy of referring for prosecution, to the extent practicable, all adults who unlawfully crossed the Southwest border of the United States, "including those initially arriving with minors" ("the DHS Referral Policy").  U.S. MSJ SOF 15.

**C.     Plaintiffs' Detention and Separation**

Plaintiffs—five adult noncitizens and their respective children—were apprehended in the U.S. Border Patrol's Yuma Sector in Arizona in May 2018 and transported to the Yuma Border Patrol Station.[3]  U.S. MSJ SOF 44, 62, 79, 97,115.  Pursuant to the DHS Referral Policy in effect at the time, Border Patrol agents identified the adult Plaintiffs as amenable to prosecution because they had entered the United States unlawfully and initiated the prosecution referral process for the adult Plaintiffs for violations of § 1325.  U.S. SOF 45, 63, 80, 98, 116.  Based on Border Patrol's decision to initiate the prosecution referral process for the adult Plaintiffs, the minor Plaintiffs were designated as UACs, and accordingly, Border Patrol agents requested placement of the minors with ORR.  *Id.*  After Border Patrol agents completed processing of the adult Plaintiffs and the criminal referral processes concluded, the adult Plaintiffs were transferred to the custody

---

[3] U.S. Border Patrol is a component of U.S. Customs and Border Protection ("CBP"), which is an agency within DHS.  Border Patrol possesses responsibility for apprehending individuals who enter the United States between ports of entry.  Its geographic areas of responsibility along the Southwest Border are divided into several sectors.  Border Patrol's Yuma Sector encompasses parts of Arizona and California.

4

1   of ICE as single adults for a custody determination pending removal proceedings.[4]  U.S.

2   MSJ SOF 56,74,91, 109, 126.  The adult Plaintiffs were not prosecuted and remained in

3   ICE custody until they were reunified with their children.  U.S. MSJ SOF 54, 56,72,74,87,

4   91, 105,109, 126.

## ARGUMENT

### I.      Sovereign Immunity Has Not Been Waived For Plaintiffs' Claims

Plaintiffs are not entitled to partial summary judgment because the Court lacks

jurisdiction over their claims.  While the current Administration does not defend the

wisdom of the policy choices made by the prior Administration that led to the separation

of families at the United States-Mexico border, the FTCA does not permit recovery in tort

for harms that arise from federal policy decisions.  Any other outcome would contravene

the text and purpose of the FTCA and threaten to expose the federal government and, in

turn, the public fisc to monetary damages for myriad policies.

### A. Plaintiffs' Claims Are Impermissible Institutional or Systemic Tort Claims

As explained in the United States' motion for summary judgment, Plaintiffs' claims

are not cognizable under the FTCA because they are "institutional" or "systemic" claims

which seek to hold the United States liable based on the conduct of an agency or the

government as a whole.  U.S. MSJ 5-8.  The FTCA, however, waives sovereign immunity

only for the wrongful acts of individual employees of the government acting within the

scope of their employment and does not render the United States liable for the action of an

agency or the government as a whole.[5]

---

[4] ICE also is an agency within DHS.  ICE's Enforcement & Removal Operations, among other things, is authorized to take custody of noncitizens following their apprehension by Border Patrol and to make a determination as to whether to detain or release the noncitizen during the pendency of his or her removal proceeding.

[5] *Id.* (citing *Meier v. United States*, 2006 WL 3798160, at *3-4 (N.D. Cal. Dec. 22, 2006) (dismissing claim based on corporate negligence theory), *aff'd*, 310 F. App'x 976 (9th Cir. 2009); *Lee v. United States*, 2020 WL 6573258 at *6 (D. Ariz. Sept. 18, 2020) (dismissing claims of "generalized theories of negligence asserted against the staff and employees of federal institutions as a whole" for lack of jurisdiction); *F.R. v. United States*, No. CV-21-00339, 2022 WL 2905040 at *3 (D. Ariz. July 22, 2022) ("[A] cognizable FTCA claim must be predicated on the tortious misconduct of individual

5

Plaintiffs' motion for partial summary judgment underscores that their claims are impermissible institutional or systemic tort claims. Throughout their brief Plaintiffs repeatedly focus on what they characterize as reckless or negligent aspects of "the government's" policy-making process that resulted in the DHS Referral Policy as well as challenge the policy itself. *See, e.g.*, Pls. MSJ 3-10, 16-25. Specifically, Plaintiffs seek to hold the United States liable for "the government's" decision to adopt a prosecution referral policy that would result in the separation of parents and children "without notifying key officials it was coming", Pls. MSJ at 7, and "without a plan that would ensure that families, including Plaintiffs, received information about their family members' whereabouts and regularly communicated while separated."), *id*. at 18; *see also id*. at 8 ("*The government* also implemented the Policy without developing a tracking system that would allow parents to locate their children and facilitate regular communication, and without a plan to ensure reunification.") (emphasis added); *id*.at 10 ("Despite these obvious flaws in implementation, *the government* continued to separate families[.]") (emphasis added).[6]

In other words, Plaintiffs seek to hold the United States liable under the FTCA for the conduct of "the government" in allegedly recklessly or negligently designing and implementing an agencywide policy.[7] But that is precisely the sort of institutional conduct that does not give rise to liability under the FTCA.

government employees, rather than on alleged wrongdoing by the United States or its agencies writ large."); *B.A.D.J. v. United States*, No. CV-21-00215, 2022 WL 11631016 *5 (D. Ariz. Sept. 30, 2022) ("To the extent Plaintiffs allege harms resulting from policymaking or agency-wide misconduct, the Court lacks subject matter jurisdiction over those claims.").

[6] *See also* Pls. MSJ at 15 ("*the government* acted in an extreme and outrageous manner by . . . adopting a policy under which migrant parents and children would be separated for months or years[.]") (emphasis added); *id*. at 17 (basing IIED claim on "*the government's* conduct in adopting and implementing the DHS Referral Policy") (emphasis added); *id*. at 19 ("*The government* implemented the Policy without a plan to reunify families.") (emphasis added)

[7] Although Plaintiffs make passing reference to their allegation that "the government" separated families *intending* to cause distress, Pls. MSJ 2 n.1, 8 n.5, they expressly state that they are *not* basing their motion for partial summary judgment on such a theory and do not proffer any statement of material fact to support such a theory.

