David B. Rosenbaum (009819)
Travis C. Hunt (035491)
BriAnne N. Illich Meeds (036094)
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
Telephone: (602) 640-9000
drosenbaum@omlaw.com
thunt@omlaw.com
billichmeeds@omlaw.com
*Counsel for C.M. Plaintiffs*

*(Additional Counsel for Plaintiffs Listed on the Signature Page)*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| C.M., on her own behalf and on behalf of her minor child, B.M.; et al. | No. 2:19-cv-05217-SRB |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| United States of America, | **[ORAL ARGUMENT REQUESTED]** |
| Defendant. | |

# <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 2

A.      GOVERNMENT OFFICIALS PURSUED FAMILY SEPARATION TO DETER IMMIGRATION EVEN THOUGH THEY KNEW IT WAS CRUEL AND CONTRARY TO LAW ................................................................................................ 2

B.      FAMILY SEPARATION IS FINALLY APPROVED IN MAY 2018 WITH THE LEGAL COVER OF PROSECUTION: "████████████████ ████████████████" ................................................................................................ 6

C.      GOVERNMENT OFFICIALS IGNORED REPEATED WARNINGS THAT SEPARATIONS WOULD CAUSE SEVERE EMOTIONAL DISTRESS AND THAT THEY WERE UNABLE TO TRACK OR FACILITATE COMMUNICATION BETWEEN SEPARATED FAMILY MEMBERS ............................ 9

D.      THE GOVERNMENT CRUELLY SEPARATED PLAINTIFF FAMILIES AND DID NOT REUNIFY THEM FOR MONTHS. ................................................................ 10

ARGUMENT ......................................................................................................................... 13

I.      PLAINTIFFS' CLAIMS ARE NOT INSTITUTIONAL TORT CLAIMS ......................... 13

II.      THE DFE DOES NOT APPLY HERE ............................................................................. 16

      A.      The DFE Does Not Bar Plaintiffs' Claims Because the Government's Separation of Plaintiff Families Was Unconstitutional ............................................. 17

            1.      The challenged conduct violated Plaintiffs' constitutional right to family integrity and thus was not discretionary. ............................................. 17

            2.      The *Bivens* qualified-immunity framework does not apply ........................... 21

      B.      The designation of Plaintiff Children as UACs violated the TVPRA and thus was not discretionary. ............................................................................................ 22

      C.      The Challenged Conduct Is Not of the Kind that the DFE Was Designed to Shield ............................................................................................................................. 24

III.      PLAINTIFFS HAVE ADDUCED SUFFICIENT EVIDENCE TO SUPPORT THEIR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM ............... 26

CONCLUSION ...................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.F.P. v. United States,*
  No. 1:21-CV-780, 2022 WL 2704570 (E.D. Cal. July 12, 2022) ...............................14, 15

*ARA Leisure Servs. v. United States,*
  831 F.2d 193 (9th Cir. 1987) ...................................................................................... 25

*B.A.D.J. v. United States,*
  No. 21-CV-00215, 2022 WL 11631016 (D. Ariz. Sept. 30, 2022)...................................15

*Bear Medicine v. United States,*
  241 F.3d 1208 (9th Cir. 2001) ................................................................................ 23, 25

*Berkovitz v. United States,*
  486 U.S. 531 (1988) ................................................................... 17, 22, 23, 24

*Bivens v. Six Unknown Fed. Narcotics Agents,*
  403 U.S. 388 (1971) ...................................................................................16

*C.D.A. v. United States,*
  Civ. No. 21-469, 2023 WL 2666064 (E.D. Pa. Mar. 26, 2023) ...................................... 23

*Caban v. United States*
  728 F.2d 68 (2d Cir. 1984) ......................................................................... 28

*Cnty. of Sacramento v. Lewis,*
  523 U.S. 833 (1998) ................................................................ 18, 19, 20

*D.B. v. Cardall,*
  826 F.3d 721 (4th Cir. 2016) ...................................................................... 24

*D.B. v. Poston,*
  119 F. Supp. 3d 472 (E.D. Va. 2015) ........................................................ 24

*D.J.C.V. v. United States,*
  605 F. Supp. 3d 571 (S.D.N.Y. 2022) .............................................. 18, 21, 22, 24

*Dillard Dep't Stores v. Silva,*
  106 S.W.3d 789 (Tex. App. 2003) ............................................................. 28

*Doe v. Oesterblad,*
  No. 13-CV-1300, 2015 WL 12940181 (D. Ariz. June 9, 2015)...................................... 29

*E.C.B. v. United States*,
    No. 22-CV-915, slip op. (D. Ariz. Nov. 8, 2022) .............................................. 15

*E.S.M. v. United States*,
    No. 21-CV-029, 2022 WL 11729644 (D. Ariz. Oct. 20, 2022) ........................15

*F.R. v. United States*,
    No. 21-CV-339, 2022 WL 2905040 (D. Ariz. July 22, 2022) .................................. 15, 21

*Fuentes-Ortega v. United States*,
    No. 22-CV-449, 2022 WL 16924223 (D. Ariz. Nov. 14, 2022) ........................15

*Galicia v. United States*,
    No. 13-CV-0105, 2015 WL 12696086 (D.N.M. Feb. 24, 2015)....................... 28

*Gasho v. United States*,
    39 F.3d 1420 (9th Cir. 1994) ....................................................................... 26

*Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*,
    380 F.3d 872 (5th Cir. 2004) ........................................................................ 20

*Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*,
    319 F. Supp. 3d 491 (D.D.C. 2018) ...................................................... 18, 24

*K.O. v. United States*,
    No. 4:20-CV-12015, 2023 WL 131411 (D. Mass. Jan. 9, 2023) ................... 18, 24

*Lee v. United States*,
    No. 19-CV-08051, 2020 WL 6573258 (D. Ariz. Sept. 18, 2020)....................15

*Lewis v. Dirt Sports LLC*,
    259 F. Supp. 3d 1039 (D. Ariz. 2017) ...........................................................29

*Loumiet v. United States*,
    828 F.3d 935 (D.C. Cir. 2016) .................................................................... 21

*Maldonado v. Lloyd*,
    No. 18-CV-3089, 2018 WL 2089348 (S.D.N.Y. May 4, 2018).......................23

*Meier v. United States*,
    No. 05-CV-4404, 2006 WL 3798160 (N.D. Cal. Dec, 22, 2006) .................... 16

*Miller v. United States*,
    163 F.3d 591 (9th Cir. 1998) ................................................................. 16, 22

*Mintz v. Bell Atl. Sys. Leasing Intern., Inc.*,
    905 P.2d 559 (Ariz. Ct. App. 1995) .........................................................28, 29

*Ms. L. v. U.S Immigr. & Customs Enf't*,
   302 F. Supp. 3d 1149 (S.D. Cal. 2018) ...................................................................... 18, 19

*Ms. L. v. U.S Immigr. & Customs Enf't*,
   310 F. Supp. 3d 1133 (S.D. Cal. 2018), *modified*, 330 F.R.D. 284 (S.D. Cal.
   2019)................................................................................................... 9, 18, 24, 30

*Myles v. United States*,
   47 F.4th 1005 (9th Cir. 2022) .......................................................... 16, 20, 24, 25

*Nurse v. United States*,
   226 F.3d 996 (9th Cir. 2000) ................................................................................... 17

*Reyna as Next Friend of J.F.G. v. Hott*,
   921 F.3d 204 (4th Cir. 2019) ................................................................................... 18

*Pankratz v. Willis*,
   744 P.2d 1182 (Ariz. Ct. App. 1987) ...................................................................... 30

*Porter v. Osborn*,
   546 F.3d 1131 (9th Cir. 2008) ................................................................................. 21

*Quilloin v. Walcott*,
   434 U.S. 246 (1978) ................................................................................................. 17

*R.I.L.R v. Johnson*,
   80 F.Supp.3d 164 (D.D.C. 2015) ............................................................................ 19

*Rhoden v. United States*,
   55 F.3d 428 (9th Cir. 1995) ..................................................................................... 28

*Rosales-Mireles v. United States*,
   138 S. Ct. 1897 (2018) ....................................................................................... 19, 20

*Rosenbaum v. Washoe Cty.*,
   663 F.3d 1071 (9th Cir. 2011) ................................................................................. 17

*Ruiz v. United States*,
   No. 13-CV-1241, 2014 WL 4662241 (E.D.N.Y. Sept. 18, 2014) ........................... 25

*S.E.B.M. v. United States*,
   No. 1:21-cv-00095, 2023 WL 2383784 (D.N.M. Mar. 6, 2023)........................ 26, 28

*Savage v. Boies*,
   272 P.2d 349 (1954) ................................................................................................. 27

*Troxel v. Granville,*
    530 U.S. 57 (2000) ............................................................................ 17

*United States v. Gaubert,*
    499 U.S. 315 (1991) ..................................................... 16, 17, 22, 24

*Velasquez v. United States,*
    No. 00-CV-036, 2002 WL 32818333 (D. Ariz. Sept. 26, 2002) ...................... 28

*W.S.R. v. Sessions,*
    318 F. Supp. 3d 1116 (N.D. Ill. 2018) ............................................ 30

*Whisnant v. United States,*
    400 F.3d 1177 (9th Cir. 2005) ..................................................... 25

*Wilbur P.G. v. United States,*
    No. 4:21-CV-04457, 2022 WL 3024319 (N.D. Cal. May 10, 2022) .............. 14, 15

**Statutes**

6 U.S.C. § 279(g)(2) ................................................................... 22, 23

8 U.S.C. § 1232(b)(3) ...................................................................... 22

8 U.S.C. § 1232(g) ......................................................................... 22

8 U.S.C. § 1325 ............................................................................. 6

18 U.S.C. § 3501 ........................................................................ 11, 13

42 U.S.C. § 1983 ........................................................................... 16

Federal Tort Claims Act ............................................................. *passim*

Trafficking Victims Protection Reauthorization Act ................................. *passim*

## **PRELIMINARY STATEMENT**

The record provides ample evidence to support a finding at trial that government officials intentionally inflicted severe emotional distress on Plaintiffs by separating them in a cruel and outrageous manner, including by ripping Plaintiff children from their mothers' arms and taunting the mothers when they showed signs of distress, failing to provide Plaintiffs with information about one another's whereabouts, failing to facilitate communication between Plaintiff mothers and children for weeks or months, and failing to reunite them until required to do so by a court order. The government officials' conduct in separating Plaintiffs—despite never prosecuting the adult Plaintiffs—was not an exercise of prosecutorial discretion or enforcement of immigration law, but rather aimed to deter other asylum-seekers from entering the United States, and officials compounded the trauma Plaintiffs suffered by failing to provide Plaintiffs with even a minimal level of care. Plaintiffs are entitled to compensation under the Federal Tort Claims Act ("FTCA") for their extraordinary harms.

