David B. Rosenbaum (009819)
Travis C. Hunt (035491)
BriAnne N. Illich Meeds (036094)
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
Telephone: (602) 640-9000
drosenbaum@omlaw.com
thunt@omlaw.com
billichmeeds@omlaw.com
*Counsel for C.M. Plaintiffs*

*(Additional Counsel for Plaintiffs Listed on the Signature Page)*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

|  |  |
|---|---|
| C.M., on her own behalf and on behalf of her minor child, B.M.; et al.<br><br>Plaintiffs,<br><br>v.<br><br>United States of America,<br><br>Defendant. | No. 2:19-cv-05217-SRB<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANT'S 56.1 STATEMENT** |

Plaintiffs offer the following Response ("Resp.") to Defendant's Statement of Facts in Support of Motion for Summary Judgment (ECF 372). This document is supported by Plaintiffs' Statement of Undisputed Material Facts in Support of Plaintiffs' Motion for Summary Judgment (ECF 379) ("Pls. 56.1") and exhibits ("Fidler Ex."), as well as additional exhibits referenced herein that are described in, and attached to, the accompanying Declaration of Diana E. Reiter ("Reiter Ex.").

**Resp. ¶ 1**: Undisputed.

**Resp. ¶ 2**: Undisputed that under the relevant *Flores* court order, ICE must detain minors in a non-secure, licensed facility after 20 days. Disputed that ICE cannot house children in a family residential center ("FRC") after 20 days, provided ICE took steps to ensure the FRC was non-secure and licensed.

**Resp. ¶ 3**: Disputed. ICE has made operational choices not to establish non-secure, licensed family facilities in accordance with the *Flores* settlement agreement.

**Resp. ¶ 4**: Undisputed.

**Resp. ¶ 5**: Undisputed.

**Resp. ¶ 6**: Undisputed as to the authors, recipient, date, and title of the DHS Referral Memo, which speaks for itself.

**Resp. ¶ 7**: Undisputed.

**Resp. ¶ 8**: Undisputed that the DHS Referral Memo speaks for itself.

**Resp. ¶9**: Disputed. During implementation of the DHS Referral Policy (Option 3 of the DHS Referral Memo), government officials, particularly within U.S. Customs and Border Protection ("CBP"), used the phrase "amenable to prosecution" to refer to adults whom U.S. Border Patrol ("BP") apprehended for *suspected* violations of 8 U.S.C. 1325, based on the *possibility* they would be prosecuted, including adults whom BP never referred to the U.S. Attorney's Office ("USAO") for prosecution or whom the USAO declined to prosecute. Reiter Ex. 12, Agent R. 108:2-20 (agreeing that "amenable for prosecution" meant the person "can be prosecuted but ha[d] not yet been referred for prosecution"); *id.* Ex. 11, Agent C. 91:6-24 (defining amenable to prosecution as "an adult that meets our prosecution guidelines" and agreeing that it did not necessarily mean "referred for prosecution"); *id.* Ex. 10, Jordan 60:19-61:25 (agreeing that "amenable to prosecution" is a different question from whether a person was actually prosecuted); *id.* Ex. 14, Hastings 46:17-47:2 (explaining that amenable to prosecution meant "they can be prosecuted," but had not yet been referred for prosecution); *id.* 47:11-16 (explaining that a parent was still "amenable for prosecution" even where the parent had been referred for prosecution but DOJ had declined to prosecute); Resp. ¶ 116 (BP designated Plaintiff V.C. as "amenable for prosecution," yet never referred her for prosecution). BP referred to adults as "amenable to prosecution" even where—as in the case of four of five Plaintiff mothers—the adults were not eligible for prosecution due to BP's failure to timely Mirandize and take their statement within six hours of apprehension as required by statute (18 U.S.C. § 3501(c)) and USAO policy, or due to BP's failure to timely refer cases to the USAO for consideration and filing with the court within 48 hours of apprehension, as

required by *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991). *See* Fidler Ex. 26, Agent R. 181:13-22 (During implementation of the DHS Referral Policy, BP Prosecution Unit was instructed to refer all cases to USAO, even if the agent was aware of a "problem with [the] criminal case."); Reiter Ex. 15, Lokey 71:12-72:11; 143:9-144:21 (explaining legal requirements for prosecution, including 48-hour rule, and that the USAO discussed the requirements with BP agents); Reiter Ex. 10, Jordan 91:18-92:4 (BP directed to "refer all cases" to USAO); *id.* at 59:23-60:4 ("the direction was that we'd refer all subjects that were alleged to have illegally entered the United States regardless of family unit status"); *id.* Ex. 12, Agent R. 188:15-24 ("Q. [Y]ou didn't have any authority to refuse to refer cases to the [USAO] in May of 2018? A. Correct."); Resp. ¶¶ 54, 63, 80 98 (C.M., O.A., L.G., and M.R. ineligible for prosecution due to various legal requirements).[1]

**Resp. ¶ 10**: Undisputed that CBP Commissioner Kevin McAleenan and others participated in several meetings with Department of Homeland Security ("DHS") Secretary Kirstjen Nielsen to discuss the DHS Referral Memo and Policy. Disputed as to what was discussed at these meetings; the cited testimony does not support the assertion that the meetings were "to discuss readiness and operational aspects of the implementation of the proposed options." Plaintiffs were not afforded the opportunity to depose Nielsen. Acting Director of U.S. Immigration and Customs Enforcement ("ICE") Thomas Homan testified that he informed Nielsen at such meetings that ICE, the agency responsible for reunifying families separated under the DHS Referral Policy, had "dealt with reunification in the past," yet he acknowledged that ICE had never previously dealt with family separations on the scale that occurred under the Policy. Reiter Ex. 7, Homan 48:17-50:1. Homan also testified that Matthew Albence, ICE Executive Associate Director, would have been responsible for ensuring that ICE and HHS personnel were adequately trained prior to implementation, and Albence testified that ███████████████████████████

---

[1] *See also* Reiter Ex. 11, Agent C. 157:22-158:5 (agreeing that in Yuma, the directive was "to refer for prosecution all adults in family units who had children five and over"); *id.* at 314:17-315:14 ("Q. [F]or [Plaintiff] families…[t]he children were sent to ORR custody [and] prosecution of the mother was [] declined…in each of those cases, the separation[s]…[were] mandated by the directives that had been given to you from the chain of command, correct? A. Yes.")

1    ████████████████. *Id.* at 100:7-21; *id.* Ex. 2, Albence 177:24-178:13. Before the Policy

2    was implemented, Homan did not see a reunification plan and did not know the details of

3    how reunification would be effectuated. *Id.* Ex. 7, Homan 40:10-42:1; 53:19-54:8. Key

4    operational personnel were not informed of the Policy until its implementation or shortly

5    prior to implementation, Pls. 56.1 ¶¶ 32-35; *see generally* Fidler Ex. 13 (DHS Office of

6    Inspector General ("OIG") report describing DHS's failures to adequately plan for

7    implementing the Policy).

