Scott W. Stern (California Bar No. 336427)
(*admitted pro hac vice*)
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
sstern@earthjustice.org
Phone: (415) 217-2117

Timothy J. Preso (Montana Bar No. 5255)
(*admitted pro hac vice*)
Earthjustice
313 East Main Street, PO Box 4743
Bozeman, MT  59715-4743
tpreso@earthjustice.org
Phone: (406) 586-9699

Roger Flynn (Colorado Bar No. 21078)
Jeffrey C. Parsons (Colorado Bar No. 30210)
(*admitted pro hac vice*)
Western Mining Action Project
PO Box 349, 440 Main Street, Suite 2
Lyons, CO 80540
wmap@igc.org
Phone: (303) 823-5738

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Patagonia Area Resource Alliance; Arizona Mining Reform Coalition; Borderlands Restoration Network; Center for Biological Diversity; Earthworks; Friends of Santa Cruz River; Friends of Sonoita Creek; Save the Scenic Santa Ritas; and Tucson Audubon Society, | Case No. 4:23-cv-00280-JGZ |
| Plaintiffs, | FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| v. | |
| United States Forest Service; Kerwin S. Dewberry, Forest Supervisor, Coronado | |

National Forest; and U.S. Fish and Wildlife )
Service, )
)
                    Defendants, )
            and )
)
Arizona Standard, LLC; and South32 )
Hermosa, Inc., )
)
                    Defendant-Intervenors. )
)
)

2

# INTRODUCTION

1.      This suit challenges the U.S. Forest Service and U.S. Fish and Wildlife Service's actions to approve the Sunnyside and Flux Canyon exploratory mineral drilling projects in the heart of southeast Arizona's Patagonia Mountains, one of the most biologically diverse mountain ranges in the United States. Situated within the Coronado National Forest, these rugged mountains provide important habitat for numerous species protected under the Endangered Species Act ("ESA"). They contain nesting and foraging sites for the threatened Mexican spotted owl and Western yellow-billed cuckoo, and they represent a key movement corridor for the endangered jaguars and ocelots that recently and increasingly have been moving northward from Mexico to reoccupy their historic range in the United States. In addition, they provide the municipal water source for nearby communities, including the town of Patagonia, Arizona.

2.      But the Patagonia Mountains—and the rare and imperiled species they host—now face a severe threat. Defendant, the U.S. Forest Service ("USFS"), has approved two mineral exploration drilling projects that threaten significant impacts in the most environmentally sensitive portion of these mountains. Specifically, on June 16, 2023, USFS authorized the Sunnyside Exploration Drilling Project, a seven-year program of exploratory drilling proposed by Arizona Standard, LLC—a subsidiary of Barksdale Capital Corporation, a Canadian metals exploration company—that seeks to prove up the resources for a future industrial copper-lead-zinc-silver mine in the area. The Sunnyside Project calls for development of as many as thirty new well pads with industrial machinery running 24 hours a day, 7 days a week in the heart of the most biodiverse part

1

of the Patagonia Mountains, amidst occupied nesting habitat for imperiled owls and cuckoos.

3.    Just days earlier, on May 30, 2023, USFS separately authorized the Flux Canyon Exploration Drilling Project, proposed just down the slope and approximately one mile from the Sunnyside project area by a company called Arizona Minerals, Inc.—a Nevada-based corporation held by South32 Ltd., an Australian mining and metals company. The Flux Canyon Project, which also seeks to identify silver, lead, and zinc deposits, calls for development of seven additional well pads—also with machinery running 24 hours a day, 7 days a week—with a year-long timeframe.

4.    The combined impacts of these projects would transform this mostly undeveloped landscape with a constant disruption of noise, lights, dust, human activity, and vehicle traffic for the foreseeable future. Such disruptions threaten to drive Mexican spotted owls and yellow-billed cuckoos from established breeding territories and to prevent jaguars and ocelots—both of which have been detected in recent years in nearby areas—from residing in or moving through the area.

5.    USFS's approvals of these projects triggered its obligations under the ESA and the National Environmental Policy Act ("NEPA"). First, the ESA required USFS to consult with the Defendant U.S. Fish and Wildlife Service ("FWS") to ensure that the projects are "not likely to jeopardize the continued existence of any endangered species or threatened species" or destroy or adversely modify such species' designated critical habitat. 16 U.S.C. § 1536(a)(2). Here, regarding the Sunnyside Project, USFS engaged in formal ESA consultation with FWS. That consultation yielded a biological opinion

authored by FWS that determined the project would not jeopardize ESA-listed species or destroy or modify their critical habitat. In reaching those conclusions, however, FWS failed to utilize the best available scientific and commercial data, disregarded apparent cumulative impacts, and repeatedly applied irrational reasoning to discount harm to imperiled wildlife. Nevertheless, USFS relied on FWS's biological opinion to dismiss any potential for the Sunnyside Project to cause significant impacts to ESA-listed species and to comply with USFS's own ESA obligations, without further analysis.

6.     Regarding the Flux Canyon Project, USFS concluded this project would have no effect, or at least no adverse effect, on ESA-listed species—findings that put USFS on a path to avoid the ESA's formal consultation requirement for this project. FWS concurred with USFS's no-adverse-effect determinations and thereby concluded the ESA analysis process for the Flux Canyon Project. However, in reaching these determinations, USFS ignored important evidence about habitat suitability in the project area, and USFS and FWS again irrationally disregarded apparent harms, including cumulative impacts.

7.     USFS applied a similarly flawed approach in analyzing environmental impacts pursuant to NEPA. USFS determined that the Sunnyside Project presents no significant impacts requiring a full environmental impact study, and that the Flux Canyon Project is so inconsequential that it requires no environmental assessment at all. These findings were arbitrary and unlawful.

8.     First, USFS failed to adequately consider the cumulative impacts of both of these projects when combined with each other as well as with numerous other nearby mineral exploration projects that are ongoing or foreseeable. The Forest Service failed to

fulfill this fundamental NEPA duty despite the fact that this Court specifically admonished the agency to do so in rejecting the Forest Service's authorization of an earlier version of the Sunnyside Project without adequate environmental analysis in *Defenders of Wildlife v. U.S. Forest Serv.*, No. CV-14-02446-TUC-RM (D. Ariz. Sept. 15, 2015). The number of ongoing, authorized, and anticipated development projects in this sensitive area of the Patagonia Mountains has only grown since that time. Yet USFS again failed to acknowledge or examine the combined impact of such projects on imperiled species and their habitats.

9. Second, in approving the Sunnyside project, USFS erroneously discounted numerous direct and indirect impacts to Mexican spotted owls that live in proposed development areas, drawing unjustified conclusions based on inapplicable science to arbitrarily downplay the effects of constant noise, light, construction, and human activity over seven years in close proximity to the owls' nesting and roosting sites. USFS also failed to undertake a required analysis of the baseline conditions of affected water resources, despite the risks that the Sunnyside Project poses to the drinking water of nearby communities due to leakage of wastewater, contamination of groundwater, and other impacts. And when the public attempted to raise such issues during USFS's administrative process, the agency dodged its obligation to address important objections on the merits by repeatedly dismissing them on improper and irrational bases.

10. Third, regarding the Flux Canyon Project, USFS premised its exclusion of this project from any NEPA environmental analysis based on still more unjustified conclusions, and papered over its inability to determine with certainty whether the project

4

would harm imperiled species—a determination that was essential for any exclusion of the project from NEPA's "look-before-you-leap" analysis requirements.

11.    These oversights, omissions, misreadings, and failures violated the ESA and NEPA. Accordingly, Plaintiffs—a collection of conservation and community organizations dedicated to preserving the Patagonia Mountains from environmental harm—now turn to this Court for relief. Specifically, Plaintiffs request that this Court declare that the U.S. Forest Service and U.S. Fish and Wildlife Service violated the ESA and NEPA in authorizing the Sunnyside and Flux Canyon Projects, and issue an order setting aside the defendant agencies' challenged actions.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over this action pursuant to the citizen-suit provision of the ESA, 16 U.S.C. § 1540(g)(1)(C), and 28 U.S.C. § 1331, because this suit presents a federal question under the laws of the United States, including NEPA. This Court also has jurisdiction under 28 U.S.C. § 1346, because the United States is a defendant. Defendants' sovereign immunity is waived pursuant to the ESA and the Administrative Procedure Act, 5 U.S.C. § 702.

13.    This Court has the power to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–02 and 16 U.S.C. § 1540(g)(1)(A), and to set aside the challenged decisions pursuant to 5 U.S.C. § 706(2)(A), and the general equitable powers of this Court.

14.    Venue is proper in this Court pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to

1    Plaintiffs' claims occurred in this District. Additionally, Plaintiffs Patagonia Area

2    Resource Alliance, Arizona Mining Reform Coalition, Borderlands Restoration Network,

3    Center for Biological Diversity, Friends of Santa Cruz River, Friends of Sonoita Creek,

4    Save the Scenic Santa Ritas, and Tucson Audubon Society are headquartered in this

5    District.

6        15.    This case should be assigned to the Tucson Division of this Court because

7    the Patagonia Mountains lie within the counties of this Division, the challenged agency

8    actions were taken within these counties, and Plaintiffs Patagonia Area Resource

9    Alliance, Arizona Mining Reform Coalition, Borderlands Restoration Network, Center

10   for Biological Diversity, Friends of Santa Cruz River, Friends of Sonoita Creek, Save the

11   Scenic Santa Ritas, and Tucson Audubon Society are headquartered in this Division.

12       16.    Plaintiffs provided Defendants with 60 days' written notice of Plaintiffs'

13   intent to sue under the ESA on July 13, 2023, as required by 16 U.S.C. § 1540(g)(2).

14                                       **PARTIES**

15       17.    Plaintiff Patagonia Area Resource Alliance ("PARA") is a grassroots

16   organization of volunteer community members committed to protecting and preserving

17   the Patagonia, Arizona, area. It is a watchdog organization that monitors the activities of

18   mining corporations, as well as government agencies, to make sure their actions have

19   long-term, sustainable benefits to the region's public lands, watershed, and broader

20   ecosystem.

21       18.    Plaintiff Arizona Mining Reform Coalition ("AMRC") works in Arizona to

22   improve state and federal laws, rules, and regulations governing hard rock mining to

                                            6

protect communities and the environment. AMRC works to hold mining operations to the highest environmental and social standards to provide for the long term environmental, cultural, and economic health of Arizona.

19.    Plaintiff Borderlands Restoration Network is a Patagonia, Arizona-based non-profit organization that works to grow a local restorative economy by rebuilding healthy ecosystems, restoring habitat for plants and wildlife, and reconnecting border communities to the land through shared learning. Its work is primarily focused on protecting and restoring wildlife corridors and the surface waters of Sonoita Creek and surrounding watersheds.

20.    Plaintiff Center for Biological Diversity ("CBD") is a non-profit public interest organization with a headquarters office located in Tucson, Arizona, representing more than 89,000 active members nationwide and dedicated to the conservation and recovery of threatened and endangered species and their habitats. CBD has a longstanding interest in projects of ecological significance undertaken in the National Forests of the Southwest, including mining projects.

21.    Plaintiff Earthworks is a non-profit organization dedicated to protecting communities and the environment from the adverse impacts of mineral and energy development while promoting sustainable solutions. Earthworks stands for clean air, water and land, healthy communities, and corporate accountability. It works for solutions that protect both the Earth's resources and our communities.

22.     Plaintiff Friends of Santa Cruz River is a non-profit organization dedicated to ensuring the continued flow of the Santa Cruz River, the life-sustaining quality of its waters, and the protection of the riparian biological community it supports.

23.     Plaintiff Friends of Sonoita Creek is a non-profit organization dedicated to protecting and restoring the water and natural habitat of the Sonoita Creek Watershed. It informs residents and visitors about the watershed's importance to life forms and relationship to the geography through hands-on activities, presentations, hikes and collaboration with kindred organizations.

24.     Plaintiff Save the Scenic Santa Ritas is a non-profit organization that is working to protect the Santa Rita and Patagonia Mountains from environmental degradation caused by mining and mineral exploration activities.

25.     Plaintiff Tucson Audubon Society, founded in 1949, is a member-supported, non-profit organization dedicated to inspiring people to enjoy and protect birds and their habitats through recreation, education, wildlife conservation, advocacy, and protection and restoration of the environment on which we all depend. Drilling projects in the Patagonia Mountains would adversely impact a high-priority reservoir of biodiversity that Tucson Audubon has worked, and continues to work, to protect through a wide range of efforts. These efforts include designation of Important Bird Areas, research and conservation pertaining to numerous species at various levels of endangerment—including the Mexican spotted owl and Western yellow-billed cuckoo—and habitat-enhancement programs in the Sonoita Creek Watershed, most notably the Society's stewardship of 13.25 acres of riparian habitat, as well as its management of the

1   Paton Center for Hummingbirds, located in Patagonia, which receives 20,000 visitors

2   annually from across the United States and the world. Tucson Audubon has

3   approximately 3,200 members, many of whom live in southeast Arizona in areas that

4   would be directly or indirectly impacted by the Projects at issue.

5          26.     Plaintiffs bring this action on their own institutional behalf and on behalf of

6   their members. Members of each Plaintiff group use the lands and waters at and around

7   the site of the Sunnyside and Flux Canyon Projects for recreational, conservation, and

8   aesthetic purposes. Members of each Plaintiff group hike, picnic, appreciate the

9   undisturbed wildlife, and view and photograph wild plant and animal life in the Patagonia

10  Mountains and within the specific Project areas. Members of some of the Plaintiff groups

11  participate in community-science research projects that contribute vital data for wildlife

12  conservation in the area, and many take part in volunteer activities, such as trail

13  maintenance, that contribute to the area's recreational, conservation, and aesthetic value.

14  Many of Plaintiffs' members, officers, staff, and supporters moved to the Patagonia area

15  precisely to pursue these aesthetic and recreational activities. Plaintiffs' members,

16  officers, staff, and supporters have concrete plans to continue pursuing these activities in

17  the Coronado National Forest and on the specific lands involved in both Projects. Many

18  of Plaintiffs' members live in the town of Patagonia, which is approximately seven miles

19  from the Project sites, and many of these members visit the Project areas and their

20  surrounding lands on a daily or weekly basis.

21         27.     By authorizing the challenged Sunnyside and Flux Canyon Projects and

22  otherwise taking actions to facilitate these projects, the USFS and FWS have approved

9

1   actions that threaten to significantly harm Plaintiffs' interests in the Patagonia Mountains

2   and the specific Project areas. The legal violations alleged in this complaint thus cause

3   direct injury to the aesthetic, conservation, recreational, and wildlife preservation

4   interests of Plaintiffs and their members. In addition, Plaintiffs, and their members, have

5   been, and are being, harmed by USFS and FWS's failures to conduct a proper ESA or

6   NEPA analysis. and to fully involve the public—including Plaintiffs and their

7   members—in the required NEPA process for both Projects. Because of this failure, USFS

8   and FWS have overlooked serious environmental impacts and underestimated and

9   misstated the harms resulting from both Projects, all to the detriment of Plaintiffs'

10  interests.

11        28.    Plaintiffs' and their members' aesthetic, conservation, recreational, and

12  wildlife preservation interests have been, are being, and, unless their requested relief is

13  granted, will continue to be adversely and irreparably injured by Defendants' failure to

14  comply with federal law. These are actual, concrete injuries that are traceable to

15  Defendants' conduct. The relief that Plaintiffs request will redress the injuries of each

16  Plaintiff group and their members.

17        29.    Each of the Plaintiff groups submitted extensive comments to USFS during

18  public comment periods for the Projects. In addition, each group submitted timely

19  administrative objections to USFS regarding the Sunnyside Project, and submitted a 60-

20  day notice letter to USFS and FWS detailing ESA violations regarding both projects. All

21  of the issues and claims raised in this complaint were previously raised to the defendant

22  agencies and are properly before this Court for judicial review.

10

30.     Defendant United States Forest Service is a federal agency within the U.S. Department of Agriculture. USFS is responsible for the management of National Forests, including the Coronado National Forest. Among its management responsibilities, USFS must ensure that activities it authorizes in the Coronado National Forest comply with governing federal environmental statutes, including the ESA and NEPA. USFS authorized the Flux Canyon and Sunnyside Projects challenged in this case.