6

**B.   Plaintiffs' Claims Are Barred by the Discretionary Function Exception**

As explained in the United States' motion for summary judgment, the FTCA's discretionary function exception ("DFE") also bars Plaintiffs' claims because they challenge policy-based discretionary determinations that resulted in the placement of Plaintiffs and their children in separate custody, as well as the continued detention of the adult Plaintiffs in ICE custody pending their immigration removal proceedings.  *See* U.S. MSJ 8-26.[8]  Plaintiffs' partial motion for summary judgment further underscores that their claims arise from conduct that falls squarely within the DFE.

**1.   Plaintiffs' Challenges to Prosecution Referrals Pursuant to the DHS Referral Policy and the Placement of Children with ORR Are Barred by the DFE**

Plaintiffs acknowledge that they were separated as a result of enforcement action taken pursuant to the DHS Referral Policy.  Pls. MSJ 10-14.  The adoption and case-by-case implementation of the DHS Referral Policy involved the exercise of the sort of quintessential policy-based discretion that is protected by the DFE.  U.S. MSJ 10-17. In particular, the decisions whether and when to pursue referral for prosecution of an amenable adult, and when to seek an ORR placement for a child when a parent was to be processed for a prosecution referral, are policy-based discretionary decisions.  *See* U.S. MSJ 15-17.

Plaintiffs cannot avoid the DFE simply because the adult Plaintiffs ultimately were not prosecuted by the U.S. Attorney's Office.  *See* Pls. MSJ 8, 18.  The decision of the Yuma Sector Prosecutions Unit to refer a case for prosecution to the U.S. Attorney's Office is protected by the DFE, even if Prosecution Unit agents believed a referral could result in a declination of prosecution by the U.S. Attorney's Office.  U.S. MSJ 13-16.  That the U.S.

---

In any event, the record evidence does not support the allegation that the relevant decisionmaker, Secretary Nielsen, acted with such an intent.  *See* U.S. MSJ 10-12, 17-20, 23-26; U.S. MSJ SOF 18, 19.

[8] The test for application of the DFE is set forth in the United States' motion for summary judgment.  U.S. MSJ 8-9.  For the sake of brevity, and because the court is already familiar with the DFE through the United States' motion for summary judgment and other filings, the United States references and incorporates that analysis here in lieu of repeating it.

Attorney's Office might ultimately use its prosecutorial discretion and decline to pursue a particular case based on its own policy-based judgment does not mean the Border Patrol's referral decision was not susceptible to policy considerations.  *Id*; U.S. Supp. SOF 9. Indeed, the U.S. Attorney's Office testified that the Yuma Sector Prosecutions Unit acted in "good faith" in submitting prosecution referrals to the U.S. Attorney's Office for their review and consideration even where a case could result in declination.  U.S. Supp. SOF 10; U.S. Opp. Ex. A Att. 12 (USAO 30(b)(6) 222).[9]

In any event, Plaintiffs incorrectly focus on the final referral decisions, made by the Yuma Sector Prosecutions Unit.  As the United States explained, as soon as possible following a noncitizen adult's apprehension and intake into the Yuma Border Patrol Station, Border Patrol agents with a different unit—the Yuma Station Processing, Screening and Transportation Unit ("PST Unit")—would determine if the adult was amenable to prosecution and to be processed for a referral for prosecution.  U.S. MSJ SOF 34-38; U.S. MSJ Ex. D (Jordan Decl. at ¶ 11); *see also* U.S. Opp. Ex. A Att. 5 (Jordan 179-183).  Following that determination, Yuma Station PST Unit Border Patrol agents would, as soon as practicable, seek an ORR placement for any child accompanying an adult amenable to prosecution.  *Id.*  PST Unit agents would then continue further processing of the adult and any minor in custody.  *Id.*  Only after completion of processing of the adult would his or her case file be transferred to the Yuma Sector Prosecutions Unit, which was responsible for ultimately preparing and making the actual referral to the U.S. Attorney's Office.  *Id.*  Thus, Plaintiffs focus on the decision by a separate unit (the Yuma Sector Prosecutions Unit) relating to whether to refer a case to the U.S. Attorney's Office, but that

---

[9] The referrals reflected the understanding that prosecuting § 1325 violations by all noncitizens was a priority of the Department of Justice.  U.S. Opp. Ex. A Att. 5 (Jordan 59, 114, 137-138) (Special Operations Supervisor for the Yuma Border Patrol Station's PST Unit, testifying it was his understanding that "the Attorney General issued a directive that the US Attorney[']s Office would accept all cases for illegal entry," that "it was our understanding as an agency that this was a prosecution priority for the Department of Justice and the US Attorney[']s Office," and that "we intended to make a referral on all these adults that we did separate."); *id.* at 130 ("At the time that we declare the child a UAC, we had every intention of prosecuting -- or referring that individual for prosecution"); U.S. Supp. SOF 7, 8.

referral decision occurred after the prior discretionary decision by agents in the Yuma

Station PST Unit to make an ORR placement request.

 The manner in which the Yuma Sector structured its screening and referral process

involved the exercise of discretion that implicated the constraints and exigencies associated

with noncitizens, particularly minors, in custody.  U.S. MSJ 13-16.[10]  In particular, time

constraints arose not only from the TVPRA, but also from the *Flores* Settlement

Agreement, which calls for the transfers of minors out of Border Patrol custody "as

expeditiously as possible."  *See* U.S. MSJ 15-16 & n.14; *see also* U.S. MSJ Ex. A Att. 1

(McAleenan 67-68) ("it was really ingrained in [Border Patrol] operations that the

placement of a child and ensuring that an unaccompanied child spend as little time as

possible, ideally within 24 hours, is placed and transported to a better custodial setting.");

U.S. Opp. Ex. A Att. 5 (Jordan 184-189) (Border Patrol operated under "direction that we