In its motion for summary judgment, the government does little to address these facts. Instead, the government largely rehashes the very same arguments it made in moving to dismiss the Complaint—arguments this Court rejected. The government's principal argument is that Plaintiffs' claims are barred by the discretionary function exception ("DFE"). But this argument is predicated on the government's mischaracterization of the challenged conduct. The government claims Plaintiffs challenge the decisions to refer for prosecution individuals who were "amenable to prosecution" and to detain Plaintiff mothers in immigration detention. But that is not the case Plaintiffs have brought, and the government's arguments do not support dismissal of Plaintiffs' *actual* claims—that the government used the possibility of prosecution as a pretext to separate Plaintiffs for months.

Indeed, in rejecting the government's DFE arguments in its motion to dismiss, this Court concluded that the government's argument "rests on [a] false premise" because the government was not "enforcing federal law when it separated Plaintiffs" or "simply exercising prosecutorial discretion," and found that Plaintiffs "plausibly alleged that the government's separation of their families violated their constitutional rights, which is not shielded by the

[DFE]." ECF 31 (citations omitted). Since then, Plaintiffs have developed substantial evidence to support, completely, the allegations in the Complaint, confirming the correctness of the Court's prior ruling that the DFE does not apply.

The government's remaining arguments—that Plaintiffs assert impermissible "institutional" tort claims and fail to establish a claim for intentional infliction of emotional distress—ignore decisions from numerous courts in this Circuit rejecting them and distort the facts. The government's motion should be denied.

## FACTUAL BACKGROUND

In addition to the following facts, Plaintiffs incorporate by reference the facts from their Statement of Undisputed Material Facts ("Pls. 56.1"), ECF 379, filed in support of Plaintiffs' Motion for Partial Summary Judgment ("Pls. Mot."), ECF 378.

### A.   Government Officials Pursued Family Separation to Deter Immigration Even Though They Knew It Was Cruel and Contrary to Law

In one of his first acts as President, Donald Trump signed Executive Order No. 13767, titled "Border Security and Immigration Enforcement Improvements," the purpose of which was "to prevent further illegal immigration into the United States" along the "southern border." Ex. 27 to Declaration of Diana E. Reiter, at 1. Less than three weeks after the order was signed, U.S. Customs and Border Protection ("CBP") Commissioner Kevin McAleenan organized an interagency meeting at CBP headquarters on February 14, 2017, where he and U.S. Immigration and Customs Enforcement ("ICE") employees, including Executive Associate Director Matthew Albence, proposed separating families to deter immigration pursuant to that order's directives. *See* Pls. 56.1 ¶ 1 (citing Fidler Ex. 86, McAleenan Tr. at 112:22-113:4)*;* Reiter Ex. 2, White Tr. at 82:1-16 ████████████████████████ ████████████████████████████████████████████ *see also* Pls. Resp. ¶ 11. Under the proposal, DHS would ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████ Fidler Ex. 2, Swartz Tr. at 11:18-23; Pls. Resp. ¶ 11.

The purpose of the proposal was ███████████████████████

██████████████████████████████ Fidler Ex. 2, Swartz Tr. at 11:24-12:2; *id*. at

14:1-13 ████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ *see generally* Pls. Resp. ¶ 11. Captain Jonathan White, Deputy

Director for Children's Programs at ORR, who attended the meeting, testified of the

proposal: ████████████████████████████████████████████████

███████████████. Resp. ¶ 11 (citing Reiter Ex. 2, White Tr. at 105:15-106:1). Some of those in

attendance were horrified. *See, e.g.*, Fidler Ex. 2, Swartz Tr. at 13:5-25; Reiter Ex. 2, White

Tr. at 106:3-107:7.

Over the next few weeks, DHS employees exchanged drafts of a white paper

outlining the family separation proposal discussed at the February 14, 2017 meeting. *See*

Reiter Exs. 79, 28-31, 39, 60. Senior government officials, including Acting ICE Director

Thomas Homan, discussed the proposal with DHS Secretary John Kelly. Reiter Ex. 3,

Hamilton Tr. at 71:7-73:5; 74:6-75:3; 76:6-12; 113:3-117:16. Kelly publicly confirmed that

DHS was considering separating families to deter immigration on March 6, 2017: "Yes, I

am considering [that], in order to deter more movement along this terribly dangerous

network, I am considering exactly that." Pls. 56.1 ¶ 2; *see also id*. (quoting Kelly's notes:

████████████████████████████████████████████████████████

Kelly's announcement was met with immediate public backlash. Nonprofit

organizations, members of Congress, and concerned citizens sent letters to DHS officials

condemning the proposal. *See, e.g.*, Pls. 56.1 ¶¶ 3-5; Pls. Resp. ¶ 18. These letters, including

letters received by Kirstjen Nielsen and Homan, emphasized that separating families would

cause severe harm to children. *See id.* Government officials nevertheless pursued the policy.

In response to an email from McAleenan reporting an increase in family unit apprehensions

along the southwest border, Homan wrote to Gene Hamilton, the immigration counselor to

the DHS Secretary: "we need to discuss my proposal for separation." Pls. Resp. ¶ 11 (citing

Reiter Ex. 81). Around that same time, U.S. Border Patrol ("BP") launched a pilot program

("Pilot") in the El Paso Sector, under which BP agents presented for prosecution all adults who entered the country without inspection, including those traveling with children, for misdemeanor unlawful entry under 8 U.S.C. § 1325. Pls. 56.1 ¶ 6. Under the Pilot, a parent was referred for prosecution, BP agents separated the parent from their child, and the child was deemed an Unaccompanied Alien Child ("UAC") and sent to ORR. *Id*. ¶ 7. The Pilot's purpose was to provide ██████████████████ Fidler Ex. 82 at 3.

McAleenan, Albence, and other high-ranking DHS officials including Acting Secretary Elaine Duke discussed family separation during an August 17, 2017 immigration priorities meeting. Pls. Resp. ¶ 11 (citing Reiter Exs. 32, 42; *id*. Ex. 1, McAleenan Tr. at 151:3-15; *id*. Ex. 3 Hamilton Tr. at 108:3-25; *id*. Ex. 104, Albence Tr. at 104:15-105:8). Tom Blank, Homan's chief of staff, reported that "no authorization to separate families" was given at the meeting, and instead there were "calls for paper and 'kicking the can down the road.'" Pls. Resp. ¶ 11 (citing Reiter Ex. 80). DHS's Office of Policy ("DHS Policy") was ████████████████████████████████████████████ ████████████████████████████ Reiter Ex. 3, Hamilton Tr. at 151:8-152:24; *see also id*. Ex. 5, Dougherty Tr. at 114:5-120:7. On August 17, 2017, DHS Policy circulated a draft memorandum ("Separation Memo"), which listed pros and cons of the proposal. Pls. Resp. ¶ 11 (citing Reiter Ex. 43 at 3). On September 5, 2017, DHS Policy circulated a revised draft of the Separation Memo, which objected to █████████████████████ ████████████████████████████████████████████ ███████████████████████████████ Reiter Ex. 38; Pls. Resp. ¶ 16. Blank forwarded the revised Separation Memo to Homan stating: "It is a strong statement of opposition to what ICE wants to do in terms of separating families." *Id*. ¶ 11 (citing Reiter Ex. 76). Homan responded, "Well, I am not giving up. I will fight it." *Id*. (citing Reiter Ex. 35). The next day, DHS Policy circulated a revised Separation Memo which was stripped of the detailed objections previously included; the revised version noted only ████████████████████████████████████████████ ████████████████████████████. *Id*. ¶ 16 (citing Reiter Ex. 45).

1     DHS Policy finalized the Separation Memo on October 17, 2017, and sent it to CBP,

2    ICE, and DHS's Office of General Counsel ("OGC") through DHS's formal Executive

3    Secretary process. *Id*. ¶ 16; *see also* Reiter Ex. 5, Dougherty Tr. at 140:22-141:19. The final

4    memorandum, titled "Limiting Reliance on Family Detention," set forth ICE's proposal to

5    ████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████

7    Reiter Ex. 46 at 1-2. The purpose of the proposal was to ████████████████

8    ████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████

10    ████████████████████████████████████ *See* Pls. Resp. ¶ 16.

11     Homan, McAleenan, and Albence were undeterred. In advance of a November 22,

12    2018 Immigration Priorities Meeting, Albence signed off on a briefing memo for Duke that

13    ████████████████████████████████████████████████████████

14    ██████████. *See* Reiter Ex. 67 (memo cleared by Albence); *see also id*. Ex. 68 (explaining

15    purpose of meeting). On December 11, 2017, Homan and McAleenan briefed the recently-

16    confirmed Secretary Nielsen on that proposal ████████████████████████

17    ████████████████████████████████████ Pls. Resp. ¶ 11 (citing Reiter

18    Ex. 48 at CD-US-0035388-91; CD-US-0035405 ████████████████████████

19    ████████████████████████████████████████████████████████

20    ██████████████████████); *see also* Reiter Ex. 7, Homan Tr. at 146:5-148:24; 150:10-15;

21    152:5-14; 154:8-12; *id*. Ex. 47; *id*. Ex. 69 at 1-3 ████████████████████

22    ████████████████████████████████████████████████████████

23    ████████████. Over the next several months, Nielsen, McAleenan, Homan, Albence, and

24    others continued discussing the proposal. *See* Pls. Resp. ¶ 11; Reiter Exs. 53-57; *id*. Ex. 3,

25    Hamilton Tr. at 174:5-177:25; *id*. Ex. 8, Wolf Tr. at 165:18-168:22; 182:9-184:1; 203:13-

26    24.