8        **Resp. ¶ 11**: Disputed. Homan's testimony suggests he did not think prosecution

9    alone would be effective in reducing illegal border crossings. Reiter Ex. 7, Homan 68-69

10   ("Q. And you understood that the prosecution of adults in family units would lead to

11   separation, correct? A. I understood that if we prosecuted these parents *and* deport them,

12   it provides a consequence. [...] The consequence was deportation."). McAleenan testified

13   there was an "understanding" that prosecution *and* detention affected "choices to cross"

14   the border, and that Nielsen "was aware, generally, of both prosecution affecting the flow

15   *as well as* detention through removal in an immigration proceeding reducing the number

16   of people attempting to cross because they would not be successful in doing so." Reiter

17   Ex. 1, McAleenan 265:1-7; *Id.* Ex. 103, McAleenan 138:21-25. This paragraph omits the

18   material fact that since at least February 2017, two authors of the DHS Referral Memo—

19   McAleenan and Homan—as well as other senior officials, had been advocating for a

20   policy to separate family units apprehended along the southwest border, arguing that

21   separating families would be effective in deterring immigration. *See, e.g.*, Fidler Ex. 86,

22   McAleenan at 112:22-113:4 ███████████████████████████████████████

23   ████████████████████████████████████████████████████████"); Fidler

24   Ex. 2, Swartz at 14:1-13 (█████████████████████████████████████████

25   ██████████████████████████████████████████████████████████ of

26   ████████████████████████████████████████████████████████████

27   ███████*d.* at 11:24-12:2 ███████████████████████████████████████

28   ████████████████████████████████████████████); Reiter Ex. 2, White

1   79:15-82:16 ███████████████████████████████████████████

2   ████████████████████████████████████████████████████████

3   ███████████████████████████ *id.* at 82:18-83:9 ███████████

4   ████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████

6   █████████████ *id.* at 105:15-107:7 ██████████████████████

7   ████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████

10  ███████████████ ; *id.* at 95:14-97:12 ███████████████████

11  ████████████████████████████████████████████████████████

12  ████████ *id.* at 92:8-95:3 ███████████████████████████████

13  ████████████████████████████████████████████████████████

14  ██████████████████████████████ *id.* Ex. 79 (Feb. 16, 2017 email from

Maggie Wynne, Counselor to the HHS Secretary for Human Services Policy, to an

individual at the White House Executive Office of the President, explaining that "DHS

propose[d] separating children in family units [...]. DHS would do this [...] as a deterrent

to families who have not yet entered the U.S." and that "DHS stressed to[] ORR that the

overall intent of the action is to serve a deterrent in the longer term"). Senior officials

regularly referred to this plan as the "family separation policy" or "family separation

proposal," and, throughout most of 2017, the proposed policy was not tied to

prosecutions—i.e., CBP would separate families independent of any prosecution referral

or process. *See, e.g, id.* Ex. 7, Homan 81:15-23 (family separation proposal in 2017 did

not include a prosecution element); *id.* Ex. 80 (Aug. 14, 2017 Blank email to Homan

reporting on how a meeting with DHS Acting Secretary Elaine Duke "c[a]me out in terms

of making decisions or authorizing the separation of families. Matt [Albence] gave me a

brief and it appears this was a not a good meeting in terms of decisions. Calls for more

paper and 'kicking the can down the road.' No authorization to separate families."); *id.*

Ex. 76 (Sept. 5, 2017 Blank email to Homan responding to DHS Policy objections: "It is a strong statement of opposition to what ICE wants to do in terms of separating families."); *id.* Ex. 35 (Sept. 5, 2017 Homan email responding to Blank: "Well, I am not giving up. I will fight it.").[2]

Throughout these discussions, officials continued to emphasize the policy's expected "deterrent effect." *See, e.g.*, Pls. 56.1 ¶ 2 (quoting then DHS Secretary John Kelly's notes: ███████████████████████████████████████

Reiter Ex. 86 ████████████████████████

█████████████████████████████████████████████, *id.* Ex. 44 (Sept. 2017 draft of Separation Memo discussing a ████████████████████████████████████████ ████████████████████████████████████

---

[2] *See also* the following contemporaneous documents referring to the proposed policy to separate families: Reiter Ex. 81 (Aug. 8, 2017 Homan email to McAleenan, Chad Wolf (then Deputy Chief of Staff to Duke), and Gene Hamilton (then Senior Counsel to Duke) in response to a report of an increase in apprehensions along the southwest border: "Very concerning. Gene, we need to discuss my proposal for separation."); *id.* (Aug. 8, 2017 email from ICE Chief of Staff Thomas Blank: "Tom [Homan] has been advocating that we need to separate family units and send the adults to adult detention and the children to HHS. If we announced that, how bad do you think it would get??"); *id.* Ex. 42 ███████████████████ ████████████████████████████████████ Reiter Ex. 32 ███████████

Ex. 34 (Sept. 2017 email discussing concerns raised by DHS's Office of Policy ("DHS Policy") about the "Family Separation/Detention" proposal); *id.* Ex. 82 (Dec. 2017 email discussing "Immigration and Border Security briefing" for Nielsen, who was confirmed as DHS Secretary earlier that week, and referencing the "[s]eparation of families proposal"); *id.* Ex. 48 at 1, 3, 18 (Dec. 10, 2017 briefing for Nielsen discussing ███████████████ ████████████████████); *id.* Ex. 83 (Jan. 2018 memo prepared for the "DHS FAMILY SEPARATION WORKGROUP"); *id.* Ex. 57 (Mar. 2018 document prepared for ████ ███████████████████ *id.* Ex. 56 (Mar. 2018 email chain listing attendees at "Family Separation Issue Meeting"); *id.* Ex. 84 (Mar. 12, 2018 email ████████ ████████████████████████████████████████████ Reiter Ex. 85 (Apr. 6, 2018 email ██████████████ ████████████ *id.* Ex. 25 (May 2018 draft memo ████████████████████ ████████████████████████████ *id.* Ex. 71 at -601 ██████████████ ████████████████████████████ Reiter Ex. 72 ████████ ████████); *id.* Ex. 75 and Fidler Ex. 33 (May 21, 2018 materials prepared by DHS's Office of Civil Rights and Civil Liberties referring to DHS Referral Policy as "family separation").

1    ████████ Reiter Ex. 46 (Oct. 2017 ████████████████████████████

2    ███████████████████████████████████████████████████ *id.* Ex. 87

3    (Nov. 2017 email noting "ICE recommends a change regarding the detention of family

4    units, by separating detained parents from their children during removal proceedings. This

5    would be intended to deter families from illegally entering the United States.").[3]

6          A prosecution element was not added to the proposed family separation policy until

7    December 2017. *See, e.g.*, *id.* Ex. 95 (Dec. 4, 2017 McAleenan email to Homan and other

8    officials, ████████████████████████████████████████████████████████

9    ████████████████████); Reiter Ex. 88 (Dec. 16, 2017 email preparing bullet

10   points on "UAC Response" options for Nielsen, including an option to "Instruct CBP and

11   ICE to significantly increase the prosecution of family unit parents [...]. The parents would

12   be prosecuted for illegal entry (misdemeanor) or illegal reentry (if they have been

13   previously deported) and the minors with them would be placed in HHS custody as UACs.