31.     Defendant Kerwin S. Dewberry, sued in his official capacity, is Forest Supervisor of the Coronado National Forest. Defendant Dewberry is thus responsible for managing the land in which the challenged Projects are to be located and ensuring that activities authorized on this land, including the challenged Projects, comply with the ESA and NEPA.

32.     Defendant U.S. Fish and Wildlife Service is a federal agency within the U.S. Department of the Interior. FWS is responsible for administering the ESA with respect to terrestrial species listed as threatened or endangered, including the jaguar, ocelot, Mexican spotted owl, and Western yellow-billed cuckoo.

## LEGAL BACKGROUND

### I.      The Endangered Species Act

33.     "The ESA is 'the most comprehensive legislation for the preservation of endangered species ever enacted by any nation.' It represents a commitment 'to halt and reverse the trend toward species extinction, whatever the cost.'" *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1059 (9th Cir. 2018) (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180, 184 (1978)) (internal citation omitted). It also reflects "a

11

conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Tenn Valley Auth.*, 437 U.S. at 185. The statute's purpose is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered and threatened species." 16 U.S.C. § 1531(b). Through the ESA, Congress declared its policy "that all Federal departments and agencies shall seek to conserve endangered and threatened species and shall utilize their authorities in furtherance of the purposes of [the act]." *Id.* § 1531(c)(1).

34.     The ESA defines "conserve" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532(3). Accordingly, the goal of the ESA is not only to temporarily save endangered and threatened species from extinction, but also to recover these species to the point where they are no longer in danger of extinction, and thus no longer in need of ESA protection.

35.     Pursuant to the ESA, a species is listed as "endangered" if it is "in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6). A species is listed as "threatened" if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

36.     An important benefit the ESA conveys to listed species to prompt their recovery is the "designation" of protected "critical habitat." *Id.* § 1533(a)(3)(A)(i). Areas

designated as critical habitat are "essential" to the "conservation of the species." *Id.* § 1532(5)(A).

37.     As a key tool to achieve the Act's conservation objectives, ESA section 7(a)(2) imposes on federal agencies such as USFS a duty to ensure that actions they authorize or carry out are not likely to jeopardize listed species or destroy or adversely modify critical habitat designated for such species. 16 U.S.C. § 1536(a)(2). An agency action "jeopardizes" a protected species if it "reasonably would be expected, directly or indirectly," to reduce appreciably the species' likelihood of survival or recovery "by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02; *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 932 (9th Cir. 2008).

38.     Section 7(a)(2) requires that, before undertaking or authorizing an action that may affect ESA-listed species or their critical habitat, USFS must consult with the appropriate expert fish and wildlife agency, which is FWS in the case of terrestrial species such as those involved in this case. *See* 16 U.S.C. § 1536(a)(2)–(3); 50 C.F.R. § 402.01(b). To initiate such consultation, agencies considering an action that may affect ESA-listed species or their critical habitat must prepare a Biological Assessment ("BA") to "determine whether any such species or habitat are likely to be adversely affected by the action." 50 C.F.R. § 402.12(a). The BA process begins with a request from the action agency to FWS for information concerning whether any listed species or critical habitat is present in the project area. 16 U.S.C. § 1536(c)(1). After FWS provides this information, the action agency then determines, in the first instance, whether any listed species or

13

critical habitat is likely to be affected by the proposed action. *See id.* The BA cannot "entirely fail[] to consider an important aspect of the problem," *Mont. Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127, 1148 (D. Mont. 2004) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)), or overlook "relevant factors." *Native Ecosystems Council v. Krueger*, 946 F. Supp. 2d 1060, 1079–80 (D. Mont. 2013) (quoting *Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 953–54 (9th Cir. 2003)).

39.     If the BA concludes that the agency action will have no effect on ESA-listed species or their critical habitat, then "the consultation requirements are not triggered." *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 n.8 (9th Cir. 1994). If the BA concludes that the agency action may affect, but is not likely to adversely affect, ESA-listed species or their critical habitat, and FWS concurs in writing with that conclusion, then the ESA consultation process is terminated and no further action is necessary. 50 C.F.R. §§ 402.13(c), 402.14(b)(1). Otherwise, where the BA concludes that the agency action may affect an ESA-listed species or its critical habitat, the ESA requires formal consultation under ESA section 7(a)(2). 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

40.     The ESA section 7(a)(2) formal consultation process culminates in FWS's issuance of a biological opinion ("BiOp"), reflecting FWS's determination whether the proposed action will jeopardize an ESA-listed species or destroy or adversely modify its critical habitat. 16 U.S.C. § 1536(a)(2), (b)(3)(A); *see* 50 C.F.R. § 402.14. The BiOp must review all relevant information and evaluate the effects of the agency action and its

1    cumulative effects in determining whether the action will jeopardize an ESA-listed

2    species or destroy or adversely modify its critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50

3    C.F.R. § 402.14(g)(1)-(4). Under the ESA, "cumulative effects" means "those effects of

4    future State or private activities, not involving Federal activities, that are reasonably

5    certain to occur within the action area of the Federal action subject to consultation." 50

6    C.F.R. § 402.02.

7          41.    In fulfilling the requirements of section 7(a)(2), FWS and USFS must "use

8    the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). This

9    requirement "prohibits an agency from disregarding available scientific evidence that is

10   in some way better than the evidence it relies on." *Kern Cty. Farm Bureau v. Allen*, 450

11   F.3d 1072, 1080 (9th Cir. 2006) (cleaned up) (quoting *Sw. Ctr. for Biological Diversity v.*

12   *Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000)). Also, in making the determinations required

13   by ESA section 7(a)(2), FWS must "consider[ ] the relevant factors and articulate[ ] a

14   rational connection between the facts found and the choice made." *Ctr. for Biological*

15   *Diversity v. Bureau of Land Mgmt.*, 698 F.3d 1101, 1121 (9th Cir. 2012) (quotation

16   omitted).

17         42.    If FWS concludes in its BiOp that a proposed action is likely to jeopardize

18   an ESA-listed species or destroy or adversely modify its critical habitat, the action may

19   not proceed. *See* 16 U.S.C. § 1536(a)(2). FWS must determine whether "reasonable and

20   prudent alternatives" exist that would avoid such harmful outcomes. *Id.* § 1536(b)(3)(A).

21         43.    If FWS concludes in its BiOp that implementing a proposed action (or a

22   reasonable and prudent alternative) will not jeopardize an ESA-listed species or destroy

15

1   or adversely modify its critical habitat, but will nevertheless result in "take" of such

2   species, the agency must issue an incidental take statement with its biological opinion. 50

3   C.F.R. § 402.14(i). Under the ESA, "take" means "to harass, harm, pursue, hunt, shoot,

4   wound, kill, trap, capture, or collect" a protected species "or to attempt to engage in any

5   such conduct." 16 U.S.C. § 1532(19). "Harm" under this definition "may include

6   significant habitat modification or degradation where it actually kills or injures wildlife

7   by significantly impairing essential behavioral patterns, including breeding, feeding or

8   sheltering." 50 C.F.R. § 17.3. A BiOp's incidental take statement must specify the impact

9   of such incidental taking on the species and the reasonable and prudent measures that

10  FWS deems necessary or appropriate to minimize such impact, as well as the terms and

11  conditions necessary to implement such measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. §

12  402.14(i)(1)(i)–(ii), (iv). Any taking that complies with the terms and conditions of such

13  an incidental take statement is exempt from the prohibitions on such taking that otherwise

14  generally apply under the ESA. 16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(i)(5).

15  **II.      The National Environmental Policy Act**

16          44.      NEPA is our country's fundamental environmental charter. NEPA has

17  "twin aims." *Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983).

18  First, it requires each federal agency "to consider every significant aspect of the

19  environmental impact of a proposed action. Second, it ensures that the agency will inform

20  the public that it has indeed considered environmental concerns in its decisionmaking

21  process." *Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002) (citation

22  and internal quotation marks omitted).

16

45.     To that end, NEPA requires federal agencies to prepare a detailed environmental impact statement ("EIS") before undertaking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS must describe the underlying purpose and need for the proposed action and objectively evaluate all reasonable alternatives that are consistent with the identified purpose and need. 40 C.F.R. §§ 1502.13, 1502.14(a). The EIS must also evaluate a no-action alternative and all reasonably available measures to mitigate adverse environmental impacts. *Id*. § 1502.14(c), (e).

46.     If an agency believes a proposed action is unlikely to have significant environmental effects, or if an agency is unsure whether a proposed action will have significant environmental effects, it may instead prepare a less exhaustive environmental assessment ("EA") of the proposed action, its impacts, and its alternatives. *Id*. § 1501.5. "If substantial questions are raised regarding whether the proposed action *may* have a significant effect upon the human environment, a decision not to prepare an EIS is unreasonable." *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988) (emphasis in original).

47.     NEPA defines "effects" to include the direct, indirect, and cumulative effects of proposed actions. *See* 40 C.F.R. § 1508.1(g); *see also id*. §§ 1508.7–1508.8 (2019) (for NEPA processes begun before the 2020 revision of these regulations). Under NEPA, cumulative effects are "effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions," regardless of who undertakes those actions. *Id*. §

17

1508.1(g)(3). The terms "effects" and "impacts" are synonymous for NEPA purposes and include "effects on natural resources and on the components, structures, and functioning of affected ecosystems," as well as "aesthetic, historic, cultural, economic, social, or health [effects]." *Id*. § 1508.1(g).

48.     If an agency concludes through an EA process that no EIS is required because the proposed action will not significantly affect the environment, it must issue a "finding of no significant impact," or "FONSI," explaining the basis for that determination. *Id*. § 1501.6.

49.     In narrow situations, neither an EIS nor an EA is required and federal agencies may invoke a "categorical exclusion" ("CE") from further NEPA analysis or documentation. *See id.* § 1501.4. Categorical exclusions are appropriate only for categories of actions that the agency has previously determined "normally do not have a significant effect on the human environment." *Id*. § 1508.1(d); *see also id.* § 1501.3(a)(1). Even if an agency determines that a CE covers a proposed action, the agency must still "evaluate the action for extraordinary circumstances in which a normally excluded action may have a significant effect." *Id*. § 1501.4(b); *see also Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 741 (10th Cir. 2006) (referring to the "extraordinary circumstances" language as a "safety-valve"). Otherwise, the agency "shall prepare an environmental assessment or environmental impact statement, as appropriate." 40 C.F.R. § 1501.4(b)(2). When relying on a CE, an agency "must supply a convincing statement of reasons why potential effects are insignificant." *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999) (citation and internal quotation marks omitted).

18

50.     In evaluating an agency's use of a CE, courts in this Circuit consider not only whether the project will result in significant environmental impacts, but "whether the path taken to reach the conclusion was the right one in light of NEPA's procedural requirements." *West v. Sec'y of the Dep't of Transp.*, 206 F.3d 920, 929 (9th Cir. 2000) (citation omitted).

51.     USFS's categorical exclusion regulations require "scoping" prior to the use of a categorical exclusion. *See* 36 C.F.R. § 220.6(c). The Service's "scoping process" is used to "determine the scope of the issues to be addressed." *Alaska Ctr.*, 189 F.3d at 858. If USFS "determines, based on scoping, that it is uncertain whether the proposed action may have a significant effect on the environment," the Service must prepare an EA. 36 C.F.R. § 220.6(c). Thus, only if the agency appropriately determines that a proposed action certainly will have no significant environmental effect may a categorical exclusion be utilized. *See id.* If USFS "determines, based on scoping, that the proposed action may have a significant environmental effect," the Service must prepare an EIS. *Id*.

52.     In 2020, and again in 2022, CEQ revised its NEPA regulations. *See National Environmental Policy Act Implementing Regulations Revisions*, 87 Fed. Reg. 23,453 (Apr. 20, 2022); *Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act*, 85 Fed. Reg. 43,304 (July 16, 2020). Because the NEPA process for the Sunnyside Project began before September 14, 2020, the previous regulations apply with respect to that Project. *See* 40 C.F.R. § 1506.13; *see also* Celeste Kinsey, District Ranger, Scoping Notice, Aug. 19, 2019; U.S. Forest Serv., Sunnyside Exploration Drilling Project: Draft Environmental Assessment 6

19

(Mar. 2021) ("Sunnyside Draft EA") ("This analysis and NEPA documentation is being prepared pursuant to the 1978 implementing regulations."). Because the NEPA process for the Flux Canyon Project began after September 14, 2020, the revised regulations apply with respect to that Project. *See* Celeste Kinsey, District Ranger, Scoping Notice, July 29, 2022. Because the NEPA process for the Flux Canyon Project began after May 20, 2022, the further revised versions of 40 C.F.R. §§ 1502.13, 1507.3, 1508.1(g), (z), also apply with respect to that Project. *See* National Environmental Policy Act Implementing Regulations Revisions, 87 Fed. Reg. at 23,453.

53.    Congress amended NEPA in the Fiscal Responsibility Act of 2023, which became effective June 3, 2023. *See* Pub. L. No. 118-5, § 321, 137 Stat. 10, 38-46 (2023). Nothing in this amendment indicates that Congress meant to apply it to NEPA processes conducted before its enactment, such as those at issue here, *see id.*, and it should not be construed to apply to such processes given that Plaintiffs and other parties relied on the NEPA provisions in effect during these processes to guide their participation, *see Bahr v. Regan*, 6 F.4th 1059, 1069 (9th Cir. 2021) (recognizing "presumption against retroactivity" where retroactive statutory application would "affect[] reliance interests"). In any event, even if the amendment were applied to this case, it does not modify the NEPA legal duties at issue. *See, e.g.*, § 321(a), (b), 137 Stat. at 38-39 (requiring that agencies must prepare an EIS for actions posing "a reasonably foreseeable significant effect on the quality of the human environment," must prepare an EA "if the significance of such effect is unknown," and must "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document").

20

1

2    **III.    The Administrative Procedure Act**

3         54.    The Administrative Procedure Act (APA) provides that "[a] person

4    suffering legal wrong because of agency action, or adversely affected or aggrieved by

5    agency action within the meaning of a relevant statute, is entitled to judicial review

6    thereof." 5 U.S.C. § 702.

7         55.    The APA further provides that "the reviewing court shall . . . hold unlawful

8    and set aside agency actions, findings, and conclusions found to be . . . arbitrary,

9    capricious, an abuse of discretion, or otherwise not in accordance with law," *id*. §

10   706(2)(A), or which have been taken "without observance of procedure required by law."

11   *Id*. § 706(2)(D).

12                          **FACTUAL BACKGROUND**

13   **I.    The Patagonia Mountains**

14        56.    The Patagonia Mountains are a range running north from the Mexican

15   border for fifteen miles. Roughly 50 miles southeast of Tucson, Arizona, the Patagonia

16   Mountains are located within the Coronado National Forest. They are a "sky island"

17   mountain range, meaning they are set apart from other mountain ranges and are

18   ecologically quite different from the lowland environments that surround them. The

19   Patagonia Mountains rise up, strikingly, from a surrounding sea of desert.

20        57.    The mountains are characterized by steep slopes and canyons with rugged

21   cliff faces and rocky outcrops at higher elevations, as well as gently sloping hills and

22   drainages at lower elevations. Evergreen oaks and junipers dot the area, along with

21

various shrubs and succulents. Drainages in the area support riparian deciduous forest communities. The climate of this area is known for warm, wet summers and mild winters with only occasional snow.

58.     The Patagonia Mountains contain the tributaries of Sonoita Creek, including Alum Gulch and Harshaw Creek, waterways that provide essential water to downstream ecosystems and human communities. An unnamed ephemeral tributary of Alum Gulch flows through steep-walled Humboldt Canyon, which holds some of the area's most valuable wildlife habitat. The Patagonia Mountains' creeks and their watersheds are recharge areas for groundwater aquifers. Residents of the Town of Patagonia, as well as approximately 300 individuals in the surrounding communities, depend entirely on the water supply originating in these mountains.