---

[10] *See also* U.S. MSJ Ex. A Att. 1 (McAleenan 291) ("The imperative, once a decision is made to refer for prosecution, is that the child get a placement to be in a better custodial situation than in a border patrol station."); U.S. MSJ Ex. A Att. 4 (Vitiello 170) (explaining that a separation could occur even if the prosecution of the parent was declined, because a referral to ORR would then have been made "because the parent was on the workflow toward 1325 prosecution").  While Plaintiffs claim that the separations occurred as a result of recklessness or negligence, they make a passing reference to efforts to prosecute as merely "pretext" to bring about a separation.  Pls. MSJ 9 n.4.  As the United States has explained, however, the discretionary function exception does not permit inquiry into a decisionmaker's subjective intent.  *See U.S. v. Gaubert*, 499 U.S. 315, 325 (1991); *Franklin Sav. Corp. v. United States*, 180 F.3d 1124, 1127 (10th Cir. 1999).  And to the extent the intent of any decisionmaker is relevant, Plaintiffs have not adduced evidence that Secretary Nielsen—the official who approved the DHS Referral Policy— adopted the policy as a pretext to bring about separations.  Moreover, the record evidence demonstrates that the timing of seeking placement with ORR when the DHS Referral Policy was in effect was consistent with pre-existing Border Patrol practice.  *See* U.S. MSJ 15-16, U.S. MSJ SOF 27; *see also* U.S. Opp. Ex. A Att. 13 (Hastings 146-47) (when asked who made the decision that a parent who is designated as amenable to prosecution was unavailable and that the children would then be treated as UACs, Chief Hastings testified "It's policy even prior to this time frame."); U.S. Opp. Ex. A Att. 5 (Jordan 110-111) (when asked about the timing of ORR placement requests in May 2018, Agent Jordan testified that it "worked as it always had. So any minors that were deemed to be unaccompanied were referred to the Office of Refugee Resettlement as soon as practical."); U.S. Supp. SOF 12, 13.  Indeed, in situations in the Yuma Sector prior to the DHS Referral Policy where an adult member of a family unit was identified to be processed for a prosecution referral, the same process existed whereby an ORR placement request was made as soon as practicable following the decision to process that adult for a referral for prosecution. *See also* U.S. Opp. Ex. A Att. 5 (Jordan 52-53, 55-56); U.S. Opp. Ex. A Att. 6 (Comella 374-380).  U.S. Supp. SOF 12, 13.

9

should always strive to have juveniles out of our custody within 24 hours.").[11]  The relative geographic remoteness of the Yuma Sector "added extra layers of logistics and planning" in transferring minors out of Border Patrol custody.  *See* U.S. Opp. Ex. A Att. 5 (Jordan 122-123); U.S. Supp. SOF 13.

Border Patrol officials testified that they understood that delaying an ORR placement request and transfer of a child until after the U.S. Attorney's Office reached a decision—or even later once a prosecution is completed—would affect children's welfare and Border Patrol operations.  *See* U.S. Opp. Ex. A Att. 5 (Jordan 122-133; 187-194); U.S. Supp. SOF 13.[12]  The Border Patrol stations were "built and designed in a different era" in which single males were the predominant demographic encountered and were not intended for detention of children.  *See* U.S. Opp. Ex. A. Att. 5 (Jordan 187-188); U.S. Supp. SOF 4. Accordingly, the evidence indicates that the "[Border Patrol had] always strived to get the children through [its] facilities and get them to an age-appropriate facility as soon as practical."  *Id*.  Moreover, because Border Patrol stations must operate around the clock, while U.S. Attorneys' Offices and courts do not, the Border Patrol considered that an additional build-up of detainees in the Border Patrol station would occur should ORR placements be delayed, and that additional time of children in its custody would pull resources away from frontline enforcement duties.  *See id*. at 190-91; U.S. Supp. SOF 13. Border Patrol officials testified that they believed that the need to expeditiously transfer a minor out of Border Patrol custody was especially acute in the May 2018 time period given

---

[11] The TVPRA requires that a UAC be transferred to ORR custody within 72 hours, which for operational reasons was treated as running from the time the child determined to be a UAC was apprehended.  *See* U.S. MSJ 16 n.14; U.S. MSJ Ex. A Att. 1 (McAleenan 67); *see also* U.S. Opp. Ex. A Att. 5 (Jordan 126, 186) (the time in Border Patrol custody of a minor designated as a UAC is determined to begin running at time of apprehension).  U.S. Supp. SOF 13.

[12] *See also* U.S. MSJ Ex. A Att. 3 (Hastings 306-307) (due to time constraints imposed by the TVPRA, Border Patrol agents could not delay seeking an ORR placement until after the U.S. Attorney's office made a decision on whether to accept a prosecution referral); U.S. Opp. Ex. A Att. 5 (Jordan 127) ("we would not know what the results of the prosecution would be in a timely enough manner for us to move the children out"); U.S. Supp. SOF 13.

the high and irregular volume of migrants unlawfully crossing the border, especially in the Yuma Sector.  *See* U.S. Opp. Ex. A Att. 5 (Jordan 128-129) (testifying that it "was not practical for us to wait on the pendency of the US Attorney's Office and their decision to prosecute based on the amount of juveniles that we had in custody and just the overall volume of detainees that we had in our station at that time"); U.S. Supp. SOF 13, 14.[13] During this time, the Yuma Sector on average had close to 400 detainees in custody each day, with spikes of additional detainees (sometimes 100 or more) resulting from additional apprehensions.  *See* U.S. Opp. Ex. A Att. 5 (Jordan 40, 194-200); U.S. Opp. Ex. C; U.S. Supp. SOF 13, 14.  This high volume of detainees and large fluctuations created major challenges for scheduling, resource allocation, and the "need to adequately staff the border to deal with [Border Patrol's] primary enforcement mission of protecting the border and ensuring homeland security."  *Id*. at 200-201; *see also* U.S. Opp. Ex. A Att. 5 (Jordan 203-204) ("[D]elaying the movement of those juveniles would have only exacerbated the already strained conditions that we were dealing with . . . . and would have negatively impacted our ability to enforce the immigration laws and protect the border."); U.S. Supp. SOF 13, 14.[14]  Border Patrol officials also testified that it was difficult to delay the decision to make an ORR placement until a prosecution was accepted and completed because the

---

[13] Border Patrol Chief Hastings testified that during the Spring of 2018 the Border Patrol Sectors across the Southwest Border were experiencing a very high volume of noncitizens' apprehension, and that the need to make a placement request with ORR as quickly as possible was especially urgent in May 2018 given the high volume of noncitizens apprehended during that time frame. U.S. Opp. Ex. A Att. 13 (Hastings 101-102, 134).  A supervisory agent in the PST Unit described the Yuma Border Patrol Station as "overwhelmed" due to the volume of noncitizens being apprehended and transferred to the station, with no ability to control the volume and timing of noncitizens unlawfully crossing the border. U.S. Opp. Ex. A Att. 6 (Comella 394, 413-414). U.S. Supp. SOF 13, 14.

[14] *See also* U.S. Opp. Ex. A. Att. 5 (Jordan 181) (In "May of 2018, we were dealing with capacity issues and ever changing amounts of people coming into our facility . . . and they strained the detention resources that we had, the enforcement resources that we had, and required us to pull frontline manpower into the processing area to deal with custody and care of all the juveniles that we had in custody and all the detainees that were currently being processed."). U.S. Supp. SOF 13, 14.