**B.      Family Separation Is Finally Approved in May 2018 With the Legal Cover of Prosecution: ███████████████████████████████████"**

On April 6, 2018, Attorney General Jeff Sessions announced the Zero Tolerance Policy, which directed southwest border U.S. Attorney's offices ("USAOs") "in consultation with DHS—to adopt immediately a zero-tolerance policy for all offenses referred for prosecution under [8 U.S.C. §] 1325(a)." Pls. 56.1 ¶ 17. Approximately two weeks later, McAleenan, Homan, and other senior DHS officials sent Nielsen a memorandum titled "Increasing Prosecutions of Immigration Violations," which proposed three options for implementing the Zero Tolerance Policy ("DHS Referral Memo"). *Id*. ¶ 18. The Memo was accompanied by a legal analysis of the proposal prepared by OGC attorney John Mitnick, Reiter Ex. 78 at 8-11, which reportedly explained that the government's "legal position" on "separating adults and children through the immigration process. . .is likely strongest [when] separation occurs in connection with a referral of an adult family member for criminal prosecution." Reiter Ex. 98 (article published by Scott Shuchart, former senior adviser in the DHS Office of Civil Rights and Civil Liberties). On May 4, 2018, Nielsen signed off on Option 3, the option McAleenan and Homan recommended, under which BP sectors along the southwest border "were directed to refer…***all*** amenable adults" for prosecution under 8 U.S.C. § 1325, regardless of family unit status ("DHS Referral Policy"). Pls. 56.1 ¶ 20 (emphasis added); *see also id*. ¶¶ 21-28.

With the legal cover of prosecution, family separation was given the green light. At the time Nielsen signed the memo, she understood that authorizing Option 3 would mean ██████████████████████████████████ Pls. 56.1 ¶ 25; Reiter Ex. 102, Wolf Tr. at 265:6-15. Notes from a meeting on implementation of the policy explained in no uncertain terms: ████████████████████████████████ Pls. Resp. ¶ 11 (citing Reiter Ex. 26 at 3). Employees across agencies, including those charged with implementing the DHS Referral Policy, routinely referred to the policy as "family separation," betraying that separation— not prosecution—was the goal. *See id*. ¶ 11 (citing, e.g., Reiter Ex. 72 (call notes from call between Sessions and U.S. Attorneys stating ██████████████████████████ *id*. Ex. 25

(May 2018 draft memo from Johnson to Albence: ███████████████████████ ███████████████████████████)

Indeed, in practice DHS separated families regardless of whether the parents were prosecuted or ever placed in criminal custody, and even though DHS officials understood that many separated parents would not be prosecuted. In Yuma, BP agents were directed to separate children from any parent deemed "amenable" to prosecution. Pls. Resp. ¶ 42 ("Q. [A]s of May of 2018, is it accurate to say that, regardless of what happened with the prosecution, your directive was to separate parents and children? A. Those amenable, yeah."); *id*. ¶¶ 9, 11, 26; Pls. 56.1 ¶¶ 40, 42. Any parent suspected of crossing the border without inspection was considered "amenable to prosecution." Pls. Resp. ¶¶ 9, 11, 26, 31, 37; *see also* Reiter Ex. 10, Jordan Tr. at 59:23-60:4; *id*. Ex. 11, Agent C Tr. at 157:22-158:5.

BP agents were, therefore, directed to separate families regardless of the status of the parent's prosecution referral, and families were separated even when BP did not refer the parent for prosecution or the USAO declined to prosecute. *See* Pls. Resp. ¶ 9 (adults were "amenable for prosecution" even if no referral had been made and even if USAO declined to prosecute); *id*. ¶ 40 (Yuma BP agents knew USAO might not prosecute adults referred for prosecution, and separated families before USAO had decided whether to prosecute); *see also id*. ¶¶ 11, 26, 35, 37, 42 (describing process). BP officers were required to separate families even where the officers knew the prosecution referrals were flawed or otherwise would not be accepted. *See id*. ¶¶ 9, 11, 42, 45, 54, 63, 80, 98; Pls. 56.1 ¶ 42 (Yuma BP agent agreed that "in May 2018, if you noticed a problem with a criminal case, your instructions were…to still refer those cases to the U.S. Attorney's Office"). If BP agents missed critical deadlines which meant the parent could not be prosecuted, such as failing to timely refer cases to the USAO such that the parent's criminal complaint could be filed within 48 hours of apprehension, the agents nevertheless deemed the child "unaccompanied," referred the child to ORR, and separated the family. *See* Pls. Resp. ¶¶ 9, 11, 54, 63, 80, 98; *see also id*. ¶¶ 45, 49, 63, 64, 69, 72, 80, 84, 87, 98, 104, 105, 116 (reflecting that C.M., M.R., L.G., and O.A. were separated from their children before the

USAO made a decision whether to prosecute them and despite defects in their referrals that rendered them ineligible for prosecution, and that V.C. was separated from her child even though she was never referred for possible prosecution).

Government officials did not deem children of parents "amenable to prosecution" to be "unaccompanied" as a result of their parent being sent to criminal custody. *Contra, e.g.*, Defendant's Motion for Summary Judgment ("Mot. 14"). Instead, as the government's own expert explained, BP agents designated children as "unaccompanied" because the parent ***might*** be referred for prosecution and ***might*** become unavailable ***at some point in the future***:

> Q.  So what you're saying [is that] the intention to prosecute an adult meant that the child became a UAC.  Is that correct?
> A.  We can reasonably expect that the parent would not be there to care for the child, yes.
> Q.  And if the adult was never prosecuted, that wouldn't change anything.  Is that correct?
> A.  No [it wouldn't change anything]…if the child was referred to ORR, they would be picked up. Whether or not the parent was there, we often didn't know…what was going to come of the parent's case.

Reiter Ex. 10, Jordan Tr. at 130:6-131:10; *see also* Pls. Resp. ¶ 26 (citing Reiter Ex. 10, Jordan Tr. at 110:18-113:21 ("once [BP officers] determine[d] that [they] ***intended*** to *refer* [the parent] for prosecution") (emphases added); *id*. (citing Fidler Ex. 10, Hastings Tr. at 46:3-21 (CBP considered child a UAC "immediately upon the encounter with the child, if the adult is [deemed] amenable [to prosecution]"); *id*. ¶ 9; Pls. 56.1 ¶ 41. BP agents, including in Yuma, therefore regularly separated families and referred children to ORR ***before*** the parent's case was referred for prosecution, ***before*** the parent was sent to criminal custody, ***before*** the USAO made a decision about whether to accept the prosecution referral, and in some cases, even when the agents had no expectation that the parent would ***ever*** be prosecuted. *See* Pls. Resp. ¶¶ 11, 26, 54, 63, 80, 98.

That separation was the goal is further evidenced by the fact that high-ranking ICE officials, including Albence, never intended to reunite separated families—except for purposes of removing them. *See* Pls. Mot. 7-8, 10, 15; Pls. 56.1 ¶¶ 43-45; Fidler Ex. 3, White

Tr. at 309:8-20 ("I believed that making reunification impossible was a design feature of the [] policy…"). Even when parents' criminal proceedings were completed, and they were released from criminal custody, the government did not reunite them with their children. *See* Pls. Mot. 8; Pls. 56.1 ¶¶ 43, 44; Reiter Ex. 74 at 1 (May 11, 18 email from U.S. Attorney Elizabeth Strange: ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████ Indeed, government officials ***intentionally*** kept families separated after prosecuted parents completed their time in criminal custody. *See* Pls. Mot. 9-10 n.4; Pls. 56.1 ¶¶ 48-50. In Yuma, families were not reunited even if parents returned from criminal custody while their children were still detained at the BP station; instead, "the [child] [] remained a UAC and [was] placed at a juvenile facility while the adult continue[d] into removal proceedings." Pls. 56.1 ¶ 44. BP agents in Yuma made no attempt to reunite separated parents and children even when the parents' prosecution referrals were declined. *See id*. ¶ 43 (Yuma BP agents "w[ould] not try to reunite [parents and children] if prosecution [was] denied for [the] parent."); *see also* Pls. Mot. 9; Pls. 56.1 ¶¶ 44, 46-50.

Even after President Trump signed a June 20, 2018 executive order directing DHS to keep families together, McAleenan and Albence, at Nielsen's direction, instructed officers to only reunify families at the time of removal. *See* Pls. Mot. 15; Pls. 56.1 ¶¶ 121-122; *see also* Pls. Resp. ¶ 18. The government reunited families only after a federal court ordered it to do so. *Ms. L. v. U.S Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018), *modified*, 330 F.R.D. 284 (S.D. Cal. 2019) ("*Ms. L II*"); Pls. 56.1 ¶ 123. Because government officials never intended to reunify families before removal, it had to assemble a 375-person emergency response team to locate and reunify separated parents and children. *See id*. ¶ 124.

### C. Government Officials Ignored Repeated Warnings That Separations Would Cause Severe Emotional Distress and That They Were Unable to Track or Facilitate Communication Between Separated Family Members

As detailed in Plaintiffs' Motion for Partial Summary Judgment, high-ranking DHS officials, including Nielsen, McAleenan, and Homan, disregarded repeated warnings that

separation would cause significant harm to families—especially to children, for whom separation would be detrimental to their health, safety, and wellbeing. *See* Pls. Mot. 3-5; Pls. 56.1 ¶¶ 3, 5, 14-16; *see also* Pls. Resp. ¶ 18. These officials were also aware that the agencies that would be responsible for tracking separated families and facilitating communication between them under the DHS Referral Policy would be unable to do so using the systems that were in place when the policy was authorized. *See* Pls. Mot. 3-5, 7-8; Pls. 56.1 ¶¶ 4, 9-13; *see also* Pls. Resp. ¶ 18, 31. Because the government did not address these system issues, "there was no unified record of what parent went where and what child went where." Pls. 56.1 ¶ 45; Pls. Resp. ¶ 31. This made it difficult for separated family members to communicate. *See, e.g.*, Pls. 56.1 ¶¶ 45, 53; Pls. Resp. ¶ 31.

### D. The Government Cruelly Separated Plaintiff Families and Did Not Reunify Them For Months.

All five Plaintiff families, seeking asylum, arrived in the United States in May 2018. Pursuant to the DHS Referral Policy, government officials separated Plaintiffs *before* the USAO made a determination whether to prosecute them, and in most, if not all, cases, without any expectation that the mother would *ever* be prosecuted. Plaintiff families remained separated until a federal court ordered the government to reunite them. *See* Def. 56.1 (ECF 372) ¶¶ 55-56, 90-91, 106, 109, 125-26; Pls. Resp. ¶¶ 55-56, 90-91, 106, 109, 125-26; Pls. 56.1 ¶ 125.

<u>V.C. and G.A.</u>

V.C. and G.A. were apprehended on May 8, 2018 at 2:35 p.m. and entered BP custody that day, where BP agents told V.C. that they were going to take her son. Pls. 56.1 ¶¶ 55-56; Def. 56.1 ¶¶ 114-115; Pls. Resp. ¶¶ 114-115. The next morning, on May 9, 2018, at 11:14 a.m., BP agents notified ORR that a minor in their custody was in need of placement. Fidler Ex. 50 at CM-US-CPB-U-0000159.   On May 10, 2018, BP agents separated V.C. and G.A. in a shockingly cruel manner that included taunting V.C. that it was Mother's Day and refusing to tell V.C. if she would be able to see or speak to G.A. again. Pls. 56.1 ¶¶ 57-62. Despite her pleas, no officer provided V.C. with information about her son. *Id.* ¶ 62. V.C.

and G.A. were only able to speak twice while separated, and only for mere minutes. *Id.* ¶¶ 65, 66. The first call was nearly two months after they were separated. *Id.* ¶ 65.