14   [...] Not all parents could be criminally prosecuted because of the large number of families

15   illegally entering, but the increase would be reported and it would have a deterrent

16   effect."); *id.* Ex. 94 (Dec. 17, 2017 draft memo, prepared for Nielsen and discussing

17   "Policy Options to Respond to Border Surge," noting "substantial deterrent effect" ████

18   ████████████████████████████████████████████████████████████

19   ████████ *id.* Ex. 37 at -652A ████████████████ *id.* Ex. 54 at -204A-10A (Jan. 18,

20   2018 draft memo discussing policy proposal); *id.* Ex. 55 at -540 (Jan. 19, 2018 "DHS

21   UAC Policy Decisions Talking Points" discussing "substantial deterrent effect"). As

22   memorialized in handwritten notes reflecting a call between then-AG Sessions in May

23   2018 with Southwest Border United States Attorneys, ████████████████████████

24   ████████ Reiter Ex. 26 at -596; *see also id.* Ex. 89 at -665 (Dec. 18, 2017 Blank email

25   forwarding the Dec. 16 "Policy Options" memo and commenting: "We think we might

---

[3] *See also, e.g.* Reiter Ex. 43 (Aug. 2017 ████████████████████████
███████████████████ *id.* Ex. 96 at -777 (October 3, 2017 draft
███████████████████████████████████████████████████████████

have the greenlight to separate [family units] . . ..").

Although the DHS Referral Policy implemented in May 2018 on its face contained a prosecution element, Pls. 56.1 ¶ 18, it effectively was no different than the family separation policy proposed in 2017 in that DHS separated apprehended family units regardless of whether the adults were prosecuted or even referred for prosecution. *See* Pls. 56.1 ¶ 40 (Yuma BP agents knew the USAO might not prosecute adults referred for prosecution, and BP separated families before USAO had any input on whether there would be a prosecution); Resp. ¶¶ 9, 42 (explaining process); Resp. ¶¶ 54, 63, 80, 98; Reiter Ex. 73 (May 7, 2018 email reflecting Arizona USAO did not have capacity to prosecute everyone, but families were separated anyway); *id.* Ex. 7, Homan 213:9-215:19 (explaining "the only difference" between the detention proposal and the Policy was that "everybody across the board [was] going to be referred for prosecution").

**Resp. ¶ 12**: Undisputed that the agency heads who proposed the policy options in the DHS Referral Memo testified in this litigation that the prompt removal of inadmissible non-citizens who had been ordered removed was one action that might reduce illegal border crossings. Disputed that McAleenan, Homan, and other senior officials believed the DHS Referral Policy would result in the *prompt* removal of non-citizens. *See, e.g.*, *id.* Ex. 38 at -649, -650 (DHS Policy's written objections to ICE's memo recommending a separation policy, which were circulated to Homan and Albence and noted: ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████ ████ ████████ ███████ ███████ *id.* Ex. 2, Albence 131:20-135:20 (acknowledging that ███████████████████████████████████

███████████████████████████████████████

███████████████████████ Further, this paragraph omits that McAleenan, Homan, and other senior officials had been advocating for a policy that would permit them to separate non-citizen parents and children since at least February 2017 on the basis that it

- 8 -

would be effective in deterring immigration. *See* Resp. ¶ 11.

**Resp. ¶ 13**: Disputed, except undisputed that the agency heads who proposed the policy options in the DHS Referral Memo testified in this litigation that the detention of adult non-citizens pending removal was an effective tool to ensure that the removal proceedings were completed and removal, if ordered, could be effectuated. Disputed that McAleenan, Homan, and other officials believed the DHS Referral Policy would result in the *prompt* removal of non-citizens. *See* Resp. ¶ 12. Further, this paragraph omits that McAleenan, Homan, and other officials had been advocating for a policy that would permit them to separate non-citizen parents and children since at least February 2017 on the basis that it would be effective in deterring immigration. *See* Resp. ¶ 11.

**Resp. ¶ 14**: Undisputed, but see Resp. ¶ 11.

**Resp. ¶ 15**: Undisputed that the DHS Referral Policy speaks for itself.

**Resp. ¶ 16**: Disputed. The DHS Referral Policy did not authorize the continued separation of families once the parents were transferred to ICE custody pending removal proceedings. Continued separation of families violated both existing ICE policy and the law. *See, e.g.*, *Ms. L. v. ICE*, 310 F. Supp. 3d 1133, 1144-46 (S.D. Cal. 2018); Fidler Ex. 83 § 1.9 (CBP should maintain family unity "to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation."); *id.* at § 1.9 4.3 ("Family Units: Generally, family units with juveniles should not be separated . . . "); *id.* § 5.6 (same); Resp. ¶ 31. In 2017, McAleenan, Albence, Homan, and other officials considered an "administrative separation policy," i.e., family separations as a result of the adult's detention while in removal proceedings, regardless of whether the parent was prosecuted, but legal and logistical concerns were raised and it was never formally approved. *See* Resp. ¶ 11; *see also* Reiter Ex. 38 at -649-50

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

*id*. Ex. 40 (similar); *id*. Ex. 44 ████████████████████████

1    ██████████████████████████████████████ *id*. Ex. 45 (revised

2    Separation Memo noting ████████████████████████; *id*. Ex. 64 at

3    519A-21A (email noting concerns, ████████████████

4    ████████████████████████████; *id*. Ex. 65 (████████████████

5    ████████████████████████████████████████████████████

6    ████████████ *id*. Ex. 66 ████████████████████████████

7    ████████████████████; *see also id*. Ex. 43 (August 2017 draft of Separation

8    Memo (WF 1148722) ████████████████████████); *id*. Ex. 6,

9    McCament 79:9-82:5, 281:21-287:22 ████████████████).

**Resp. ¶ 17**: Disputed that there was no prescribed specific course of action for

reunification. Prompt reunification was required by law and existing ICE Policy. Resp. ¶

16. Undisputed that the government had no plan as to when or under what circumstances

separated families would be reunited. *See* Pls. 56.1 ¶¶ 24, 47-50, 124.

**Resp. ¶ 18**: Disputed.[4] Nielsen was repeatedly warned that separating families

would cause parents and children to suffer severe and lasting trauma. Pls. 56.1 ¶¶ 3-5,

13-16, 51.[5] The DHS Referral Memo contained no plan for how to track separated

families, ensure separated family members could communicate, or reunite families. *See*

Pls. 56.1 ¶¶ 25-27. Nielsen nonetheless authorized the DHS Referral Policy knowing that

DHS would separate families immediately, Fidler Exs. 19 & 20, thereby recklessly

disregarding the substantial risks of causing severe harm to separated families and

---

[4] Defendant opposed Plaintiffs' request to depose Secretary Nielsen and Plaintiffs were not afforded the opportunity to do so.
[5] *See also* Reiter Ex. 41 (March 2017 letter (Fidler Ex. 6), received by Nielsen, warning that "the emotional and physical stress children experience as they seek refuge in the United States [could be] exacerbated by the additional trauma of being separated from their [families]."); Reiter Ex. 61 at -932 ("It is deeply troubling that as a matter of policy we would retraumatize these children by separating them from their families."); *id*. Ex. 63 at -492 (explaining that "separation from a parent can cause significant negative mental health effects in children"); *id*. 62 at -979-80 (describing how family separation would exacerbate children's existing trauma and that separating non-citizen adults and children could lengthen and create inefficiencies in the legal process); *id*. Ex. 102, Wolf 329:20-330:25 (explaining discussions about 2018 AAP letter among Homan, McAleenan, and Nielsen were more about the fact that "they had received the letter" than about concern for the welfare of children); *id*. at 264:13-24; 269:1-21; 298:1-25 ████████████████████████

without ensuring there was a plan for tracking those separated or facilitating communication between separated family members, and without any reunification plan. Pls. 56.1 ¶¶ 25-28. And after the June 22, 2018 Executive Order purportedly ending family separation, Nielsen provided "clear [] direction" that families should not be reunited until removal. Reiter Ex. 93 at -746. Nielsen's decision to intentionally prolong separations until long after a parent's prosecution and sentence were completed (where such a prosecution even occurred) undermines the Congressional testimony cited, which claimed that the separations were merely a byproduct of prosecuting "parents who had broken the law," Defs. Ex. B Att. 2 at 15-16, as is the fact that many parents, including Plaintiffs, were separated from their children yet were never prosecuted.