**Figure 1**. Humboldt Canyon, within the Sunnyside project area. Photograph by Laiken Jordahl, June 15, 2023.

1

**II.     Endangered and Threatened Species in the Area**

2        59.     The Patagonia Mountains are a region of tremendous biodiversity. Many

3    ESA-listed species reside in the Patagonias, including the endangered Gila topminnow,

4    Sonoran tiger salamander, Pima pineapple cactus, Huachuca water-umbel, beardless

5    chinchweed, and the threatened Chiricahua leopard frog, Bartram's stonecrop, and

6    Mexican gartersnake.

7        60.     The Patagonia Mountains also provide occupied habitat for the ESA-listed

8    Mexican spotted owl. The Mexican spotted owl (*Strix occidentalis lucida*) is one of the

9    largest owls in North America. The owls' geographic range extends from the Rocky

10   Mountains and the Colorado Plateau in the north to the Mexican Plateau in the south.

11   Throughout its range, the owl's roosting and nesting habitat is generally associated with

12   mature and old-growth forests or rocky canyons. Mexican spotted owls exhibit high

13   fidelity to their home ranges, although they forage and roam widely, gradually moving

14   downslope for the winter. Their population appears to have been declining for decades,

15   due in part to mining. In 1993, FWS listed the Mexican spotted owl as "threatened" under

16   the ESA. Endangered and Threatened Wildlife and Plants; Final Rule To List the

17   Mexican Spotted Owl as a Threatened Species, 58 Fed. Reg. 14,248 (Mar. 16, 1993). In

18   2004, FWS designated 8.6 million acres of critical habitat for the owl, including areas

19   within the Patagonia Mountains. 69 Fed. Reg. 53,182, 53,216 (Aug. 31, 2004). The

20   project areas for both the Sunnyside and Flux Canyon Projects fall entirely within the

21   owls' designated critical habitat. In addition, FWS's 2012 Mexican Spotted Owl

22   Recovery Plan called for designation of Protected Activity Centers ("PACs")

23

1    encompassing at least 600 acres surrounding known nesting and roosting sites for

2    Mexican spotted owls, and called for application of conservation measures within such

3    PACs to protect owl habitat. U.S. Fish & Wildlife Serv., Mexican Spotted Owl Recovery

4    Plan, First Revision VIII (Sept. 5, 2012). Such PACs were intended to protect activity

5    centers used by owls rather than their entire home ranges.

6         61.    The Western yellow-billed cuckoo (*Coccyzus americanus occidentalis*) is a

7    slender migratory songbird that lives in forests across the western United States, mainly

8    in Arizona, California, and New Mexico. In spite of its ostentatious tail and distinctive

9    call, the cuckoo is often difficult to detect, as it conceals itself in dense foliage.

10   Historically, the cuckoo was a "common nester," but by the 1980s fewer than 200 pairs

11   remained in Arizona. *Western Yellow-billed Cuckoo*, NAT'L PARK SERV.,

12   https://www.nps.gov/articles/western-yellow-billed-cuckoo.htm (last updated Feb. 4,

13   2015). In 2014, FWS listed the cuckoo as "threatened" under the ESA. Endangered and

14   Threatened Wildlife and Plants; Determination of Threatened Status for the Western

15   Distinct Population Segment of the Yellow-billed Cuckoo (Coccyzus americanus), 79

16   Fed. Reg. 59,992 (Oct. 3, 2014). Although they remain rare, cuckoos nest and breed

17   throughout the Patagonia Mountains. Their nesting and breeding habitat generally

18   encompasses riparian woodlands below 7,000 feet in elevation, but—as recent surveys

19   have documented—in southern Arizona also includes ephemeral and intermittent

20   drainages as well as upland areas. In 2021, FWS designated approximately 298,845 acres

21   of critical habitat for the cuckoo, including areas within the Patagonia Mountains.

22   Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the

24

1  Western Distinct Population Segment of the Yellow-Billed Cuckoo, 86 Fed. Reg. 20,798

2  (Apr. 21, 2021).

3          62.    The North American jaguar (*Panthera onca*) is a large and secretive cat

4  species with a distinctively marked coat featuring pale yellow to tan colored fur covered

5  by spots that transition to rosettes on the sides. Historically, jaguars appear to have lived

6  across the southern United States, but by the mid-twentieth century they had been nearly

7  extirpated due to human persecution. In the years that followed, jaguars were spotted

8  only intermittently in the United States, and only in the southwest. In 1972, FWS listed

9  the jaguar as "endangered." List of Endangered Foreign Fish and Wildlife, 37 Fed. Reg.

10  6476 (Mar. 30, 1972). In the last quarter-century, however, several jaguars have been

11  spotted in southern Arizona, presumably having migrated from Mexico back into their

12  historic territory. In 2012 and 2013, and then again in 2016, a male jaguar known as El

13  Jefe was spotted in the Santa Rita Mountains, just miles northeast from the Patagonia

14  Mountains. He was the only jaguar known to primarily reside in the United States,

15  although others have since been documented. In 2014, in part due to such sightings, FWS

16  designated the Patagonia Mountains as critical habitat for jaguars, along with the nearby

17  Santa Rita, Empire, and Huachuca Mountains and the Grosvenor and Canelo Hills.

18  Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for

19  Jaguar, 79 Fed. Reg. 12,572, 12,593 (Mar. 5, 2014).

20          63.    Because jaguars roam widely, the Patagonia Mountains are vital to their

21  recovery; FWS has determined that these mountains likely constitute a jaguar movement

22  corridor, one of the few places where jaguars can cross the border to and from Mexico.

25

1    FWS has further determined that maintaining the integrity of this movement corridor is

2    important for improving the viability of the jaguar species in southern Arizona. FWS also

3    has noted that "connectivity between expansive open areas of habitat for the jaguar in the

4    United States is necessary if viable habitat for the jaguar is to be maintained,"

5    Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for

6    Jaguar, 79 Fed. Reg. at 12,607, and, because jaguars depend on remote regions with

7    minimal human contact, mining activity "may render an area unsuitable to jaguars." *Id*. at

8    12,588; *see id*. at 12,573. Historically, human activity in the Patagonia Mountains has

9    been deadly for jaguars, with several killed in the area since 1904. David E. Brown &

10   Carlos A. Lopez Gonzales, *Borderland Jaguars: Tigres de la Frontera* 6 tbl. 1 (2001).

11        64.    Ocelots (*Leopardus pardalis*) are a medium-sized spotted cat species.

12   Historically, ocelots ranged throughout the southwest, but today fewer than 100 remain in

13   the United States. In 1972, FWS listed the ocelot as "endangered." List of Endangered

14   Foreign Fish and Wildlife, 37 Fed. Reg. 6476 (Mar. 30, 1972); *see also* Endangered and

15   Threatened Wildlife and Plants; Endangered Status for U.S. Population of the Ocelot, 47

16   Fed. Reg. 31,670 (July 21, 1982). Although ocelots are famously difficult to detect, and

17   their presence in the Patagonia Mountains has not been systematically monitored, it is

18   likely that—like jaguars—they rely on the Patagonia Mountains for travel. Also, as with

19   the jaguar, FWS has determined that the Patagonia Mountains likely constitute a dispersal

20   corridor for ocelots moving from Mexico into the United States, and that maintaining this

21   corridor is important to improving the viability of the ocelot species in the United States.

22   An ocelot was photographed in the Patagonia Mountains in 2012, and several others have

26

recently been photographed in the nearby Santa Rita Mountains. Like jaguars, ocelots rely on broad, open areas with minimal human presence, conditions that are likely to be disrupted by mining projects.

### III.     The Sunnyside Project

65.     On April 1, 2011, Regal Resources USA, Inc. ("RR"), submitted a Plan of Operations to USFS, proposing a mineral exploration drilling project in the Humboldt Canyon area of the Patagonia Mountains, within the Coronado National Forest.

66.     In the 2011 Sunnyside Plan, RR proposed to drill up to three holes at five drill sites (for a total of up to fifteen holes). In total, the Plan estimated that the Project would disturb approximately 1.42 acres of surface land, through the development of drill pads, catchment ponds, and road repair.

67.     In time, however, RR revised its plan and the proposed Sunnyside Project ballooned. Ultimately, RR proposed to drill 24 hours per day, 7 days per week, at six drill sites in the same area. Five of the drill sites would be 15 feet by 90 feet; the sixth would be 50 feet by 75 feet. To enable this activity, RR would bring considerable equipment into the Patagonia Mountains, including drilling rigs, backhoes, road graders, dozers, trucks, water pumps, and chainsaws. Drilling at night would require artificial lighting. RR anticipated the project being complete in one year, with drilling occurring for at least six months (two months at each location with two sites being drilled at a time), with a break in operations from March 1 through September 30 to avoid the Mexican spotted owl breeding season and the local activity period of the Western yellow-billed cuckoo.

27

1    Reclamation, invasive weed control, and erosion control would not be completed for up

2    to three years.

3            68.    Over the next several years, as part of the NEPA process, PARA (a Plaintiff

4    in the present action) and another conservation organization provided comments to

5    USFS, explaining the significant environmental impacts that the then-proposed

6    Sunnyside Project would cause. Nevertheless, on September 12, 2014, USFS published a

7    Decision Memorandum approving the Sunnyside Project and categorically excluding it

8    from further NEPA analysis. In reaching this decision, USFS concluded the Project

9    would be completed within one year and that no extraordinary circumstances—such as

10   impacts to threatened or endangered species or cumulative impacts—precluded the

11   agency's use of a categorical exclusion.

12           69.    On October 29, 2014, PARA challenged that decision by bringing suit

13   against USFS (among other defendants) in this Court, alleging violations of NEPA and

14   the APA. Shortly thereafter, in response to the listing of the Western yellow-billed

15   cuckoo and new information about the Project's potential effects on ESA-listed species,

16   FWS withdrew its concurrence and reinitiated consultation with USFS under the ESA.

17   On January 9, 2015, following a motion for preliminary injunction filed by plaintiffs in

18   the PARA litigation, USFS withdrew its Decision Memorandum. The parties jointly

19   moved for a stay of litigation to allow USFS and FWS to complete the reinitiated

20   consultation, which the Court ordered.

21           70.    On April 8, 2015, USFS published a new Decision Memorandum, again

22   approving the Sunnyside Project and categorically excluding it from further NEPA

                                               28

1    analysis. In reaching this decision, USFS again concluded the Project would be

2    completed within one year and that no extraordinary circumstances—such as impacts to

3    threatened or endangered species or cumulative impacts—precluded the agency's use of a

4    categorical exclusion.

5         71.    On May 27, 2015, PARA amended its previous complaint, alleging

6    violations of NEPA and the APA. Four months later, this Court granted summary

7    judgment in favor of PARA, concluding that USFS's reliance on a categorical exclusion

8    was arbitrary and capricious because the Sunnyside Project could not be completed

9    within one year, due to the six-month non-operational period (to allow for Mexican

10   spotted owl and Western yellow-billed cuckoo breeding seasons) and the three-year

11   period for reclamation and revegetation. *Defenders of Wildlife v. U.S. Forest Serv.*, No.

12   CV-14-02446-TUC-RM, slip. op. at 6–8 (D. Ariz. Sept. 15, 2015). This Court further

13   ruled that USFS's extraordinary-circumstances analysis underlying the categorical

14   exclusion was "undermined" by the Service's failure to "provide a convincing

15   explanation" as to why the negative effects of light and noise on the Mexican spotted owl

16   "are certain to be environmentally insignificant." *Id*. at 12–13, 16. Finally, this Court

17   ruled that USFS's reliance on a categorical exclusion violated NEPA due to the Service's

18   failure to analyze the cumulative effects of the Sunnyside Project together with other,

19   nearby mineral exploration projects on National Forest land, including an adjacent

20   private-land drilling project called the Hermosa project, at the Trench Camp tract of

21   private property within the same general area of the Patagonia Mountains ("Hermosa

22   Project"). *Id*. at 13–16.

72.     In the years that followed, RR transferred options on the Sunnyside Project to Barksdale Capital Corporation ("Barksdale"), a Canadian metals exploration company. In 2019, Arizona Standard, LLC ("AS")—an Arizona-based corporation that is a subsidiary of Barksdale—submitted a Plan of Operations to USFS, proposing a further revised—and substantially enlarged—version of the Sunnyside Project. FWS characterized the "new proposed mineral exploration project" as being sited at "a location similar to the prior Sunnyside Exploratory Drilling Project." U.S. Fish & Wildlife Serv., Biological Opinion 2 (Dec. 1, 2022) ("Sunnyside BiOp"). "The main difference between the prior and current proposed actions was an increase in drill pads, duration, and changes to the previous proposed project's Mexican spotted owl conservation measures." *Id*. In 2021, and then again in 2022, AS submitted further revised Plans of Operations.

73.     In the most recent Sunnyside Plan, as in earlier iterations of the Plan, AS proposed to drill 24 hours per day, 7 days per week. Now, however, AS proposed to construct up to 30 drill pads and drill over seven years, with reclamation to continue for an eighth year and reclamation monitoring for up to six years thereafter. To accomplish this proposed development, a fleet of heavy-duty vehicles would access the Project area along several existing roads, including Flux Canyon Road, and AS would widen a number of these, including Flux Canyon Road. A portion of the project would occur within the sensitive biodiversity stronghold of Humboldt Canyon. In total, AS estimated the Project would disturb approximately 10.06 acres of surface land. However, this acreage encompasses only the project's area of ground disturbance and does not reflect

1   that it proposes noise and disturbance extending far beyond the project's physical

2   disturbance boundaries.

3   74.   AS noted it would halt drilling and other construction activities "within the

4   core area of a Mexican spotted owl PAC from March 1 through August 31 unless it has

5   been determined that the PAC is unoccupied or the owls are not nesting that year, as

6   inferred from results of surveys conducted according to protocol." U.S. Forest Serv., Plan

7   of Operations: Sunnyside Exploration Drilling Project 47 (Dec. 19, 2022) ("2022

8   Sunnyside Plan"). Accordingly, the project proposal contemplated development activity

9   within known nesting and roosting areas for Mexican spotted owls, including within the

10  heart of their activity areas unless nesting was documented.

11  75.   The equipment that AS would operate in the Patagonia Mountains for this

12  Project include an excavator, bulldozer, loader, road grader, two dump trucks, a tractor,

13  three water trucks, a service/fuel truck, four tractor-trailer trucks, six pickups, fifteen

14  3,500-gallon water storage tanks, and multiple chainsaws, water pumps, diesel

15  generators, and portable toilets. Drilling at night would require artificial lighting.

16  76.   As USFS has acknowledged, the ground disturbance, noise, dust, presence

17  of drill rigs, and increased vehicle traffic would amount to a "change in scenery" that

18  "may affect residents, business owners, and visitors' expectations of the Coronado

19  National Forest and the local historic rural landscape." U.S. Forest Serv., Sunnyside

20  Exploration Drilling Project: Environmental Assessment 7 (Jan. 2023) ("Sunnyside EA").

21  The drilling would take place on designated critical habitat for jaguars, Western yellow-

22  billed cuckoos, and Mexican spotted owls, including in five areas designated as Protected

31

Activity Centers for Mexican spotted owls that are intended to sustain and enhance owl breeding.



**Figure 2**. Sunnyside Project map. From U.S. Forest Serv., Sunnyside Exploration Drilling Project: Environmental Assessment 80 (Jan. 2023).

32

1   77.     The drill sites for the Sunnyside Project would be within the drainage of

2   Alum Gulch, which drains into Sonoita Creek. Historic mining operations in the

3   Patagonia Mountains have led to concerning levels of lead, copper, arsenic, fluoride, and

4   acidity in Alum Gulch and Sonoita Creek, which provide the water supply for the Town

5   of Patagonia. Pursuant to the federal Clean Water Act, Alum Gulch is subject to an EPA-

6   approved Total Maximum Daily Load calculation for cadmium, copper, zinc, and acidity,

7   while Sonoita Creek is a state-designated impaired waterway for aquatic life and wildlife

8   uses as a result of zinc contamination.