11

defendant's initial appearance might need to be held over and the defendant might be held over for trial if there was not a guilty plea. *Id.* at 192-194. U.S. Supp. SOF 13.[15]

In sum, Border Patrol made a discretionary decision not to delay the placement of minors, and this decision was susceptible to policy considerations. *Id.*

### 2.  Plaintiffs' Challenge to Border Patrol's Custodial and Detainee Movement Decisions in a Secure Setting Is Barred by the DFE

Plaintiffs also seek to hold the United States liable for the manner in which separations were effectuated and the allegedly limited information provided by Border Patrol agents regarding the ultimate destinations of the minors.  Pls. MSJ 20-21.[16]

Courts have consistently held that operations in a secure custodial setting, including decisions when, where, and how to move detainees, are protected by the DFE.[17]  Courts'

---

[15] *See also* U.S. Opp. Ex. A Att. 12 (USAO 30(b)(6) 80-82) (testifying to various reasons an initial appearance could be delayed or held over). U.S. Supp. SOF 13.

[16] As set forth in the Statement of Facts in Opposition, during processing, parents would be told that their children were going to be transferred to different facilities.  *See* U.S. Opp. Ex. A Att. 1 (McAleenan 149); U.S. Opp. Ex. A Att. 6 (Comella 203-208). U.S. Supp. SOF 3, 6. In fact, *Plaintiffs'* Statement of Facts establishes that they were told that they would be transferred to separate custodial facilities, and parents and children were held together in Border Patrol custody prior to the time of transfer.  *See* Pls. SOF 58, 59, 62, 72, 73, 75, 86, 100,113.

Additionally, in their motion, Plaintiffs assert that the agents involved in their processing and/or transfers did not receive training relating to separations.  Pls. MSJ 7. Although it is unclear whether Plaintiffs include this alleged lack of training as a basis for their claims, the United States disputes this assertion.  *See* U.S. Contr. SOF 31. Nevertheless, any claim based on the training of Border Patrol agents is barred by the DFE.  *See Nurse v. United States*, 226 F.3d 996, 1001 (9th Cir. 2000) ("negligent and reckless employment, supervision and training of the [Federal employees] . . . fall squarely within the discretionary function exception"); *Guerrero v. United States*, No. CV-12-00370, 2012 WL 12842348, *3 (D. Ariz. Dec. 19, 2012) (claim based upon negligent training of Border Patrol agents barred by DFE because "a law enforcement agency's training and supervision of its officers involves substantial policy considerations.").

[17] *See Bell v. Wolfish*, 441 U.S. 520, 547–48 (1979) (prison administrators afforded wide-ranging deference in adopting and executing policies and practices that in their judgment are needed to preserve internal discipline and maintain institutional security); *Alfrey v. United States*, 276 F.3d 557, 565 (9th Cir.2002) (decisions relating to detainee movements and security protected by DFE); *Mitchell v. United States*, 149 F. Supp. 2d 1111, 1114–15 (D. Ariz. 1999) (day-to-day detention-related decisions protected by DFE), *aff'd,* 20 Fed. Appx. 636 (9th Cir. 2001); *see also Calderon v. United States*, 123 F.3d 947, 951 (7th Cir. 1997) (balancing of security with rights of detainees to socialize is decision protected by DFE).

unwillingness to second-guess physical movement and other custodial decisions in secure settings extends to Border Patrol stations, given the myriad security and logistical challenges of the environment and the competing priorities of agents assigned to functions relating to processing, care, and transportation of detainees.  *See Pereyra v. United States*, No. CV 03-267, 2008 WL 11394371, *7 (D. Ariz. Sept. 26, 2008) (lawsuit arising out of care and monitoring of detainee while in Border Patrol custody barred by DFE because it was susceptible to various considerations including "manpower considerations" and "logistics").

The alleged acts and omissions occurring in the Yuma Border Patrol Station must be viewed in the context in which they occurred.  This context included complex and logistically challenging functions relating to processing, detainee care and custody management, and detainee movements within and out of a Border Patrol station.  *See* U.S. Opp. Ex. A Att. 5 (Jordan 84-85) (testifying to the need for multiple agents to perform various tasks relating to processing and detainee movement); U.S. Supp. SOF 15.  Further, the Border Patrol station was dealing with a large number of detainees of various demographics who all needed to be processed, cared for, and transported out of custody as quickly as possible, all while responding to the continual surge of additional detainees being transported to and booked into the station and while still attempting to provide sufficient resources to front-line border enforcement.  *See supra* at 10-11; *see also* U.S. Opp. Ex. A Att. 5 (Jordan 80) (testifying that the Yuma Station had a limited number of agents to "accomplish processing everyone that was there and moving them out as expeditiously as possible"); *id*. at 145 (testifying that the systems and processes in place in Yuma were "to promote the efficiency and economy of the Government and move people through [the] facilities in as timely manner as efficiently as possible, all while balancing the challenges of maintaining border security at the same time."); U.S. Supp. SOF 13, 14, 15.  The manner in which the separations occurred necessarily are susceptible to these policy considerations.

Plaintiffs also state that in the Yuma Sector if a prosecution of a parent was declined or completed and their child remained in Border Patrol custody, Border Agents would not seek to reunify the parent and child.  Ps. MSJ 8. This is not material to Plaintiffs' claims, as their children were transferred from Border Patrol custody prior to their prosecutions being declined. U.S. MSJ SOF 49, 69, 84, 104, 120.  In any event, for these same reasons stated above, the DFE bars challenge to the decision whether to reunify and reprocess a parent and child as a family unit if a child was still present in the Border Patrol station after prosecution of the adult was declined or the sentence was completed.  As explained in the United States' motion for summary judgment, that decision was left to the policy-based discretion of the Border Patrol agents in the station.  *See* U.S. MSJ 15 n.12; U.S. MSJ Ex. A Att. 1 (McAleenan 94-95, 222, 293).  Such a scenario was a "rare occurrence" at the Yuma Station and thus the Yuma Station did not create a process for identifying when it occurred and how to address it.  *See* U.S. Opp. Ex. A Att. 5 (Jordan 174-175); U.S. Supp. SOF 16.  There is no doubt that agency officials and operators in the field could have reasonably concluded that, under certain circumstances, the best approach would have been to reunite the parent and child, rather than proceed with the transfer of the child to ORR custody.  But the decision not to create a process for that scenario was a policy decision: it involved balancing its relative infrequency with the amount of time and resources it would require for agents to review the system of records to identify any such instances and to reprocess the parent and child as a family unit and extend their time in Border Patrol custody while awaiting transportation.  *See* U.S. Opp. Ex. A Att. 5 (Jordan 206-210); *see also* U.S. Opp. Ex. A Att. 5 (Jordan 209-210) (additional time in custody "would have only slowed down the processing and the through-put on all the new individuals that were coming back and would have had second and third order effects there where it just compounded the amount of time that everyone that followed them was held in custody"); U.S. Supp. SOF 16.  Accordingly, this decision reflected a discretionary determination that was susceptible to policy analysis.