V.C. was never referred for possible prosecution or taken into criminal custody. *Id.* ¶¶ 68-69; Pls. Resp. ¶ 116. V.C. was transferred to ICE detention on May 14, 2018, and remained separated from G.A. until July 26, 2018. Def. 56.1 ¶¶ 125-26; Pls. Resp. ¶¶ 125-26.

<u>M.R. and J.R.</u>

M.R. and J.R. were apprehended on May 8, 2018 at 3:50 p.m. and entered BP custody the following day. Def. 56.1 ¶¶ 78, 79; Pls. Resp. ¶¶ 78, 79. Before they even arrived at the Yuma station, a BP agent told M.R. the government would take her son away from her. Fidler Ex. 57, M.R. Tr. at 80:13–16. In the morning on May 9, officers notified ORR that they had a minor in need of placement. Fidler Ex. 56 at CM-US-CPB-U-0000115. On or around May 10, 2018, BP agents separated M.R. and J.R. in a shockingly cruel manner that included yelling at M.R. for bringing her child to the United States, refusing to tell M.R. where her son would be taken, and telling M.R. she would be deported without her son. *See* Pls. 56.1 ¶¶ 70-82. During their separation, M.R. asked government agents where they took her son, but they would not tell her. *Id.* ¶ 76. M.R. tried to call J.R. every day, using a phone card she had to add money to, but could not reach him. *Id.* ¶ 78. After approximately one month, M.R. finally was allowed to speak to her son—but only for a few minutes. *Id.* ¶ 79. M.R. and J.R. were only able to speak to each other one more time while separated. *Id.* ¶¶ 78-82.

On May 11, 2018, *after* J.R. had been taken from her, BP agents referred M.R. for possible prosecution after they failed to timely read M.R. her Miranda rights or take her statement within six hours of apprehension as required, and after they failed to timely refer her case to the USAO for consideration and filing with the court within 48 hours of apprehension as required. Pls. Resp. ¶¶ 80, 87. The USAO declined to prosecute her that same day citing a violation of "AUSA Guidelines." *Id.* On May 12, 2018, M.R. was

transferred into ICE detention and remained separated from J.R. until July 26, 2018. *Id.* ¶¶ 90-91; Def. 56.1 ¶¶ 90-91.

C.M. and B.M.

C.M. and B.M. were apprehended on May 9, 2018 at 7:22 p.m. and entered BP custody on May 10. Def. 56.1 ¶¶ 43-44; Pls. Resp. ¶¶ 43-44. That morning, officers notified ORR they had a minor in need of placement. Fidler Ex. 59 at CM-US-CPB-U-000041. On or around May 11, 2018, BP agents separated C.M. and B.M. in a shockingly cruel manner that included wishing C.M. "Happy Mother's Day," telling C.M. she would be deported without her son, laughing at C.M.'s indigenous accent, and pulling B.M. from his mother by force. *See* Pls. 56.1 ¶¶ 85-90. Despite her pleas, government officers did not provide C.M. with any information about B.M. Pls. *Id*. ¶¶ 90, 91. C.M. and B.M. sometimes went weeks without being able to speak to each other; the few calls they were able to have were never more than a few minutes. *Id*. ¶¶ 92-95; Pls. Resp. ¶ 60.

On May 14, 2018—five days after she was apprehended, and four days *after* her son was taken—a BP agent emailed the USAO for guidance on whether to refer C.M. for possible prosecution, as those agents had failed to send C.M.'s case to the USAO with sufficient time for the USAO to file a complaint regarding C.M. in criminal court within 48 hours of C.M.'s apprehension as required. Pls. Resp. ¶ 54. The USAO declined to consider C.M. for prosecution that same day. *Id*.; Fidler Ex. 63. C.M. was never taken into criminal custody. Pls. 56.1 ¶ 98. On May 15, 2018, C.M. was transferred into ICE detention and remained separated from B.M. until July 26, 2018. Def. 56.1 ¶¶ 55-56; Pls. Resp. ¶¶ 55-56.

O.A. and L.A.

O.A. and L.A. were apprehended on May 11, 2018 at 5:40 p.m. and entered BP custody that night. Def. 56.1 ¶¶ 96-97; Pls. Resp. ¶¶ 96-97. On May 12 at 12:22 a.m., BP officers notified ORR they had a minor in need of placement. Fidler Ex. 66 at CM-US-CPB-U-0000138. On May 13, 2018, agents separated O.A. and L.A. in a shockingly cruel manner that included failing to tell O.A. where L.A. was being taken. *See* Pls. 56.1 ¶¶ 99-104. During their separation, despite O.A.'s pleas, no one provided her with any information about L.A.

*Id*. ¶¶ 104, 106-107. Even though no government officer assisted her, O.A. was able to locate her daughter using a number provided by another detained women. *Id*. ¶ 107. O.A. finally spoke with L.A. about one month after they were separated. Pls. 56.1 ¶ 108.

On May 14, 2018—*after* L.A. had been taken—the USAO notified CBP that it was declining to consider O.A. for possible prosecution, citing a lack of "Legal Sufficiency." Pls. Resp. ¶¶ 98, 104, 105. O.A. was never taken into criminal custody. Pls. 56.1 ¶ 119. On May 14, 2018, O.A. was transferred into ICE detention and remained separated from L.A. until September 13, 2018. Pls. Resp. ¶¶ 106, 109; Def. 56.1 ¶¶ 106, 109.

<u>L.G. and B.G.</u>

L.G. and B.G. were apprehended on May 16, 2018 at 8:10 p.m. and entered BP custody the next day. Pls. Resp. ¶¶ 61-62; Def. 56.1 ¶¶ 61-62. BP agents notified ORR on May 17 that they had a minor in need of placement. Fidler Ex. 68 at CM-US-CPB-U-0000092. A few hours later, agents separated L.G. and B.G. in a shockingly cruel manner that included failing to tell L.G. where they were taking her daughter. Pls. 56.1 ¶¶ 113-115. Despite L.G.'s pleas, no government officer provided her with information about B.G. *Id*. ¶ 115. L.G. and B.G. only spoke twice during the two and a half months they were apart. The first time was forty days after their separation. *Id*. ¶¶ 115-17; Pls. Resp. ¶ 77.

On May 18, 2018, *after* they took B.G. away, agents referred L.G. for possible prosecution even though they had failed to timely read L.G her Miranda rights or take her statement within six hours of apprehension as required. Pls. Resp. ¶¶ 63, 72. The USAO declined to prosecute L.G. that same day citing a "Miranda Violation." Pls. Resp. ¶ 63; *see also* 18 U.S.C. § 3501. L.G. was never taken into criminal custody. Pls. 56.1 ¶ 119. On May 25, 2018, L.G. was transferred into ICE detention and remained separated from B.G. until July 24, 2018. Def. 56.1 ¶¶ 73-74; Pls. Resp. ¶¶ 73-74.

## **ARGUMENT**

## I.    **PLAINTIFFS' CLAIMS ARE NOT INSTITUTIONAL TORT CLAIMS**

The government contends that Plaintiffs' claims are "institutional" tort claims "based on 'policymaking or agency-wide misconduct' that are not cognizable under the FTCA."

Mot. 6, 8. The government is wrong. Plaintiffs' claims are based on the tortious misconduct of individual federal employees acting within the scope of their employment: the BP agents who separated Plaintiffs; and Kirstjen Nielsen, Thomas Homan, Kevin McAleenan, and Matthew Albence.

The government's argument—which cites only the first paragraph of Plaintiffs' Complaint, Mot. at 6—disregards the remainder of the pleading, and overlooks substantial evidence that Plaintiffs have developed in support of their allegations of tortious misconduct by individual federal employees. The record demonstrates that specific BP agents,[1] acting within the scope of their employment, cruelly separated Plaintiff families, some by physical force, *see* Pls. 56.1 ¶ 89; terrorized Plaintiffs by forcing them to watch as other immigrant families were forcibly torn apart, *see id.* ¶¶ 61, 75, 89, 100-101; taunted Plaintiffs before and after separating them, *see id.* ¶¶ 59, 72, 85, 87; told Plaintiff mothers they would be deported without their children, *see id.* ¶¶ 64, 76, 85; lined up Plaintiff children and forced them to bathe before taking them away, *see id.* ¶¶ 58, 60, 74, 86, 102; and refused to tell Plaintiff mothers where their children were being taken or whether they would see them again. *See id.* ¶¶ 62, 76, 90, 104, 106, 115; *see also* Pls. Mot. 10–15, 20–21, 24–25 (describing in detail the individual federal employee conduct at issue).[2] The record further shows that Nielsen, Homan, McAleenan, and Albence, acting within the scope of their employment, engaged in tortious conduct by, among other things, implementing the DHS Referral Policy without ensuring that separated families were provided with information about one another's whereabouts and wellbeing, were able to reliably communicate during their extended

---

[1] That Plaintiffs are unable to identify the agents by name—because the government kept no record of which officials separated Plaintiffs, *see* Pls. 56.1 ¶ 120—does not render Plaintiffs' claims "institutional" torts. *See Wilbur P.G. v. United States*, No. 4:21-CV-04457, 2022 WL 3024319, at *6 (N.D. Cal. May 10, 2022) (holding that plaintiffs' inability to name specific employees did not support dismissal as "institutional" tort claims because the *government* should be able to determine which of its own employee engaged in the misconduct).