   **Resp. ¶ 19**: Undisputed that DHS officials claimed these were the policy objectives for the DHS Referral Policy in this litigation and in Congressional hearings after the Policy became public knowledge, but this paragraph omits the voluminous record of documents contemporaneous to the Policy's development and implementation showing that its purpose was to deter immigration by separating families. Resp. ¶¶ 11, 13; *see also* Reiter Ex. 97 (Jan. 2018 email between ICE officials regarding potential "talking points" that were "based on the prep materials for [Nielsen's] hearing," in which one official remarked: "I thought we were supposed to stay away from any mention of separating families as a deterrence tool?").

   **Resp. ¶ 20**. Disputed. *See* Resp. ¶¶ 12, 17; Pls. 56.1 ¶¶ 48-50.

   **Resp. ¶ 21**. Undisputed that McAleenan testified in this litigation that other policies were discussed and considered.

   **Resp. ¶ 22:** Undisputed that these agencies held meetings prior to implementation of the DHS Referral Policy. Disputed to the extent the assertion implies that the government had adequate resources and was ready to implement the Policy; the record in this case and the DHS OIG's detailed findings in its November 25, 2019 report establish that the government was not prepared to implement the DHS Referral Policy. *See* Pls. 56.1 ¶¶ 31-36, 45; Fidler Ex. 13.

**Resp. ¶ 23**: Undisputed that the ConOp speaks for itself.

**Resp. ¶ 24**: Undisputed that McAleenan testified that he provided this direction, but immaterial as minor Plaintiffs were not under five years old at the time of separation.

**Resp. ¶ 25**: Undisputed.

**Resp. ¶ 26**: Undisputed that no such directives had been issued, but government officials violated the Trafficking Victims Protection Reauthorization Act ("TVPRA") by designating Plaintiff children as UACs because Plaintiff mothers were not "[un]available to provide care and physical custody" to Plaintiff children. *See* 6 U.S.C. § 279(g)(2); *see also* Reiter Ex. 90 at -428 (2018 memo describing CBP and ICE policies, including instructions that "[i]f a parent or legal guardian is available to provide care and custody for an alien child, then the child does not meet the definition of a UAC."); *id.* Exs. 91 & 92 (2009 and 2010 CBP guidance providing the same direction); *id.*10, Jordan 130:10-131:10 (children were referred to ORR as UACs even where the parent was still present, because BP "expect[ed] that the parent would not be there to care for the child"); *id.* at 110:18-113:21 (children were deemed UACs "once [BP officers] determine[d] that [they] *intended* to *refer* [the parent] for prosecution") (emphasis added).[6]

**Resp. ¶ 27:** Undisputed, but see Resp. ¶ 26 regarding the unlawful designation of Plaintiff children as UACs.

**Resp. ¶ 28:** Disputed to the extent that it implies ICE had an existing policy or process that authorized the continued separation of families pending removal proceedings. *See* Resp. ¶¶ 22, 30-31.

**Resp. ¶ 29**: Undisputed but immaterial because Plaintiffs were not transferred tto ICE as family units.

**Resp. ¶ 30**: Disputed. The government did not have a plan for how reunification

---

[6] *See also* Reiter Ex. 10, Jordan 124:2-15 ("[I]f [BP agents] had made the determination that we *intended* to [] refer that adult for prosecution, then [] we…refer[red] the child for placement with [ORR] because we *believed* that that parent *would* be sent to the US Marshal Service and would be prosecuted.") (emphases added); *id.* at 127:10-130:5 (children referred to ORR based on BP officers' *intention* to refer the adult for prosecution); Fidler Ex. 10, Hastings 46:3-21 (CBP considered child a UAC "immediately upon the encounter with the child, if the adult is [deemed] amenable [to prosecution]")

would be effectuated under the DHS Referral Policy. *See* Resp. ¶ 17. There is also no evidence in the record that during implementation of the Policy, parents were given the option to be reunified and repatriated together upon removal, nor is there evidence that they were told this was an option.

**Resp. ¶ 31**: Disputed. The DHS Referral Policy was a significant policy change. Pls. 56.1 ¶ 29. While it is unclear how Defendant defines "processing non-citizen parents and children upon apprehension," prior to implementation of the Policy, it was not the practice of the Yuma Sector BP to systematically designate adults in apprehended family units as "amenable for prosecution" and refer them for prosecution. Resp. ¶ 9, 16; *see also* Pls. 56.1 ¶ 40. It also was not the practice of the Yuma Sector BP to systematically refer non-citizen children accompanied by their parents for ORR placement where there was no concern as to criminal history of the parent, threats to the safety of the public or child welfare concerns, an outstanding warrant for the adult, illness or other medical issues impacting the parent's ability to care for the child, or concerns relating to parentage (*see* Def.'s ¶56.1 42); in fact, the designation of Plaintiff children as UACs violated the TVPRA because Plaintiff mothers were "available to provide care and physical custody" at the time of designation. 6 U.S.C. § 279(g)(2); *see also* Resp. ¶ 26. Disputed that officials utilized pre-existing processes or practices for establishing communication between separated families. As of July 6, 2018, nearly two months after implementation of the policy, ICE was still attempting to develop processes to facilitate communication between separated parents and children. Pls. 56.1 ¶ 45; *see also id.* at ¶ 53 (describing June 16, 2018 email noting there were "790 kids in our shelters who are not able to contact their parents."); *see generally* Fidler Ex. 13.[7] Disputed that ICE and ORR utilized

---

[7] Indeed, DHS officials were aware they did not have a functioning system or process to *link* parents and children, much less facilitate communication between them. *See generally* Fidler Ex. 13; *see also* Reiter Ex. 101, McCament 236:13-237:24 (acknowledging that system upgrades for tracking separated families that ICE employees had been requesting since January 2018 were not made before DHS Referral Policy was issued.); *id.* Ex. 16, Harper 86:23-87:21; 91:1-25; 99:25-101:5; 141:21-142:13; 149:10-150:24;156:7-157:2 (discussing difficulty in linking separated adults and children); Fidler Ex. 3 at 314:6-13 (agreeing that DHS "implemented a policy to separate families without establishing a system that would

pre-existing processes or practices regarding reunification. In fact, the government agencies and departments responsible for reunifying separated families did not have a consistent understanding of the basic elements of a reunification plan, e.g., when and under what circumstances DHS would permit and facilitate reunification of separated families. *See* Resp. ¶ 17; Pls. 56.1 ¶ 45 (quoting Fidler Ex. 13 at -941). As of July 6, 2018, two months after implementation of the Policy, ICE was still developing a reunification process. *Id.* (citing Pls. Ex. 13 at -926-42 (detailing tracking issues and concluding that "[a]s of March 2019, [a joint ICE-HHS] working group still did not have a formal reunification plan in place") and Ex. 3 at 304:23-309:20 (testifying that ICE did not maintain the information required to reunify families); Pls. 56.1 ¶ 47.