9   **IV.     Agency Efforts to Comply with ESA: Sunnyside Project**

10   78.     Pursuant to the requirements of the ESA, *see* 16 U.S.C. § 1536(a)(2), (c)(1),

11   USFS prepared a BA of the Sunnyside Project. Drawing on FWS's official species list,

12   the BA considered impacts on Mexican spotted owls, Western yellow-billed cuckoos,

13   jaguars, ocelots, and a rare plant species known as Bartram's stonecrop. The BA

14   determined that the Project "may affect, and is likely to adversely affect" the Western

15   yellow-billed cuckoo, the ocelot, the jaguar and its designated critical habitat, and the

16   Mexican spotted owl and its designated critical habitat. U.S. Forest Serv., Biological

17   Assessment for Sunnyside Exploration Drilling Project 5-17, 5-26, 5-33 (Aug. 2020)

18   ("Sunnyside BA"). The BA determined that the Project "is not likely to jeopardize the

19   continued existence of Bartram's stonecrop." *Id*. at 5-36.

20   79.     On August 6, 2020, USFS communicated its determinations to FWS. In

21   response, FWS prepared a BiOp, which it finalized on December 1, 2022. FWS

22   determined that the Project "is not likely to jeopardize the continued existence" and is not

33

1   likely to "destroy or adversely modify critical habitat" of the Mexican spotted owl,

2   Western yellow-billed cuckoo, jaguar, and ocelot. Sunnyside BiOp at 19–20, 38–39, 58,

3   62. FWS anticipated that the Project would result in incidental take of the Western

4   yellow-billed cuckoo, jaguar, and ocelot, but exempted USFS's approval of the Project

5   from the ESA's take prohibition subject to several terms and conditions. Although FWS

6   also anticipated that the Project would result in incidental take of the Mexican spotted

7   owl, FWS exempted USFS's approval of the Project from ESA's take prohibition for

8   owls without providing any terms or conditions or reasonable and prudent measures to

9   minimize or mitigate the project's impact.

10      **V.      Agency Efforts to Comply with NEPA: Sunnyside Project**

11          80.     On March 2, 2021, USFS published a Draft EA for the Sunnyside Project.

12   USFS solicited public comment on the Draft EA, and Plaintiffs timely submitted

13   comments. Plaintiffs wrote that the Draft EA "is legally and factually inadequate,"

14   providing USFS with extensive information as to the document's errors and omissions.

15   Ron Robinson et al., Comments on Draft EA, Sunnyside Exploration Drilling Project,

16   Apr. 2, 2021, at 3 ("Robinson Comments"). Among other points, Plaintiffs noted that the

17   draft EA had systematically undercounted risks to the ESA-listed species in the area,

18   failed to consider the cumulative impacts of the many drilling and mining projects

19   operating and anticipated in the vicinity, and failed to take measures to safeguard their

20   water, including undertaking an analysis of baseline water conditions.

21          81.     Almost two years later, USFS responded to the comments it had received

22   regarding the Draft EA. The agency repeatedly averred in conclusory fashion that its

34

1  responses to many of Plaintiffs' concerns were "described in the EA" or "summarized in

2  the EA." U.S. Forest Serv., Sunnyside Exploration Drilling Project, Response to

3  Comments from the Draft Environmental Analysis 60, 64, 65, 67, 68, 69, 70, 71, 74 94,

4  95 (Jan. 2023) ("Sunnyside Response to Comments").

5       82.    In January 2023, USFS published its Final EA, FONSI, and Decision

6  Notice ("DN") approving the Sunnyside Project.

7       83.    On March 10, 2023, pursuant to 36 C.F.R. §§ 218.8–218.9, Plaintiffs timely

8  filed Objections with USFS. Plaintiffs informed USFS that the Decision Notice "is based

9  on an inadequate EA and FONSI . . . . The remedy for these violations is for the Forest

10  Service (USFS) to withdraw the DN, EA, and FONSI and not issue any decision or take

11  any action based on the inadequate EA." Roger Flynn et al., Objection to the Sunnyside

12  Exploration Drilling Project, Draft Decision Notice (DN), Finding of No Significant

13  Impact (FONSI) and Final Environmental Assessment (EA), Mar. 10, 2023, at 1 ("Flynn

14  Objections"). Plaintiffs noted that USFS must instead prepare an EIS. *Id*. at 3.

15       84.    Among many other objections, Plaintiffs informed USFS that the EA and

16  agency failed to collect and analyze and establish baseline conditions for resources that

17  may be affected (including water); failed to adequately account for the risks to ESA-

18  listed species (e.g., Mexican spotted owls, Western yellow-billed cuckoos, jaguars,

19  ocelots, etc.); assumed without scientific basis the absence of ESA-listed species;

20  assumed without scientific analysis that certain risks were trivial; failed to conduct an

21  adequate cumulative effects analysis; and failed to identify appropriate mitigation

22  measures. All of these were objections that Plaintiffs had previously raised in their

35

1  comments on the Draft EA except to the extent that certain objections to the final EA

2  were based upon USFS's reliance on the FWS BiOp, which had not been prepared at the

3  time Plaintiffs' Draft EA comments were due and thus was not available to Plaintiffs or a

4  subject of USFS reliance at that time.

5       85.     On May 25, 2023, USFS responded to Plaintiffs' Objections, concluding

6  that the agencies had not violated NEPA or other laws or regulations. Letter from Kurt

7  Davis, Deputy Forest Supervisor, U.S. Dep't of Agric., to Roger Flynn, Western Mining

8  Action Project, May 25, 2023, at 2 ("Davis Response"). USFS dismissed numerous

9  Objections, insisting the agency had "considered" Plaintiffs' suggestions, *see, e.g.*, *id*. at

10  appx. A, 4, or "properly analyzed" the science, often without addressing the substance of

11  Plaintiffs' Objections. *See id*. at appx. A, 12, 14. In response to several Objections, USFS

12  insisted that "[t]he objector does not have standing on th[e]s[e] contention[s]" because

13  Plaintiffs had allegedly failed to raise such arguments previously during the comment

14  period on the Draft EA. *Id*. at appx. A, 22, 24, 25, 26.

15  **VI.    The Flux Canyon Project**

16       86.     On June 30, 2021, Arizona Minerals, Inc. ("AMI")—a Nevada-based

17  corporation owned by South32 Ltd. ("South32"), an Australian mining and metals

18  company—submitted a Plan of Operations ("Flux Canyon Plan") to USFS, proposing a

19  mineral exploration drilling project in the Flux Canyon area of the Patagonia Mountains,

20  within the Coronado National Forest.

21       87.     In the Flux Canyon Plan, AMI proposed to drill up to ten holes on six drill

22  pads (resulting in up to 60 holes in total, at an average depth of 1,500 feet). The drill pads

36

1  themselves would be roughly 50 feet by 50 feet. To drill, AMI would need to construct

2  temporary access roads to four drill pads, ranging in length from 340 to 830 feet (1,940

3  feet in total); the remainder would be accessible from the existing Flux Canyon Road.



**Figure 3**. Flux Canyon Project map. From U.S. Forest Serv., Decision Memo: Flux Canyon Exploration Drilling Project 6 (May 2023).

37

88.     In total, the Flux Canyon Plan estimated that the Flux Canyon Project would disturb approximately 1.8 acres of surface land, through the construction of temporary access roads, drill pads, and drill pad construction areas. As with the Sunnyside Project, however, this acreage total reflects the extent of actual ground disturbance rather than the full scope of the Project's geography, which would extend along a substantial portion of the lower part of Flux Canyon, or the full scope of its noise and disturbance impacts, which would extend even farther.

89.     The Flux Canyon Plan proposed drilling 24 hours per day, 7 days per week. To enable this, AMI would bring considerable equipment into the Patagonia Mountains, potentially including a flatbed trailer, a track excavator, a dozer, a backhoe, a forklift, three pick-up trucks or SUVs, a service truck with fuel tank, a 5,000-gallon water tank, pipes, cores, plastic sheeting, and a portable toilet. Drilling at night would require artificial lighting.

90.     The Flux Canyon Plan proposed drilling for up to seven months (two months at each location with two sites being drilled at a time in a staggered fashion), with contemporaneous reclamation and revegetation activities to begin at each pad as soon as drilling of that pad has stopped. The Flux Canyon Plan asserted that, due to the concurrent efforts (i.e., reclamation of one pad while another pad is being drilled), all project operations, including reclamation and revegetation, would be complete within twelve months.

1

**VII.    Agency Efforts to Comply with ESA: Flux Canyon Project**

2      91.     Pursuant to the requirements of the ESA, *see* 16 U.S.C. § 1536(a)(2), (c)(1),

3    USFS prepared a BA of the Flux Canyon Project. The BA determined that the Project

4    "may affect, but is not likely to adversely affect," the ocelot or jaguar (or the jaguar's

5    designated critical habitat). U.S. Forest Serv., Flux Canyon Exploration Drilling Project

6    Plan of Operations: Biological Assessment and Evaluation 36–37 (May 10, 2022) ("Flux

7    Canyon BA"). The BA further determined that the Project would have "no effect" on any

8    other ESA-listed species in the project area, including the Mexican spotted owl and the

9    Western yellow-billed cuckoo. *Id*.

10      92.     On September 23, 2022, the USFWS concurred in USFS's determination

11    that the Flux Canyon Project "may affect, but is not likely to adversely affect," the ocelot

12    or jaguar (or its designated critical habitat). Letter from Julie McIntyre, U.S. Dep't of

13    Interior, to Kevin Dewberry, Forest Supervisor, Coronado Nat'l Forest, Proposed Flux

14    Canyon Exploration Drilling Project, Sept. 23, 2022, at 7 ("Flux Canyon Concurrence").

15    Because "'no effects' determinations do not require review from the USFWS," the

16    Service did not address or concur in USFS's determination with respect to other listed

17    species, including the Mexican spotted owl and the Western yellow-billed cuckoo. *Id*.

18    **VIII.  Agency Efforts to Comply with NEPA: Flux Canyon Project**

19      93.     On August 10, 2022, USFS published a scoping notice for the Flux Canyon

20    Project, inviting the public to comment on the proposed project. On September 14, 2022,

21    Plaintiffs timely submitted comments to USFS.

22

94.     Plaintiffs' comments, and those of other concerned citizens, explained to USFS that Flux Canyon does not meet the USFS guidelines for categorical exclusion from the requirement to prepare an EA or EIS, for three principal reasons: (1) the project cannot plausibly be completed within one year in an environmentally responsible manner consistent with USFS responsibilities; (2) extraordinary circumstances were present, because the project would result in harm to several species protected under the ESA; and (3) other projects in the area (including the Sunnyside Project) will result in impacts that will cumulatively have significant effects on the environment when combined with the Flux Canyon Project. *See* Arizona Mining Reform Coalition et al., to Celeste Kinsey, Flux Canyon Exploration Drilling  3–6 (Sept. 14, 2022) ("AMRC Comments"). In its own comments, the Arizona Game and Fish Department noted "the presence of two Patagonia-Santa Rita Habitat Linkages within the project vicinity" and recommended that USFS "consider the cumulative effects of current exploration activity in the Patagonia Mountains." Letter from Raul Vega, Reg'l Supervisor, Ariz. Game & Fish Dep't, to Celeste Kinsey, District Ranger, Coronado Nat'l Forest, Scoping for Flux Canyon Exploration Drilling, Sept. 14, 2022, at 2.

95.     On September 18, 2022—just four days after USFS received Plaintiffs' comments and the recommendation from Arizona Game and Fish—the Service finalized a document dismissing them. For instance, in response to the argument—from Plaintiffs and Arizona Game and Fish—that USFS must consider the cumulative effects of the multiple drilling projects in the Patagonia Mountains, USFS acknowledged that such effects must be considered and claimed to have considered cumulative effects in its

1    "analysis of extraordinary circumstances"—but nevertheless insisted it was not required

2    to "include a written cumulative effects analysis" and provided none. U.S. Forest Serv.,

3    Consideration of Comments for Flux Canyon Exploration Drilling Project 4, 6 (Sept. 18,

4    2022) ("Consideration of Comments").

5         96.    On May 30, 2023, USFS published its Decision Memorandum approving

6    the Flux Canyon Project. USFS categorically excluded the project from further NEPA

7    analysis. True to USFS's earlier comment, the Decision Memorandum did not include a

8    written cumulative effects analysis; not once did it mention the Sunnyside Project or,

9    indeed, any other drilling project in the Patagonia Mountains.

10                        **ERRORS IN THE ESA PROCESS**

11        97.    The Forest Service's approval of the Sunnyside and Flux Canyon Projects

12   authorizes the combined development of 36 mineral exploration wells with associated

13   road and well pad construction over seven years in two development areas only about a

14   mile apart within the most environmentally sensitive portions of one of the highest-value

15   wildlife habitats in the American southwest. These projects would disrupt the project

16   areas and surrounding lands with a constant disruption of noise, lights, dust, human

17   activity, and vehicle traffic. These impacts threaten to drive Mexican spotted owls and

18   Western yellow-billed cuckoos from established breeding and foraging territories, and to

19   disrupt the ability of jaguars and ocelots to occupy the area or utilize its habitat to

20   successfully move from Mexico into their historical range in the United States. These

21   developments would take place in an area where other projects that are ongoing and

22   anticipated will only add to their cumulative level of disturbance.

41

98.      Nevertheless, in assessing the impacts of these projects to sensitive and imperiled owls, cuckoos, jaguars, and ocelots, both USFS and FWS acted arbitrarily, misread or ignored applicable scientific and commercial information, and overlooked significant risks to the ESA-listed species of the Patagonia Mountains.

**I.      Failure to Use Best Available Science Regarding Owl Impacts**

99.      First, FWS failed to "use the best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), in addressing the Sunnyside Project's threat of injury to Mexican spotted owls. As a result, FWS arbitrarily minimized the Project's impact to Mexican spotted owls and issued irrational and unlawful no-jeopardy and no-adverse-modification conclusions for this species. USFS acted arbitrarily in relying on FWS's flawed BiOp.

100.     In its BiOp, FWS dismissed the potential for the chronic noise of the Sunnyside Project to injure Mexican spotted owls. In reaching this conclusion, FWS misread the study on which it relied and wholly ignored several other relevant studies. Specifically, FWS's BiOp concluded that noise levels from the Sunnyside Project would "attenuate below the threshold for injury of owls"—which it identified as 92 dBA (weighted decibels)—"at approximately 100 feet from any drill area or area of heavy equipment use." Sunnyside BiOp at 35. FWS further concluded that "[o]wls experiencing short-term harm" from Project operations "may fail to successfully rear young or may depart in one or more breeding seasons, but will not likely permanently desert the area because of the disturbance." *Id.* at 40. In reaching both of these central conclusions about the extent of project impacts, FWS relied exclusively on one scientific study: David K.

Delaney et al., Effects of Helicopter Noise on Mexican Spotted Owls, 63 J. WILDLIFE MGMT. 60 (1999) ("Delaney (1999)").

101.    On its face, however, the Delaney study supported neither of these conclusions. At the outset, Delaney (1999) identified the 92 dBA noise level cited by FWS only as the threshold for Mexican spotted owls to flush and fly away in response to helicopter disturbance, *see* Delaney (1999) at 68, not as an all-encompassing "threshold level for injury of owls," as the BiOp claimed. BiOp at 35. In fact, Delaney (1999) identified a much lower noise threshold—46 dBA—for the owls' flushing response to chainsaw disturbance, which it deemed to validate "the already established pattern that ground-based activities are typically more disturbing to raptors than aerial activities." Delaney (1999) at 68, 74. FWS in the BiOp did not explain why it determined the Sunnyside Project's threshold noise level for *any* injury to owls based on Delaney (1999)'s higher threshold for aerial helicopter disturbance rather than its lower threshold for ground-based chainsaw disturbance, given that Sunnyside Project impacts will result from ground-based construction and drilling activities.

102.    Further, Delaney (1999) documented Mexican spotted owls' reactions only to intermittent bursts of less than ten minutes of helicopter disturbance and five minutes of chainsaw disturbance per day—not any kind of long-term disturbance and certainly not the round-the-clock, chronic noise disturbance for up to seven years that the Sunnyside Project threatens. Delaney (1999) at 65. Also, it focused on measuring specific owl responses to these short-term disturbances, including flushing and alert behavior, and offered no evidence about whether owls were likely to "permanently desert the area

43

1   because of the disturbance," as the BiOp claimed. *Id.* at 60–61; Sunnyside BiOp at 40. It

2   explicitly stated that its findings were specific to the circumstances it studied and

3   "caution[ed] against use of [its] findings to infer how spotted owls would respond under

4   different circumstances that were not directly tested," including more frequent

5   disturbances. Delaney (1999) at 74. FWS ignored these important features of the Delaney

6   study and, in doing so, relied on the study to reach conclusions that were wholly

7   unsupported by that study and defied the express limitations and cautions of the study's

8   authors.