14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3. Plaintiffs' Challenge to the Planning and Preparation for the DHS Referral Policy Is Barred by the DFE

Plaintiffs also assert that "the government's" planning for increased enforcement actions pursuant to the DHS Referral Policy was inadequate.  Although Plaintiffs' motion raises a number of broad allegations regarding the government's policies and how those policies were applied to thousands of individuals during the zero-tolerance-policy period, Pls. MSJ 3-10, Plaintiffs' claims must necessarily be limited to the government's conduct as it applied to only the Plaintiffs themselves.[18]  And the DFE bars Plaintiffs' claims based upon alleged inadequacies in planning for the implementation of the DHS Referral Policy, including decisions regarding resources and staffing, and considerations of the sufficiency of then-existing processes and systems to track families after separation.  U.S. MSJ 12-13.

Claims based upon challenges to the agencies' tracking systems and the frequency of communications once Plaintiffs were placed in separate custody with ICE and ORR are barred by the DFE.  Prior to the DHS Referral Policy, there were processes and systems in place and previously utilized to capture family relationships, document when a separation occurred, and record the basis for the separation.  U.S. MSJ SOF 31.  Prior to implementation of the DHS Referral Policy, system enhancements were made to U.S. Border Patrol's "e3 system" to provide additional methods for capturing family relationships and documenting separations.  *See* U.S. Contr. SOF 10, 11.  Plaintiffs claim that these existing systems and processes were not up to the task of dealing with a larger volume of separations, but that is essentially a claim that the government should have taken a different policy approach.  Decisions relating to processes and systems for tracking individuals in federal custody (which, in this case, involved the custody of multiple agencies) are the sort of policy-based decision-making protected by the DFE.  *See* U.S. MSJ 12-13; *see also Campos v. United States*, 888 F.3d 724, 733 (5th Cir. 2018) (deficiencies in computer database system that failed to reveal immigration status protected

---

[18] Specifically, with respect to the documentation of the family relationships and separations, *see* U.S. MSJ SOF 46-48, 51 (for C.M. and B.M.); 66-68, 71 (for L.G. and B.G.); 81-83, 89 (for M.R. and J.R.); 99-101, 108 (for O.A. and L.A.); and 117-119, 124 (for V.C. and G.A).

by discretionary function exception); *Cruz v. United States*, 684 F. Supp. 2d 217, 224 (D.P.R. 2010) (dismissing claim that VA negligently designed and maintained inadequate computer systems and safeguards).[19]

Further, Plaintiffs' claims that challenge the frequency of communications during separation similarly are barred by the DFE.  Because the enforcement actions taken pursuant to the DHS Referral Policy that resulted in Plaintiffs' separations are covered by the DFE, the manner in which those separations were carried out, such as the degree of communications with and about their children, must also be protected.  *See Sloan v. H.U.D.*, 236 F.3d 756, 762 (D.C. Cir. 2001) (claims that are "inextricably tied" or "inextricably linked" to the conduct protected by section 2680(a) are also barred).  Even if, however, a claim based upon such communications could be parsed out from Plaintiffs' separations, the DFE nevertheless bars Plaintiffs' claims based on allegedly insufficient communications while in custody.  *See S.E.B.M. v. United States*, No. 1:21-cv-00095 --- F. Supp. 3d --- 2023 WL 2383784, at *16 (D.N.M. Mar. 6, 2023).  When a parent is in ICE custody and a child in the care of an ORR facility, the frequency and duration of communications is inherently limited based on a number of factors, including the adult's secure detention setting (and, at various times, being moved to various ICE facilities during the pendency of their removal proceedings), and the need for such communications to be coordinated and scheduled in advance given the protocols in place for communications with children in the care of an ORR facility.  *See id.* ("[I]mmigration detention involves unique security concerns that makes it difficult for detainees to be available for regular calls and thus flexibility is necessary."); U.S. MSJ Ex. F (De La Cruz Decl. ¶ 32).[20]

---

[19] As discussed in the United States' motion for summary judgment, inter-agency notice and planning occurred prior to adoption of the DHS Referral Policy, including several meetings with Secretary Nielsen; *see* U.S. MSJ SOF 10, 22, and there were pre-existing processes and practices related to all the various functions to be performed in carrying out the DHS Referral Policy, including establishing communications and reunification.  *Id.* at 31.  Further, guidance was provided regarding documentation of the family relationship and separation.  *Id.* at 32, 33.  Thus, it cannot be said that no efforts were made to plan and prepare for the DHS Referral Policy.

[20] *Accord Washington v. Reno*, 35 F.3d 1093, 1100 (6th Cir. 1994) (a detainee's right to telephone access is "subject to rational limitations in the face of legitimate

1

2

## II. Plaintiffs Cannot Establish Claims for Intentional Infliction of Emotional Distress Under Applicable State Law

Plaintiffs' IIED claims also fail because they are based on the lawful exercise of the federal government's law enforcement authority, which is privileged under state law. *See* U.S. MSJ 26-28. As discussed in the United States' motion for summary judgment, Arizona law does not provide for an IIED claim arising out of a lawful arrest and detention. *See Savage v. Boise*, 272 P.2d 349, 352 (Ariz. 1954); *accord Mintz v. Bell Atl. Sys. Leasing Inter., Inc.*, 905 P.2d 550, 563 (Ariz. Ct. App. 1995); *Lerner v. John Hancock Life Ins.*, No. cv-09-01933, 2011 WL 13185713, at *3 (D. Ariz. Mar. 21, 2011); Restatement (Second) of Torts § 46, comment g. Plaintiffs therefore cannot as a matter of law satisfy the first element of their claim ("extreme and outrageous" conduct). Moreover, there is at a minimum a dispute of material fact regarding whether the United States "intended to cause emotional distress or recklessly disregarded the near certainty that such distress would result." *Johnson v. McDonald*, 197 Ariz. 155, 160, 3 P.3d 1075, 1080 (1995). In sum, the asserted facts set forth by Plaintiffs in support of their claim for IIED as a matter of law do not satisfy the required elements of the tort.