[2] Plaintiffs' use of "the government" as shorthand for the conduct of individual federal employees in their pleadings and briefs does not convert Plaintiffs' claims into institutional tort claims. *See, e.g.*, *A.F.P. v. United States*, No. 1:21-CV-780, 2022 WL 2704570, at *18 (E.D. Cal. July 12, 2022) ("References to the 'United States Government' as a whole are not unexpected in an FTCA action, which may only be brought against 'the United States itself.'") (citation omitted).

separations, or could be reunited, and despite warnings that the policy would cause trauma to separated families. *See* Pls. 56.1 ¶¶ 3-16, 24, 26, 30-37, 45, 47, 51, 53-54, 124; Pls. Resp. ¶¶ 10, 11, 13, 17, 18, 22, 31; *see also* Pls. Mot. at 5, 6, 9, 15, 17–18, 21, 22 (detailing Nielsen, McAleenan, Homan, and Albence's reckless disregard of the near certainty of causing severe emotional distress).[3]

In addition to disregarding the evidence, the government also ignores the substantial body of case law rejecting this exact argument in FTCA actions brought by separated families. Courts in this Circuit, including in cases the government cites,[4] uniformly have declined to dismiss such actions on this basis where, as here, the plaintiffs alleged employee-level misconduct. *See, e.g.*, *A.F.P.*, 2022 WL 2704570, at *18 (FTCA claim cognizable because plaintiffs "attribute[d] specific actions, including designing the family separation policy, subjecting plaintiffs to separation, and inflicting cruel conditions of confinement, to certain CBP and ICE employees, as well as other individual federal officials"); *see also* *Wilbur P.G.*, 2022 WL 3024319, at *6; *E.S.M.*, 2022 WL 11729644, at *2; *Fuentes-Ortega*, 2022 WL 16924223. That Plaintiffs' Complaint also details problems with the DHS Referral Policy generally does not change the analysis. *See* Reiter Ex. 100, *E.C.B.* slip op. at 8 (while complaint condemned agency policies, plaintiff also presented claims predicated on tortious misconduct of individual government employees); *B.A.D.J.*, 2022 WL 11631016, at *5 (rejecting institutional tort argument even though plaintiffs "criticize[d] the Government's

---

[3] *Lee v. United States*, 2020 WL 6573258 (D. Ariz. Sept. 18, 2020), Mot. 6, is distinguishable. The court in *Lee* concluded that the plaintiff's claims were "too vague and conclusory" to support a cause of action under the FTCA because the plaintiff had failed to "set forth the alleged acts or omissions of specific federal employees." *Lee*, 2020 WL 6573258 at *6. Here, by contrast, Plaintiffs have alleged and substantiated individual tortious misconduct by federal employees. Courts in this Circuit have routinely found that *Lee* has no application under such circumstances. *See Fuentes-Ortega*, No. 22-CV-449, 2022 WL 16924223, at *5 (D. Ariz. Nov. 14, 2022); *E.C.B. v. United States*, No. 22-CV-915, at 8 (D. Ariz. Nov. 8, 2022) (Reiter Ex. 100); *A.F.P.*, 2022 WL 2704570, at *18; *E.S.M. v. United States*, No. 21-CV-029, 2022 WL 11729644, at *2 (D. Ariz. Oct. 20, 2022).

[4] The government's citation to *F.R. v. United States*, No. 21-CV-339, 2022 WL 2905040, at *4 (D. Ariz. July 22, 2022), and *B.A.D.J. v. United States*, No. 21-CV-00215, 2022 WL 11631016, at *5 (D. Ariz. July 30, 2022), is misleading. While both courts observed they lacked subject matter jurisdiction insofar as the complaints alleged misconduct of agencies writ large, both *allowed* plaintiffs' claims to proceed because plaintiffs also alleged tortious conduct by individual employees.

adoption of the Zero Tolerance Policy," explaining that "[*i*]*ndividual* officials craft the Government's policies, which are later implemented by the Government's *individual* employees") (emphases added).[5]

Finally, the government's reliance on *Meier v. United States*, No. 05-CV-4404, 2006 WL 3798160 (N.D. Cal. Dec, 22, 2006), is misplaced. There, the court dismissed certain FTCA claims because, under California law, only corporations—not private individuals— could be liable for negligent hiring, training, and supervision. But this Court already held that, under Arizona law, "Plaintiffs have demonstrated a private analogue." *See* ECF 31 at 3-4 (citing *United States v. Muniz*, 374 U.S. 150, 153 (1963); 28 U.S.C. § 1346(b)). Moreover, the *Meier* court held that those claims based on the negligent acts of the government employee *were* cognizable under the FTCA. *Meier*, 2006 WL 3798160, at *3.

## II.    THE DFE DOES NOT APPLY HERE

The government contends that the DFE bars Plaintiffs' claims because the claims "challenge discretionary policy determinations by the federal government." Mot. 8. For the DFE to apply, (1) the challenged conduct must "involve[ ] an element of judgment," and (2) that judgment must be "of the kind that the [DFE] was designed to shield." *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991); *see also Myles v. United States*, 47 F.4th 1005, 1011 (9th Cir. 2022). In this Circuit, "the government bears the burden of establishing that the test is met and that discretionary immunity applies." *Miller v. United States*, 163 F.3d 591, 594 (9th Cir. 1998). The government has not met its burden here—as the Court correctly found in denying the government's motion to dismiss on this basis, *see* ECF 31 at 7.

Rather than addressing the conduct at issue—the government's cruel separations of Plaintiff families, its refusal to provide Plaintiff mothers with information about their children, its failure to allow Plaintiffs to communicate with one another for weeks or months, and its refusal to reunite Plaintiffs until required by court order—the government tries to

---

[5] The government's discussion of 42 U.S.C. § 1983, under which municipalities may be held liable for unconstitutional actions taken pursuant to official municipal policy, and *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), is inapposite. Plaintiffs here properly challenge the tortious acts of individual federal employees under the FTCA.

reframe Plaintiffs' claims. But the government cannot shoehorn Plaintiffs' claims into the DFE by mischaracterizing them. The DFE does not bar Plaintiffs' claims because: (1) the challenged conduct was unconstitutional and therefore was not discretionary; (2) the government's designation of Plaintiff children as UACs violated the law and therefore was not discretionary; and (3) the challenged conduct is not "of the kind that the [DFE] was designed to shield." *Gaubert*, 499 U.S. at 322-23.

### A.   The DFE Does Not Bar Plaintiffs' Claims Because the Government's Separation of Plaintiff Families Was Unconstitutional

"In general, governmental conduct cannot be discretionary if it violates a legal mandate." *Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000). As such, conduct is not "a matter of choice for the acting employee," *Berkovitz v. United States*, 486 U.S. 531, 536 (1988), where that conduct violates a constitutional right, *Nurse*, 226 F.3d at 1002. As to such conduct, the Constitution "limit[s] the discretion of federal officials such that the FTCA's [DFE] exception [does] not apply." *Id.* at 1002 n.2.

### 1.   The challenged conduct violated Plaintiffs' constitutional right to family integrity and thus was not discretionary.

The government's cruel and forcible separation of Plaintiffs without providing Plaintiff mothers with information about their children and without ensuring Plaintiff families could communicate for weeks or months, and its refusal to reunify Plaintiffs until ordered to do so, violated Plaintiffs' constitutional right to family integrity. The "substantive due process right to family integrity…is well established." *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011); *see also Troxel v. Granville*, 530 U.S. 57, 65 (2000) ("The liberty interest…of parents in the care, custody, and control of their children…is perhaps the oldest of the fundamental liberty interests recognized by this Court."); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978).

Courts considering the constitutionality of the government's family separation policy—including this Court in denying the government's motion to dismiss—overwhelmingly have found that the government's "separation of migrant parents and their

minor children when both are held in immigration detention and when there has been no showing the parent is unfit or poses a danger to the child" was likely unconstitutional. *Ms. L. v. U.S Immigr. & Customs Enf't*, 302 F. Supp. 3d 1149, 1162 (S.D. Cal. 2018); *see also* ECF 31 at 7; *D.J.C.V. v. United States*, 605 F.Supp.3d 571, 594-95 (S.D.N.Y. 2022) (collecting cases). The record confirms the allegations on which these decisions were based. *See* Pls. 56.1 ¶¶ 55-119. In *Ms. L.*, the court held that the plaintiffs' allegations—which are supported by the record here—"sufficiently describe[d] government conduct that arbitrarily tears at the sacred bond between parent and child, and is emblematic of the 'exercise of power without any reasonable justification in the service of an otherwise legitimate governmental objective.'" *Ms. L.*, 302 F. Supp. 3d at 1167 (quoting *Cnty. of Sacramento*, 523 U.S. at 846); *see also Ms. L. II*, 310 F. Supp. 3d at 1145-46 ("A practice of this sort implemented in this way is likely to be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience, interferes with rights implicit in the concept of ordered liberty, and is so brutal and offensive that it does not comport with traditional ideas of fair play and decency." (cleaned up); *Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 499 (D.D.C. 2018) ("easily conclud[ing]" that plaintiffs were "likely to succeed on…their substantive due process claim that their continued separation…violate[d] their right to family integrity under the Fifth Amendment").[6]

---

[6] *Reyna as next friend of J.F.G. v. Hott*, 921 F.3d 204 (4th Cir. 2019), and *Delgado v. INS*, 637 F.2d 762 (10th Cir. 1980), Mot. 23, are readily distinguishable. *Reyna* considered whether plaintiffs had a substantive due process right to "family unity" that precluded ICE from transferring plaintiffs from a detention facility near their children to one farther away; plaintiffs did not challenge their separation from their children, and there was no allegation that plaintiffs did not know where their children were or were unable to communicate with them. 921 F.3d at 210-11; *see also K.O. v. United States*, 2023 WL 131411, at *9 (D. Mass. Jan. 9, 2023) (declining to apply *Reyna* in the family-separation context). In *Delgado*, the court concluded that deporting plaintiff, who was *not* separated from his children at the border and whose children were U.S. citizens, would not violate their right to family integrity; the court emphasized that, unlike Plaintiffs here, plaintiff and his children were given a "choice"—"either to leave the children to grow up in this country without a father or to take the children to another country." 637 F.2d at 763-64. The government's citation to *Peña Arita v. United States*, 470 F. Supp. 3d 663 (S.D. Tex. 2020), Mot. 18, likewise is unavailing, as the court did not consider whether family separation was unconstitutional, *see id.* 686-87, and in any event the decision is an outlier. *See supra* at 17-18.

1   "[I]n a due process challenge to executive action, the threshold question is whether the

2   behavior of the governmental officer is so egregious, so outrageous, that it may fairly be

3   said to shock the contemporary conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833,

4   847 n.8 (1998). This standard is satisfied where, as here, "the conduct was 'intended to injure

5   in some way unjustifiable by any government interest,' or in some circumstances if it

6   resulted from deliberate indifference." *Rosales-Mireles v. United States*, 138 S. Ct. 1897,

7   1906 (2018) (quoting *Cnty. of Sacramento*, 523 U.S. at 849-50).