**Resp. ¶ 32**: Undisputed that the document speaks for itself.

**Resp. ¶ 33:** Undisputed that the electronic system provided an opportunity to include a parent's name and Alien Registration Number ("A number"). Disputed that in May 2018 there was any electronic system that provided a feature through which BP agents could indicate that the child had been separated from their parent, Reiter Ex. 23 at -660 & Reiter Ex. 24 at -595-99, or the parent's location, Pls. 56.1 ¶ 45; Fidler Ex. 13.

**Resp. ¶ 34:** Undisputed, but this paragraph omits that while the Policy was in effect, the Processing, Screening, and Transportation ("PST") Unit also made ORR placement requests for children that were not UACs, including Plaintiff children, and for whom there was only a *possibility* that their parent or guardian would be accepted for prosecution and thus, according to Defendant, unavailable to provide care and physical

---

allow the government to link parents and children"); Reiter Ex. 9, Guadian 101:20-103:19 ("ORR…had kids at their shelters that were asking to communicate with their parents [] in ICE custody but ICE had no idea that we even had that particular parent in custody."). Even where the parent's identity and location was known, case workers had difficulty establishing reliable contact with parents. *Id.* Ex. 17, Case Worker Z. at 25:9-13 (explaining it was "time consuming" to locate parents because case workers had to "call around and look for [them]"); *id.* at 105:9-19 (acknowledging that, even with L.G.'s name and A-number, shelter was unable to locate L.G. for first two weeks of B.G.'s detention); *id.* Ex. 18, Case Worker C. at 64:1-14 ("It was very difficult to maintain contact with the parents after the separation, even after locating them"); *id.* at 134:13-136:20; 137:16-19; 139:2-140:24; 147:6-24; 148:24-149:9; 158:6-159:10; 168:8-13 (describing difficulty of locating and maintaining contact with C.M. even though they had her name and A-number); *id.* Ex. 19, Case Worker R. at 90:3-91:18; 152:9-160:15 (explaining that even with parent's A-number, it could still be difficult to facilitate communication).

custody. Resp.¶¶ 26, 34, 54, 63, 80, 98.

**Resp. ¶ 35:** Undisputed that during implementation of the DHS Referral Policy, when a Yuma Sector BP agent in the PST Unit identified an adult non-citizen in a family unit as amenable for prosecution, a request to ORR for placement of the child was made as soon as possible. Disputed that any additional steps were taken to "process[ ]" the parents for prosecution before BP submitted a request to ORR for placement of the child. Resp. ¶ 26. Disputed that the request to ORR for placement of the child was consistent with practices in place prior to the Policy as there is no evidence in the record that, before the Policy, BP systematically designated children apprehended in family units as UACs when their parent was "available to provide care and physical custody," such as Plaintiffs. 6 U.S.C. § 279(g)(2); *see* Resp. ¶¶ 26, 34, 54, 63, 80, 98.

**Resp. ¶ 36:** Undisputed, however transfer of the file to the Prosecution Unit could take days and in Plaintiffs' cases occurred *after* their children had been transferred to ORR custody. Def. Ex. D, Att. 1 at -090, -093; *id.* at Att. 2 at -089-90, -103; *id.* at Att. 3 at -112-113, -116; *id.* at Att. 4 at -135-36, -139.

**Resp. ¶ 37:** Undisputed to the extent that "responsible" indicates the Prosecutions Unit managed the process for sending prosecution referrals to the Arizona USAO. Disputed to the extent "responsible" implies the Prosecutions Unit had any discretion as to which cases to refer while the Policy was in effect. BP agents were directed to refer for prosecution all parents who crossed the border without inspection, even if they knew or had reason to believe the referrals would not be accepted. Pls. 56.1 ¶ 42; Resp. ¶ 9.

**Resp. ¶ 38:** Undisputed.

**Resp. ¶ 39:** Undisputed.

**Resp. ¶ 40:** Undisputed.

**Resp. ¶ 41:** Disputed. Defendant does not cite documentary evidence supporting the assertion that the majority of family units were not separated and, in the Yuma Sector, where Plaintiffs were apprehended and separated, the majority of apprehended family units (58%) were separated. Reiter Ex. 58 at -662.

**Resp. ¶ 42:** Undisputed with respect to the time period prior to implementation of the DHS Referral Policy. Disputed as to the time period during which the Policy was in effect. During this latter period, unlike during the former period, BP agents were instructed to separate all adults potentially "amenable to prosecution" for alleged violations of 8 U.S.C. § 1325 (regardless of actual prosecution) from their children except for cases presenting "humanitarian" reasons, which included not separating parents from children 4 years old or younger. Fidler Ex. 24 at 180:16-23 ("Q. [A]s of May of 2018, is it accurate to say that, regardless of what happened with the prosecution, your directive was to separate parents and children? A. Those amenable, yeah."); Reiter Ex. 10, Jordan 90:1-99:25 (explaining directive) ; Resp. ¶ 26.

### *C.M. and B.M.*

**Resp. ¶ 43:** Undisputed, however, C.M. and B.M. were seeking asylum in accordance with 8 U.S.C. § 1158(a)(1) (authorizing individuals the right to seek asylum even if they entered between ports of entry). Pls. 56.1 ¶ 84.

**Resp. ¶ 44:** Undisputed.

**Resp. ¶ 45:** Disputed. C.M. was never "processed for prosecution." BP agents never formally referred C.M. to the USAO for possible prosecution because BP had failed to refer her case to the USAO in time to be filed with the court within 48 hours of apprehension, as required by *Riverside. See* Def. Ex. H; Reiter Ex. 12, Agent R. 99:3-100:10. The USAO declined to prosecute C.M. and she was never transferred into criminal custody. Pls. 56.1 ¶¶ 97-98. Undisputed that BP agents identified C.M. as "amenable to prosecution." Undisputed that BP agents made an ORR placement request for B.M.

**Resp. ¶46:** Undisputed, however DHS officials failed to communicate with LSSNY regarding ICE's transfers of C.M. to different facilities, and as a result LSSNY could not locate C.M. for weeks. Pls. 56.1 ¶¶ 93-94

**Resp. ¶ 47:** Undisputed, but because the family relationship and identifying information were not linked between DHS databases, ICE Field Office Juvenile Coordinators ("FOJCs") were required to manually read thousands of I-213s to identify

connections between family unit members and then reconstruct family relationships and manually track family members' locations in a shared document. Resp. ¶ 31, n. 4.

**Resp. ¶ 48:** Undisputed, but see Resp. ¶ 47.

**Resp. ¶ 49:** Undisputed, but this paragraph omits that B.M. was flown to New York, arriving at LSSNY at 3:00 a.m. Pls. 56.1 ¶¶ 86-89; Reiter Ex. 18, Case Worker C. 69:21-71:12; Reiter Ex. 59. B.M.'s book out and transfer occurred prior to BP taking any steps to refer C.M. to the USAO for potential prosecution. *See* Pls' Resp. ¶¶ 45, 54.

**Resp. ¶ 50:** Undisputed.

**Resp. ¶ 51:** Undisputed, but see Resp. ¶ 46.

**Resp. ¶ 52:** Disputed to the extent Defendant suggests C.M. was processed for prosecution. *See* Resp. ¶ 45.

**Resp. ¶ 53:** Disputed. The I-213 does not contain "criminal charges for violation of 8 U.S.C. § 1325." The I-213, created by a BP processing agent, only states that agent's expectation that C.M. would be presented for prosecution. Def. Ex. D, Att. 1 at -038-39; Reiter Ex. 12, Agent R. 58:18-59:3 (explaining BP's "prosecution unit," not processing agents, prepare and refer cases to USAO). Undisputed that the I-213 states that C.M. was served a Notice to Appear that initiates immigration proceedings, but Defendant's record citation does not contain the Notice to Appear or proof of its service.