9           103.   FWS also "ignore[d] available biological information" concerning the

10  extent and severity of project impacts on Mexican spotted owls. *Kern Cty. Farm Bureau*,

11  450 F.3d at 1080–81 (quoting *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988)).

12  Although overlooked by FWS in its BiOp, available studies suggest that the Sunnyside

13  Project's chronic noise is likely to significantly impair Mexican spotted owls' ability to

14  successfully forage by diminishing their ability to hear prey. One study, J. Tate Mason et

15  al., *Anthropogenic Noise Impairs Owl Hunting Behavior*, 199 BIOLOGICAL

16  CONSERVATION 29, 31 (2016) determined that chronic noise levels of 61 dBA so

17  interfered with the hearing of Northern saw-whet owls that the owls were unable to

18  capture any mice at all. Another study, Masayuki Senzaki et al., *Traffic Noise Reduces

19  Foraging Efficiency in Wild Owls*, 6 SCI. RPTS. 30602, 30603 (2016), determined that

20  chronic noise levels of just 40 dBA reduced long-eared and short-eared owls' ability to

21  detect prey, while noise levels of 80 dBA made prey detectability virtually impossible.

22

44

104.    These findings are likely to be representative of chronic noise impacts on Mexican spotted owls because, like the owl species involved in the Mason and Senzaki papers, Mexican spotted owls rely heavily upon auditory cues when hunting. These findings therefore indicate that chronic noise impacts from the proposed Sunnyside Project would seriously compromise the affected spotted owls' ability to hunt in the Project area and surrounding vicinity. In fact, the noise attenuation projections for the Sunnyside Project that were utilized in the project BA indicate that, even up to 1,600 feet from drilling and construction equipment, project noise is expected to exceed the 61 dBA threshold that was associated with no owl hunting success in Mason, et al. (2016). *See* Sunnyside BA at 5-2. These attenuation projections further indicate that Project noise is expected to reach Senzaki, et al. (2016)'s documented threshold for impacts on owls' ability to detect prey—40 dBA—as far as 12,800 feet (more than two miles) from the noise source. *Id*. FWS took no account of these impacts.

105.    Because of the likelihood that the Sunnyside Project's chronic noise impacts will extensively interfere with the affected Mexican spotted owls' ability to forage throughout a large area surrounding the proposed drilling and construction activity, there is also a high likelihood that the affected owls will permanently abandon territories in the impacted area for at least the full duration of proposed drilling activities (i.e., up to seven years), and potentially longer depending on the extent of disturbance associated with subsequent reclamation activities. FWS failed to consider the impact of project noise on owl foraging in reaching its contrary conclusion that Mexican spotted owls would not likely be permanently driven from the project area.

45

106.    For its part, USFS relied on the FWS BiOp to satisfy its own ESA

obligations regarding the Sunnyside Project, without further analysis. USFS did so

despite having received Plaintiffs' Objections that explained the deficiencies in the

BiOp's unjustified reliance on Delaney (1999).

**II.    Arbitrary "No Effect" Determination for Western Yellow-Billed Cuckoos**

107.    USFS further failed entirely to consider relevant factors in issuing its "no

effect" determination for Western yellow-billed cuckoos regarding the Flux Canyon

Project. In its BA for the Flux Canyon Project, USFS concluded that the project would

have "no effect" on Western yellow-billed cuckoos, a conclusion that did not require a

concurrence from FWS, *see* Flux Canyon Concurrence at 1, thus ending the agencies'

inquiry into impacts on the cuckoo. USFS's Decision Memo approving the Flux Canyon

Project echoed this conclusion. *See* U.S. Forest Serv., Decision Memo, Flux Canyon

Exploration Drilling 12 (May 30, 2023). In reaching this conclusion, however, USFS

ignored important evidence concerning cuckoo habitat in the project area.

108.    USFS based its no-effect determination on the assertion that Western

yellow-billed cuckoos are unlikely to occur in the Flux Canyon project area, because this

area "does not contain suitable foraging or breeding habitat." Flux Canyon BA at 33. In

reaching this conclusion, USFS did not actually survey the project area but instead relied

on the assumption that cuckoos in Arizona are "most commonly found in lowland

riparian woodlands," while the project would occur in "the upper hillsides." *Id.* at 33; *see*

*also id.* at 78. Yet the assumption that cuckoos are unlikely to breed or forage in the

1    hillsides where the Flux Canyon Project would take place is contrary to the information

2    available to the agency.

3         109.    As FWS has documented, in southeastern Arizona locations such as the

4    Patagonia Mountains, cuckoo "breeding habitat is more variable than in the rest of its

5    range" and "may include . . . hillsides," *see* Endangered and Threatened Wildlife and

6    Plants; Designation of Critical Habitat for the Western Distinct Population Segment of

7    the Yellow-Billed Cuckoo, 86 Fed. Reg. 20,798, 20,836–37 (Apr. 21, 2021); *see also id.*

8    at 20,841, 20,845, and cuckoos are known to forage in "upland areas" following

9    precipitation. *Id.* at 20,840. Indeed, in considering the environmental consequences of the

10   Sunnyside Project, USFS itself acknowledged that recent surveys of southeastern Arizona

11   have found cuckoos breeding "in upland areas." Sunnyside EA 30 (citing Jennie

12   MacFarland & Jonathan Horst, *Yellow-Billed Cuckoo Surveys on the Coronado National*

13   *Forest Within Eight Sky Island Mountain Ranges in Southeastern Arizona* (Oct. 2015)).

14   In completely failing to consider this information, and thus the likelihood of cuckoo

15   foraging or breeding habitat in the project area, USFS ignored important and relevant

16   factors that undermined its "no effect" determination for this species.

17        **III.    Disregard of Relevant Information About Project Impacts**

18        110.    In addition, both FWS and USFS repeatedly ignored or misconstrued

19   relevant information in reaching their ESA determinations that the Sunnyside and Flux

20   Canyon Projects would have no effect, may affect but would not adversely affect, or

21   would be unlikely to jeopardize or destroy or adversely modify critical habitat for the

22   Mexican spotted owl, Western yellow-billed cuckoo, jaguar, and ocelot.

47

1     111.   In evaluating cumulative effects of the Sunnyside Project, FWS's BiOp

2  repeatedly ignored the "best . . . commercial data available" concerning the Hermosa

3  Project located immediately east of the proposed Sunnyside Project on private land

4  known as the Trench Camp property. 16 U.S.C. § 1536(a)(2). Specifically, FWS ignored

5  the project proponent's own January 17, 2022, update advising that the Hermosa Project

6  currently involves drilling of two sloped tunnels as a prelude to 22 years of mining

7  production commencing as soon as Fiscal Year 2027. In addition to mine shafts, planned

8  surface developments for the Hermosa Project include a paste plant, processing plant, and

9  dry-stack tailings storage facility. Instead of considering this information—which was

10  available nearly a full year before FWS issued the BiOp—FWS evaluated the Sunnyside

11  Project's cumulative effects with the Hermosa Project based only on a stale media report

12  and omitted key information concerning the scope of the project's threat to listed species

13  and their habitats. USFS equally ignored such information in relying on FWS's flawed

14  BiOp.

15     112.   FWS and USFS repeatedly relied on affected species' ability to avoid

16  impacts of the Sunnyside and Flux Canyon Projects simply by moving to other locations.

17  These agencies' analyses concluded that Sunnyside and Flux Canyon would not have

18  adverse effects on ESA-listed species largely because the Projects occupy only a small

19  proportion of these species' total habitat and they can simply go elsewhere to avoid

20  project disturbance. Such agency reasoning ignores the threat that, in doing so, these

21  species would then be harmed by ongoing and foreseeable developments occurring

22

48

1    simultaneously at numerous nearby sites, including, at minimum, the Sunnyside and Flux

2    Canyon Projects themselves and the Hermosa Project.

3        113.    Similarly, USFS discounted any effect to Mexican spotted owls from the

4    Flux Canyon Project on the basis that owls occupying the nearest designated PAC do not

5    use the perimeter of that area that is closest to the Project, and "there have been no MSO

6    detections within 0.5 miles of the Project in eight years of survey in the area." Flux

7    Canyon BA at 26–27. Yet reliance on this historical record of owl activity to dispel any

8    possible effect of the Flux Canyon Project failed to consider an important factor: the

9    onset of new disturbance in nearby owl PACs from the Sunnyside Project and its

10   potential to displace owls to locations much closer to the Flux Canyon Project. In short,

11   the future will not look like the past for Mexican spotted owls in the Flux Canyon Project

12   vicinity. The Sunnyside BiOp explicitly anticipates that Sunnyside Project impacts just

13   upslope from the Flux Canyon Project may cause owls to use "unfamiliar habitats" or

14   "shift their activities within their existing home ranges to avoid areas with increased

15   human activities," Sunnyside BiOp at 35—both of which threaten to bring owls within

16   the impact zone of the Flux Canyon Project. USFS ignored this threat in determining that

17   the Flux Canyon Project poses no effect to Mexican spotted owls.

18       114.    USFS and FWS discounted any adverse effect to jaguars from the Flux

19   Canyon Project on the basis that jaguars are rare. USFS asserted that information from

20   field camera surveys "supports the notion that there are no jaguars currently in the

21   vicinity of the Project." Flux Canyon BA at 28. FWS stated that "jaguars in Arizona are

22   rare in any one specific location, making the probability of jaguar presence during project

49

1   implementation unlikely." Flux Canyon Concurrence at 10. Yet FWS's own Sunnyside

2   BiOp concluded that, given evidence of jaguar presence north of the Patagonia

3   Mountains in the Santa Rita Mountains, and south of the Patagonia Mountains in Sonora,

4   Mexico, "the possibility that a jaguar may occur in the action area at some time during

5   the [Sunnyside] Project cannot be discounted." Sunnyside BiOp at 47–48. USFS and

6   FWS offered no justification for their contrary decision to discount the possibility that

7   such a jaguar occurrence could occur in proximity to, and during operation of, the Flux

8   Canyon Project. Indeed, by concurring with USFS's effects determination for jaguars on

9   the basis that jaguars' rarity in Arizona makes "the probability of jaguar presence during

10  project implementation unlikely," Flux Canyon Concurrence at 10, FWS adopted a

11  rationale that could be used to avoid ESA formal consultation requirements for virtually

12  any development in jaguar habitat. Yet FWS itself has documented that jaguars do occur

13  in Arizona. FWS and USFS thus discounted any threat to the jaguar based on a

14  speculative and overbroad dismissal of the species' presence that does not conform with

15  FWS's own analysis and evidence about jaguar occurrence in Arizona.

16                              **ERRORS IN THE NEPA PROCESS**

17          115.    For the same reasons that the ESA demanded a probing analysis of the

18  Sunnyside and Flux Canyon Projects' impacts on ESA-listed species in the sensitive

19  Patagonia Mountains region, NEPA demanded a "hard look" to fully identify these

20  projects' significant impacts on the human environment. Indeed, this Court in the 2015

21  *Defenders of Wildlife* decision specifically faulted USFS for failing to undertake such an

22  analysis in approving a prior version of the Sunnyside Project that contemplated a smaller

50

1    project with fewer impacts. Yet instead of taking the "hard look" that NEPA requires,

2    USFS time and again relied on irrational assumptions and unjustified conclusions to

3    discount impacts and sidestep necessary environmental analysis.

4    **I.      Failure to Consider the Sunnyside Project's Cumulative Impacts**

5          116.    Despite NEPA's demand that an agency consider cumulative impacts, *see*

6    40 C.F.R. § 1508.7 (2019), USFS failed to adequately consider the effects of other mineral

7    exploration projects near the Sunnyside Project area—including the Flux Canyon Project

8    that the agency approved on the same day that it approved the Sunnyside Project. Many

9    mineral projects are operating, authorized, or planned in the immediate vicinity of the

10   Sunnyside Project, including the Flux Canyon Project, private-land Hermosa Project, and

11   public-land Hermosa Critical Minerals Project ("Hermosa CMP"). (The proponent of all

12   three projects is South32.) The Sunnyside project area immediately borders the Hermosa

13   Project area and is located only about a mile from the Flux Canyon Project area; the

14   Sunnyside Project will drill "near the top" of Flux Canyon, and access to Sunnyside will

15   proceed along Flux Canyon Road, which runs through the Hermosa Project area.

16   Sunnyside BA at 3-1. The precise location of the Hermosa CMP has yet to be made

17   public, but it is proposed to occur near the Trench Camp property within this same part of

18   the Coronado National Forest where the other referenced projects are located.

19   Nevertheless, USFS improperly overlooked or inadequately addressed these mineral

20   exploration projects in its cumulative effects analysis.

21         117.    The EA's only mentions of the Flux Canyon Project were a one-paragraph

22   description of the Project, with no consideration of its impacts or proximity to Sunnyside,

51

1   and two conclusory sentences asserting that Flux Canyon "would result in similar

2   impacts" to monarch butterflies and the potential habitat for the butterflies and Bartram's

3   stonecrop. Sunnyside EA at 26 tbl. 8, 42, 43. Contrary to USFS's claim that "[t]he Flux

4   Project [was] appropriately included in the EA's cumulative effects analysis to MSO,"

5   Davis Response at appx. A, 21, the EA includes *no* discussion of Flux Canyon's

6   cumulative impacts on Mexican spotted owls, nor on Western yellow-billed cuckoos,

7   jaguars, or ocelots. Likewise, the Sunnyside BiOp included no mention of the Flux

8   Canyon Project. In sum, despite approving the Sunnyside Project in close geographic and

9   temporal proximity to the Flux Canyon Project, USFS failed entirely to evaluate the

10   cumulative impact of these projects on the species most likely to be harmed by Project

11   activities.

12       118.   The Sunnyside EA also includes no mention—much less analysis—of the

13   Sunnyside Project's cumulative impact with Hermosa CMP. Nor does the Sunnyside

14   BiOp. Hermosa CMP is a "proposed zinc and manganese mining and processing

15   operation," which "will involve subsurface and surface disturbance of lands within the

16   Coronado Forest." *See South32 Hermosa Critical Minerals Project*, PERMITTING

17   DASHBOARD (May 5, 2023), https://www.permits.performance.gov/permitting-

18   project/fast-41-covered-projects/south32-hermosa-critical-minerals-project. Hermosa

19   CMP would significantly expand South32's ongoing exploration of patented mine claims

20   (i.e., private property) onto unpatented mine claims (i.e., public lands of the Coronado

21   National Forest administered by USFS). USFS is already forecasting that authorization of

22   Hermosa CMP is likely to move swiftly; it is the first mining project to be added to the

52

Biden administration's FAST-41 fast-track approval process, indicating Hermosa CMP is a high federal priority. Yet, although the EA contains brief mentions of the private-land Hermosa Project, albeit with minimal and inadequate detail or analysis, it contains no mention of its public-land counterpart.

119.   Additionally, the EA contains few details and little analysis of the Sunnyside Project's cumulative impact with the private-land Hermosa Project. The EA described this project as the "[d]evelopment of the 450-acre Trench Camp property immediately to the east of the project area into a full-scale zinc mine." Sunnyside EA at 26 tbl. 8. Likewise, the BA noted that "immediately to the east of the Project area," South32 "is currently conducting exploration activities in preparation for mining . . . as part of their Hermosa Project." Sunnyside BA at 3-1. But such descriptions grossly undersell the sheer size of this nearby project, which South32 expects to have a 22-year timespan and produce 4.3 million metric tons per year. *See Hermosa Project Update*, SOUTH32 (Jan. 17, 2022), https://www.south32.net/docs/default-source/exchange-releases/hermosa-project-update-0x6e16b082af2a4715.pdf?sfvrsn=9a4bb0cc_0. South32 has indicated its intention to start blasting mine shafts and dewatering this summer of 2023. USFS failed to detail, discuss, or consider such cumulative impacts.