### A. Law Enforcement Privilege Prevents Plaintiffs from Establishing "Extreme and Outrageous" Behavior

Plaintiffs cannot satisfy the first element of their claim, as a matter of law, because they challenge privileged law enforcement conduct. Plaintiffs must prove that the United States engaged in behavior that "falls at the very extreme edge of the spectrum of possible conduct." *Watts v. Golden Age Nursing Home*, 127 Ariz. 255, 258, 619 P.2d 1032, 1035 (1980). "Under this standard, even a defendant's 'unjustifiable' conduct does not necessarily rise to the level of 'atrocious' and 'beyond all possible bounds of decency' that would cause an average member of the community to believe it was 'outrageous.'" *Matson v. Safeway*, No. 12-8206, 2013 WL 6628257, at *4 (D. Ariz. Dec.

---

security interests" (*quoting Strandberg v. City of Helena*, 791 F.2d 744, 747 (9th Cir. 1986))); *see also Harrison v. Fed. Bureau of Prisons*, 464 F. Supp. 2d 552, 559 (E.D. Va. 2006) (the "provision of telephone services is a matter committed to its discretion that will not be second-guessed through an FTCA claim.").

17, 2013) (quoting *Nelson v. Phoenix Resort Corp*., 181 Ariz. 188, 199 (Ariz. App.1994)).  As a matter of law, Plaintiffs cannot show that the government's exercise of its law enforcement authority meets the "extremely high burden of proof for demonstrating intentional infliction of emotional distress in Arizona."  *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 747 (9th Cir. 2004).  *See also Demetrulias v. Wal-Mart Stores Inc*., 917 F. Supp. 2d 993, 1012 (D. Ariz. 2013) ("The adjectives 'extreme' and 'outrageous' are not just for show; evidence of callousness or insensitivity will not suffice.").

Plaintiffs argue that "the government acted in an extreme and outrageous manner by . . . adopting a policy under which migrant parents and children would be separated[.]" Pls. MSJ 16.  But they have not challenged the legality of the adult Plaintiffs' detention, and Arizona law does not permit IIED claims arising out of a lawful arrest and detention. *See Savage*, 272 P.2d at 352.  The cases Plaintiffs cite in support of their argument are inapposite, as they do not involve behavior that is comparable to a lawful enforcement action taken pursuant to statutory authority.[21]  Instead, it is well-established that a plaintiff's IIED claim must be viewed in the specific context in which the conduct occurs, and that the conduct, even if it "would otherwise be extreme and outrageous, may be privileged under the circumstances."  Restatement (Second) of Torts § 46 (1965).

Moreover, however unwise the policy that led to family separations, that officials in the current Administration have denounced the policy choices reflected in the DHS Referral Policy cannot itself be a basis, as Plaintiffs suggest, *see* Pls.' MSJ 1-2 & n.1, to find that it was "extreme and outrageous" as a matter of state law, which categorically precludes IIED claims based on lawful arrest and detention.[22]  And insofar as there is any

---

[21] *See Pankratz v. Willis*, 744 P.2d 1182 (Ariz. Ct. App. 1987) (case involving abduction of a child by former wife); *Kajtazi v. Kajtazi*, 488 F. Supp. 15 (E.D.N.Y. 1978) (case involving abduction of a child by former husband).  Plaintiffs also cite to *Carranza v. United States*, No. 3:12-cv-02255, 2013 WL 3333104 (D. Or. July 1, 2013), where the court's decision to not dismiss the IIED claim turned, in part, on accepting as true the allegation that the plaintiff was placed under arrest for improper purposes.

[22] Indeed, the statements pointed to by Plaintiffs are consistent with this Administration's clear condemnation of the DHS Referral Policy and expressions of regret for the consequences that ensued.  *See, e.g.*, U.S. MSJ at 1, 8.  The United States does not defend the wisdom of those policy choices, but it is for the Court to determine

18

relevance to Plaintiffs' contention "that prosecution was simply a pretext for the separation" (Pls. MSJ 9 n4), the record evidence concerning Secretary Nielsen's intentions precludes summary judgment in favor of Plaintiffs.  *See* U.S. MSJ 24; U.S. MSJ SOF 18, 19.

Nor can Plaintiffs establish an IIED claim based on the timing of Border Patrol's request for an ORR placement for unaccompanied children.  Pls. MSJ 18.  As explained, the timing of the ORR placement decision was a discretionary law enforcement determination that implicated multiple policy considerations, including minimizing the time that minors were forced to spend in Border Patrol custody.  *See supra* at 10-12; U.S. MSJ 13-17.

Plaintiffs also contend that the manner of their separations at the Yuma Border Patrol Station was extreme and outrageous because they were performed "in an inhumane manner[.]" Pls. MSJ 17, 20.  There is record evidence that controverts Plaintiffs' allegation, which at the very least creates a genuine issue of material fact as to the notice given to the Plaintiffs here and the conduct during separation.[23]  Notably, Plaintiffs do not bring a claim for battery.  But in any event, these allegations are insufficient because the separations were inextricably tied to lawful detentions shielded by law enforcement privilege.  *See supra* at 17-18.

Likewise, the amount of information provided and the frequency and duration of communications between the adult and minor Plaintiffs do not establish "extreme and outrageous" conduct.  The record evidence demonstrates that the adult and minor Plaintiffs communicated while in separate custody, and the minor Plaintiffs also

---

whether the alleged behavior in question was, under the circumstances, "extreme and outrageous" as a matter of law.  For the reasons explained, such discretionary policy choices do not give rise to tort liability under the FTCA or state law.

[23] For example, Border Patrol explained during the processing of the adult Plaintiffs and children that the children would be placed in separate custody, and Plaintiffs acknowledge they were detained together for some time prior to the transfer. *See* U.S. Opp. Ex. A Att. 6 (Comella 203-208); U.S. Opp. Ex. A At. 1(McAleenan 149); U.S. Supp. SOF 3.  There is also evidence controverting Plaintiffs' allegations of verbal mistreatment.  *See* U.S. Opp. Ex. A Att. 6 (Comella 29-30, 43, 203-208, 229-233, 401-402); U.S. Supp. SOF 5.

communicated with other non-detained family members.[24]  A district court recently held in another family separation case that the limited and brief calls that occurred while the adult and child were in separate custody were "reasonable" under the circumstances.  *See S.E.B.M.,* 2023 WL 2383784 *16.