8          Here, the overwhelming evidence demonstrates that the challenged actions of

9   government officials were "intended to injure" and were "unjustifiable by any government

10   interest." *Rosales-Mireles*, 138 S. Ct. at 1906. The record supports the conclusion that the

11   separation of Plaintiff families—and thousands of other families—was carried out to deter

12   other would-be asylum seekers from entering the United States. Pls. Resp. ¶ 11.[7] Causing

13   extraordinary trauma to parents and children to deter other individuals from pursuing claims

14   they have a legal right to present cannot serve a justifiable government interest. *Rosales-*

15   *Mireles*, 138 S. Ct. at 1906; *Ms. L.*, 302 F. Supp. 3d at 1166-67; *cf. R.I.L.R v. Johnson,* 80

16   F. Supp. 3d 164 (D.D.C. 2015) (using civil detention "for the sake of sending a message of

17   deterrence to other Central American individuals who may be considering immigration"

18   does not serve a legitimate government interest). Nor can the extreme cruelty with which

19   the separations were carried out serve any legitimate government interest. *See* Pls. 56.1 ¶¶

20   56-63, 71-77, 85-91, 100-104, 113-15. Moreover, the government never even prosecuted

21   Plaintiff mothers—the purported policy purpose of the DHS Referral Policy. *See* Pls. Resp.

22   ¶¶ 45, 63, 80, 98, 116; *compare id.* and Pls. Resp. ¶¶ 9, 11, 16, 26 *to* Mot. 3 (describing DHS

23   Referral Memo as "a policy of referring for prosecution…all adults who unlawfully crossed

24   the Southwest border") and Mot. 14 (arguing children were designated UACs because

25

26   ───────────────
     [7] Evidence reflecting that government officials intended to inflict emotional distress by
27   separating migrant families including Plaintiffs to deter other migrants from seeking asylum
     precludes granting the government's Motion for the reasons discussed herein. By contrast,
28   Plaintiffs need only establish that officials recklessly disregarded the severe emotional
     distress that separations would cause to prevail on their motion. *See* Pls. Mot. at 2 n.1, 9 n.4.

children cannot accompany parents into criminal custody); *see also id.* 10, 11. Where, as here, government conduct "ha[s] no legitimate policy rationale," the DFE does not apply. *Myles*, 47 F.4th at 1011.

And, even if the challenged conduct was not the result of officials' intent to injure migrant families (which it was), that the challenged conduct was, at the very least, the clear result of "deliberate indifference" further supports the conclusion that the conduct shocks the conscience. *Rosales-Mireles*, 138 S. Ct. at 1906. The American Academy of Pediatrics, immigration advocates, members of Congress, and officials throughout the government warned that family separations would "only further traumatize those already fleeing harm" and could significantly harm children's brain development through the onset of "toxic stress," and that the government was not ready to manage family separation on a large scale. Pls. 56.1 ¶¶ 3-5, 13-16, 51; Pls. Resp. ¶ 18. That the government proceeded with the separations in the face of these warnings evidences, at the very least, a "conscious[] disregard [of] a known and excessive risk to [Plaintiffs'] health and safety." *Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 880 (5th Cir. 2004).

The government's contention that the DFE "precludes inquiry into the subjective mindset of the decisionmaker," and that, in any event, "Plaintiffs have not adduced evidence of an unconstitutional motive on the part of Secretary Nielson," Mot. 24, fails. In a due process challenge to executive action, intent often *is* relevant to the "threshold question" of "whether the behavior of the governmental officer" shocks the contemporary conscience. *Cnty. of Sacramento*, 523 U.S. at 847 n.8. As set forth above, a government officer's conduct shocks the conscience where it "[wa]s 'intended to injure in some way unjustifiable by any government interest,'" or "resulted from deliberate indifference." *Rosales-Mireles*, 138 S. Ct. at 1906 (quoting *Cnty. of Sacremento*, 523 U.S. at 849-50). This is especially true where the intended injury is to children, an already vulnerable population. Accordingly, courts have consistently applied this standard in the family-separation context. *See supra* at 19-20.

Moreover, as demonstrated, Plaintiffs have adduced substantial evidence establishing that Nielsen, Homan, McAleenan, Albence, and other government officials engaged in the

challenged conduct with an intent to harm—and were not simply engaged in "the evenhanded enforcement of the immigration laws." Mot. 25 (citation omitted).[8] *See* Pls. 56.1 ¶¶ 1, 2, 18, 62, 65, 76, 79, 90, 92, 93, 104, 106, 108, 115-117, 122-125; Pls. Resp. ¶¶ 11, 18. These intentionally harmful actions shock the contemporary conscience. There is, therefore, at the very least an issue of material fact as to senior officials' intent that bears on the constitutionality of the conduct at issue.

### 2.    The *Bivens* qualified-immunity framework does not apply.

In arguing that a constitutional right must be "clearly established" to overcome the DFE, Mot. 21-23, the government imports the wrong framework from an irrelevant area of law. The clearly-established standard is drawn from the *Bivens* context, and the government cites no precedent from any circuit extending the framework for *Bivens* suits against individual officers to DFE immunity for unconstitutional acts in FTCA suits against the United States. *Cf. Loumiet v. United States*, 828 F.3d 935, 946 (D.C. Cir. 2016) ("We have found no precedent in any circuit [extending qualified immunity principles to preserve DFE immunity for some unconstitutional acts], nor does [the government] cite any. At this juncture we see no cause to make this the first.").

Courts in this Circuit have expressly rejected application of the *Bivens* qualified-immunity framework in the family-separation context. *See A.F.P*, 2022 WL 2704570, at *13; *F.R.*, 2022 WL 2905040, at *5; *D.J.C.V.*, 605 F. Supp. at 597. There is good reason for this consistent practice: FTCA suits are against the government, which "is not entitled to

---

[8] Contrary to the government's assertion, Mot. 24-25, it is the intent of the officials who engaged in the challenged conduct—which, in addition to Nielsen, includes Homan, McAleenan, Albence, and the officers who interacted with Plaintiffs—that matters for purposes of the shocks-the-conscience standard. *See Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). The government cites no authority supporting the proposition that only the department head's intent is relevant to the DFE analysis. *See* Mot. 24-25 (citing *Vill. of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 267 (1977), and *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 196-97 (2003), neither of which involved the DFE or FTCA).

defend on the basis of any official immunity that its executive employees individually might possess." *D.J.C.V.*, 605 F. Supp. 3d at 597 (citation omitted).[9]

## B. The designation of Plaintiff Children as UACs violated the TVPRA and thus was not discretionary.

The DFE does not apply where a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," *Berkovitz*, 486 U.S. at 536, and a federal employee acts in violation of that authority, *see Miller*, 163 F.3d at 593; *Gaubert*, 499 U.S. at 324. Here, government officials violated federal law by designating Plaintiff children as UACs and thus their conduct in doing so—including separating Plaintiff families as a result[10]—is not shielded by the DFE.

The government violated the Trafficking Victims Protection Reauthorization Act ("TVPRA") and the statutory definition of an "unaccompanied alien child" by designating Plaintiff children as UACs. Under the TVPRA, a minor is a UAC only if the minor: (1) has no lawful immigration status in the United States; (2) is under the age of 18; and (3) either has "no parent or legal guardian in the United States" or "*no parent or legal guardian in the United States is available to provide care and physical custody*." 6 U.S.C. § 279(g)(2) (emphasis added); *see also* 8 U.S.C. § 1232(g) (incorporating definition). At no point were Plaintiff mothers "[un]available to provide care and physical custody" to Plaintiff children. 6 U.S.C. § 279(g)(2). Whether a parent is "available" during criminal proceedings, *see* Mot. 14-15, is irrelevant, because Plaintiff mothers were *never* prosecuted. After extensive discovery, the government still "fails to explain how a parent who is merely 'amenable' to

---

[9] *Bryan v. United States*, 913 F.3d 356, 364 (3d Cir. 2019), Mot. 22, in which the Third Circuit held that plaintiffs could not pursue FTCA claims where the relevant officers "did not violate clearly established constitutional rights," is not to the contrary. There, the Third Circuit did not analyze whether the "clearly established" standard extends to FTCA claims because *plaintiffs* themselves assumed (incorrectly) that the standard applied. *See* Brief of Appellants at 63-64, *Bryan v. United States*, 913 F.3d 356 (3d Cir. 2019) (No. 17-1519).

[10] Plaintiffs' separations resulted from government officials' designating Plaintiff children as UACs because, where (unlike here) a child is properly designated as a UAC, the TVPRA requires BP to transfer the child to ORR custody within 72 hours. 8 U.S.C. § 1232(b)(3); Reiter Ex. 10, Jordan Tr. at 188:14-20.

prosecution—but has not been charged with a crime—is, for that reason, unavailable to care for her child." ECF 31 at 6 n.4.[11]

Here, government officials designated Plaintiff children as UACs based on an *expectation* that Plaintiff mothers would become unavailable *in the future*.[12] Pls. Resp. ¶ 26; *see also id.* ¶ 9. But the statute prohibits designating children as UACs under those circumstances: it requires that the parent actually *be* unavailable, *see* 6 U.S.C. § 279(g)(2), not that the government believes the parent *might later* become unavailable. *See Maldonado v. Lloyd*, 2018 WL 2089348, at *5 (S.D.N.Y. May 4, 2018) ("[A] child is not 'unaccompanied'—and therefore, neither a UAC nor properly within ORR's regulatory ambit—if a parent is physically present in the United States and…is available to provide care and physical custody."). Designating Plaintiff children as UACs on the basis of Plaintiff mothers' amenability to prosecution violates the TVPRA's clear statutory text and the "course of action" that the TVPRA "prescribes." *Berkovitz*, 486 U.S. at 536.[13] Accordingly,

---

[11] Nielsen testified before Congress that family separations under the DHS Referral Policy were just like separations that occur when U.S. citizen parents are put in jail. *See* Fidler Ex. 35 at 44, 48 ("Just like when parents break the law in the United States [], we do not put the children in jail with the parents[,]" and "[t]he consequence of any adult going to jail in this country is they are separated from their child"). But the government does not place children of U.S. citizens in foster care simply because their parents *may*, at some point *in the future*, be charged with a crime—especially a misdemeanor that carries a sentence of time served.

[12] The government argues at length that the decision to refer a parent for prosecution, designate the child a UAC, and separate the family were acts within each BP agent's discretion based on "operational and pragmatic considerations," Mot. 15. But this assertion is belied by the testimony of Yuma BP agents. Pls. 56.1 ¶¶ 40-42; Pls. Resp. ¶ 37. Thus, the government's motion must fail for the additional reason that the evidence demonstrates that BP agents were not exercising discretion because they were *mandated* to refer parents for prosecution and separate them from their children. *See C.D.A. v. United States*, No. 21-CV-469, 2023 WL 2666064, at *14 (E.D. Pa. Mar. 28, 2023) ("the front-line employees tasked with implementing the [zero-tolerance] policy did not reasonably have any element of choice.") (collecting cases). In any event, the government cannot ignore statutory requirements in favor of "pragmatic considerations."