**Resp. ¶ 54:** Disputed that C.M. was referred to the USAO for criminal prosecution. On May 14, 2018, BP emailed a list of individuals, including C.M., for whom BP had already violated the 48-hour rule. *See* Def. Ex. H. at -982. BP was seeking USAO's guidance on whether to proceed with referrals. *Id.* at -0981. Undisputed that within hours, the USAO declined to consider C.M. and others on the list for prosecution. *Id.*

**Resp. ¶ 55:** Undisputed that C.M. was transferred to ICE civil detention.

**Resp. ¶ 56:** Undisputed.

**Resp. ¶ 57:** Undisputed, but the government was required to permit C.M. to reopen her removal proceeding pursuant to class settlements in *M.M.M. v. Sessions*, No. 1:18-cv-

1832-DMS (S.D. Cal.); *M.M.M. v. Sessions*, No. 1:18-cv-1835-PLF (D.D.C.); *Ms. L v. ICE*, 3: 18-cv-428 (S.D. Cal); and *Dora v. Sessions*, 18-cv-1938 (D.D.C.).

**Resp. ¶ 58:** Undisputed.

**Resp. ¶ 59:** Undisputed.

**Resp. ¶ 60:** Disputed. B.M.'s LSSNY case manager testified that B.M. communicated with C.M. by telephone on only three occasions (May 17, May 31, and July 12) totaling a maximum of 19 minutes during their 76 days of separation. Reiter Ex. 18, Case Worker C. 170:23-172:20; *see also id*. 134:13-136:20; 137:16-19; 139:2-140:24; 147:6-24; 148:24-149:9; 158:6-159:10; 168:8-13 (explaining difficulties with locating and communicating with C.M.).

### *L.G. and B.G.*

**Resp. ¶ 61:** Undisputed, but L.G. understood she was entering lawfully at an official port of entry and both she and B.G. were seeking asylum in accordance with 8 U.S.C. § 1158(a)(1) (authorizing individuals the right to seek asylum even if they entered between ports of entry). Pls. 56.1 ¶ 112; Reiter Ex. 22, L.G. 59:15-61:7.

**Resp. ¶ 62:** Undisputed.

**Resp. ¶ 63:** Disputed. L.G. was never "processed for prosecution." BP agents failed to timely Mirandize and take L.G.'s statement within six hours of arrest as required by law (18 U.S.C. § 3501(c)) and USAO policy. Def. Ex. D, Att. 2 at -088-90; Reiter Ex. 12, Agent R. 90:21-91:7; 92:6-16; 97:21-98:7; *id.* Ex. 50; *id.* Ex. 51 at -062. Nevertheless, on May 18, 2018, BP agents referred L.G. to the USAO for possible prosecution. Def. Ex. D, Att. 2 at 089-90; Reiter Ex. 12, Agent R. 54:2-17. The USAO declined to prosecute L.G. based on "Miranda violation" and she was never transferred into criminal custody. Pls. 56.1 379, ¶¶ 118-19; Reiter Ex. 12, Agent R. 292:12-19; *id.* Ex. 52 at -003. Undisputed that BP agents identified L.G. as "amenable to prosecution." Undisputed that BP agents made an ORR placement request for B.G., but this request was made after agents failed to timely Mirandize and take L.G.'s statement.

**Resp. ¶ 64:** Disputed to the extent Defendant suggests that L.G. was processed for prosecution. *See* Resp. ¶ 63. BP agents did not refer L.G. to the USAO until May 18, 2018, and the USAO did not decline to prosecute her until later that day, and thus BP's processing was not complete until after that point. Def. Ex. D, Att. 2 at -089-90.

**Resp. ¶ 65:** Disputed. The I-213 does not contain "criminal charges for violation of 8 U.S.C. § 1325." The I-213, created by a BP processing agent, only states that agent's expectation that L.G. would be presented for prosecution. Def. Ex. D, Att. 2 at 086-88; Reiter Ex. 12, Ramirez 58:18-59:3 (explaining that BP's "prosecution unit," not processing agents, prepare and refer cases to USAO). Undisputed that the I-213 states that L.G was processed with a "disposition" of "Expedited Removal with Credible Fear," but the record citation does not contain an expedited removal order or proof of service.

**Resp. ¶ 66:** Undisputed.

**Resp. ¶ 67:** Undisputed, but see Resp. ¶ 47.

**Resp. ¶ 68**: Undisputed, but see Resp. ¶ 47.

**Resp. ¶ 69:** Undisputed, but this paragraph omits that B.G.'s book out and transfer occurred a day *before* BP referred L.G. to the USAO for potential prosecution, and that no government officer provided L.G. with information about where they were taking B.G. *See* Resp. ¶ 63; *see also* Fidler Ex. 69, LG. 83:19–84:1, 90:3–5; 95:6-16; Reiter Ex. 22, L.G. 92:14-16; 87:9-13.

**Resp. ¶ 70:** Undisputed.

**Resp. ¶ 71:** Undisputed, but the same report states that Southwest Key staff could not locate B.G.'s mother using the ICE Locator. Def. Ex. F, Att. 2 at -370.

**Resp. ¶ 72:** Undisputed. On May 18, 2018, after B.G. was transferred to ORR, BP agents referred L.G. to the USAO for possible prosecution. *See* Def. Ex. D, Att. 2 at -089-90; Reiter Ex. 12, Agent R. 54:2-17. Within hours, the USAO declined to prosecute L.G based on "Miranda violation" and she was never transferred into criminal custody. Pls. 56.1 ¶¶ 118-19; Resp. ¶ 63. Reiter Ex. 12, Agent R. 292:12-19.

**Resp. ¶ 73:** Undisputed that L.G. was transferred to ICE civil detention.

**Resp. ¶ 74:** Undisputed.

**Resp. ¶ 75:** Undisputed, but the government was required to permit L.G. to reopen her removal proceeding pursuant to class settlements in *M.M.M. v. Sessions*, No. 1:18-cv-1832-DMS (S.D. Cal.); *M.M.M. v. Sessions*, No. 1:18-cv-1835-PLF (D.D.C.); *Ms. L v. ICE*, 3: 18-cv-428 (S.D. Cal); and *Dora v. Sessions*, 18-cv-1938 (D.D.C.).

**Resp. ¶ 76:** Undisputed.

**Resp. ¶ 77:** Disputed. L.G.'s Southwest Key case manager testified that B.G. communicated with L.G. by telephone on only two occasions (June 26 and July 10) totaling a maximum of 39 minutes during their 68 days of separation, with the first call occurring 40 days after their separation. Reiter Ex. 17, Case Worker Z. 151:5-19; Pls. 56.1 ¶¶ 116, 117. Undisputed with respect to calls with B.G.'s maternal grandmother and aunts.

### *M.R. and J.R.*

**Resp. ¶ 78:** Undisputed, but M.R. and J.R. were seeking asylum in accordance with 8 U.S.C. § 1158(a)(1) (authorizing individuals the right to seek asylum even if they entered between ports of entry). Pls. 56.1 ¶ 70.