120.   These USFS omissions constituted significant oversights in evaluating Sunnyside Project impacts because the Sunnyside NEPA documents repeatedly concluded that Sunnyside would not have significant effects on ESA-listed species in large part because the Project occupies only a small proportion of these species' habitat and they can simply go elsewhere to avoid the construction, drilling, and noise that this

Project threatens. For instance, in one key summary passage USFS wrote, "Since the area that would be disturbed by the proposed action at any given time is relatively small, most wildlife species would be able to shift their activities within their home range, which would have less adverse effects than if those species were displaced from their existing home ranges entirely." Davis Response at appx. A, 23. Yet despite relying on affected species' ability to avoid Project impacts by moving to other locations, at no point did USFS consider where such species will go when development is occurring at Hermosa *and* Sunnyside *and* Flux Canyon (to say nothing of Hermosa CMP, or other nearby disturbances). Had USFS adequately analyzed the cumulative impacts of the many other mineral projects in the vicinity, however, USFS could not have reasonably concluded that ESA-listed species could avoid significant impacts from Sunnyside by simply relocating, and USFS's FONSI could not have been justified.

121.   In sum, USFS ultimately concluded that the drilling, construction, light, noise, dust, and human presence of the Sunnyside Project will not result in significant adverse effects to ESA-listed species, but USFS failed to consider the *cumulative* effects of drilling, construction, light, noise, dust, and human presence in the multiple mineral projects that are ongoing and/or about to proliferate across the Patagonia Mountains area of the Coronado National Forest. The presence of multiple projects not only increases each of these impacts; it reduces the nearby areas to which imperiled species can flee, thus increasing the odds of habitat abandonment. The presence of multiple projects also reduces the overall connectivity of the region, a quality on which jaguars and ocelots depend for recovery—and a quality that is unusually important in the Patagonia

Mountains, given the region's role as a rare and vital corridor between Mexico and the United States. *See* Sunnyside BiOp at 56 ("the maintenance of this corridor is important to improving the viability of these species in southern Arizona"); *see also id*. at 62–63. Further, as Plaintiffs pointed out to the agency, Mexican spotted owls and Western yellow-billed cuckoos also depend on connectivity—both are part of interbreeding metapopulations, the behaviors of which will be disrupted by the cumulative presence of multiple mineral projects. USFS failed to consider such factors.

## II.   Failure to Consider the Sunnyside Project's Direct and Indirect Impacts to Mexican Spotted Owls

122.   Despite NEPA's demand that an agency consider direct and indirect impacts, *see* 15 C.F.R. § 1508.8 (2019), USFS failed to consider numerous such impacts to Mexican spotted owls, completely overlooking or arbitrarily dismissing the effects of the Sunnyside Project's prolonged noise, light, construction, and human activity over seven years, as well as the shortcomings of mitigation measures and alternatives that the agency relied upon to minimize such adverse effects.

123.   First, USFS failed to consider the impacts of seven years of nonstop drilling noise on Mexican spotted owls. As Plaintiffs informed the agency, a number of studies suggest that exposure to nonstop noise could reduce overall fitness, reduce fledging, reduce hatching success, and increase the presence of stress hormones, which indicate distress. *See* Flynn Objections at 26 (citing Nathan J. Kleist et al., *Chronic Anthropogenic Noise Disrupts Glucocorticoid Signaling and Has Multiple Effects on Fitness in an Avian Community*, 115 PNAS E648 (2018), and Lisa S. Hayward et al., *Impacts of Acute and*

55

1    *Long-Term Vehicle Exposure on Physiology and Reproductive Success of the Northern*

2    *Spotted Owl*, 2 ECOSPHERE 1 (2011)). Such studies indicate the likelihood that 24/7

3    drilling, road construction, etc., will significantly affect Mexican spotted owls.

4          124.    USFS refused to consider this evidence. Davis Response at appx. A, 25.

5    Instead, as discussed *supra* in the ESA context, USFS repeatedly relied on scientific

6    evidence concerning Mexican spotted owls' responses to short-term, sporadic noise

7    disturbances—not any kind of chronic, long-term noise—to discount resulting impacts,

8    and did so despite the limitations included in the scientific evidence that the agency cited,

9    which explicitly cautioned against such reliance.

10         125.    When, during the USFS objections process for the Sunnyside Project,

11   Plaintiffs attempted to raise these shortcomings of the BiOp on which USFS had relied,

12   USFS dismissed Plaintiffs' objections, stating: "The 'disturbance' differs in the study

13   (helicopter and chainsaw noise) and in the proposed action (drilling and associated

14   activities), however that would not change the effects analyses from noise and wildlife

15   displacement." Davis Response at appx. A, 23. However, as discussed, the Delaney study

16   itself warned that the type of disturbance *was* critical to the application of its findings,

17   and USFS did not explain its contrary conclusion. Elsewhere in its objections response,

18   USFS took a different tack, attempting to disclaim any flaws in the BiOp's use of the

19   Delaney study by arguing that "[t]he EA does not cite the Delaney paper, nor contain any

20   statements that misinterpret this study." *Id.* at appx. A, 23. Yet this response ignored the

21   facts that USFS relied on the BiOp to find no significant effect and the BiOp relied on

22   Delaney for its findings, and that USFS first cited the Delaney study in its BA. *See*

Sunnyside BA at 5-15; *see also* Davis Response at appx. A, 23, 25 (acknowledging USFS reliance on Delaney). Further, USFS relied on FWS analysis to respond to objections that the Project will harm Mexican spotted owls. *See id.* at appx. A, 6 ("The Forest minimizes adverse environmental impacts to federally listed wildlife and plant resources through ESA consultation with the USFWS."). USFS thus sought both to defend its indirect but critical reliance on the Delaney study (albeit erroneously) and to disavow reliance on it. Neither tactic had merit.

126.   Second, in addition to erroneously relying on the Delaney study to discount significant harms from the Sunnyside Project to Mexican spotted owls, USFS dismissed affirmative evidence that noise from the Sunnyside Project could result in the owls' permanent abandonment of the project area. The EA cited no evidence to support its assertion that "exploratory drilling activities (up to seven years) has the potential to result in temporary avoidance of habitats within the action area by Mexican spotted owls . . . . However, it is more likely that owls would shift their activities within their existing home ranges to avoid areas with increased human activities." Sunnyside EA at 33. Yet Plaintiffs provided USFS with "evidence that some raptors may permanently abandon nesting territory in response to persistent disturbance." Flynn Objections at 25 (citing Laura A. Romin & James A. Muck, Utah Field Office Guidelines for Raptor Protection from Human and Land Use Disturbances 7–8 (U.S. Fish & Wildlife Serv. 1999)). USFS failed to address this evidence. Davis Response at appx. A, 24.

127.   Third, USFS disregarded an apparent defect in a key mitigation measure that the agency relied upon to avoid significant effects on Mexican spotted owls. USFS

1    concluded that the Project's breeding-season mitigation measure would "minimize direct

2    and indirect impacts to nesting Mexican spotted owls." Sunnyside DN/FONSI at 8; *see*

3    *also* Sunnyside BA at B-7. Pursuant to this mitigation measure, to "reduce the adverse

4    effects of" the Sunnyside Project, *see* Sunnyside BiOp at 35, USFS "required" AS to

5    cease "drilling activities, road construction, maintenance, or improvements" within the

6    core area of an owl PAC from March 1 through August 31 "unless the Coronado National

7    Forest has determined that the PAC is unoccupied or the owls are not nesting that year, *as*

8    *inferred from results of surveys conducted according to protocol*." Sunnyside DN/FONSI

9    at 8 (emphasis added); *see also* Sunnyside EA at 97. The apparent implication of this

10   mitigation measure is that, unless owl nesting within the core area of an affected PAC has

11   been documented by March 1 of a given year, drilling may proceed in the PAC's core

12   area. Yet, according to the protocol referenced in this mitigation measure, the Forest will

13   not even begin to conduct nesting-status surveys until April 1 at the earliest (and June 1 at

14   the latest). *See* U.S. Fish & Wildlife Serv., Appendix D – Mexican Spotted Owl Survey

15   Protocol (Mar. 15, 2012). USFS concedes that owls are likely to avoid nesting in an area

16   where drilling activities are ongoing, *see* Sunnyside EA at 34 ("noise from heavy

17   equipment use could disturb nesting birds and adversely affect nesting and other

18   activities"), so to begin surveying for nests only after at least one month of 24/7 drilling

19   is essentially to guarantee not to find any nesting owls. USFS did not explain how the

20   cited mitigation measure could reduce Project impacts to Mexican spotted owls given this

21   apparent incongruity between the timing of Project activities and the agency's cited nest-

22   monitoring protocol.

58

**III.    Failure to Adequately Analyze Baseline Conditions in the Sunnyside Project Area**

128.    Contrary to the requirements of NEPA, the Sunnyside environmental assessment contains no detailed analysis of the baseline conditions of affected water resources despite the fact that Project-area waters constitute the drinking-water source for the Town of Patagonia and other nearby residences. The Sunnyside Plan of Operations acknowledged "a potential risk to impact groundwater quality and quantity through potential water exchange between aquifers. Deep boreholes drilled through the groundwater system could create a preferred pathway for groundwater in deeper formations to migrate upward and intermingle with the shallow parts of the system." 2022 Sunnyside Plan at 31. Yet despite Plaintiffs' complaints and objections, USFS failed to establish the baseline water quality conditions for the Sunnyside Project so that an informed analysis of likely changes in water quality could be conducted. The Sunnyside EA acknowledged that "[n]o groundwater quality samples have been collected in the project area and the quality of groundwater in the project area is unknown." Sunnyside EA at 60. The Sunnyside DN overlooked this issue altogether.

129.    In response to Plaintiffs' objections, USFS acknowledged the absence of baseline groundwater data for the Project area but argued that "detailed information in the Water Resources Report (PR 486, pp. 4–15) provides surrogate information about the affected environment and proximate groundwater conditions that were used to make reasonable predictions about existing conditions in the immediate drilling locations." Davis Response at appx. A, 36. Yet this Report itself acknowledged considerable

59

uncertainty in its discussion of groundwater: "During drilling, the proponent . . . could allow groundwater from the deeper aquifer systems, *about which little is known at this time*, to flow to shallower aquifer systems or to the ground surface." U.S. Forest Serv., Sunnyside Exploration Drilling Project: Water Resource Analysis Technical Report 15 (June 24, 2022) ("Water Resource Report") (emphasis added).

130.    Further, USFS failed to explain why or how the surrogate data adequately accounted for the groundwater quality and quantity in the Project area. The Water Resource Report relied heavily on a 2001 study of groundwater samples and noted that "[o]nly one of the 20 monitoring wells sampled (CCK-08/09) is located within 3 miles of the project area." *Id.* at 8; *see also* Sunnyside EA at 60 (relying on this same twenty-year-old data). USFS offered no rationale to justify its reliance on twenty-year-old data, most from miles away, to safeguard threatened drinking-water sources in the Project area. Nor did the agency rationally analyze information from the closest monitoring well in its cited study, which exhibited arsenic contamination exceeding the federal drinking-water standard, or information from the Humboldt Well within the Sunnyside Project area, which was contaminated with heavy metals and required remediation for that reason.

IV.    **Failure to Properly Consider Scientific Objections Regarding the Sunnyside Project**

131.    Compounding the errors in its environmental analysis, USFS's response to Plaintiffs' objections improperly dismissed serious scientific criticisms in determining that the Sunnyside Project would not have significant adverse environmental effects. In objections to the DN, EA, and FONSI, Plaintiffs disputed the "repeated

1    mischaracterizations of a paper by Delaney et al., 1999" in the BiOp and therefore the EA

2    that depends on it, for the reasons outlined above. Flynn Objections at 25. Relatedly,

3    Plaintiffs objected to the fact that "[t]he BiOp, EA, and DN make scientifically erroneous

4    or unfounded assertions about effects of noise and human activity on [Mexican spotted

5    owls] and by extension [Western yellow-billed cuckoos]." *Id*. at 31. Plaintiffs objected to

6    inadequate study of cumulative effects on owls, noting, for instance, that "neither the

7    BiOp nor the EA provides any measure of how disturbance in core areas or non-core

8    areas outside of the breeding would affect the owls." *Id*. at 24. Plaintiffs objected to the

9    fact that "[n]either the BiOp, EA, nor DN explains or analyzes reasons for" not requiring

10   the cessation of drilling during cuckoo breeding season. *Id*. at 30–31. Yet USFS declined

11   to respond to any of these objections. Instead, USFS insisted that "[t]he objector does not

12   have standing on th[e]s[e] contention[s]" because Plaintiffs had allegedly failed to

13   previously raise such arguments in their comments on the Draft EA. Davis Response at

14   appx. A, 22, 24, 25, 26, 27.

15        132.    However, each of the objections mentioned in the last paragraph responded

16   to flaws in the BiOp and the EA's reliance on those flaws. It was not possible for

17   Plaintiffs to raise such issues in their comments on the Draft EA for the Sunnyside

18   Project. Plaintiffs submitted their comments responding to the Draft EA on April 3, 2021

19   and the comment period concluded on April 5, 2021. The BiOp was released on

20   December 1, 2022. In commenting on the Draft EA, Plaintiffs could not have raised flaws

21   in the BiOp for the simple reason that the BiOp was released well over a year after the

22   end of the Draft EA comment period. Rather, the objection period following the issuance

of the DN/EA/FONSI was the first opportunity Plaintiffs had to raise flaws in the BiOp

and the EA's reliance on those flaws. Nevertheless, USFS summarily dismissed these

objections without responding to them on the merits.

**V.      Failure to Consider the Flux Canyon Project's Cumulative Impacts on ESA-Listed Species**

133.   USFS's NEPA failures also extended to the agency's even more cursory

analysis of the Flux Canyon Project. Contrary to the requirements of NEPA, USFS failed

to perform an adequate cumulative effects analysis of the impacts of the Flux Canyon

Project, completely overlooking numerous nearby mineral exploration projects that

threatened to compound the Flux Canyon Project's environmental effects. As noted

above—and as Plaintiffs informed USFS—the Sunnyside Project, Hermosa Project, and

Flux Canyon Projects are all within the same small part of the Patagonia Mountains

within the Coronado National Forest. Thus, as Plaintiffs pointed out in their comments to

USFS, "these projects would affect the same populations of Mexican spotted owls,

western yellow-billed cuckoos, jaguars, and other ESA-listed species in the Patagonia

Mountains." AMRC Comments at 6. For the reasons discussed above, the cumulative

impact of these many mineral projects is likely to result in significant harm to these

imperiled species. Indeed, the Arizona Game and Fish Department specifically called

upon USFS to consider such cumulative impacts in its September 2022 letter to USFS

regarding the Flux Canyon Project.

134.   Despite this information, neither the USFS's DM nor BA nor the FWS

concurrence letter for the Flux Canyon Project mentioned the Sunnyside Project. Nor did

62

the DM, BA, or concurrence mention the Hermosa CMP or Hermosa Project—even

though the proponent of the Hermosa projects, South32, is also the proponent of the Flux

Canyon Project. Indeed, recent South32 literature discusses the Hermosa Project side-by-

side with the Flux Canyon Project, emphasizing their proximity and interconnectedness.

*See Hermosa Site Tour Presentation*, SOUTH32 (May 26, 2023), slides 25-26,

https://www.south32.net/docs/default-source/exchange-releases/hermosa-project-site-

tour-0x72a67f4f737a0b7b.pdf?sfvrsn=e51ca4f4_0. USFS's only response to public

comment on this point was to claim that its determination whether extraordinary

circumstances precluded invocation of a categorical exclusion for the Flux Canyon

Project "considers the . . . cumulative effects from the impacts of the proposed action,"

but then to disavow any requirement for a "written cumulative effects analysis" to

document the examination that had purportedly been conducted. Consideration of

Comments at 4. USFS offered no explanation how the public could confirm that such a

cumulative effects analysis actually was conducted or whether it was sufficient or

accurate, given that USFS refused to write it down.

## VI.     Erroneous Application of the One-Year Categorical Exclusion to the Flux Canyon Project

135.    USFS's invocation of a categorical exclusion for the Flux Canyon Project

also was improper because the Flux Canyon Project does not fit into 36 C.F.R. §

220.6(e)(8) ("Short-term (1 year or less)"), the only CE that USFS invoked. *See* U.S.