Finally, Plaintiffs base their IIED claims, in part, on the duration of their separations.  Pls. MSJ 21.  However, the duration of their separations was a direct result of ICE's exercise of its unchallenged statutory authority to maintain custody of the adult Plaintiffs pending immigration proceedings, which the DHS Referral Policy did not constrain or otherwise change.  U.S. MSJ SOF 31.  Because the continued detention of the adult Plaintiffs following the criminal process was expressly authorized by federal statute, it cannot serve as the basis for an IIED claim under state law.[25]

### B.  Plaintiffs Have Not Established the Element of Intent

Regarding the second element of the IIED claim, Plaintiffs contend that "the government recklessly disregarded the near certainty that parents and children separated under the Policy would suffer severe emotional harm." Pls. MSJ 21.  Plaintiffs cannot prevail on summary judgment on this element for several reasons.

As an initial matter, Plaintiffs' IIED claim is premised on the impermissible assumption that the United States can be found liable for conduct by "the government" as a whole in planning, adopting, and implementing the DHS Referral Policy, when the FTCA has only waived sovereign immunity for the acts of individual employees.  The

---

[24] Regarding the communication while in separate custody, *see* U.S. MSJ SOF 60 (for C.M. and B.M.); 77 (for L.G. and B.G.); 95 (for M.R. and J.R.); 113 (for O.A. and L.A.); and 131 (for V.C. and G.A.).

[25] In arguing otherwise, Plaintiffs cite to cases applying a "shock the conscience" test on a motion to dismiss involving allegations accepted as true regarding allegedly improper government motives, and lack of legitimate objectives in maintaining custody of parents separately from their children.  *See* Pls. MSJ 18 n.7, 21. However, this case is no longer at the motion to dismiss phase, and thus no longer requires accepting as true Plaintiffs' allegations that the DHS Referral Policy lacked any permissible governmental objectives.  *See* U.S. MSJ 17-20; U.S. MSJ SOF 18, 19.  Moreover, Plaintiffs expressly state that their motion for partial summary judgment is predicated on the government's alleged recklessness, not ill intent, *see* Pls. MSJ 2 n.1 & 8 n.3, making the cases upon which Plaintiffs purportedly rely all the more inapposite.

20

claimed facts are not material because they do not focus on the actual decision-maker: Secretary Nielsen.  Pls. MSJ 3-5, 21-22.[26]  Plaintiffs' only attempt to establish a disregard of emotional distress by Secretary Nielsen is based upon information contained in letters from various organizations, informing "the government" that separations of parents and child would cause harm.  Pls. MSJ 5, 22.  Plaintiffs have not established that those letters were actually received by Secretary Nielsen.[27]

But even if this information (or the views contained therein) were brought to her attention, that is not a sufficient basis on which to grant summary judgment on this element.  The assessment of an IIED claim must account for the context in which the claim arises.  And here, the context involves a high-level federal law enforcement policy, where even the Plaintiffs have not challenged the legality of the adult Plaintiffs' detention under that policy.  In that context, a host of factors must be weighed and accounted for, as with any law enforcement conduct.  For that reason, privileged conduct cannot give rise to an IIED claim, even if the law enforcement actor "is well aware that [assertion of the privileged conduct] is certain to cause emotional distress."  Restatement (Second) of Torts § 46 cmt. g (1965).  Moreover, here, there is evidence in the record that when the relevant decisionmaker (Secretary Nielsen) adopted the DHS Referral Policy, she considered a variety of factors, including the impact on families, ORR's established system of care of minors, the systems and processes already in place to facilitate communications, *see* U.S. MSJ SOF 10, 20, 42, and countervailing law enforcement, national security interests, resource considerations, and humanitarian concerns, U.S. MSJ SOF 11-14, 19; U.S. MSJ 11-12.  In particular, there is record evidence that when she

---

[26] Specifically, Plaintiffs refer to letters from Congress and other organizations sent in March 2017 to then-Secretary Kelly, Pls. MSJ 3, 22, who left the position of Secretary over a year before the DHS Referral Policy was adopted; comments made by a U.S. magistrate in November of 2017, Pls. MSJ 4, to unspecified recipients and prior to the appointment of Secretary Nielsen; and letters from various organizations in December 2017 to the Acting DHS Inspector General, Pls. MSJ 4-5, 22.

[27] *See* U.S. Contr. SOF 14; U.S. Opp. Ex. A Att. 3 (DHS 30(b)(6) 275-277); U.S. Opp. Ex. B.

21

considered these factors, she had not understood there to be a near certainty that the Referral Policy would cause severe emotional distress.  U.S. Opp. Ex. B at 42-43.  Accordingly, at a minimum, there is a genuine issue of material fact that would preclude granting summary judgment to the Plaintiffs on this element.

Plaintiffs' assertion that the Border Patrol agents involved in the separations of Plaintiffs acted with reckless disregard of the near certainty of severe emotional distress also fails.  Pls. Opp. 22.  For the reasons already noted *supra*, Border Patrol agents' transfers of Plaintiffs to separate custodial facilities is privileged.  Further, Plaintiffs cannot attribute reckless disregard to Yuma Border Patrol agents collectively, given that the various tasks relating to processing, custody management, and detainee movement were handled by multiple agents, *see* U.S. Supp. SOF 15, the challenging circumstances under which such agents were operating, *see* U.S. Supp. SOF 14 and supra at 13-15, and the lack of information knowable to each agent regarding the duration of ORR custody, *see* U.S. Supp. SOF 3, 6.   Moreover, as the United States has demonstrated, Yuma Border Patrol agents documented Plaintiffs' family relationships and separations to facilitate tracking and communications as well as reunification once Plaintiffs were in separate custodial facilities.  *See* U.S. MSJ SOF 46-48, 51, 66-68, 71, 81-83, 89, 99-101, 108, 117-119, 124; *see also* U.S. Supp. SOF 3.

**III.    Plaintiffs Cannot Establish Claims for Negligence**

Plaintiffs also seek to hold the United States liable for negligence, on the theory that "the government" breached its duty of care to Plaintiffs by transferring the adult and minor Plaintiffs to separate custodial facilities "in a manner that was unnecessarily cruel", providing allegedly inadequate communications while in separate custody, and allegedly lacking reunification plans.  Pls. MSJ 23-26.  Plaintiffs' negligence claim is premised on privileged conduct under state law and is otherwise barred by the DFE.  As explained in the United States' motion for summary judgment, the DFE bars Plaintiffs' claims, and Plaintiffs cannot overcome that exception by alleging a constitutional violation because they have not shown that the government violated a constitutional right

that was clearly established and specifically prescribed at the time of the alleged conduct. U.S. MSJ 23-26.  But even if this Court concludes otherwise on the IIED claim, Plaintiffs' constitutional path around the DFE would not extend to their negligence claim. This is because a substantive Due Process Clause violation cannot be premised on negligent conduct.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).