[13] Any argument that Plaintiff mothers' detention in ICE custody rendered them unavailable, and thus made the children UACs, must fail. The record demonstrates that Plaintiffs were separated because Plaintiff mothers were deemed "amenable to prosecution," Pls. Resp. ¶¶ 9, 26, 45, 63, 80, 98, 116; Mot. 14 (arguing children were designated UACs because children cannot accompany parents into criminal custody), and the government cannot invoke the DFE's protection based on a post-hoc justification for the separations. *See Bear Medicine v. United States*, 241 F.3d 1208, 1216 (9th Cir. 2001) ("[O]ur inquiry into the nature of a decision is not meant to open the door to ex post rationalizations by the Government in an

the challenged conduct is not protected by the DFE.[14]

## C.   The Challenged Conduct Is Not of the Kind that the DFE Was Designed to Shield

Even if the government had discretion to separate Plaintiffs' families (it did not), the manner of separation and the government's failures to provide information, to allow communication, and to reunify families is not conduct "of the kind that the [DFE] was designed to shield." *Gaubert*, 499 U.S. at 323. The DFE is designed to shield conduct that is "grounded in social, economic, and political policy." *Berkovitz*, 486 U.S. at 536–37 (1988). The DFE thus does not apply where the challenged conduct had "no legitimate policy rationale." *Myles*, 47 F.4th at 1012 (citation omitted).

The government does not and cannot point to any legitimate policy rationale underlying the manner in which government officials separated Plaintiffs. The extreme cruelty with which the separations were carried out does not serve any valid policy interest. ""[T]he only conceivable reason for separating these families was 'the *in terrorem* effect it may have on others.'" *K.O.*, 2023 WL 131411, at *8 (quoting *D.J.V.C.*, 605 F. Supp. 3d at 596); *cf. Myles*, 47 F.4th at 1012 ("As decisions to knowingly lie under oath, tamper with

---

[14] *D.B. v. Poston*, 119 F. Supp. 3d 472 (E.D. Va. 2015), *aff'd in part, vacated in part, remanded sub nom. D.B. v. Cardall*, 826 F.3d 721 (4th Cir. 2016), Mot. 14, a largely vacated, out-of-Circuit case, does not help the government here. The question whether the child was properly designated a UAC arose in an entirely different context—a habeas petition—under entirely different facts—the child, who had run away from home, was apprehended when his mother was 160 miles away. 119 F. Supp. 3d at 482. The Fourth Circuit did not affirm the district court's reasoning that the UAC designation was discretionary, instead concluding that ORR's determination that the mother was unfit justified the UAC designation. No allegation or finding of parental unfitness was made here.

attempt to invoke the [DFE] shield."); *D.J.C.V.*, 605 F. Supp. 3d at 590, 596 (whether DFE applies turns on the BP officers' basis for separating plaintiffs *at the time of separation*, not whether there might have been an alternative basis for separation). In any event, Plaintiff mothers' detention did not render them unavailable. *See Jacinto-Castanon*, 319 F. Supp. 3d at 501-02 ("[T]he fact that [plaintiff] may be subject to some form of immigration detention does not explain why she must be detained separately from her sons."); *see also Ms. L. II*, 310 F. Supp. 3d at 1149 (preliminarily enjoining the government from separately detaining parents and children absent a determination the parent is unfit or presents a danger to the child and ordering the government to reunify separated families). Notably, Plaintiffs were reunited in immigration detention.

witnesses, or fabricate evidence cannot be 'grounded in' and are not 'susceptible to' such analyses the [DFE] does not provide refuge for such conduct." (citation omitted)).

The government similarly cannot establish that its failures to provide information, to allow communication, and to reunify families was susceptible to policy analysis. The undisputed facts establish the government failed to provide Plaintiffs even a minimal level of care. *See* Pls. 56.1 ¶¶ 26-27, 31-37, 45, 59, 62, 65, 71, 76, 79, 85, 87, 90, 92-93, 104, 106, 108, 115-117, 122-125; Pls. Resp. ¶¶ 46, 49, 60, 69, 77, 95, 99, 107, 108, 113, 131. This conduct evidences a clear "failure to adhere to accepted professional standards." *Bear Medicine*, 241 F.3d at 1217. Such a failure "is not 'susceptible to a policy analysis'" and is not protected by the DFE. *Id.*; *see also Ruiz v. United States*, No. 13-CV-1241, 2014 WL 4662241, at *8 (E.D.N.Y. Sept. 18, 2014) (rejecting DFE defense where CBP officers detained a four-year-old child and waited fourteen hours before contacting her parents because the officers' actions appeared "to be the result of negligence or laziness"); *ARA Leisure Servs. v. United States*, 831 F.2d 193, 195 (9th Cir. 1987).

The government attempts to reframe the challenged conduct as mere "inadequacies in planning for increased enforcement actions pursuant to the DHS Referral Policy," that were based on policy "decisions regarding resources and staffing and assessments of the sufficiency of existing processes and systems," and thus are protected by the DFE. Mot. 12-13. This argument fails. First, the Ninth Circuit has held that, while "the *design* of a course of governmental action is shielded by the [DFE],…the *implementation* of that course of action is not." *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005). The conduct implementing the DHS Referral Policy that Plaintiffs challenge thus is not protected by the DFE. Second, the government may not "use the mere presence of budgetary concerns to shield [the challenged] conduct from suit under the FTCA." *Id.* at 1184; *see also id.* at 1183-84 ("Budgetary constraints underlie virtually all governmental activity," and "[w]ere we to view inadequate funding alone as sufficient to garner the protection of the [DFE], we would read the rule too narrowly and the exception too broadly") (citations omitted). In any event, the government does not (and cannot) explain how taunting Plaintiff mothers, failing to

provide Plaintiff mothers with information, failing to facilitate communication, and failing to reunify Plaintiffs until forced by a court "involve[es] the allocation and deployment of limited governmental resources." Mot. 13 (quotation marks omitted).

The government otherwise avoids addressing the challenged conduct,[15] and instead mischaracterizes Plaintiffs' claims as challenges to the government's decision "to increase prosecutions of all amenable adults." Mot. 12-17. The government is wrong. As this Court observed in denying the government's motion to dismiss, "[a]ny argument that the government was simply exercising prosecutorial discretion ignores the crucial fact that the government never charged any Plaintiff with a crime." ECF 31 at 6. Because no Plaintiff was ever charged with a crime, Plaintiffs' lawsuit could not *possibly* be a challenge to the government's prosecutorial discretion. The government's citation to cases holding that decisions whether to prosecute are protected by the DFE is thus a red herring. *See, e.g.*, Mot. 14 (citing *Gasho v. United States*, 39 F.3d 1420 (9th Cir. 1994) and *S.E.B.M. v. United States*, No. 1:21-cv-00095, 2023 WL 2383784 (D.N.M. Mar. 6, 2023)).

## III.   PLAINTIFFS HAVE ADDUCED SUFFICIENT EVIDENCE TO SUPPORT THEIR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM

The government argues that Plaintiffs cannot establish a claim for IIED because "Plaintiffs cannot show that the government's exercise of its law enforcement authority" meets Arizona's burden of proof for such claims. Mot. 26-27. Because the government's argument, once again, ignores this Court's prior rulings and rests on a fundamental mischaracterization of Plaintiffs' claims, this Court should reject it.

The government's motion is notable for what it does not challenge: it does not dispute that government officials engaged in the conduct at issue with intent to cause distress to Plaintiffs (or that those officials recklessly disregarded the near certainty that such distress

---

[15] The Motion does not address the officers' conduct in separating Plaintiffs *at all*. It mentions "communication" between Plaintiff mothers and children just once, stating vaguely that "the adult and minor Plaintiffs communicated during their separations." Mot. 26. It omits that the government did now allow V.C. to speak to her son for almost two months; M.R. and O.A. did not speak to their children for one month; L.G. did not speak to B.G. for 40 days; and C.M. spoke to her son after a week and then went several weeks before she was allowed to speak to him again. *See* Pls. 56.1 ¶¶ 65-66; 78-82; 92-93; 108; 116, 117.

would result); that Plaintiffs have in fact suffered severe emotional distress; or that this distress is the direct result of the government's conduct. Nor does the government dispute that the *actual* conduct at issue is "extreme and outrageous." Instead, the government makes two related arguments, neither of which has any merit: that "[t]here is no basis in Arizona law for IIED claims arising out of a lawful arrest and detention;"[16] and that Plaintiffs' IIED claim fails because Plaintiffs' separations were the "direct result" of "BP's and ICE's law enforcement actions to enforce existing federal criminal and statutory immigration authorities," and that conduct is "privileged." Mot. 27-28. But as this Court already found, Plaintiffs' claims are *not* based on "the government's exercise of its law enforcement authority." *See* ECF 31 at 6.

The record demonstrates that the Court's prior conclusion is correct. BP officers deemed Plaintiff children UACs and forcibly separated from their mothers *before* the USAO decided whether to pursue Plaintiff mothers' prosecutions. *See* Pls. Resp. ¶¶ 49, 63, 69, 80, 84, 104, 116. In fact, Plaintiffs were separated even though BP agents had reason to believe that most, if not all, Plaintiff mothers would *never* be prosecuted. *See id.* ¶ 116 (V.C. never referred for prosecution); *id.* ¶¶ 45, 54, 80, 87 (C.M. and M.R. ineligible for possible prosecution due to violation of 48 hour rule); *id.* ¶¶ 63, 80 (L.G. and M.R. ineligible for possible prosecution because BP agents failed to timely Mirandize them); *see also id.* ¶ 98 (O.A.'s referral declined for legal sufficiency and possible violation of 48 hour rule); *see generally id.* ¶ 9. No Plaintiff mother was ever prosecuted for any offense. Pls. 56.1 ¶¶ 68, 83, 97, 110, 118. Defendant has identified no law that would "authorize[]" Plaintiffs' separations under these circumstances—and indeed, the Constitution and the TVPRA

---

[16] Defendant's reliance on *Savage v. Boies*, 272 P.2d 349 (Ariz. 1954), for the proposition that an IIED claim cannot be based on conduct arising out of lawful arrest and detention is misplaced. Mot. 27. *Savage* merely held that defendant officers were not liable for "unlawful arrest" where the evidence was undisputed that plaintiff's arrest and detention were properly authorized. *Id.* at 350. The court then held that plaintiff *could* bring an IIED claim based on statements the officers made to her about the whereabouts and wellbeing of her child in effectuating that lawful arrest and detention, finding "a jury would be justified in finding that emotional distress…is substantially certain to be produced by such conduct." *Id.* at 351.

prohibit it. *See supra* at 17-24.[17] Accordingly, the government's claim that summary judgment should be granted in its favor because its conduct is privileged must be rejected. *See, e.g.*, *Rhoden v. United States*, 55 F.3d 428, 432 (9th Cir. 1995) (reversing summary judgment granted in favor of United States where there were disputed issues of material fact as to whether plaintiff's detention complied with the Fourth Amendment and was thus privileged); *Velasquez v. United States*, No. 00-CV-036, 2002 WL 32818333, at *5-6 (D. Ariz. Sept. 26, 2002) (finding that "defendant bears the burden of proving a nonconsensual privilege" in defense of tort liability, and that federal officers' conduct was not privileged because it did not comply with applicable law following bench trial).