**Resp. ¶ 79:** Undisputed.

**Resp. ¶ 80:** Disputed. M.R. was never "processed for prosecution." BP agents failed to timely Mirandize and take M.R.'s statement within 6-hours of arrest as required by law (18 U.S.C. § 3501(c)) and USAO policy. Def. Ex. D, Att. 3 at -110; Reiter Ex.12, Agent R. 90:21-91:7; 92:6-16; 97:21-98:7. Nevertheless, on May 11, 2018, BP agents referred M.R.'s case to the USAO for possible prosecution after they had already violated *Riverside*'s requirement that the case be filed within 48 hours of apprehension. *See* Def. Ex. D, Att. 3 at -112-13; Reiter Ex. 12, Agent R. 54:2-17; ; *id*. Ex. 49 at 3; *id*. Ex. 15, Lokey Tr. at 119:6-121:2; 128:19-129:14.. Within hours, the USAO declined to prosecute M.R. based on "AUSA Guidelines." Pls. 56.1 ¶ 83; Reiter Ex. 12, Agent R. 292:12-19. Undisputed that BP agents identified M.R. as "amenable to prosecution." Undisputed that BP agents made an ORR placement request for J.R., but this request was made after BP

agents failed to timely Mirandize and take M.R.'s statement, and even though they failed to timely refer M.R.'s case to the USAO.

**Resp. ¶ 81:** Undisputed.

**Resp. ¶ 82:** Undisputed, but see Resp. ¶ 47.

**Resp. ¶ 83:** Undisputed, but see Resp. ¶ 47.

**Resp. ¶ 84:** Undisputed. J.R.'s book out and transfer occurred a day before BP referred M.R. to the USAO for potential prosecution. *See* Resp. ¶ 80.

**Resp. ¶ 85:** Disputed to the extent Defendant suggests that M.R. was processed for prosecution. BP agents did not refer M.R. to the USAO until May 11, 2018, and the USAO did not decline to prosecute her until later that day. Def. Ex. D, Att. 3 at -112-13; Resp. ¶80. BP's processing was not complete until after that point.

**Resp. ¶ 86:** Disputed. The I-213 does not contain "criminal charges for violation of 8 U.S.C. § 1325." The I-213, created by a BP processing agent, only states that agent's expectation that M.R. would be presented for prosecution. Def. Ex. D, Att. 3 at -111; Reiter Ex. 12, Agent R. 58:18-59:3 (explaining BP's "prosecution unit," not processing agents, prepare and refer cases to USAO). Undisputed that the I-213 states that M.R. was served a Notice to Appear that initiates immigration proceedings, but Defendant's record citation does not contain the Notice to Appear or proof of service.

**Resp. ¶ 87:** Undisputed. On May 11, 2018, after J.R. had been transferred to ORR custody, BP agents referred M.R. to the USAO for possible prosecution. Def. Ex. D, Att. 3 at -112-13; Reiter Ex. 12, Agent R. 54:2-17. Within hours, the USAO declined to prosecute M.R. based on "AUSA Guidelines" and M.R. was returned to Yuma Station by 12:14 pm the same day. *Id.* at 292:12-19; Def. Ex. D, Att. 3 at -106, -113; Reiter Ex. 15, Lokey 119:6-121:2; 128:19-129:14; *see also* Pls. 56.1¶ 83; Resp. ¶ 80.

**Resp. ¶ 88:** Undisputed.

**Resp. ¶ 89:** Undisputed, but that report does not contain J.R.'s mother's name, alien number, or location of detention.

**Resp. ¶90:** Undisputed that M.R. was transferred to ICE civil detention.

**Resp. ¶ 91:** Undisputed.

**Resp. ¶ 92:** Undisputed.

**Resp. ¶ 93:** Undisputed, but the government was required to permit M.R. to reopen her removal proceeding pursuant to class settlements in *M.M.M. v. Sessions*, No. 1:18-cv-1832-DMS (S.D. Cal.); *M.M.M. v. Sessions*, No. 1:18-cv-1835-PLF (D.D.C.); *Ms. L v. ICE*, 3: 18-cv-428 (S.D. Cal) and *Dora v. Sessions*, 18-cv-1938 (D.D.C.).

**Resp. ¶ 94:** Undisputed. The day before, June 26, 2018, Judge Sabraw issued a nationwide preliminary injunction ordering the government to reunite separated families, like M.R. and J.R. *Ms. L. v. ICE*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018).

**Resp. ¶ 95:** Disputed. M.R. testified that she had to wait approximately one month to speak to her son after their separation and that they only spoke twice during their separation. Pls. 56.1 ¶¶ 79, 80. Fidler Ex. 57 at 94:6-25. She recalled a third attempted call, but she was not connected to her son. *Id.*

### *O.A. and L.A.*

**Resp. ¶ 96:** Undisputed, but O.A. and L.A. were seeking asylum in accordance with 8 U.S.C. § 1158(a)(1) (authorizing individuals the right to seek asylum even if they entered between ports of entry). Pls. 56.1 ¶ 99.

**Resp. ¶ 97:** Undisputed.

**Resp. ¶ 98:** Disputed. O.A. was never "processed for prosecution." BP referred O.A.'s case to the USAO for possible prosecution and on May 14, 2018, the USAO declined to consider it based on "Legal Sufficiency"; O.A. was never transferred into criminal custody. Def. Ex. D, Att. 4 at -135-36; Pls. 56.1 ¶¶ 110-11. Defendant's cited evidence suggests that O.A.'s referral was in violation of *Riverside*'s requirement that O.A.'s case be filed within 48 hours of apprehension. *See* Def. ¶ 105 (citing Def. Ex. D, Att. 4 at -135-36). Undisputed that BP agents identified O.A. as "amenable to prosecution." Undisputed that BP agents made an ORR placement request for L.A.

**Resp. ¶ 99:** Undisputed, but the confirmation email does not contain O.A.'s name. Def. Ex. D, Att. 6 at -461A-62A.

**Resp. ¶ 100:** Undisputed, but see Resp. ¶ 47.

**Resp. ¶ 101:** Undisputed, but see Resp. ¶100.

**Resp. ¶ 102:** Disputed to the extent Defendant suggests that O.A. was processed for prosecution. O.A. was never processed for prosecution. BP's processing was not complete until after that the USAO declined to prosecute O.A., and the government's evidence suggests that this did not occur until May 14, 2018. Resp. ¶ 98.

**Resp. ¶ 103**: Disputed. The I-213 does not contain "criminal charges for violation of 8 U.S.C. § 1325." The I-213, created by BP agents, only states the agent's expectation that O.A. would be presented for prosecution. Def. Ex. D, Att. 4 at -134; Reiter Ex. 12, Agent R. 58:18-59:3 (explaining BP's "prosecution unit," not processing agents, prepare and refer cases to USAO). Undisputed that the I-213 states that O.A. was served with an order of expedited removal, but Defendant's record citation does not contain the expedited removal order or proof of its service.

**Resp. ¶ 104:** Undisputed. L.A.'s book out and transfer occurred a day before the USAO declined O.A.'s potential prosecution. *See* Resp. ¶ 98; Fidler Ex. 66 at -138-39.

**Resp. ¶ 105:** Undisputed. On May 14, 2018, after L.A. had been transferred to ORR custody, BP agents referred O.A. to the USAO for possible prosecution. *See* Def. Ex. D, Att. 4 at -135-36; Reiter Ex. 12, Agent R. 54:2-17. The USAO declined to prosecute O.A. based on "Legal Insufficiency," and she was never transferred into criminal custody. Pls. 56.1 ¶¶ 110-11; Reiter Ex. 12, Agent R. 292:12-19; *see also* Resp. ¶ 98.