Forest Serv., Decision Memo: Flux Canyon Exploration Drilling Project 3 (May 2023)

("Flux Canyon DM"). The Project cannot plausibly be completed within one year in any

environmentally responsible manner. As Plaintiffs informed USFS, "to meet the one-year cutoff" for invoking this particular categorical exclusion, USFS included "no provision for cessation of activity during the breeding season" of the Mexican spotted owl and Western yellow-billed cuckoo, "contrary to what the Forest Service has required for similar projects." AMRC Comments at 3–4. This omission also was contrary to the recommendations of FWS. *See* U.S. Fish & Wildlife Serv., Mexican Spotted Owl Recovery Plan, First Revision 77 (2012).

136.    Further, to shoehorn the Flux Canyon Project into its desired categorical exclusion, USFS also approved a five-month reclamation and revegetation period that comports with neither mandatory operator standards nor biological reality: "It does not even cover a single growing season, is nowhere near the three years to six years set by the Forest Service for similar projects," such as Sunnyside, "and does not conform to standard practice for reclamation projects." AMRC Comments at 4. The reclamation plan requires no outcomes (e.g., a certain percentage of ground to be covered by vegetation) and sets no benchmarks (i.e., reach X by year 1, reach Y by year 2), nor is it even long enough for USFS to determine whether any such outcomes or benchmarks have been achieved. This stands in stark contrast to, for example, the 2015 Sunnyside Project, which included a three-year plan for reclamation and revegetation for a project of a similar size. *Defenders of Wildlife*, No. CV-14-02446-TUC-RM, at 3. Finally, without requiring monitoring and adaptive management for more than one growing season, the proponent cannot possibly ensure that reclamation plants are taking root. *Cf.* 36 C.F.R. § 228.8(g)(4) (requiring that, "within 1 year of the conclusion of operations," operator of mineral

64

1  exploration project must "reclaim the surface disturbed" by actions including

2  "[r]eshaping and revegetation of disturbed areas, where reasonably practicable"). USFS

3  offered no explanation of how application of the CE for one-year projects under 36

4  C.F.R. § 220.6(e)(8) could be reconciled with the practicalities of achieving necessary

5  project reclamation objectives under these circumstances.

6  **VII.   Failure to Account for the Possible Presence of ESA-Listed Species in the
          Flux Canyon Project Area**

7

8       137.    Finally, despite the requirements of NEPA, USFS failed to account for the

   possible presence of Western yellow-billed cuckoos in the Flux Canyon Project area.

9
   Instead, USFS erroneously sought to justify its invocation of a categorical exclusion by
10
   irrationally concluding that the Flux Canyon Project would have no impact on this ESA-
11
   listed species. As Plaintiffs pointed out to USFS, the Flux Canyon Plan contained no
12
   mention of Western yellow-billed cuckoos, and therefore no measures to minimize
13
   impacts on this species. USFS's own review of impacts to the cuckoo was cursory and
14
   relied on erroneous assumptions. The BA cited only surveys that appear to be from
15
   outside the Flux Canyon Project area to estimate the nearest presence of cuckoos, and
16
   determined breeding and foraging territory for cuckoos to be "near the drainage bottom
17
   as opposed to the upper hillsides, where Project activities will occur." Flux Canyon BA at
18
   33, 78; Flux Canyon DM at 12. USFS attempted to justify this treatment of the cuckoo
19
   issue by claiming that the Flux Canyon area "does not contain suitable foraging or
20
   breeding habitat," because cuckoos in Arizona are "most commonly found in lowland
21
   riparian woodlands." Flux Canyon BA at 33. USFS concluded that the project would
22

65

have no effect based on this rationale. Further, USFS claimed that FWS had concurred in

its "no effect" finding for cuckoos in FWS's September 23, 2022 letter to USFS about the

Flux Canyon Project, even though that FWS letter explicitly stated that it did not review

USFS's determination regarding cuckoos.

138.   As discussed *supra* in the ESA context, USFS's "no effect" determination

was flawed. That determination was premised on the assumption that cuckoos were

unlikely to breed or forage on the hillsides where the Flux Canyon Project would be

located, but that assumption is inaccurate in southern Arizona locations such as the

Patagonia Mountains, where cuckoo habitat is more variable and encompasses ecological

conditions such as those existing in the Flux Canyon Project area. USFS failed to apply

available scientific information about the diversity of the area's cuckoo habitat in its Flux

Canyon Project conclusions.

**FIRST CLAIM FOR RELIEF**
**(Violation of ESA and APA—Failure to Use Best Scientific and Commercial Data**
**Available in Analyzing Impacts of the Sunnyside Project)**

139.   Plaintiffs hereby reallege, as if fully set forth herein, each and every

allegation contained in paragraphs 1 through 138.

140.   The ESA demands that USFS, in consultation with FWS, ensure that the

actions it takes will not jeopardize the survival of endangered or threatened species or

destroy or adversely modify their critical habitat. 16 U.S.C. § 1536(a)(2). In undertaking

such consultations, the ESA requires that "each agency shall use the best scientific and

commercial data available." *Id*.

141.    Here, FWS's BiOp for the Sunnyside Project dismissed the potential for the Sunnyside Project's chronic noise impacts to cause serious injury to Mexican spotted owls, including permanent abandonment of their long-established territories in the project area, by disregarding key limitations and cautions in the Delaney (1999) scientific study on which the BiOp purported to rely, and by disregarding altogether the scientific information contained in the Mason (2016) and Senzaki (2016) studies concerning chronic noise impairment of owl foraging.

142.    Further, in examining impacts of the Sunnyside Project together with the contemporaneous development of the Hermosa Project on the nearby Trench Camp property, FWS's BiOp ignored available commercial data from the Hermosa Project developer that provided a specific development timeline and description of planned project developments. Instead, FWS's BiOp offered only cursory discussion of likely cumulative impacts from the Sunnyside Project together with the Hermosa Project based on a stale media report that omitted key information about Hermosa Project scope and timing.

143.    USFS relied on FWS's BiOp to fulfill its own ESA obligations without acknowledging these omissions or undertaking any independent analysis to address them.

144.    Both agencies thus failed to use the best scientific and commercial data available to determine whether the Sunnyside Project is likely to jeopardize ESA-listed species or destroy or adversely modify their critical habitat, as required by the ESA.

**SECOND CLAIM FOR RELIEF**
**(Violation of ESA and APA—Arbitrary Determination That Flux Canyon**
**Project Threatened "No Effect" to Western Yellow-Billed Cuckoos**

67

145.    Plaintiffs hereby reallege, as if fully set forth herein, each and every allegation contained in paragraphs 1 through 144.

146.    The ESA demands that USFS, in consultation with FWS, ensure that the actions it takes will not jeopardize the survival of endangered or threatened species or destroy or adversely modify their critical habitat. 16 U.S.C. § 1536(a)(2). In fulfilling the requirements of section 7(a)(2), USFS must prepare a BA, *see* 50 C.F.R. § 402.12, and this BA cannot "entirely fail[] to consider an important aspect of the problem," *Mont. Wilderness Ass'n*, 310 F. Supp. 2d at 1148 (cleaned up), or overlook "relevant factors." *Native Ecosystems Council*, 946 F. Supp. 2d at 1079–80 (cleaned up).

147.    Here, USFS's BA reached a "no effect" determination concerning the Flux Canyon Project's impact on Western yellow-billed cuckoos, but did so without surveying the project area. In the absence of any such survey, USFS relied on unjustified assumptions about the unsuitability of cuckoo habitat in the project area that defied readily available scientific information about the variety of cuckoo habitat in southeast Arizona, which established that such habitat extends to encompass the ecological conditions that are present within the Flux Canyon Project area and surrounding vicinity.

148.    By failing entirely to consider this information, and thus the likelihood of cuckoo foraging or breeding habitat in the Flux Canyon Project area, USFS failed to consider an important aspect of the problem and ignored important and relevant factors that undermined its "no effect" determination for this species.

**THIRD CLAIM FOR RELIEF**

68

**(Violation of ESA and APA—Arbitrary Disregard of Relevant Factors in Evaluating Project Impacts on ESA-Listed Species)**

149.   Plaintiffs hereby reallege, as if fully set forth herein, each and every allegation contained in paragraphs 1 through 148.

150.   The ESA demands that USFS, in consultation with FWS, ensure that the actions it takes will not jeopardize the survival of endangered or threatened species or destroy or adversely modify their critical habitat. 16 U.S.C. § 1536(a)(2). In so doing, USFS and FWS must "consider[ ] the relevant factors and articulate[ ] a rational connection between the facts found and the choice made." *Ctr. for Biological Diversity*, 698 F.3d at 1121 (cleaned up).

151.   Here, both USFS and FWS repeatedly ignored or misconstrued relevant information in determining that the Sunnyside and Flux Canyon Projects would have no effect, may affect but would not adversely affect, or would be unlikely to jeopardize or destroy or adversely modify critical habitat for the Mexican spotted owl, Western yellow-billed cuckoo, jaguar, and ocelot.

152.   Both agencies repeatedly discounted project impacts by asserting that affected species could simply shift their activities elsewhere to avoid disturbance effects, without considering the prospect that such movements would drive affected species into the impact zones of other projects proceeding contemporaneously in the same area of the Patagonia Mountains. Similarly, USFS arbitrarily discounted effects of the Flux Canyon Project on Mexican spotted owls based on a historical survey data, without considering USFS's own estimation that the Sunnyside Project only a mile away may drive owls into

1   unfamiliar habitats that they have not historically occupied. And USFS and FWS both

2   discounted impacts of the Flux Canyon Project on jaguars based on jaguars' asserted

3   rarity in the project area, despite the fact that these agencies' evaluation of the nearby

4   Sunnyside Project concluded that the presence of jaguars in that project area could not be

5   discounted given recent evidence of jaguar movements in nearby areas.

6       153.   In adopting such reasoning and reaching such conclusions, USFS and FWS

7   failed to consider the relevant factors and articulate a rational connection between the

8   facts they found and the choices they made. Further, USFS's reliance on FWS's BiOp in

9   such circumstances disregarded FWS's irrational reasoning and failed to discuss readily

10  available information that undercut the BiOp's conclusions.

11                              **FOURTH CLAIM FOR RELIEF**
    **(Violation of NEPA and APA—Arbitrary and Capricious Analysis of Cumulative**
12                          **Impacts of the Sunnyside Project)**

13      154.   Plaintiffs hereby reallege, as if fully set forth herein, each and every

14  allegation contained in paragraphs 1 through 153.

15      155.   NEPA demands that an agency preparing an EA take a "hard look" at the

16  cumulative impacts of the project and its alternatives, resulting from all past, present, and

17  reasonably foreseeable future actions. *Ctr. For Biological Diversity v. Salazar*, 695 F.3d

18  893, 916–17 (9th Cir. 2012); *see also* 40 C.F.R. §§ 1508.9, 1508.25(c) (2019). The

19  applicable regulations define a cumulative impact as "the impact on the environment

20  which results from the incremental impact of the action when added to other past,

21  present, and reasonably foreseeable future actions regardless of what agency (Federal or

22  non-Federal) or person undertakes such other actions. Cumulative impacts can result

1   from individually minor but collectively significant actions taking place over a period of

2   time." *Id*. § 1508.7 (2019).

3        156.   An EA must "fully" address cumulative impacts, *Kern*, 284 F.3d at 1078,

4   giving "a sufficiently detailed catalogue of past, present, and future projects, and provide

5   adequate analysis about how these projects, and differences between the projects, are

6   thought to have impacted the environment." *Te-Moak Tribe of W. Shoshone of Nev. v.*

7   *Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010). Merely "conclusory" analysis is

8   insufficient. *Id*. at 604. Rather, the agency "must provide some quantified or detailed

9   information; general statements about possible effects and some risk do not constitute a

10  hard look absent a justification regarding why more definitive information could not be

11  provided." *Ctr. for Cmty. Action & Env't Just. v. Fed. Aviation Admin*., 61 F.4th 633, 644

12  (9th Cir. 2023) (cleaned up).

13       157.   Here, the Sunnyside Project NEPA documents omitted any detailed or

14  quantified consideration of the effects that nearby mineral projects would cumulatively

15  have on ESA-listed species. USFS offered no discussion of the cumulative impact posed

16  by the Sunnyside Project together with the Flux Canyon Project on Mexican spotted

17  owls, Western yellow-billed cuckoos, jaguars, and ocelots. USFS further failed to discuss

18  at all the cumulative impact of the Sunnyside Project together with the fast-tracked

19  Hermosa CMP project in the Coronado National Forest, and offered only cursory

20  discussion of Sunnyside's cumulative impact with the Hermosa Project on the private

21  Trench Camp property. The agency thus failed to adequately assess the impacts these

22  projects would cumulatively have on habitat connectivity and the likelihood of habitat

71

1   abandonment. Such omissions and cursory, incomplete, and very brief discussions of

2   other nearby mineral projects are arbitrary and capricious. The EA lacks "a sufficiently

3   detailed catalogue" of other projects, *see Te-Moak Tribe*, 608 F.3d at 603, and

4   "quantified or detailed information" about their cumulative impacts. *Ctr. for Cmty. Action*

5   *& Env't Just.*, 61 F.4th at 644. Indeed, in multiple other cases involving impacts to

6   spotted owls, the Ninth Circuit has held a cumulative impacts analysis to be "insufficient"

7   where it "merely contemplated other projects but had no quantified assessment of their

8   combined impacts." *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 872 (9th Cir. 2020) (cleaned

9   up); *see also Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989,

10  997 (9th Cir. 2004). USFS similarly violated NEPA here.

11          158.    The arbitrariness of USFS's cumulative impacts analysis is highlighted by

12  the fact that this Court concluded in 2015 that USFS's determination that the Sunnyside

13  Project would not significantly affect ESA-listed species was "undermined" by the

14  agency's "failure to consider the Sunnyside Project's cumulative effects in relation to

15  other temporally and geographically similar mineral exploration projects," including an

16  earlier private-land Hermosa mineral project. *Defenders of Wildlife*, No. CV-14-02446-

17  TUC-RM, at 13. This Court explained: "The record indicates that the Hermosa Project

18  will have similar environmental effects as the Sunnyside Project, meaning the

19  environmental disturbances from the projects will exist over a larger geographical area

20  and a larger temporal timeframe than that analyzed in the revised Decision

21  Memorandum." *Id*. at 15–16. Yet today, eight years after that ruling—as the ongoing and

22

72

1    anticipated mineral projects in the region have expanded—USFS has again unlawfully

2    continued to neglect analyzing cumulative impacts in violation of NEPA.

3                                    **FIFTH CLAIM FOR RELIEF**
     **(Violation of NEPA and APA—Arbitrary and Capricious Analysis of the Sunnyside**
4         **Project's Direct and Indirect Impacts to Mexican Spotted Owls)**

5          159.    Plaintiffs hereby reallege, as if fully set forth herein, each and every

6    allegation contained in paragraphs 1 through 158.

7          160.    Under NEPA and its applicable regulations, an agency preparing an EA has

8    an obligation to take a "hard look" at the direct, indirect, and cumulative impacts of the

9    project and its alternatives, resulting from all past, present, and reasonably foreseeable

10   future actions. *Salazar*, 695 F.3d at 916–17; *see also* 40 C.F.R. §§ 1508.7, 1508.8,

11   1508.9, 1508.25(c) (2019).  Direct effects are those "caused by the action and occur at the

12   same time and place" as the proposed project. *Id*. §1508.8(a) (2019).  Indirect effects are

13   those "caused by the action and are later in time or farther removed in distance, but are

14   still reasonably foreseeable." *Id*. § 1508.8(b) (2019).

15         161.    "An agency cannot avoid its statutory responsibilities under NEPA merely

16   by asserting that an activity it wishes to pursue will have an insignificant effect on the

17   environment." *Jones v. Gordon*, 792 F.2d 821, 828 (9th Cir. 1986) (cleaned up). "The

18   agency must supply a convincing statement of reasons why potential effects are

19   insignificant." *Steamboaters v. FERC*, 759 F.2d 1382, 1393 (9th Cir. 1985); *see also*

20   *Jones*, 792 F.2d at 828 ("an agency must provide a reasoned explanation of its decision").