In addition, Plaintiffs have failed to establish the elements of a negligence claim under state law.  In order to maintain a negligence claim, "a plaintiff must prove four elements: (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007).  Furthermore, a plaintiff cannot recover for the same conduct under both a negligence theory and an intentional tort theory.  "Any given act may be intentional or it may be negligent, but it cannot be both.  Intent and negligence are regarded as mutually exclusive grounds for liability."  *Lewis v. Dirt Sports LLC*, 259 F. Supp. 3d 1039, 1046 (D. Ariz. 2017).

As to their placements in separate custody, Plaintiffs do not dispute that they were lawfully arrested and detained.  Plaintiffs cite to no authority that Arizona law imposes a duty to maintain a parent and child together in custody during the criminal referral or prosecution process, or while the adult is being held in secure detention pendency federal immigration proceedings.  *See E.L.A. v. United States*, No. 2:20-cv-1524, 2022 WL 2046135 *6 (W.D. Wash. June 3, 2022) (dismissing negligence claim because plaintiffs could not identify duty under state law to maintain family unity during detention).  The only "duty" of family unity that Plaintiffs have pointed to throughout this litigation allegedly arises from the Constitution, not state law.  But the Constitution cannot be the source of an actionable duty in suits brought under the FTCA; rather, the duty must arise under state law. *See FDIC v. Meyer*, 510 U.S. 471, 478 (1994) ("[T]he United States . . .

23

1

has not rendered itself liable under [the FTCA] for constitutional tort claims.").[28]

2

Plaintiffs also seek to hold the United States liable for negligence based upon the

3

durations of their separations.  *See* Pls. MSJ 25 ("*the government* . . . did not reunite them

4

until required by court order to do so[.]" (emphasis added).  In their motion, Plaintiffs

5

appear to argue that the durations of their separations violated a standard found in CBP's

6

manual titled "National Standards on Transport, Escort, Detention, and Search"

7

("TEDS"), which states, among other things, that "CBP will maintain family unity to the

8

greatest extent operationally feasible, absent a legal requirement or an articulable safety

9

or security concern that requires separation."  Pls. MSJ 25 n.10 (citing TEDS ¶¶ 1.9, 4.3).

10

The TEDS manual is irrelevant, however, because Plaintiffs fail to establish that a duty

11

exists in the first place under state law to maintain family unity while in detention.  In any

12

event, Plaintiffs fail to establish that the duration of their separation violated the TEDS

13

manual because it applies only to "*CBP's* interaction with detained individuals," *see*

14

TEDS at p. 3 (emphasis added).  Here, the adult Plaintiffs were detained by *ICE* during

15

the pendency of their immigration proceedings; CBP thus played no role with respect to

16

the length of their detention.

17

Plaintiffs also fail to carry their burden of establishing the applicable standard of

18

care under which the Court would be required to assess the defendant's conduct and any

19

alleged breach of the identified state law duty.  *See Ramirez v. Glendale Union High Sch.*

20

*Dist. No. 205*, No. 03-0060, 2006 WL 8439630 *4 (D. Ariz. Sept. 20, 2006) (plaintiff did

21

not meet his burden of establishing the standard of care and therefore could not maintain

22

his state law negligence claim as a matter of law); *Petty v. Arizona*, No. CV-15-0133,

23

2018 WL 2220665, at *3 (D. Ariz. May 15, 2018) (granting summary judgment for

24

defendant where plaintiff failed to provide evidence of standard of care in custodial

25

setting); *Harris v. United States*, No. CV-19-0024, 2021 WL 2334385 (D. Ariz. June 8,

26

27

28

_____

[28] Indeed, cases arising from alleged breaches to a right to familial association treat such claims as constitutional claims.  *See, e.g., Keates v. Koile*, 883 F.3d 1228, 1236-38 (9th Cir. 2018); *Daurio v. Arizona Department of Child Safety*, No. CV-18-03299, 2020 WL 6940812 *3 (D. Ariz. Nov. 25, 2020).

2021) ("The burden is on a plaintiff to establish the applicable standard of care.") (quoting *Kalar v. MacCollum*, 496 P.2d 602, 604 (Ariz. 1972)).  Plaintiffs have provided no evidence regarding the standard of care (or breach thereof) under Arizona law with respect to the timing and manner of Border Patrol's request for ORR placement of the minor Plaintiffs upon initiation of the prosecution referral process of the adult Plaintiffs or carrying out a transfer of custody.

Finally, with respect to communications between the adult and minor Plaintiffs while in separate custody, Plaintiffs argue that the applicable standard of care is supplied by ICE's Performance-Based National Detention Standard, Section 5.6(V)(E)(3), which states that indigent detainees "may request a call to immediate family or others in personal or family emergencies or on an as-needed basis," and by the *Flores* Agreement, which provides that children are to have "contact with family members who were arrested with the minor."  Pls. MSJ 25 n. 10.  Even assuming *arguendo* that these provisions could supply the applicable standard of care under *state* law, Plaintiffs have presented no evidence that either of these standards were not met.  *See S.E.B.M.,* 2023 WL 2383784 *16 (finding that the limited and brief calls that occurred satisfied these provisions and were reasonable under the circumstances).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for partial summary judgment should be denied.

Dated: April 24, 2023                    Respectfully Submitted,


                                         BRIAN M. BOYNTON
                                         Principal Deputy Assistant Attorney General

                                         JAMES G. TOUHEY, JR.
                                         Director, Torts Branch

                                         *s/ Phil MacWilliams*
                                         PHILIP D. MACWILLIAMS
                                         Trial Attorney

D.C. Bar No. 482883
E-mail: phil.macwilliams@usdoj.gov
U.S. Department of Justice
Civil Division, Torts Branch
Benjamin Franklin Station, P.O. Box 888
Washington, DC 20044
Telephone: (202) 616-4285
Attorneys for the United States of America

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I hereby certify that on April 24, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

*s/ Phil MacWilliams*
PHILIP D. MACWILLIAMS
Attorney for United States of America

27