Plaintiffs have adduced sufficient evidence to support their IIED claim. In denying the government's motion to dismiss, the Court observed that "IIED claim[s] brought under the FTCA [are viable]…where '[federal] agents' actions [are] motivated by malice,'" and concluded that Plaintiffs' "Complaint contains ample factual allegations suggesting that the government's separation of families was motivated by malice." ECF 31 at 3-4 (citations omitted). Plaintiffs have developed substantial evidence supporting the allegations cited by the Court in reaching this conclusion, including, for example, that: the purpose of the DHS Referral Policy was to deter immigration by forcibly separating families, Pls. 56.1 ¶¶ 1, 2, 18; Pls. Resp. ¶ 11; DHS officials knew that separating families would cause trauma when they adopted the policy, *see* Pls. 56.1 ¶¶ 3, 5, 14; Pls. Resp. ¶¶ 11, 18; Plaintiffs watched in terror as officers separated other families while in custody, *see* Pls. 56.1 ¶¶ 61, 75, 89, 100-101; BP officers directed Plaintiffs to bathe their children before they were taken away, *see*

---

[17] The government's authority, *see* Mot. 27-28, is inapposite because unlike in those cases, the conduct challenged here was contrary to law and without authorization or legitimate purpose. *Cf. Mintz v. Bell Atl. Sys. Leasing Intern., Inc.*, 905 P.2d 559, 563 (Ariz. Ct. App. 1995) (not reversible error for trial court to find defendant's actions (calling plaintiff back to work and reassigning her job duties when she didn't return) were not outrageous, in part because of defendant's "legitimate business purpose" as employer in so doing); *S.E.B.M.*, 2023 WL 2383784 at *8 (because plaintiff's "own explanation of events" was that she was separated from her father as "a direct result of the government's decision to prosecute him," there was no justiciable dispute as to whether the challenged conduct was authorized by law or otherwise privileged); *accord Galicia v. United States*, No. 13-CV-0105, 2015 WL 12696086, at *2 (D.N.M. Feb. 24, 2015); *Dillard Dep't Stores, Inc. v. Silva*, 106 S.W.3d 789, 797 (Tex. App. 2003); *Caban v. United States*, 728 F.2d 68, 74-75 (2d Cir. 1984).

*id*. ¶¶ 58, 60, 74, 86, 102; Plaintiff mothers begged officers not to take their children from them, *see id*. ¶¶ 87, 103; officers taunted Plaintiff mothers before and during separations, *see id*.¶¶ 59, 72, 85, 87; officers told Plaintiff mothers they would be deported without their children, *see id*. ¶¶ 64, 76, 85; officers sometimes ripped children away by force, such as when five-year-old Plaintiff B.M. refused to let go of his mother, *see id*. ¶ 89; Plaintiff families were not told anything about each other's whereabouts or wellbeing, despite Plaintiffs' repeated requests for information, *see id*. ¶¶ 62, 76, 90, 104, 106, 115; the government's tracking efforts were insufficient to ensure that Plaintiffs would be able to locate and communicate with each other after they were separated, *id*. ¶¶ 26, 45; Pls. Resp. ¶¶ 46, 71; and Plaintiff families were not permitted to speak to each other for weeks after their separations, *see* Pls. 56.1 ¶¶ 65, 79, 92-93, 108, 116, 117; Pls. Resp. ¶¶ 31; 60, 77, 95, 131; *see also* Pls. Mot. at 16-22; and *supra* at 13-16.[18]

Such conduct easily satisfies Arizona's standard for extreme and outrageous conduct, as it goes "beyond all possible bounds of decency" and is "atrocious and utterly intolerable in a civilized community." *Mintz*, 905 P.2d at 563 (citation omitted). "[M]ember[s] of the community"—including high-level government officials—regard this conduct as outrageous and intolerable. *See Doe v. Oesterblad*, No. 13-CV-1300, 2015 WL 12940181, at *5 (D. Ariz. June 9, 2015); Pls. 56.1 ¶¶ 126-129 (family separations "a human tragedy" (President Biden), "unconscionable" (Secretary Mayorkas), and "shameful" (Attorney General Garland)); *id*. ¶ 128 (Garland "can't imagine anything worse than tearing parents from their children"); Reiter Ex. 11, Agent C Tr. at 229:14-230:12; 232:11-19 (agreeing "completely inappropriate" to physically remove children who were holding on to their parents, say "Happy Mother's Day" to crying mothers, and mock indigenous accents); *see*

---

[18] The government argues that "[i]nsofar as Plaintiffs claim they were intentionally harmed, they cannot also maintain claims for negligence based on the same challenged acts or omissions." Mot. 24 n.23 (citing *Lewis v. Dirt Sports LLC*, 259 F. Supp. 3d 1039 (D. Ariz. 2017)). The government misreads *Lewis*. There, unlike here, defendants admitted their conduct was intentional—and thus could not be negligence. *Lewis*, 259 F. Supp. 3d at 1046. As the *Lewis* court noted, "[w]here a defendant's intent is genuinely disputed, intentional tort and negligence theories both may be considered by a jury." *Id*. at 1046 n.5.

1   *also id.* Ex. 13, Bash Tr. at 102:17-104:1 ██████████████████████████

2   ████████████████████████████████████████████████████████████████

3   ████████ ; *id.* Ex. 3, Hamilton Tr. at 347:16-348:14 ███████████████

4   ████████████████████████████████

5       Arizona courts have long held that "few acts [are] more calculated to engender a

6   sense of outrage in both the victim and the average member of the community" than the act

7   of separating children from their parents. *See Pankratz v. Willis*, 744 P.2d 1182, 1189 (Ariz.

8   Ct. App. 1987). And indeed, courts across the county have repeatedly found the

9   government's adoption and implementation of the DHS Referral Policy is shocking,

10  outrageous, and utterly intolerable. *See Ms. L. II*, 310 F. Supp. 3d at 1142-46; *W.S.R. v.*

11  *Sessions*, 318 F. Supp. 3d 1116, 1126 (N.D. Ill. 2018) (separations "can only be deemed

12  arbitrary and conscience shocking").[19]

13      Plaintiffs' position is that the undisputed material facts demonstrate that the

14  government's conduct was extreme and outrageous as a matter of law, and that government

15  officials recklessly disregarded the near certainty that severe emotional distress would result.

16  *See* Pls. Mot. at 16-21. While Plaintiffs believe they will ultimately prove that government

17  officials *intended* to cause them severe emotional distress, at the very least, the discovery

18  record establishes that, on the issue of intent, there are factual issues to present to the Court

19  at trial.

20  **<u>CONCLUSION</u>**

21      For the foregoing reasons, the Court should deny the government's motion for

22  summary judgment in its entirety.

23      Respectfully submitted this 24th day of April, 2023.

24

25                  /s/ *David B. Rosenbaum*
                David B. Rosenbaum

26  ────────────────────

27  [19] The forced separation of families is globally recognized as outrageous and intolerable. For example, the International Criminal Court recently issued an arrest warrant for Vladimir

28  Putin related to Russia's abduction and deportation of Ukrainian children, many of whom were then put up for adoption in Russia. *See, e.g.*, Reiter Ex. 99.

Travis C. Hunt
BriAnne N. Illich Meeds
OSBORN MALEDON, P.A.
2929 North Central Avenue,
21st Floor
Phoenix, Arizona 85012-2793

Diana Reiter*
Erik Walsh*
Lucy McMillan*
Harry Fidler*
Kaitlyn Schaeffer*
Brian Auricchio*
Julia Kindlon*
Anna Kaul*
Arnold & Porter Kaye Scholer LLP
250 West 55th Street | New York, New York 10019-9710
212-836-8000
diana.reiter@arnoldporter.com
erik.walsh@arnoldporter.com
lucy.mcmillan@arnoldporter.com
harry.fidler@arnoldporter.com
kaitlyn.schaeffer@arnoldporter.com
brian.auricchio@arnoldporter.com
julia.kindlon@arnoldporter.com
anna.kaul@arnoldporter.com

R. Stanton Jones*
David Hibey*
Emily Reeder-Richetti*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
202-942-5000
stanton.jones@arnoldporter.com
david.hibey@arnoldporter.com
emily.reeder@arnoldporter.com

Sean Morris*
Arnold & Porter Kaye Scholer LLP
777 S. Figueroa St., 44th Fl.
Los Angeles, CA  90017
sean.morris@arnoldporter.com

Jonathan H. Feinberg*
Kairys, Rudovsky, Messing, Feinberg
 & Lin LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
215-925-4400
jfeinberg@krlawphila.com

Mark Fleming*
Mark Feldman*
National Immigrant Justice Center
224 S. Michigan Ave., Suite 600
Chicago, IL 60604
312-660-1370
mfleming@heartlandalliance.org
mfeldman@heardlandalliance.org

Trina Realmuto
Mary Kenney*
National Immigration Litigation Alliance
10 Griggs Terrace
Brookline, MA 02446
857-305-3600
trina@immigrationlitigation.org
mary@immigrationlitigation.org

Katherine Melloy Goettel*
Emma Winger*
Gianna Borroto
American Immigration Council
1331 G Street NW, Suite 200
Washington, DC 20005
202-507-7512
202-742-5619
kgoettel@immcouncil.org
ewinger@immcouncil.org
gborroto@immcouncil.org

*Counsel for C.M. Plaintiffs*
*Admitted *pro hac vice*

1
2
3
4

### CERTIFICATE OF SERVICE

5
6

I hereby certify that on April 24, 2023, I electronically file the foregoing with the Clerk

7

of the Court via the Court's Electronic Filing System, which will provide electronic

8

notification to all filing users.

9
10
11

/s/Amy Ebanks

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28