**Resp. ¶ 106:** Undisputed that O.A. was transferred to ICE civil detention.

**Resp. ¶ 107:** Undisputed. After midnight on May 15, 2018, L.A. arrived at Cayuga Centers; around 2:30 a.m. she underwent an intake assessment in which the shelter worker reported that L.A. was crying for her mother and was too young to understand many of the intake questions. Def. Ex. F. Att. 4 at -009, -011.

**Resp. ¶ 108:** Undisputed, but this paragraph omits that five-year-old L.A. self-reported her separation from her mother to shelter staff, and the report cited does not

contain her mother's name, A-number, or location. Def. Ex. F. Att. 4 at -009, -210. Case workers were not able to identify L.A.'s mother until several days later, *id.* at -156.

**Resp. ¶ 109:** Undisputed.

**Resp. ¶ 110:** Undisputed. The removal order was issued three weeks after Judge Sabraw issued a nationwide preliminary injunction ordering the government to reunite separated families, and the government still had not complied. *Ms. L. v. ICE*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018). The government was also required to permit O.A. to reopen her removal proceeding pursuant to class settlements in *M.M.M. v. Sessions*, No. 1:18-cv-1832-DMS (S.D. Cal.); *M.M.M. v. Sessions*, No. 1:18-cv-1835-PLF (D.D.C.); *Ms. L v. ICE*, 3: 18-cv-428 (S.D. Cal); and *Dora v. Sessions*, 18-cv-1938 (D.D.C.).

**Resp. ¶ 111:** Undisputed.

**Resp. ¶ 112:** Undisputed. O.A. was not reunited with L.A. until 79 days after Judge Sabraw issued a nationwide preliminary injunction ordering Defendant to reunite separated families, like O.A. and L.A. *Ms. L*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018).

**Resp. ¶ 113:** Disputed. Pls. 56.1 ¶108; *see also* Fidler Ex. 64, O.A. 84:1–3.

### *V.C. and G.A.*

**Resp. ¶ 114**: Undisputed, but V.C. and G.A. were seeking asylum in accordance with 8 U.S.C. § 1158(a)(1) (authorizing individuals the right to seek asylum even if they entered between ports of entry). Pls. 56.1 ¶ 55.

**Resp. ¶ 115:** Undisputed.

**Resp. ¶ 116:** Disputed. V.C. was never "processed for prosecution." BP agents never even referred V.C. to the USAO for possible prosecution. *See* Def. Ex. D, Att. 5. Undisputed that BP agents identified V.C. as "amenable to prosecution," but they took no steps toward referring her to the USAO. *Id.* Undisputed that BP agents made a placement request for G.A. with ORR.

**Resp. ¶ 117:** Undisputed.

**Resp. ¶ 118:** Undisputed, but see Resp. ¶ 47.

**Resp. ¶ 119:** Undisputed, but see Resp. ¶118.

**Resp. ¶ 120:** Undisputed.

**Resp. ¶ 121:** Disputed to the extent Defendant suggests that V.C. was processed for prosecution. *See* Resp. ¶ 116.

**Resp. ¶ 122:** Disputed. The I-213 does not contain "criminal charges for violation of 8 U.S.C. § 1325." The I-213, created by a BP processing agent, only states that agent's expectation that V.C. would be presented for prosecution. Def. Ex. D, Att. 5 at -157; Reiter Ex. 12, Agent R. 58:18-59:3 (explaining that BP's "prosecution unit" not processing agents that prepare and refer cases to USAO). Undisputed that the I-213 states that V.C. was processed with the "disposition" of "Warrant of Arrest / Notice to Appear," which initiates immigration proceedings, but Defendant's record citation does not contain the Notice to Appear or proof of service.

**Resp. ¶ 123:** Undisputed.

**Resp. ¶ 124:** Undisputed, but that report shows that as of May 12, 2018, it did not contain V.C's name, alien number, or location of detention. Def. Ex. F. Att. 5.

**Resp. ¶ 125:** Undisputed that V.C. was transferred to ICE civil detention.

**Resp. ¶ 126:** Undisputed.

**Resp. ¶ 127:** Undisputed.

**Resp. ¶ 128:** Undisputed, but the government was required to permit V.C. to reopen her removal proceeding pursuant to class settlements in *M.M.M. v. Sessions*, No. 1:18-cv-1832-DMS (S.D. Cal.); *M.M.M. v. Sessions*, No. 1:18-cv-1835-PLF (D.D.C.); *Ms. L v. ICE*, 3: 18-cv-428 (S.D. Cal); and *Dora v. Sessions*, 18-cv-1938 (D.D.C.).

**Resp. ¶ 129:** Undisputed.

**Resp. ¶ 130:** Undisputed.

**Resp. ¶ 131:** Undisputed. V.C. was permitted to speak with her six-year old son G.A. on only two occasions for a total of 20 minutes over the 77 days of their separation. Reiter Ex. 20, Case Worker V. 150:18-152:5.

Respectfully submitted this 24 day of April, 2023.

/s/ *David B. Rosenbaum*
David B. Rosenbaum
Travis C. Hunt
BriAnne N. Illich Meeds
OSBORN MALEDON, P.A.
2929 North Central Avenue,
21st Floor
Phoenix, Arizona 85012-2793

Diana Reiter*
Erik Walsh*
Lucy McMillan*
Harry Fidler*
Kaitlyn Schaeffer*
Brian Auricchio*
Julia Klindon*
Anna Kaul*
Arnold & Porter Kaye Scholer LLP
250 West 55th Street | New York, New
York 10019-9710
212-836-8000
diana.reiter@arnoldporter.com
erik.walsh@arnoldporter.com
lucy.mcmillan@arnoldporter.com
harry.fidler@arnoldporter.com
kaitlyn.schaeffer@arnoldporter.com
brian.auricchio@arnoldporter.com
julia.klindon@arnoldporter.com
anna.kaul@arnoldporter.com

R. Stanton Jones*
David Hibey*
Emily Reeder-Ricchetti*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
202-942-5000
stanton.jones@arnoldporter.com
david.hibey@arnoldporter.com
emily.reeder-
ricchtti@arnoldporter.com

Sean Morris*
Arnold & Porter Kaye Scholer LLP
777 S. Figueroa St., 44th Fl.
Los Angeles, CA  90017
sean.morris@arnoldporter.com

Jonathan H. Feinberg*
Kairys, Rudovsky, Messing, Feinberg
   & Lin LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
215-925-4400
jfeinberg@krlawphila.com

Mark Fleming*
Mark Feldman*
National Immigrant Justice Center
224 S. Michigan Ave., Suite 600
Chicago, IL 60604
312-660-1370
mfleming@heartlandalliance.org

Trina Realmuto*
Mary Kenney*
American Immigration Council
1318 Beacon Street, Suite 18
Brookline, MA 02446
857-305-3600
trealmuto@immcouncil.org
mkenney@immcouncil.org

Katherine Melloy Goettel*
Emma Winger*
Gianna Borroto*
American Immigration Council
1331 G Street NW, Suite 200
Washington, DC 20005
202-507-7512
202-742-5619
kgoettel@immcouncil.org
ewinger@immcouncil.org
gborrotoimmcouncil.org

*Counsel for C.M. Plaintiffs*

## **CERTIFICATE OF SERVICE**

     I hereby certify that on April 24, 2023, I electronically file the foregoing with the Clerk of the Court via the Court's Electronic Filing System, which will provide electronic notification to all filing users.

/s  Amy Ebanks