21

22

                                            73

162.    Here, USFS violated NEPA by failing to take the required "hard look" at direct and indirect impacts to Mexican spotted owls and failed to provide a convincing explanation for its determination that these impacts would be insignificant.

163.    First, USFS overlooked the impacts of seven years of nonstop drilling noise on Mexican spotted owls, ignoring the evidence presented by Plaintiffs as well as Plaintiffs' warnings about the limitations of the Delaney study of disparate and inapplicable types of noise impacts and owl responses. This disregard of scientific evidence of significant effects was arbitrary and capricious, because agency determinations must be "founded on reasonable inferences from scientific data," and an agency may not "misconstrue the existing data." *Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 583 (9th Cir. 2016). Further, in conducting their environmental analyses, agencies must explain why "comparison legitimately may be drawn" between highly disparate scientific findings and the circumstances before them—especially where, as here, the very scientific findings upon which the agency relies explicitly disavow any such comparison. *Found. for N. Am. Wild Sheep v. Dep't of Agric.*, 681 F.2d 1172, 1179 (9th Cir. 1982); *see also Carlton v. Babbitt*, 26 F. Supp. 2d 102, 109 (D.D.C. 1998) (finding that agency arbitrarily attempted "to avoid the explicit limitations of [the author's] work" in applying inapposite scientific study). USFS arbitrarily failed to do so in relying on the Delaney study.

164.    Second, USFS dismissed evidence that noise from the Sunnyside Project could result in the owls' permanent abandonment of the Project area without providing any reasoned explanation. This dismissal was arbitrary and capricious, because the

74

agency provided no "convincing statement of reasons," *Steamboaters*, 759 F.2d at 1393, or "reasoned explanation of its decision" to discount the potential for permanent abandonment. *Jones*, 792 F.2d at 828; *see also Steamboaters*, 759 F.2d at 1393 (agency's failure to show "that it took a 'hard look' at the evidence . . . is particularly troublesome" when Plaintiffs raise "serious questions" about a project's environmental impact).

165.    Third, USFS relied on an illogical measure to mitigate impacts on Mexican spotted owls, claiming that the project proponent could avoid interrupting owl breeding activity by surveying for owls only *after* USFS's prescribed measure would apparently allow a full month of drilling in highly sensitive habitat. "[M]itigation measures that place no meaningful restrictions" on potentially harmful actors "fail[] to alleviate the risk of jeopardy to listed species." *Forest Serv. Emplys. for Env't Ethics v. U.S. Forest Serv.*, 726 F. Supp. 2d 1195, 1218 (D. Mont. 2010). This breeding-season mitigation measure "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and thus USFS's reliance on it was arbitrary and capricious.

**SIXTH CLAIM FOR RELIEF**
**(Violation of NEPA and APA—Arbitrary and Capricious Analysis of Baseline Conditions in the Sunnyside Project Area)**

166.    Plaintiffs hereby reallege, as if fully set forth herein, each and every allegation contained in paragraphs 1 through 165.

167.    NEPA requires establishment of the baseline conditions of the affected environment as a "practical requirement" of the environmental analysis process. *Oregon Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016) "Without establishing the

baseline conditions which exist" before the project begins, "there is simply no way to

determine what effect the proposed [action] will have on the environment and,

consequently, no way to comply with NEPA." *Half Moon Bay Fisherman's Mktg. Ass'n

v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988); *see also Great Basin Res. Watch v.

Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016) (holding same). While there

are several ways for an agency to establish baseline conditions, its assessment "must be

based on accurate information and defensible reasoning." *Oregon Nat. Desert Ass'n*, 840

F.3d at 570. An "unsupported assumption" is insufficient. *Id*.

168.    Here, USFS's reliance on 22-year-old water samples—taken from a small

number of wells outside the project area—as "surrogate data" to establish baseline water

conditions for its environmental analysis of the Sunnyside Project was arbitrary and

capricious. Multiple courts have rejected agency assumptions equivalent to those on

which USFS relied to extrapolate baseline water conditions from such surrogate data. *See

Idaho Conservation League v. U.S. Forest Serv.*, 429 F. Supp. 3d 719 (D. Idaho 2019)

(holding that USFS failed to comply with NEPA where it "never addressed whether . . .

hydrogeologic conditions were similar enough . . . that monitoring on the east side would

accurately estimate conditions on the west side"); *Cascade Forest Conservancy v.

Heppler*, No. 3:19-cv-00424-HZ, 2021 WL 64614 (D. Or. Feb. 15, 2021) (rejecting

USFS's extrapolative baseline groundwater analysis because "the EA fails to explain why

the three historical drillholes sampled once in 2014 are sufficient to establish an adequate

baseline for the entire Project Area," even though the sampled drillholes were in the

relevant project area); *see also N. Plains Res. Council*, 668 F.3d at 1086 ("The Board

1   contends that it is entitled to rely on this outdated data because 'the physical environment

2   of the area at issue here is substantially the same.' However, the Board does not cite any

3   scientific studies or testimony in the record that supports this conclusion."). Such

4   assumptions are equally invalid and violate NEPA in the Sunnyside Project

5   environmental analysis.

**SEVENTH CLAIM FOR RELIEF**
**(Violation of NEPA, 36 C.F.R. § 218.8(c), and APA—Arbitrary and Capricious**
**Rejection of Scientific Objections Regarding the Sunnyside Project)**

6

7

8       169.    Plaintiffs hereby reallege, as if fully set forth herein, each and every

9   allegation contained in paragraphs 1 through 168.

10      170.    Public participation is integral to the NEPA process. The applicable

11  regulations are clear that "[t]he agency shall involve environmental agencies, applicants,

12  and the public, to the extent practicable, in preparing [environmental] assessments." 40

13  C.F.R. § 1501.4(b) (2019); *see also id.* § 1506.6(a) (providing in part that agencies shall

14  "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA

15  procedures"). Although the Ninth Circuit has "not established a minimum level of public

16  comment and participation required by the regulations governing the EA and FONSI

17  process," the court "clearly ha[s] held that the regulations at issue [i.e., 40 C.F.R. §

18  1501.4(b) and § 1506.6] must mean something." *Citizens for Better Forestry v. U.S.*

19  *Dep't of Agric.*, 341 F.3d 961, 970 (9th Cir. 2003).

20      171.    Here, USFS refused to consider Plaintiffs' objections to the BiOp's flaws

21  and EA's reliance on those flaws because Plaintiffs had not done the impossible—

22  critique the BiOp well over a year before the BiOp was made public. This "Catch-22"-

77

style frustration of public engagement to ensure the legitimacy of USFS's environmental

analysis violates NEPA under any reasonable standard for minimum allowable levels of

public participation in the EA process.

172.    In addition to violating NEPA, this refusal violated the USFS's own

regulation governing the Sunnyside Project objections process. The USFS regulation

concerning resolution of objections makes clear that a written response is mandatory. 36

C.F.R. § 218.11(b)(1). Further, the USFS regulation concerning the filing of objections

states that "[i]ssues raised in objections must be based on previously submitted specific

written comments regarding the proposed project or activity and attributed to the

objector, *unless the issue is based on new information that arose after the opportunities

for comment*." 36 C.F.R. § 218.8(c) (emphasis added); *see also All. for the Wild Rockies

v. Savage*, 897 F.3d 1025, 1034 (9th Cir. 2018) (holding that plaintiff did not waive

objection to USFS project decision where plaintiff's "failure to object at an earlier time

resulted from the Forest Service's failure to disclose this aspect of the Project in the Draft

Environmental Impact Statement. It was first revealed in the Final Environmental Impact

Statement, to which [the plaintiff] promptly objected.").

173.    USFS's failure to consider Plaintiffs' objections to the BiOp's flaws and

EA's reliance on those flaws is arbitrary and unlawful under these authorities. The

objections that USFS ignored strike at the heart of the agency's no-significant-effects

finding. They concerned the significant effects of sustained noise on owls, the cumulative

effects on owls, the significant effects of sustained noise on cuckoos, and the agency's

refusal to require the cessation of drilling during cuckoo breeding season. A proper

78

1   consideration of these objections would have required the agency to reconsider its FONSI

2   and authorization of the Sunnyside Project. Instead, USFS dodged its otherwise

3   applicable regulatory obligation to respond to these objections on their merits by

4   summarily, and improperly, dismissing them. In so doing, USFS violated NEPA and 36

5   C.F.R. § 218.8(c).

6                          **EIGHTH CLAIM FOR RELIEF**

7   **(Violation of NEPA and APA—Arbitrary and Capricious Categorical Exclusion of
    the Flux Canyon Project from Further NEPA Analysis)**

8           174.    Plaintiffs hereby reallege, as if fully set forth herein, each and every

9   allegation contained in paragraphs 1 through 173.

10          175.    USFS premised its categorical exclusion of the Flux Canyon Project on the

11  omission of a cumulative effects analysis, inaccurate assumptions, an incorrect

12  extraordinary circumstances analysis, a misunderstanding of the applicable law, and

13  ultimately invoked a categorical exclusion despite an unacceptable level of uncertainty

14  about impacts to imperiled species. In so doing, USFS again violated NEPA.

15          176.    First, USFS's Decision Memorandum contained *no* cumulative effects

16  analysis; none of its NEPA documents even mention the Sunnyside Project, Hermosa

17  Project, or Hermosa CMP. This omission violated NEPA requirements that apply during

18  both the extraordinary circumstances analysis, discussed above, and the scoping process.

19  Scoping is a step USFS must undertake prior to the use of a categorical exclusion. *See* 36

20  C.F.R. § 220.6(c). In the "scoping process," USFS "determine[s] the scope of the issues

21  to be addressed." *Alaska Ctr.*, 189 F.3d at 858. USFS must analyze cumulative impacts at

22  the scoping stage. *Sierra Club v. Bosworth*, 510 F.3d 1016, 1026–7 (9th Cir. 2007); *see*

                                            79

1   *also* 36 C.F.R. § 220.4(f); Forest Serv. Handbook § 1909.15, ch. 31.3. Yet here USFS

2   failed in its scoping obligations, as well as its acknowledged obligation to consider

3   cumulative impacts in addressing extraordinary circumstances. USFS's cursory assurance

4   that it considered cumulative effects in evaluating extraordinary circumstances—but

5   prepared no "written cumulative effects analysis," Consideration of Comments at 4—

6   fails to demonstrate that the agency actually or adequately fulfilled its NEPA obligations.

7           177.    This situation directly parallels the Sunnyside case from 2015, in which this

8   Court rejected USFS's categorical exclusion in part because "[t]he Decision

9   Memorandum does not specifically discuss any individual projects" that might

10  cumulatively affect ESA-listed species, nor did the BA "analyze the cumulative effects of

11  nearby mineral explorations projects on USFS land." *Defenders of Wildlife*, No. CV-14-

12  02446-TUC-RM, at 14–15. For the same reasons, USFS's failure to analyze cumulative

13  effects for the Flux Canyon Project was arbitrary and capricious in violation of NEPA.

14          178.    Second, the Flux Canyon Project does not fit into the categorical exclusion

15  invoked by USFS. "When an agency decides to proceed with an action in the absence of

16  an EA or EIS, the agency must adequately explain its decision." *Alaska Ctr.*, 189 F.3d at

17  859. An agency's decision with respect to a CE must be "substantiated." *Los Padres*

18  *ForestWatch v. U.S. Forest Serv.*, 25 F.4th 649, 664 (9th Cir. 2022). Here, USFS offered

19  no substantiation or adequate explanation for its reliance on the (e)(8) CE that it invoked.

20  Instead, when Plaintiffs raised this issue with USFS, the agency responded simply, "The

21  project is designed as a one year project which meets the requirements of 36 CFR

22  220.6(e)(8) which includes concurrent reclamation activities." Consideration of

80

1    Comments at 6. USFS offered no explanation how invocation of this CE could be

2    justified given the project design's departure from previously adopted protocols,

3    including a cessation of activities to protect nesting bird species and a sufficient

4    reclamation period to ascertain the effectiveness of prescribed measures to protect the

5    public's lands. *See Defenders of Wildlife*, No. CV-14-02446-TUC-RM, at 6–8 (refusing

6    to allow the Sunnyside Project to be categorically excluded as a one-year project, because

7    reclamation and revegetation would take three years); 36 C.F.R. § 228.8(g)(4) (requiring

8    mineral exploration operator to accomplish "revegetation of disturbed areas, where

9    reasonably practicable"). USFS's invocation of the categorical exclusion established

10    under 36 C.F.R. § 220.6(e)(8) was thus arbitrary and unlawful.

11          179.    Third, even assuming that the Flux Canyon Project did fit into the (e)(8)

12    CE, USFS arbitrarily concluded that no extraordinary circumstances are present such that

13    the Flux Canyon Project will have a significant environmental effect. When an agency

14    concludes that a CE applies, it must still "evaluate the action for extraordinary

15    circumstances in which a normally excluded action may have a significant effect." 40

16    C.F.R. § 1501.4(b). USFS's NEPA regulations specify a number of resource conditions

17    that merit consideration in determining whether extraordinary circumstances are present,

18    including the presence of ESA-listed species. 36 C.F.R. § 220.6(b)(1)(i). Here, USFS

19    itself concedes that the project area is "within the known range and distribution" of

20    Mexican spotted owls, jaguars, and ocelots, *see* Flux Canyon BA at 25–30, and Plaintiffs

21    informed USFS that "Mexican spotted owls have been observed roughly a mile from the

22    Flux Canyon project area." AMRC Comments at 11.

81

180.    USFS regulations next specify that if any resource conditions are present, the agency must examine whether there is a "cause-effect relationship between a proposed action and the potential effect on" the resource, and "if such a relationship exists," it is "the degree of the potential effect of a proposed action on" the resource "that determines whether extraordinary circumstances exist." 36 C.F.R. § 220.6(b)(2). Here, as discussed above, USFS arbitrarily discounted any such cause-effect relationship sufficient to constitute extraordinary circumstances by applying an erroneous assumption to discount the Flux Canyon Project's potential impact on Western yellow-billed cuckoos and by disregarding the Project's cumulative impacts together with other mineral exploration and development projects that are ongoing or foreseeable in the same general area of the Patagonia Mountains. For this reason too, USFS violated NEPA.

### REQUEST FOR RELIEF

Therefore, Plaintiffs respectfully request that this Court:

1.    Declare that USFS violated the ESA, NEPA, and the APA in issuing its EA, FONSI, and DN authorizing the Sunnyside Project.

2.    Declare that USFS violated the ESA, NEPA, and the APA in issuing its BA and Decision Memo authorizing the Flux Canyon Project.

3.    Declare that FWS violated the ESA in issuing its BiOp for the Sunnyside Project and in concurring in USFS's determination of effects for the Flux Canyon Project.

4.    Award Plaintiffs temporary, preliminary, and permanent injunctive relief prohibiting implementation of USFS's Sunnyside and Flux Canyon Project decisions.

82

5.      Set aside and vacate USFS's EA, FONSI, DN, and authorization of the Sunnyside Project.

6.      Set aside and vacate USFS's Decision Memorandum and authorization of the Flux Canyon Project.

7.      Set aside and vacate FWS's BiOp for the Sunnyside Project and concurrence in USFS's determination of effects for the Flux Canyon Project.

8.      Award Plaintiffs their reasonable attorneys' fees and costs.

9.      Grant such other and further relief as the Court deems just, equitable, and proper.

Respectfully submitted this 12th day of October, 2023.

/s/ Scott W. Stern
Scott W. Stern (California Bar No. 336427)
(*admitted pro hac vice*)
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
sstern@earthjustice.org
Phone: (415) 217-2117

Timothy J. Preso (Montana Bar No. 5255)
(*admitted pro hac vice*)
Earthjustice
313 East Main Street
PO Box 4743
Bozeman, MT  59715-4743
tpreso@earthjustice.org
Phone: (406) 586-9699

Roger Flynn (Colorado Bar No. 21078)
Jeffrey C. Parsons (Colorado Bar No. 30210)
(*admitted pro hac vice*)
Western Mining Action Project

83

PO Box 349
440 Main Street, Suite 2
Lyons, CO 80540
wmap@igc.org
Phone: (303) 823-5738

*Attorneys for Plaintiffs*